## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DAVID MEYER, EVA DAVIS, SECOND AMENDMENT FOUNDATION, ILLINOIS STATE RIFLE ASSOCIATION, AND FIREARMS POLICY COALITION, INC., | |
| Plaintiffs, | |
| v. | 21-cv-518-SMY |
| KWAME RAOUL, in his official capacity as Attorney General of Illinois, BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, JOSHUA C. MORRISON, in his official capacity as State's Attorney of Fayette County, Illinois   ERIC WEIS, in his official capacity as State's Attorney of Kendall County, Illinois, CHRISTOPHER PALMER, in his official capacity as Sheriff of Fayette County, Illinois, and DWIGHT A. BAIRD, in his official capacity as Sheriff of Kendall County, Illinois | |
| Defendants. | |

## DEFENDANTS' COMBINED MOTION FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56 AND MEMORANDUM OF LAW IN SUPPORT

Aaron P. Wenzloff, #6329093
Isaac Freilich Jones #6323915
Assistant Attorneys General
Office of the Attorney General
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
Aaron.Wenzloff@ilag.gov
Isaac.FreilichJones@ilag.gov

Laura K. Bautista, #6289023
Assistant Chief Deputy Attorney General
Office of the Illinois Attorney General
500 South Second Street
Springfield, Illinois 62706
Phone: (217) 782-5819
Fax: (217) 524-5091
Laura.Bautista@ilag.gov

*Attorneys for Defendants*

## INTRODUCTION

Plaintiffs David Meyer and Eva Davis (collectively, the "Individual Plaintiffs") along with Plaintiffs Second Amendment Foundation ("SAF"), Illinois State Rifle Association ("ISRA"), and Firearms Policy Coalition ("FPC") (collectively, the "Organizational Plaintiffs") challenge four statutes (720 ILCS 5/24-1(a)(4)(iv); 720 ILCS 5/24-1(a)(10)(iv); 720 ILCS 5/24-1.6(a)(3)(I); and 430 ILCS 66/25(1)) (collectively, the "Challenged Statutes") that they allege prohibit 18-to-20 year olds from carrying firearms outside of the home, in violation of the Second Amendment.[1] Plaintiffs bring suit against Kwame Raoul, in his official capacity as Attorney General of Illinois, Brendan Kelly, in his official capacity as Director of the Illinois State Police (collectively, the "State Defendants"), and officials from Fayette and Kendall Counties.[2]

Attorney General Raoul filed a motion to dismiss because he is not a proper party to this litigation, which remains pending. He is entitled to summary judgment on this same basis. Additionally, the Organizational Plaintiffs generally lack standing because the interests being pursued herein are not germane to their purpose. Furthermore, the Organizational Plaintiffs do not have standing to pursue this case on behalf of any members other than the Individual Plaintiffs.

Plaintiffs' claims also fail on the merits because individuals under 21 years old are not the "people" whose right to keep and bear arms is protected by the Second Amendment. Even if the text of the Second Amendment did protect 18-to-20 year olds, the prohibition challenged here is

---

[1] Plaintiffs initially brought two counts, one alleging (as they continue to do so) that the Challenged Statutes violate the Second Amendment, (Doc. 1 Compl. ¶¶ 91–102) and a second count as to Plaintiff Eva Davis that the Challenged Statutes are unconstitutional as-applied to 18-to-20 year old women. Doc. 1 Compl. ¶¶ 103–10. However, Plaintiffs have abandoned Count II in their Second Amended Complaint and are only proceeding on one count alleging that the Challenged Statutes violate the Second Amendment. Doc. 88 Am. Compl. ¶¶ 76–85.

[2] Although Plaintiffs initially sued the Defendants in their individual and official capacities, they are now just proceeding against the Defendants in their official capacities. Ps' Rsp. To MTD at 5, FN1; Doc. 88 Am. Compl.

consistent with the history and tradition of firearm regulations in the United States. For these reasons, the State Defendants are entitled to summary judgment in their favor.

## UNDISPUTED MATERIAL FACTS

### The Challenged Statutes Regulate The Carrying Of Firearms By People Under 21.

1.  It is a crime for a person under 21 to possess a firearm, unless they are engaged in lawful activities under the Wildlife Code; are members of an organization for practicing shooting at targets while on those target ranges; or are licensed hunters, trappers, or fishermen while engaged in those activities. 720 ILCS 5/24-1.6(a)(3)(I); 24-2(b)(1); (b)(3); and 24-2(f).

2.  Even if a person is 21, it is a crime in Illinois to carry or possess a firearm in a vehicle, concealed on your person, or in public a loaded and accessible firearm unless it is carried and possessed in accordance with the Firearm Concealed Carry Act ("CCA") by someone with a currently valid license under the CCA. 720 ILCS 5/24-1(a)(4)(iv); 720 ILCS 5/24-1(a)(10)(iv).

3.  The CCA is a "shall-issue" licensing regime, meaning that anyone who meets certain objective criteria shall be issued a license to carry a concealed firearm. 430 ILCS 66/10. One of those criteria is that a person must be at least 21 years old to be issued a concealed carry license ("CCL"). 430 ILCS 66/25(1).

### The Individual Plaintiffs Seek to Strike Down the Challenged Statutes.

4.  Plaintiffs David Meyer and Eva Davis are residents of Illinois who are over the age of 18 but under the age of 21. Doc. 88, Am. Compl. ¶¶ 21–22.

5.  Meyer and Davis are members of ISRA, SAF, and FPC. Ex. D, Deposition of Eva Davis ("Davis Dep.") at 46:24–47:1; 55:4–16; 60:5–7; Ex. E, Deposition of David Meyer ("Meyer Dep.") at 21:13–15; 27:9–13; 30:2–4; Ex. O, Meyer_000576 FPC Meyer Member.

6.  Davis and Meyer have never been threatened with prosecution in relation to the Challenged

Statutes by the Attorney General or anyone else. Am. Compl.

7.   Plaintiffs' only basis for suing the Attorney General in this case is that he is generally responsible for enforcing the State's laws. Am. Compl. ¶ 26.

### The Organizational Plaintiffs Purport To Bring Suit On Behalf Of Their Members.

8.   ISRA is bringing this action only on behalf of its members Meyer and Davis. ISRA is not bringing this action on behalf of any individuals other than Meyer and Davis and is not bringing this lawsuit on its own behalf. Ex. A, ISRA Dep. at 65:4–66:5; Am. Compl. ¶ 24.

9.   Consistent with ISRA's mission, ISRA lobbied to pass the bill that became 430 ILCS 66/1 *et seq.* ("Concealed Carry Act" or "CCA"). ISRA Dep. at 66:20–22; 67:21–23; 68:2–5.

10.  ISRA's membership "overwhelmingly" supported "the passage of the [CCA]." ISRA Dep. at 70:21–25.

11.  ISRA did not seek authorization from its members before filing this lawsuit challenging the CCA, ISRA has no policies or procedures through which it could have consulted its membership prior to filing this lawsuit, and the decision to file this lawsuit was made unilaterally by ISRA Executive Director Richard Pearson. ISRA Dep. at 68:17–69:9.

12.  SAF is bringing this action only on behalf of its members Meyer and Davis. SAF is not bringing this action on behalf of any individuals other than Meyer and Davis and is not bringing this lawsuit on its own behalf. Ex. B, SAF Dep. at 50:1–21; Am. Compl. ¶ 23.

13.  FPC is bringing this action only on behalf of its members, not on its own behalf. Ex. C, FPC Dep. at 98:20–99:10; Am. Compl. ¶ 25.

**At the Founding, Individuals Under 21 Were Minors**
**And Were Not Protected By The Second Amendment Right**

14. The State Defendants' Expert Saul Cornell conducted an historical analysis of firearms in the Anglo-American legal tradition, including the regulation of firearms in public and the history of the regulation of minors' access to weapons and the ability to carry them in public. Ex. F, Decl. of Professor Saul Cornell and Expert Report of Saul Cornell ("Cornell Report").

15. In his report, Cornell states that, in the Founding era, individuals under 21 years old were "infants" (also referred to as "minors") as a matter of law and were not independent constitutional actors. Cornell Report at 3; *see also Horsley v. Trame*, 808 F.3d 1126, 1130 (7th Cir. 2015) ("During the founding era, persons under 21 were considered minors or 'infants.'").

16. Infants did not have a right to keep and bear arms at the time of the ratification of the Second Amendment, nor at the time of the ratification of the Fourteenth Amendment. Cornell Report at 3.

17. At the time of the adoption of the Second Amendment and until well into the twentieth century, American law "did not recognize minors as legally autonomous individuals, but rather gave society, acting through courts and legislatures, greater autonomy to intervene to promote the well-being of those under the age of majority." Cornell Report at 12–13.

18. "Infants were severely circumscribed by law and had only a narrow range of legal autonomy." *Id*. at 13.

19. Rather, individuals under the legal age of majority were "subsumed under the authority of their parents (usually their fathers) or other guardians." *Id.* at 11.

20. Thus, under the English common law that prevailed in America at the time of the Founding and into the twentieth century, "minors were legally 'disabled' in the eyes of the law and thus could not claim any Second Amendment right." *Id.* at 12.

21. Four years after the adoption of the Second Amendment, the legal status of minors was explored at considerable length by Connecticut jurist Zephaniah Swift, who notes that those under 21 could contract for necessaries including diet, apparel, education and lodging but could do little else. And after the American Revolution, courts became more involved in monitoring contract arrangements concerning minors. Cornell Report at 14.

22. Although those under 21 enjoyed some right to contract in the Founding Era, they had no independent claim of religious freedom. Cornell Report at 15–17.

23. The legal age of majority remained 21 in America well beyond when the Fourteenth Amendment was adopted. In James Kent's influential 1836 treatise, *Commentaries on American Law*, Kent explained that legal infants lacked ability to take care of themselves, "and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years." Cornell Report at 16 (citing James Kent, 2 Commentaries on American Law 259 (3d ed., 1837).

24. The idea of extending full constitutional rights to those under 21 was so far-fetched it was "literally treated as a joke in the early nineteenth century." Cornell Report at 16–17.

25. John Bouvier, author of the first American law dictionary, explained in 1858 that "[t]he rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights." *Id.* at 17 (citing John Bouvier, 1 Institutes of American Law 148 (1858)).

26. Those under 21 being infants in the eyes of the law did not change until the latter half of the twentieth century, most notably with ratification of the 26th Amendment during the Vietnam Era, which granted 18 year olds the right to vote. Cornell Report at 3–4.

**The Challenged Statutes Are Analogous To Historical Laws
Regulating Minors' Access To And Use of Firearms**

27. At the Founding, nearly all States enacted detailed militia laws that identified which individuals possessed firearms and what types, mandated periodic inspection of those firearms, required individuals to purchase specific military quality firearms and ammunition, and required individuals to comply with various requirements for militia service. Cornell Report at 17–20.

28. The Founding generation understood the scope of the Second Amendment at the time of its ratification as giving broad power to States to regulate firearms. *See id*.

29. These laws reflected the Founding era view that young men below the age of majority could not be trusted with firearms without proper supervision in most circumstances. *Id.* at 17.

30. At the time of the Founding, almost half the states passed militia laws expressly stating that parents, not infants, were responsible for obtaining the required firearms for militia service for minors in their household. Likewise, while service in the militia was compulsory, individuals below the legal majority age could not volunteer to serve as a substitute for someone seeking to hire a replacement for militia service without permission from a parent or guardian. *Id.* at 20–21.

31. Colleges in the Founding era also promulgated stringent rules prohibiting firearms ownership and use by students. Yale College prohibited possession of any guns or gun powder by students. The University of Georgia, one of the nation's oldest public institutions of higher education, also forbade guns on campus, as did the University of North Carolina. *Id.* at 22–23.

32. Minors' "access to, and the ability to keep or bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them: fathers, guardians, constables, justices of the peace, or militia officers." *Id.* at 23.

33. Throughout the nineteenth century, States and municipalities also passed laws pursuant to their police powers to regulate minors' access to, use, and purchase of firearms. *Id.* at 23–35.

34. Lewis Hochheimer, one of the leading authorities on the rights of infants in the nineteenth century, described the regulation of firearms and minors as an area of the law in which the police power was at its apex. "The scope of state regulatory authority was at its zenith when regulating arms and minors" throughout the nineteenth century. *See id.* at 32.

35. Over the course of the 19th century, 19 states and the District of Columbia—almost half of the states at the time—enacted laws that limited the ability of those under 21 to purchase and use firearms. *See, e.g.*, 1856 Ala. Acts 17; 16 Del. Laws 716 (1881); 27 Stat. 116–17 (1892) (District of Columbia); 1876 Ga. Laws 112; 1881 Ill. Laws 73; 1875 Ind. Acts 86; 1884 Iowa Acts 86; 1883 Kan. Sess. Laws 159; 1873 Ky. Acts 359; 1890 La. Acts 39; 1882 Md. Laws 656; 1878 Miss. Laws 175–76; Mo.Rev.Stat. § 1274 (1879); 1885 Nev. Stat. 51; 1893 N.C. Sess. Laws 468–69; 1856 Tenn. Pub. Acts 92; 1897 Tex. Gen. Laws 221–22; 1882 W. Va. Acts 421–22; 1883 Wis. Sess. Laws 290; 1890 Wyo. Sess. Laws 1253. Alabama, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Tennessee, Texas, and Wyoming had Second Amendment analogues in their respective State constitutions at the time they enacted these laws.

36. In 1803, a New York City law created criminal sanctions for guardians for firearms infractions committed by minors under their charge. In 1817, Columbia, South Carolina passed a law that allowed for the seizure of weapons used by minors within the city limits. *Id.*; Ex. H, Laws and Ordinances, Ordained and Established by the Mayor, Aldermen, and Commonality of the City of New-York, in Common-Council Convened, For the Good Rule and Government of the Inhabitants and Residents of Said City 83-4 (1803); Ex. J, Ordinances, of the Town of Columbia, (S.C.) Passed Since the Incorporation of Said Town: To Which Are Prefixed, the Acts of the General Assembly, For Incorporating the Said Town and Others in Relation Thereto 61 (1823).

37. In 1857, Louisville, Kentucky enacted an ordinance that prohibited the sale of gunpowder to minors, but included an exception for those who had "authority from his parent or guardian." Cornell Report at 23–24; Ex. K, A Collection of the State and Municipal Laws, in Force, And Applicable To The City of Louisville, KY. Prepared and Digested, Under an order From the General Council of Said City by Oliver H. Strattan and John M. Vaughn, City Clerks, Which Includes the State Constitution and City Charter, With Notes of Reference 175 (1857).

38. In the 1850s, three states passed laws that criminalized selling, giving, or lending pistols to minors. Cornell Report at 26–27; Ex. K, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg," § 23, 1859 Ky. Acts 245; Ex. M, Digest of the Charters and Ordinances of the City of Memphis From 1826 to 1867, Inclusive, Together With the Acts of the Legislature Relating to the City, With an Appendix 50 (William H. Bridges, ed., 1867); Ex. N, Act of February 2nd, 1856, 1885–86 Ala. Acts 17.

**The Challenged Statutes Reduce Crimes And Firearm-Related Suicides**

39. The State Defendants' Expert John J. Donohue conducted an analysis of the relationship between the Challenged Statutes and public health and safety. Ex. G, Decl. of Professor John J. Donohue and Expert Report of Professor John J. Donohue ("Donohue Report").

40. Because of still-developing cognitive systems of 18-to-20-year-olds, the onset of mental illness during emerging adulthood, and the frequency of binge drinking during early adulthood, it can be significantly more difficult to identify in advance whether these individuals will commit suicidal or homicidal acts as compared to those who are 21 or older. Donohue Report at 9–14.

41. In Illinois and the United States, 18-to-20-year-olds are the most homicidal, most murders are committed with firearms, and 18-to-20-year-olds are the most likely to use firearms to commit homicides and other violent crimes. Donohue Report at 15–18.

42. Preventing higher-risk individuals, like 18-to-20-year-olds, from purchasing guns reduces violent crime among those individuals, and will also save lives by decreasing suicides in an age group vulnerable to mental health issues. Donohue Report at 21–23; 38–50.

43. The State Defendants' Expert Lawrence Steinberg, M.D. conducted an analysis of the relationship between the Challenged Statutes and the science and research on development in adolescence and young adulthood. Ex. H, Decl. of Professor Lawrence Steinberg, M.D. and Expert Report of Professor Lawrence Steinberg, M.D. ("Steinberg Report").

44. Several aspects of brain development affecting judgment and decision-making continue at least until age 21. Steinberg Report at 8–13.

45. Individuals between 18 and 20 years old are especially at risk for violence and suicide, and, in 2020, firearms were used in more than half of all suicide attempts. Steinberg Report at 15–16.

## ARGUMENT

Attorney General Kwame Raoul is not a proper party to this litigation. And as a threshold matter, Plaintiff ISRA lacks standing to bring this action, and Plaintiffs FPC and SAF only have standing to the extent that Plaintiffs Davis and Meyer have standing.

In any event, the restrictions within the Challenged Statutes on public carrying by 18-to-20 year-olds are constitutional on the merits, for two reasons. *First,* Plaintiffs cannot satisfy their burden under the standard created by *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) to show that the plain text of the Second Amendment includes 18-to-20-year-olds. *Cf. Bruen*, 142 S.Ct. at 2125, 2135, 2141 n.11. *Second*, the undisputed facts regarding the history of gun laws in America, including an uncontroverted expert report from Professor Saul Cornell—the foremost legal historian of the Second Amendment[3]—plainly demonstrate that the restrictions on

---

[3] In fact, Professor Cornell's Second Amendment scholarship was cited favorably by the Justices many times in *Bruen*. *See*, *e.g.*, *Bruen*, 142 S. Ct. at 2149; *see also id.* at 2178, 2187–88 (Breyer, J., dissenting).

18-to-20-year-olds in the Challenged Statutes are "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130. Therefore, the Challenged Statutes are constitutional, and Defendants' Motion for Summary Judgment should be granted.

I.      **The Eleventh Amendment Bars Plaintiffs' Claims Against The Attorney General**

Attorney General Raoul lacks the requisite connection with the enforcement of the Challenged Statutes, and Plaintiffs have no evidence that he has ever threatened to enforce the Challenged States against Plaintiffs. Attorney General Raoul previously raised this argument in a motion to dismiss and reply, Doc. 53 at 10–13; Doc. 59, which remain pending. Doc. 87. Rather than repeating those arguments herein, they are incorporated by reference.

II.     **The Organizational Plaintiffs' Standing.**

ISRA lacks associational standing entirely because the undisputed evidence in the record demonstrates that the interests it seeks to protect are not germane to its purpose. Additionally, FPC and SAF only have standing to the extent that Plaintiffs Davis and Meyer have standing.

SAF, ISRA, and FPC admit they bring this lawsuit exclusively on behalf of certain of their members through the doctrine of associational standing, and not on their own behalf as organizations. Undisputed Material Facts ("UMF") ¶¶ 8, 12, 13. "Associational standing allows an organization to sue on behalf of its members even without a showing of injury to the association itself. To sue on behalf of its members, an association must show that: (1) at least one of its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021). "This three-part test for associational standing guarantees the satisfaction of Article III by requiring an organization suing as

representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *Id*. Associational standing is derivative of—and not independent from—individual standing. *Id.*

### A.  ISRA Lacks Associational Standing.

ISRA lacks standing to bring this action because it cannot show that it meets the second associational standing requirement: that "the interests it seeks to protect are germane to [its] purpose." *Retired Chi. Police Ass'n v. City of Chi.*, 76 F.3d 856, 862-63 (7th Cir. 1996). An organization cannot meet the second prong of the associational standing test if "the association's suit, if successful, would cause a direct detriment to the interests of some of its members and the litigation was not properly authorized." *Id.* at 864–65. The Seventh Circuit has explained that:

> [t]he plaintiff bears the burden of proof that it meets the required elements of standing. Consistent with that burden, where a defendant asserts that a direct-detriment conflict of interest precludes an organization from asserting associational standing, the organization bears the burden of coming forward with competent proof to rebut that challenge. In light of our discussion above, a plaintiff can defeat a direct detriment conflict challenge by showing that the litigation, if successful, will not cause a direct detriment to any of its members or that the litigation was properly authorized.

*Id.*

Here, the undisputed record shows that ISRA's participation in this suit is directly detrimental to at least some members, and that ISRA never took any steps to properly authorize the prosecution of this action. ISRA admits that it "lobbied to pass" the CCA. UMF ¶ 9. ISRA admits that the lobbying it did *in favor* of the CCA was "consistent with [ISRA's] mission." *Id.* ISRA admits that its membership "overwhelmingly" supported "the passage of the [CCA]." UMF ¶ 10. ISRA admits that it supported the version of the CCA that became law. UMF ¶ 9. ISRA admits it never sought authorization from its membership prior to reversing its stance and filing this lawsuit. UMF ¶ 11. And ISRA admits that it *has no policies or procedures through which it could have consulted its membership about the filing of this lawsuit*, and that the decision to file this

lawsuit was made unilaterally by ISRA Executive Director Richard Pearson. *Id.* Consequently, "[b]ecause the interests which [plaintiff] seeks to protect by maintaining this action do not reflect and are actually at odds with the interests of some of its members, they certainly cannot be said to be germane to [plaintiff's] overriding purposes, and [plaintiff] cannot invoke representational standing as a basis for suing the defendants." *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1381 (7th Cir. 1987). And to the extent ISRA seeks to meet its burden by introducing evidence that its presence in this case is *not* a direct detriment to its members, or that it *did* properly authorize the prosecution of this action, that evidence would create a genuine dispute of material fact that can only be resolved at trial. *See* Fed. R. Civ. P. 56(a) (Court may not grant summary judgment unless "there is no genuine dispute as to any material fact.").

**B.  SAF Only Has Standing To The Extent Plaintiffs Davis And Meyer Have Standing, And Its Standing Is Therefore Limited To Issues Raised By Davis and Meyer.**

As SAF admits, its standing to bring this action derives entirely from the standing of named individual plaintiffs Davis and Meyer. UMF ¶ 12. Consequently, "SAF's organizational standing is limited to those issues raised by [the individual Plaintiffs'] claims." *Thomas v. Kelly*, 2021 U.S. Dist. LEXIS 107611, at *17-18 (N.D. Ill. June 9, 2021). If it should be determined at any time during this litigation that Davis and Meyer lack standing or if they are dismissed from this suit for any other reason, like mootness, SAF will, by its own admission, cease to have standing. *Id.*

**C.  FPC Only Has Standing To The Extent Plaintiffs Davis And Meyer Have Standing, And Its Standing Is Therefore Limited To Issues Raised By Davis and Meyer.**

Like SAF, FPC claims to derive its standing (in part) from the standing of named individual plaintiffs Davis and Meyer. UMF ¶ 13. In addition, however, FPC asserts it is also bringing this action on behalf of all of its *other* "18-20-year-old members in Illinois." Am. Compl. ¶ 25. But the only portion of the record supporting FPC's assertion that it has "18-20-year-old members in Illinois" beyond Davis and Meyer is inadmissible hearsay that cannot be considered at summary

judgment. *See Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512 n.3 (7th Cir. 2021) ("Inadmissible hearsay evidence may not be considered on summary judgment.").

In Brandon Combs' 30(b)(6) deposition on behalf of FPC, Mr. Combs claims there are six other FPC members who reside in Illinois who were between 18 and 20 years old as of Wednesday, November 16, 2022. *See* FPC Dep. at 113:1–128:5.[4] In order for FPC to use this testimony to support its standing argument, it must present this testimony "for the truth of the matter asserted." Fed. R. Evid. 801(c)(2). But it cannot do so, because this testimony is derived from at least two levels of inadmissible hearsay. *First*, Mr. Combs received all his information regarding these members by searching an FPC database that he says contains birth-date information for some persons, and admits he has no first-hand knowledge relating to the birth dates of any of these members. *Id.* at 116:10–21. And *second*, that FPC database was itself populated with "whatever information is provided by the member." *Id.* at 81:2–5.[5] Thus, all available information relating to persons is a restatement by a 30(b)(6) deponent of information in a database, that is itself a record of statements made by third-parties to persons who input data into a database when those third parties purportedly became members of FPC. *Id.* In short, this information is "an out-of-court statement offered to prove the truth of its contents" for at least two different reasons. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

As a result, the Court cannot consider information relating to FPC's claimed "18-20-year-old members in Illinois" other than Meyer or Davis in determining whether SAF has standing. *See*

---

[4] FPC asserts that it has 49 other members in Illinois "that [they] have no date of birth information for." FPC Dep. at 117:3–7. FPC refused to provide any additional information regarding these supposed members, and counsel for FPC directed FPC's deponent not to testify as to their identities on supposed First Amendment grounds. *See* FPC Dep. at 113:1–128:5.

[5] FPC cannot plausibly argue that their database qualifies under the "business records" exception to hearsay. As FPC must admit, the evidence in the record shows that the collection of birth records is not a "regularly conducted business activity," and it was not the "regular practice of that business activity to make the" record.

Am. Compl. ¶ 25. Consequently, and just as with SAF, FPC's "organizational standing is limited to those issues raised by [plaintiffs Davis's and Meyers's] claims." *Thomas v. Kelly*, 2021 U.S. Dist. LEXIS 107611, at *17-18 (N.D. Ill. June 9, 2021). If it is determined at any time during this litigation that Davis and Meyer lack standing, FPC will likewise cease to have standing. *Id.*

### III.   The Restrictions On Carrying Firearms By 18-to-20 Year Olds In The Challenged Statutes Are Constitutional.

#### A.   The *Bruen* Decision Allows Regulation Of Firearms Consistent With The Text And Historical Understanding Of The Second Amendment.

The Supreme Court clarified in *Bruen* that the standard for analyzing Second Amendment claims "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct at 2131. In making this clarification, the Court endorsed the first step of the two-part approach that lower courts had followed (which focused on text and history), but declined to adopt the second step (which centered on means-ends scrutiny). *Id.* at 2126-27. It also built on previous precedent from *District of Columbia v. Heller*, 554 U.S. 570 (2008), establishing that the Supreme Court's decisions "should not be taken to cast doubt" on measures—such as sensitive-place restrictions and disqualifications from possessing guns—which are "presumptively lawful." *Id.* at 626–27 & n.26; *see McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We repeat those assurances here."); *see also Bruen*, 142 S. Ct. at 2157 (Alito, J., *concurring*) ("Nor have we disturbed anything that we said in *Heller* or *McDonald*[] about restrictions that may be imposed on the possession or carrying of guns."). Indeed, Justice Alito highlighted that federal law "bars the sale of a handgun to anyone under the age of 21" and that the Court's decision did not "expand the categories of people who may lawfully possess a gun." *Bruen* at 2157-58.

To analyze a Second Amendment claim, first, the plaintiff bears the burden of showing that the "Second Amendment's plain text covers" the regulated conduct. *See Bruen*, 142 S. Ct. at 2130. (if the "plain text covers an individual's conduct . . . the government *must then* justify its regulation") (emphasis added); *see also id.* at 2141 n.11 ("[*B*]*ecause* the Second Amendment's bare text covers petitioners' public carry, *the respondents here shoulder the burden* of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope.") (emphasis added).

If the plaintiff satisfies this burden, the government must show that the challenged regulation aligns with history and tradition, either by identifying historical regulations that are "distinctly similar" to the challenged regulation or by using "analogic reasoning" to show that the challenged regulation is analogous to historical regulations. *Id*. at 2131. A modern-day regulation does not need to be a "dead-ringer" for historical precursors or a "historical *twin*" to "pass constitutional muster." Rather, a modern regulation is consistent with the Second Amendment if it "impose[s] a comparable burden on the right of armed self-defense and [ ] that burden is comparably justified" as its historical predecessors. *Id*. at 2133. The *Bruen* Court made clear that regulatory variation and evolution are permissible, since "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132–33. *Bruen* also recognized that a variety of historical sources and periods may inform this analysis, including "English practices that prevailed up to the period immediately before and after the framing of the Constitution;" the public understanding of the right to keep and bear arms in 1791 when the Second Amendment was ratified and in 1868 when the Fourteenth Amendment was ratified; and interpretations of the right in the years following both Amendments' ratification. *Id.* at 2136-38 (internal quotations omitted).

**B.   The Plain Text Of The Second Amendment Does Not Confer The Right Of 18-to-20-Year-Olds To Keep And Bear Arms**

Plaintiffs cannot satisfy their burden to show that the plain text of the Second Amendment includes 18-to-20-year-olds. *Cf. Bruen*, 142 S. Ct. at 2126, 2135, 2141 n.11.2 The "operative" clause of the Second Amendment states that "the right of *the people* to keep and bear Arms, shall not be infringed." U.S. CONST., amend II (emphasis added); *see also Bruen*, 142 S. Ct. at 2128 (citing *Heller*). Here, the historical record—as described by Professor Cornell in his expert report—shows that individuals under the age of twenty-one did not have a right to bear arms at the time of the ratification of the Second Amendment, nor at the time of the ratification of the Fourteenth Amendment, almost one hundred years later. UMF ¶ 16. Thus, historically, the public understanding of the Second Amendment was that individuals younger than 21 were not among "the people" the Amendment protects. *See id.*

This is because, in the Founding era, individuals under 21 were "infants" (or "minors") as a matter of law and were not independent constitutional actors. UMF ¶ 15; *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 202 (5th Cir. 2012) ("Notably, the term 'minor' or 'infant' —as those terms were historically understood—applied to persons under the age of 21, not only to persons under the age of 18."); William Blackstone, *Commentaries on the Laws of England*, Vol. I at 463 (1st ed. 1765) ("So that full age in male or female, is twenty one years . . . who till that time is an infant, and so styled in law."); Zephaniah Swift, 1 *A System of the Laws of the State of Connecticut* 213 (1795) ("Persons within the age of 21, are, in the language of the law denominated infants, but in common speech—minors.").

The legal age of majority remained 21 in America through the nineteenth century and well beyond the adoption of the Fourteenth Amendment. *See*, *e.g.*, "Infant," *Black's Law Dictionary* (11th ed. 2019) ("An infant in the eyes of the law is a person under the age of twenty-one years")

(quoting John Indermaur, *Principles of the Common Law*, 195 (Edmund H. Bennett ed., 1st Am. Ed. 1878)). In an influential 1836 treatise, *Commentaries on American Law*, James Kent explained that legal infants lacked ability to care for themselves, "and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years." UMF ¶ 23. In fact, the idea of extending full constitutional rights to minors was so far-fetched that it was "literally treated as a joke in early nineteenth century America." *Id.* ¶ 24. John Bouvier, author of the first American law dictionary, explained in 1858 that "[t]he rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights." *Id.* at ¶ 25.

The age of majority in American law did not change until the latter half of the twentieth century, when States began lowering the age of majority to 18 and when the States ratified the Twenty-Sixth Amendment to the United States Constitution to grant voting rights to 18 year-olds. UMF ¶ 26; *see also* Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016) ("The U.S. age of majority remained unchanged from the country's founding well into the twentieth century."); Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender Soc. Pol'y & L. 613, 681-86 and Appendix (2007) (showing that all 48 continental States lowered the age of majority from 21 to 19 or 18 via legislative acts between 1964 and 1975).

At the time of the adoption of the Second Amendment and until well into the twentieth century, American law "did not recognize minors as legally autonomous individuals, but rather gave society, acting through courts and legislatures, greater autonomy to intervene to promote the well-being of those under the age of majority." UMF ¶ 17. "Infants were severely circumscribed by law and had only a narrow range of legal autonomy." *Id.* at 18. Rather, individuals under the legal age of majority were "subsumed under the authority of their parents (usually their fathers) or

other guardians." *Id.* at 19. Thus, under the English common law that prevailed in America at the time of the Founding and into the twentieth century, "minors were legally 'disabled' in the eyes of the law and thus could not claim any Second Amendment right." *Id.* at 20. Consequently, it is beyond historical debate that persons under 21 did not have a Second Amendment right to keep and bear arms at the time of its ratification, or even at the time of its incorporation against the States through the Fourteenth Amendment in 1868.

Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Heller*, 554 U.S. at 634–635 (emphasis added). Moreover, "*Heller* tells us that the Second Amendment codified a '*pre-existing* right.'" *Horsley*, 808 F.3d at 1130. The English common law tradition predating the Founding of the United States made twenty-one the age of legal majority. *See* Hamilton, *supra* at 64 (2016). The Second Amendment, ratified in 1791, adopted this English common law tradition. The Fourteenth Amendment, adopted in 1868, carried forward the same tradition of 21 years as the age of majority. And, because history shows that the public understanding of the rights of 18-to-20 year-olds under English common law, in 1791, and in 1868 was that such individuals had no right to keep and bear arms, Plaintiffs cannot demonstrate that they have such a right today. Thus, the plain text of the Second Amendment—as understood by those who ratified the Second and Fourteenth Amendments—does not cover those under 21.

### C. The Challenged Statutes' Restrictions On 18-to-20-Year-Olds Are Analogous To Longstanding Firearms Restrictions Throughout American History

The Challenged Statutes are also consistent with the history and tradition of firearm regulations in America, including numerous historically analogous firearms regulations. *See Bruen* 142 S. Ct. at 2130. Indeed, the historical record shows that laws regulating firearm possession and use by those under 21 have long been part of American legal history—from the Founding Era to the present day.

*Founding Era Regulations Of Minors And Firearms*

In the Founding era, colleges and universities promulgated stringent rules prohibiting firearms ownership and use by students, who were under twenty-one years old. UMF ¶ 31. Yale College prohibited possession of any guns or gun powder by students. *Id.* The University of Georgia, one of the nation's oldest public institutions of higher education, also forbade guns on campus, as did the University of North Carolina. *Id.* In short, minors' "access to, and the ability to keep or bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them: fathers, guardians, constables, justices of the peace, or militia officers." *Id.* at 32.

Additionally, to the extent that the history of militias is relevant—*but see Heller* at 2788– 816 (describing the Second Amendment right as an individual right unconnected with militia service)—at the time of the Founding, nearly all States enacted detailed militia laws that identified which individuals possessed firearms and what types, mandated periodic inspection of individuals' firearms, required individuals to purchase specific military quality firearms and ammunition, and required individuals to comply with various requirements related to militia service. UMF ¶ 27. The Founding generation understood the scope of the Second Amendment at the time of its ratification as giving broad power to State governments to regulate firearms. *Id*. ¶ 28. In particular, militia laws reflected the Founding era view that young men below the age of majority could not be trusted with firearms without proper supervision in most circumstances. *Id.* at 29. At the time of the Founding, almost half of the states passed militia laws expressly stating that parents, not infants, were responsible for obtaining the required firearms needed for militia service for any minors in their household. *Id.* at 30. Likewise, while service in the militia was compulsory, individuals below

the age of legal majority could not volunteer to serve as a substitute for someone seeking to hire a replacement for militia service without seeking permission from a parent or legal guardian. *Id.*

These Founding era restrictions on minors' access and use of firearms are analogous to the Challenged Statutes' restrictions on public carrying of firearms by those under 21. In each case, these restrictions rest on the understanding that people under 21 are not adults and cannot be responsibly trusted with firearms in many circumstances. Current scientific research on the adolescent development bears out that Founding era understanding. Science shows that those who are 18-to-20 years-old have still-developing cognitive systems. UMF ¶ 40. Individuals in this age group experience the onset of severe mental illnesses, commit the most homicides, are the most likely to use firearms to commit homicides and violent crimes, and are especially at risk for violence and suicide. UMF ¶¶ 40–45. Not only are the Challenged Statutes analogous to these Founding era regulations, but the reasons behind them are also analogous.

*Nineteenth Century Regulations Of Minors And Firearms*

Throughout the nineteenth century, States and municipalities also passed laws pursuant to their police powers to regulate minors' access to, use, and purchase of firearms. *Id.* ¶ 33. Thomas M. Cooley—who wrote a "massively popular" treatise in 1868 and was described by the *Heller* Court as "the most famous" 19th century legal scholar to interpret the Second Amendment, *see* 554 U.S. at 616—explained that under a State's inherent police powers the State may prohibit the sale of arms to minors (who, again, were understood at the time to include those under the age of 21). Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883). The *Heller* Court relied on Cooley's treatise as evidence of the Second Amendment's meaning. 554 U.S. at 616. Likewise, Lewis Hochheimer, one of the leading authorities on the rights of infants in the nineteenth century, described the regulation of firearms and minors as an area of the law in which

the police power was at its apex. UMF ¶ 34. Thus, as Professor Cornell summarizes, throughout the nineteenth century "the scope of state regulatory authority was at its zenith when regulating arms and minors." *Id.*

Examples of such laws regulating minors' access to and use of firearms included, in 1803, a New York City law creating criminal sanctions for guardians for firearms infractions committed by minors under their charge. *Id*. ¶ 36. In 1817, Columbia, South Carolina passed a law that allowed for the seizure of weapons used by minors within the city limits. *Id.* In 1857, Louisville, Kentucky enacted an ordinance that prohibited the sale of gunpowder to minors, but included an exception for those who had "authority from his parent or guardian." *Id.* at 37. In the 1850s, three states passed laws that criminalized selling, giving, or lending pistols to minors. *Id.* at 38. In total, over the course of the 19th century, 19 states and the District of Columbia—almost half of the States—enacted laws that limited the ability of those under 21 to purchase and use firearms. *See Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 202 n.14 (collecting statutes); *see also United States v. Rene E.*, 583 F.3d 8, 14–15 (1st Cir. 2009) (collecting cases that describe nineteenth century state regulations regarding sales, transfer, possession and use of firearms by minors). Many laws during this period prohibited those under 21 from purchasing or possessing firearms altogether. UMF ¶ 35. Several of these states also specifically restricted minors' ability to carry firearms. An 1883 Wisconsin law prohibited minors from "go[ing] armed with any pistol or revolver." 1883 Wis. Sess. Laws 290. In 1885, Nevada prohibited individuals under 21 from carrying concealed weapons. 1885 Nev. Stat. 51, ch. 51, § 1. In the early twentieth century, West Virginia did not allow anyone under 21 to obtain a license to carry firearms. 1925 W.Va. Acts 25-30, ch. 3, § 7(a). Other laws went further, prohibiting minors from possessing firearms altogether. *See, e.g.*, 1883 Kan. Sess. Laws 159, ch. CV, 1-2; 1895 Neb. Laws 237-38, Laws of Nebraska Relating to the City of

Lincoln, Art. XXVI, §§ 2, 5. In 1917, the Illinois Supreme Court held that a Chicago ordinance that required individuals to obtain a permit to purchase concealable weapons, including handguns, and denied such permits to "all minors," did not violate either the Illinois or United States Constitution. *Biffer v. City of Chicago*, 278 Ill. 562, 567–71 (1917). Even today, at least 34 jurisdictions place restrictions on those under 21 to purchase, possess, and carry firearms.[6]

In sum, there is a longstanding, unbroken tradition in American history of States and municipalities regulating the sales, transfer, possession, and use of firearms to and by minors. *See, e.g.*, *People v. Aguilar*, 2013 IL 112116, ¶ 27, *holding modified by People v. Burns*, 2015 IL 117387, ¶ 27 ("[L]aws banning the juvenile possession of firearms have been commonplace for almost 150 years and both reflect and comport with a longstanding practice of prohibiting certain classes of individuals from possessing firearms—those whose possession poses a particular danger to the public.") (quotation marks omitted). And these regulations are direct analogues to the restrictions in the Challenged Statutes for individuals under 21. The burdens imposed by these historical analogues—i.e., prohibitions on sales, possession, carrying, and use of firearms by minors—are comparable to the Challenged Statutes restricting the carrying of firearms in public by those under 21. *See Bruen*, 142 S. Ct. at 2133. ("whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations . . . .") (quotation marks omitted). The justifications

---

[6] Alaska Stat. §§ 11.61.220(a)(6), 18.65.705(1); Ariz. Rev. Stat. §§ 13- 3102(A)(2), 13-3112(E); Ark. Code § 5-73-309; Colo. Rev. Stat. § 18-12- 203(1)(b); Conn. Gen. Stat. § 29-28(b); D.C. Code § 7-2509.02(a)(1); Fla. Stat. § 790.06(2); Ga. Code § 16-11-129(b)(2)(A); Haw. Rev. Stat. Ann. § 134-9(a); 430 Ill. Comp. Stat. 66/25(1); Ky. Rev. Stat. § 237.110; La. Rev. Stat. § 40:1379.3(C)(4); Mass. Gen. Laws ch. 140, § 131(d)(iv); Mich. Comp. Laws § 28.425b(7)(a); Minn. Stat. § 624.714, subd. 2(b)(2); Neb. Rev. Stat. § 69-2433; N.J. Stat. Ann. § 2C:58- 6.1(b); N.Y. Penal Law § 400.00(1); Nev. Rev. Stat. § 202.3657(3)(a)(1); N.C. Gen. Stat. § 14-415.12(a)(2); N.M. Stat. § 29-19-4(A)(3); Ohio Rev. Code Ann. § 2923.125(D); Okla. Stat. tit. 21, § 1272(A)(6); Or. Rev. Stat. § 166.291(1)(b); R.I. Gen. Laws §§ 11-47-11, 11-47-18; S.C. Code § 23-31-215(A); Tenn. Code §§ 39-17- 1307(g)(1), 39-17-1351(b)(1); Tex. Gov. Code § 411.172(a)(2); Tex. Penal Code § 46.02(a)(2)(A); Va. Code § 18.2-308.02; Wash. Rev. Code § 9.41.070; Wis. Stat. § 175.60(3)(a); Wyo. Stat. § 6-8-104(a)(iv), (b)(ii).

for such laws are also comparable: ensuring those who carry guns in public are mature enough to act responsibly to protect both the public and children and youth. *See Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 206 ("The Second Amendment, at its core, protects 'law-abiding, *responsible*' citizens. . . . Congress found that persons under 21 tend to be relatively irresponsible and can be prone to violent crime, especially when they have easy access to handguns."); *see also Ezell v. City of Chicago*, 846 F.3d 888, 904–07 (7th Cir. 2017) (Rovner, J., *concurring in part*) ("Outside of the First Amendment context, it goes without saying that the government may restrict the rights of minors for purposes of protecting their health and welfare."); UMF ¶¶ 40–45.

That restricting firearms access for those under 21 is a longstanding feature of American legal history comports with the overwhelming view of courts to consider such restrictions. *See*, e.g., *Nat'l Rifle Ass'n of Am., Inc. v. Swearingen*, 545 F. Supp. 3d 1247, 1264 (N.D. Fla. 2021) (Florida law banning 18-to-20-year-olds from purchasing firearms was longstanding), *appeal filed*; *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 204 (federal law prohibiting licensed dealers from selling handguns to those under 21 was longstanding); *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (Texas' under 21 public-carry restriction was longstanding); *Powell v. Tompkins*, 926 F. Supp.2d 367 (D. Mass. 2013) (state law prohibiting 18-to-20-year-olds from obtaining concealed-carry licenses was longstanding) *aff'd*, 783 F.3d 332 (1st Cir. 2015), *cert. denied*, 577 U.S. 1219 (2016); *People v. Mosley*, 33 N.E.3d 137, 155 (Ill. 2015) (public-carry restrictions on 18-to-20-year-olds was "historically rooted" and did not regulate "core conduct subject to second amendment protection"); *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 993 (W.D. Wash. 2020) (prohibition on selling semiautomatic assault rifles to 18-to-20-year-olds was longstanding), *vacated to address Bruen*, 2022 U.S. App. LEXIS 33735 (9th Cir. Dec. 2, 2022).

In short, the Challenged Statutes satisfy the *Bruen* test, because they are consistent with

the history and tradition of firearm regulations in America and are supported by numerous historical analogues with comparable burdens and justifications. Thus, they are constitutional.

## CONCLUSION

For the foregoing reasons, there is no genuine dispute as to any material fact, and the Court should enter summary judgment in favor of Defendants and against Plaintiffs on all claims.

Dated: January 6, 2023                          Respectfully submitted,

                                                KWAME RAOUL and BRENDAN F.
                                                KELLY,


Aaron P. Wenzloff, #6329093                     By: /s/ Laura K. Bautista
Isaac Freilich Jones #6323915                   _____
Assistant Attorneys General                     Laura K. Bautista
Office of the Attorney General                  Assistant Chief Deputy Attorney General
100 West Randolph Street, 11th Floor            Office of the Illinois Attorney General
Chicago, Illinois 60601                         500 South Second Street
Aaron.Wenzloff@ilag.gov                         Springfield, Illinois 62706
Isaac.FreilichJones@ilag.gov                    Phone: (217) 782-5819
                                                Fax: (217) 524-5091
                                                Laura.Bautista@ilag.gov


## CERTIFICATE OF SERVICE

I certify that on January 5, 2023, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record.

                                                /s/ Laura K. Bautista
                                                _____
                                                Laura K. Bautista

Assistant Chief Deputy Attorney General