DEFENDANT'S EXHIBIT E
**DAVID MEYER  7/28/2022**

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF ILLINOIS
 3    DAVID MEYER, MITCHELL NALLEY,  )
      EVA DAVIS, SECOND AMENDMENT    )
 4    FOUNDATION, ILLINOIS STATE     )
      RIFLE ASSOCIATION, FIREARMS    )
 5    POLICY COALITIONS, INC.,       )
                                     )
 6         Plaintiffs,       )
                             )
 7    v.              ) NO. 21-cv-518-SMY
                             )
 8    KWAME RAOUL, BRENDAN F. KELLY, )
      JOSHUA C. MORRISON, JAMES      )
 9    GOMRIC, ERIC WEIS, CHRISTOPHER )
      PALMER, RICHARD WATSON, and    )
10    DWIGHT A. BAIRD,          )
                             )
11         Defendants.       )
12
13    VIDEOCONFERENCE DEPOSITION OF DAVID MEYER
14         TAKEN ON BEHALF OF THE DEFENDANTS
15             ON JULY 28TH, 2022
16
17
18
19    Prepared by:  DEBORAH S. (DEBI) REINHARDT, CCR, CSR
20
21
22
23
24
25
```

## Page 2

```
 1                  APPEARANCES
 2    For Plaintiffs:
      WILL BERGSTROM, ESQ.
 3    COOPER & KIRK, PLLC
      1523 NEW HAMPSHIRE AVE., NW
 4    WASHINGTON, D.C. 20036
      WBERGSTROM@COOPERKIRK.COM
 5
 6    For Defendants:
      JOE BRACEY, ESQ.
 7    O'HALLORAN KOSOFF GEITNER & COOK
      650 DUNDEE RD., SUITE 475
 8    NORTHBROOK, ILLINOIS 60062
      847.291.0200
 9    JBRACEY@OKGC.COM
10
11    For Defendants:
      ISAAC FREILICH JONES, ESQ.
12    OFFICE OF THE ILLINOIS ATTORNEY GENERAL
      100 W. RANDOLPH ST.
13    CHICAGO, ILLINOIS 60601
      312.814.3000
14    ISAAC.FREILICHJONES@ILAG.GOV
15
16    For Defendants:
      THOMAS J. HUNTER, ESQ.
17    BECKER, HOERNER & YSURSA, PC
      5111 W. MAIN ST.
18    BELLEVILLE, ILLINOIS 62226
      618.235.0020
19    TJH@BHYLAW.COM
20
21    Also Present:  Laura K. Bautista, Esq.; Aaron P.
      Wenzloff, Esq.; Erin Davis
22
23    (All parties, including the court reporter, appeared
      remotely via Zoom )
24
25
```

## Page 3

```
 1                     INDEX
 2    DIRECT EXAMINATION BY MR. FREILICH JONES...PAGE 4
 3    CROSS-EXAMINATION BY MR. BRACEY...........PAGE 75
 4    CROSS-EXAMINATION BY MR. HUNTER...........PAGE 77
 5    CROSS-EXAMINATION BY MR. BERGSTROM........PAGE 78
 6
                  DEPOSITION EXHIBITS
 7    NONE
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                  DAVID MEYER,
 2    having been duly sworn, testified under oath as
 3    follows:
 4                DIRECT EXAMINATION
 5    BY MR. FREILICH JONES:
 6        Q.  Morning, Mr. Meyer.
 7        A.  Morning.
 8        Q.  My name's assistant attorney general Isaac
 9    Freilich Jones.  I represent attorney general Kwame
10    Raoul and director Kelly who you sued in the case of
11    Meyer et al v Kelly et al.
12        Do you understand that today you're being
13    deposed in that matter?
14        A.  Yes.
15        Q.  And have you ever been deposed before?
16        A.  No, I have not.
17        Q.  Okay.  Fair enough.
18        If it's okay with you then maybe we can go over
19    a couple of ground rules, understandings that'll
20    make today as -- as easy as possible -- on our
21    intrepid court reporter, Ms. Reinhardt, who has to
22    get everything we say down.
23        So first, do you understand that you're
24    testifying right now under oath?
25        A.  Yes.
```

1 (Pages 1 to 4)

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

Page 5

1      Q.  And are there any reasons today at all, for
2  example illness, medication, that might prevent you
3  from testifying accurately and completely on this
4  issue?
5      A.  Nope.
6      Q.  So a couple -- again a couple of things, as
7  I mentioned, in terms of ground rules, Ms. Reinhardt
8  can only really take down one of us speaking at one
9  time.
10     So even if you know exactly what I'm about to
11  ask, and I bet most of the time you will before I'm
12  finished, my request to you is that you wait until
13  I'm finished speaking, and then answer when I'm
14  done.  I'll do exactly the same thing for you; I'll
15  wait until you're done.
16     Again, that's only so that our court reporter
17  can get it all down.
18     Is that okay?
19     A.  Yeah.
20     Q.  And a second quick ground rule, the court
21  reporter can only take things that -- that we say.
22  She can't take down a nod or an "huh-uh" or an
23  "uh-huh."  So if you have an answer to give, it's
24  much easier to say yes or no in words, even though I
25  can see that you've nodded yes, the court reporter

Page 6

1  won't be able to take that down.  So if -- we all
2  forget sometimes and nod or yes or no, I'll remind
3  you if -- if that happens.  But my request to you,
4  if you can, is when you have an answer, say it in
5  words so that the court reporter can actually get it
6  down.  Does that sound okay to you?
7      A.  Yeah.  Sounds great.
8      Q.  Okay.  Third, there's no problem with you
9  asking me to repeat a question or asking for
10  clarification if you didn't quite hear what I said.
11  Just -- that's perfectly fine.  But if you answer a
12  question, I'm going to assume that you did
13  understand it and -- and are answering it under
14  those circumstances.
15     Does that sound okay to you?
16     A.  Yup.
17     Q.  Great.  And finally breaks, you know, these
18  can be long events.  Everybody gets tired; needs --
19  needs to -- to take care of business or -- or just
20  take a break.  Feel free if at any time you need a
21  break, to let us know, hey, can we take a
22  five-minute break.  My only request to you on -- on
23  that is we're in the middle -- if you're in the
24  middle of answering a question, you finish answering
25  the question, finish that process and then take a

Page 7

1  break.  And that's perfectly fine.
2      Does that also sound okay to you as well?
3      A.  Yeah.
4      Q.  Tremendous.
5      So first, where do you live?  What's your home
6  address?
7      A.  I live in Shobonier, Illinois.  S-H-O-B-I --
8  forget spelling on that sometimes.
9      Q.  And what are you looking at right now,
10  Mr. Meyer?
11     A.  Spelling of that.  I'm sorry.  I forgot how
12  you spell it sometimes.  It's embarrassing.  Sorry
13  about that.
14     Q.  Are you looking it up on your cell phone
15  right now, Mr. Meyer, or --
16     A.  Yeah, is -- is that fine --
17         (Multiple parties speaking at the same
18  time.)
19             MR. BERGSTROM:  We can fill-in
20  the spelling afterwards if we need to.
21     A.  All right.  Sorry.
22     Q.  So the question was, just as a reminder;
23  where do you live?
24     A.  I live in Shobonier. ▓▓▓▓▓▓▓▓
25  Shobonier, Illinois.

Page 8

1      Q.  And how long have you lived there?
2      A.  Uh, twenty years.
3      Q.  Is that your entire life, or did you
4  previously live somewhere else?
5      A.  Yes.  My entire life.
6      Q.  And do you live -- like is there anybody
7  else who lives with you?
8      A.  Yeah.  I live with my parents and my
9  (indiscernible).
10     Q.  I'm sorry.  Say that one more time --
11     A.  And my brothers.
12     Q.  What are your parent's names?
13     A.  ▓▓▓ and ▓▓▓
14     Q.  If you could provide a full name for both?
15     A.  My dad is ▓▓▓▓ ▓▓▓▓  First.  Mom is
16  ▓▓▓▓▓▓▓▓ -- or
17     Q.  And you said you also resided with your
18  brother?
19     A.  Yes.
20     Q.  What is your brother's name?
21     A.  ▓▓▓ ▓▓▓▓
22     Q.  And how old is your brother?
23     A.  Uh, 17.
24     Q.  And how old are your parents?
25     A.  48?  My dad's 48.  And my mom is 46.

2 (Pages 5 to 8)

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

---

Page 9

1    Q. And what is your highest level of education?
2    A. High school.
3    Q. Did you complete your high school degree?
4    A. Yes.
5    Q. And when did you complete your high school
6    degree?
7    A. 2020.
8    Q. And where did you complete it?  What high
9    school?
10   A. Vandalia Community High School (phonetic).
11   Q. Are you currently enrolled in any education
12   programs right now?
13   A. This apprentice programs through the State.
14   Like, plumbing apprentice.  Probably be about the
15   closest thing.
16   Q. And what plumbing and apprentice program is
17   that?  Can you tell us a little bit more about that.
18   A. Be -- like I said, through the State.  It's
19   kind of the general State apprentice program.
20   It's -- really don't know how else to explain it.
21   Through -- through the company I work for.
22   Sponsored by a licensed plumber.
23   Q. Is it a community college or institution,
24   or is it at the company itself?
25   A. It's at the company.  You know, learn while

---

Page 10

1    you're working.
2    Q. And what is the name of that company?
3    A. SA Taylor Sales and Service.
4    Q. And are you currently employed with -- with
5    that company right now?
6    A. Yeah.  Uh-huh.
7    Q. And what are your responsibilities as an
8    employee of that company?
9    A. Basically, like I say, I'm apprentice
10   plumber.  So be, you know, going out with my
11   sponsor.  Learning how to do stuff.  And as an
12   apprentice I can do certain tasks by myselves
13   (phonetic); unclogging drains, servicing toilets,
14   stuff I ke that.  Then I also on the HVAC, heating
15   and cooling, learning how to do that.  So go out and
16   service a lot of stuff like that too.
17   Q. And how long have you been employed with --
18   with this employer?
19   A. Um, be two years this November.
20   Q. So you started in about November of 2020 you
21   would estimate?
22   A. Yeah.  Uh-huh.
23   Q. And did you have employment before then?
24   A. Yeah.  I worked at Woolsey's (phonetic) Ag
25   in Vandalia.

---

Page 11

1    Q. And what did you do at Woolsey's?
2    A. He has a grain bin crew.  We basically
3    service grain bins (indiscern ble) --
4    Q. The question Mr. Meyer was, what did you do
5    at Woolsey's?
6    A. Yeah.  Basically me and my boss, we went
7    around servicing grain bins.  Kind of, you know,
8    making sure -- we kind of -- we sold grain bins,
9    contract people out to build them.  And then would
10   kind of go there and make sure everything was going
11   smoothly for 'em.
12   And not that we serviced 'em.  Make sure
13   everything was running smoothly.  After they're built
14   and whatnot so.
15   Q. And is that -- tell us what that is that you
16   were servicing.  What does it do?
17   A. Uh, it's grain bins.  Basically after the
18   grain is harvest, from the field, farmer will take
19   and put their grain into the grain bin for it to
20   dry.  So it is below a certain percentage of wetness
21   basically.  So dry there -- or has to be so dry to
22   sell at the market basically.  You get more money
23   for being certain percentage of dryness.
24   Q. So the farmers were happy to have you fixing
25   their equipment --

---

Page 12

1    A. Yes.
2    Q. -- the time.
3    Before you worked at Woolsey's, did you have any
4    additional employment?
5    A. Yeah.  One -- during high school I worked on
6    a dairy farm, so.
7    Q. And what dairy farm was that?
8    A. Be Dairy Land.  Actually here -- right here
9    in Shobonier, so.
10   Q. What did you -- what were your tasks?  What
11   were your responsibilities at Dairy Land?
12   A. Basically I was a farm hand.  Milk the cows,
13   clean the stalls, stuff I ke that.  Fed 'em.
14   Whatnot.  Pretty well was all automated so.
15   Q. And during what period did you work at -- at
16   Dairy Land at the farm?
17   A. That would have been -- it was about four
18   years -- I believe it was about four years.  So
19   about from -- 2020 is when I quit to go to
20   Woolsey's.  So it would have been about 2016 is when
21   I started there if I'm -- remember correctly --
22   (Multiple parties speaking at the same
23   time.)
24   Q. Sorry.  I broke my own rule.
25   And why did you leave Dairy Land?  What resulted

---

**LEXITAS LEGAL**
**www.lexitaslegal.com**        **Phone: 1.800.280.3376**        **Fax: 314.644.1334**

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

## Page 13

1  in you leaving?
2      A.  Well, basically, it's just more of a
3  entry-level job.  You know, something for high
4  school.  So I went to Woolsey's for a little more
5  money.
6      Q.  And -- and in turn, how did you come to
7  leave Woolsey's?
8      A.  I got a job opportunity -- well, to go do
9  plumbing HVAC which earns a lot more than grain bin
10  work and so I took the opportunity.
11      Q.  And during any of the three jobs we've
12  discussed, were you ever disciplined or fired,
13  terminated, or separated?
14      A.  Not really, no.
15      Q.  And before working at the dairy farm, had
16  you had any other employment previous to that?
17      A.  Nope.
18      Q.  So that was your first job?
19      A.  Yeah.
20      Q.  All right.  So I'm gonna try to share my
21  screen very quickly.  Just let me know if it's
22  coming through or if it's not.
23      So are you able to see what I'm showing you
24  right now?
25      A.  Yeah.

## Page 14

1      Q.  And do you know what that is?
2      A.  Um, I feel like I've seen it before.
3      Q.  So I'm gonna highlight something, and I'll
4  scroll through it.
5      It's David Meyer and several other people versus
6  Kwame Raoul.
7      A.  Yeah --
8      Q.  -- the front of the lawsuit complaint.
9      Are you the same David Meyer that has sued Kwame
10  Raoul, Brendan Kelly, and the remainder of the
11  defendants in this case?
12      A.  Yes.
13      Q.  And did you review this complaint before it
14  was filed?
15      And I can scroll through just to -- to remind
16  you of what it is.  Let me know if I should slow
17  down.
18      A.  Yes.  Yeah.
19      Q.  And did you approve the filing of this
20  complaint?
21      A.  Yes.
22      Q.  And is everything in here accurate?
23      A.  Yes.
24      Q.  And let me know if you'd like me to keep
25  scrolling, or if you're satisfied that you know what

## Page 15

1  we're looking at.
2      A.  That's good.
3      Q.  So do you know who Mr. Mitchell Nalley is?
4      A.  No.  I've never met him.
5      Q.  Have you ever had any interactions with
6  Mr. Nalley?
7      A.  Nope.
8      Q.  How did come to be on the same lawsuit as
9  Mr. Nalley.
10      A.  Basically, I was scrolling through
11  Instagram, and I seen a -- not necessarily an
12  advertisement but one of their posts saying, you
13  know, for 18- to 21-year-olds to -- asking for
14  people to join it so.  That's basically how that
15  happened.
16      Q.  And -- and what did you -- well, scratch
17  that.
18      Are you -- do you know who Eva Davis is?
19      A.  No.
20      Q.  Have you ever met with Eva Davis in person?
21      A.  Nope.
22      Q.  Have you ever interacted with Eva Davis in
23  any other way?
24      A.  Nope.
25      Q.  How did you come to be in this lawsuit with

## Page 16

1  Eva Davis?  Was it the same as -- as with
2  Mr. Nalley?  On in some other way?
3      A.  Yeah, same way.
4      Q.  There are institutions or organizations that
5  I'm gonna highlight.
6      Do you see me highlighting them?
7      A.  Yes.
8      Q.  Second Amendment Foundation, Illinois State
9  Rifle Association, and Firearms Policy Council.
10      And before we talk about them, who put on the
11  Instagram posts that you reacted to, to join this
12  case?
13      A.  Uh, it would have been Firearms Policy
14  Coalition.
15      Q.  And was it only the Firearms Policy
16  Coalition, or were any other entities involved?
17      A.  That was the only one I seen at the time,
18  so.
19      Q.  And so then you saw that Instagram.  What --
20  what did you do next?  Did you reach out to
21  somebody?  Who was your next action?
22      A.  I clicked on the link and filled in a Google
23  form.
24      Q.  And did someone -- what -- what information
25  did the form request?

4 (Pages 13 to 16)

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

## Page 17

1    A.  Basically asked what age and your complaint,
2    you know, regarding the -- the post.
3        Q.  So you sent that information in.
4    What happened next?
5        A.  Um, probably couple weeks to a month after
6    that I got an email, so.
7        Q.  And who did you get an email from?
8        A.  Um, I -- I got a -- I cannot remember if it
9    was Firearms Policy Coalition, or the attorney's
10   office that is representing me.  I cannot remember
11   which one.
12       Q.  Was it from Second Amendment Foundation or
13   definitely not from Second Amendment Foundation?
14       A.  Well, I -- I got emails and stuff from all
15   them after this I was automatically taken in as a
16   member for joining this.  But not necessarily
17   regarding my acceptance into the case.
18       Q.  Okay.  Got it.
19       Well, let's -- let's take it step by step.
20       Do you remember when you received the Instagram,
21   or when you noticed - when you saw the Instagram
22   post?
23       A.  No, I can't give you an exact date.
24       Q.  Could you give us an approximate estimate
25   date?

## Page 18

1        A.  No.
2        Q.  Was it after your 18th birthday or before?
3        A.  No.  Yes, it was after my 18th birthday.
4        Q.  Was it before your 19th birthday?
5        A.  Yes.
6        Yes --
7        Q.  So when you were 18, you saw this Instagram
8    post?
9        A.  Yes.
10       Q.  And about a month later you got a reach-out,
11   which you think was from Firearms Policy Council or
12   your attorneys?
13       A.  Yes.
14       Q.  And what did they tell you?  And again, I'm
15   not asking you to reveal any privileged information
16   from your attorneys.
17       Only from Firearm Policy Council.  Not from your
18   attorneys.
19       A.  Basically I was chosen to be in the case.
20       Q.  And what did -- do you remember with any
21   greater detail what they said?
22       A.  No.
23       Q.  So what happened next?  And how long did it
24   take?  Could you walk us through the process?
25       You know, this -- as you can see -- I'm gonna

## Page 19

1    highlight it -- was filed on May 27, 2021.
2        So about how long did it take from getting that
3    acceptance notice to this being filed?
4        A.  Um, would have been several months.  Again,
5    I cannot give an exact date of when I applied for
6    this lawsuit, so.  Or when I applied to join it.
7        Q.  Do you think it was in 2021 or 2020?
8        A.  Well, yeah, it would have been in probably
9    2021 earlier.
10       Q.  And did -- did they ask for any additional
11   information from you after you were accepted and
12   before this got filed?
13       MR. BERGSTROM:  Objection.  I'm
14   just gonna reiterate that to the extent that this
15   question goes to, you know, David, conversations,
16   you and I have had, don't answer --
17       (Multiple parties speaking at the same
18   time.)
19       MR. BERGSTROM:  -- asked for
20   you can answer.
21       A.  Yes.
22       Q.  And to be clear, Mr. Meyer, I'm not asking
23   in any of these questions about communications with
24   your attorneys.
25       A.  Okay.

## Page 20

1        Q.  So were there any communications from
2    non-attorneys from these three institutions that you
3    see here, or from any other parties that you had as
4    you prepared for this lawsuit?
5        A.  I'm sorry.  You said non-attorney
6    communications?
7        Q.  Not with your attorneys from Cooper Kirk or
8    the rest of the litigation team, yes.
9        A.  Yeah.  Basically just some newsletters and
10   stuff from like the Second Amendment Foundation and
11   Illinois State Rifle Association.
12       Q.  And did -- did they collect additional
13   information from you for this case or no?
14       A.  No.
15       Q.  So when did you have the chance to review
16   this complaint?
17       A.  Can't really remember an exact date.
18       Q.  Was it right before it was filed?  Was it
19   months before it was filed?  Do you remember an --
20   an approximate date?
21       A.  Um, I don't know if -- before it was filed,
22   yeah.  Other than that, that's about as accurate as
23   I can -- can be, so.
24       Q.  Got it.
25       Fair enough.

5 (Pages 17 to 20)

DEFENDANT'S EXHIBIT E
**DAVID MEYER  7/28/2022**

## Page 21

1  I'm gonna stop sharing very briefly.  Let me
2  know -- did that --
3      A.  Yeah.
4      Q.  Great.  Thank you.
5  So let's quickly talk about the three
6  organizations that are your co-plaintiffs in this
7  case.  And I'd like to talk very briefly about the
8  Second Amendment Foundation.
9      What is the Second Amendment Foundation?
10      A.  To my understanding basically a -- a
11  foundation that, you know, tries to protect the
12  right of second amendment.
13      Q.  And are you a member of the Second Amendment
14  Foundation?
15      A.  Yes.  After I joined this lawsuit.
16      Q.  And how do you know that you're a member of
17  the Second Amendment Foundation?
18      A.  They sent me a letter telling me that I was
19  a member.
20      Q.  I'd like to quickly share my screen one more
21  time.  Am I coming through right now?
22      A.  Yeah.
23      Q.  -- able to see what I'm sharing --
24      A.  Uh-huh.
25      Yes --

## Page 22

1      Q.  So this is a document bearing the Bates
2  stamp on the bottom right corner, Meyer underscore
3  000726.
4      Your name is David Meyer; correct?
5      A.  Yes.
6      Q.  This was the -- the record that your lawyers
7  gave us of your membership in ostensibly the Second
8  Amendment Foundation.  And I think you can see right
9  here where my cursor is it says S-A-F.
10      Mr. Meyer, how old were you in 1994?
11      A.  I was not alive.
12      Q.  Did you donate in 1994?
13      A.  No.
14      Q.  Did you donate in 2019?
15      A.  That would -- no, 2019 would have been
16  before I was a member, so no.
17      Q.  Did you donate in the year 2000, the $150 as
18  is indicated here?
19      A.  No.
20      Q.  Did you donate in 2017, 25 dollars as is
21  indicated here?
22      A.  No.
23      Q.  Have you donated fifty dollars it looks like
24  one time in 2021?
25      A.  That is very possible because when I was --

## Page 23

1  became a member, there was a donation made on my
2  behalf.  But not from me.
3      Q.  And do you reside or have you ever resided
4  at 240 North Country Club Road Decatur, Illinois?
5      A.  No.
6      Q.  Mr. Meyer, are you sure you are a member of
7  the Second Amendment Foundation?
8      A.  As far as I'm concerned, uh, from the
9  letters I've seen and stuff, yes.
10      Q.  Is this record you?
11      A.  No.
12      Q.  Who might it be?  Do you have any idea who
13  this record might be for?
14      A.  Could not tell you.
15      Q.  Well, fair enough.
16      Can I ask, who made -- and you referenced that
17  potentially someone might have made a fifty-dollar
18  donation on your behalf.
19      Do you -- who was that?
20      A.  You know, it said in the letter.  But it was
21  basically whoever, um -- sorry.  I'm trying to think
22  of a way to say it.  But basically whoever opened my
23  account, per se, was a member.  And it would have
24  been somebody through, I believe, the Firearms
25  Policy Coalition maybe.

## Page 24

1      Q.  Do you know who that person was?
2      A.  No, not an exact name.
3      Q.  Have you ever known who that person was?
4      A.  No.
5      Q.  Do you have a copy of the letter that said
6  this?
7      A.  I -- yes.  Yeah.
8      Q.  Do you know -- I still am sharing my screen.
9      Do you know who resides at 240 North Country
10  Club Road?
11      A.  Well, assume somebody else named David
12  Meyer.
13      Q.  But you're not familiar --
14      A.  No.
15      Q.  -- with who that might be?
16      (There was no discernible response.)
17      Q.  Okay.  Did you give a copy of the letter to
18  your lawyers?
19      That said you got that fifty-dollar donation.
20      A.  I believe so.
21      Q.  Have you given, to your knowledge, copies of
22  all such letters to your lawyers as part of this
23  process?
24      A.  Ones I could find.
25      Q.  And that one -- am I correct in

**LEXITAS LEGAL**
**www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334**

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

## Page 25

1    understanding, that one you could find and you would
2    have given it to your lawyers?
3        A. I believe so.
4        **Q. Great.**
5        **Do you know what C-C-R-K-B-A stands for?**
6        A. No.
7        **Q. And I'm reading that from the Meyer 726**
8    **document that's currently being displayed.**
9        A. Okay.
10        No. I have no clue what that stands for.
11        **Q. And do you know what gun week, displayed on**
12    **the upper right-hand corner means?**
13        A. No.
14        **Q. And do you know what women and guns listed**
15    **also highlighted right now means?**
16        A. No.
17        **Q. Did I hear you say "no" or?**
18        A. Yeah, I said no.
19        **Q. You said no. Okay.**
20        A. Sorry.
21        **Q. No, no problem.**
22        **Did you receive any other communications from**
23    **Second Amendment Foundation over the last several**
24    **years?**
25        A. Not before I was a member. Just after that

## Page 26

1    various news letters and stuff.
2        **Q. But again, you've never seen a record**
3    **showing that you're actually a member in Second**
4    **Amendment Foundation?**
5        A. Yeah, I guess not a record.
6        **Q. And fair enough. Can I ask, do you know of**
7    **any other members of Second Amendment Foundation?**
8        A. Not off the top of my head.
9        **Q. Have you ever met any other members, even if**
10    **you didn't know their name?**
11        A. It's possible I've met somebody. But not
12    anybody that I know is a member.
13        **Q. And I've ceased sharing my screen. So that**
14    **was on purpose.**
15        **What other benefits of membership in S -- Second**
16    **Amendment Foundation have you experienced?**
17        A. Um, I -- none really.
18        **Q. And are there any activities you**
19    **participated in that you haven't already shared that**
20    **Second Amendment Foundation runs or participants in?**
21        A. Nope.
22        **Q. Great.**
23        **Moving on, what is the Illinois State Rifle**
24    **Association?**
25        A. Basically a State foundation, State of

## Page 27

1    Illinois, I guess not through the State of Illinois
2    but for the State of Illinois. To protect, I guess,
3    the right of the second amendment as well.
4        **Q. And what do you understand it's -- it's**
5    **mission to be? Can you speak a little bit more**
6    **about that.**
7        A. Basically to protect the rights of people in
8    Illinois to, you know, bear arms.
9        **Q. And are you a member of the Illinois State**
10    **Rifle Association?**
11        A. I believe so. I -- again, I've had a
12    letter. But I've not seen an official document, I
13    guess.
14        **Q. Is that letter something you shared with**
15    **your lawyers?**
16        A. I believe so.
17        **Q. And is that letter the only indication you**
18    **have that you're a member of the Illinois State**
19    **Rifle Association, or do you have any other**
20    **indication?**
21        A. Just the letter.
22        **Q. Have you ever donated any money to the**
23    **Illinois State Rifle Association?**
24        A. Um, as far as I know, same thing as the
25    Second Amendment Foundation somebody made a donation

## Page 28

1    on my behalf.
2        **Q. Do you know when that donation occurred?**
3        A. Around the same time as the one for the
4    Second Amendment Foundation.
5        **Q. And can you estimate, just to be clear, when**
6    **that might have been? Just an estimate.**
7        A. Would have been around the time I was
8    accepted for this case.
9        **Q. So probably, is it fair to say early 2021,**
10    **the first half of 2021, something like that?**
11        A. Yeah.
12        **Q. Do you know who made the donation on your**
13    **behalf?**
14        A. No.
15        **Q. Did it say in the letter you got who made**
16    **the donation on your behalf?**
17        A. It might have. But it's been a while. I
18    can't remember so.
19        **Q. And that's perfectly fine if you can't**
20    **remember. Do you have an estimate of how big the**
21    **donation was?**
22        A. Maybe around the same thing, fifty dollars?
23        **Q. Something like that?**
24        A. Yeah.
25        **Q. Do you pay any dues to Illinois State Rifle**

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

Page 29

1    Association?
2        A.  They ask for donations every now and again.
3    But usually don't have a lot left over so.
4        Q.  Of course.
5        And have you ever donated your time?  So
6    volunteering, something like that.  Have you ever
7    donated your time to Illinois State Rifle
8    Association or Second Amendment Foundation?
9        A.  Not -- I ke straightforward particularly, I
10   have -- I -- not -- not particularly.
11       Q.  Do you know any other members of the
12   Illinois State Rifle Association?
13       A.  Again, like the Second Amendment Foundation,
14   nobody that I know for a fact is one.
15       Q.  And have you ever participated in any
16   activities organized by the Illinois State Rifle
17   Association to your knowledge?
18       A.  No.
19       Q.  All right.  I'd like to ask you a couple of
20   questions now about the third organization, the
21   Firearms Policy Coalition Incorporated.
22       What is the Firearms Policy Coalition?
23       A.  To my understanding basically an
24   organization that tries to keep States in line with
25   the constitution as far as the second amendment

Page 30

1    regards, so.
2        Q.  And are you a member of the Firearm Policy
3    Coalition?
4        A.  I'm not for sure.
5        Q.  Have you ever seen any record showing that
6    you're a member of the Firearm Policy Coalition?
7        A.  No.
8        Q.  Did you ever apply for membership to the
9    Firearm Policy Collision?
10       A.  Nope.
11       Q.  Have you ever made any donations to the
12   Firearm Policy Coalition?
13       A.  No.
14       Q.  Have you ever paid any dues to the Firearm
15   Policy Coalition?
16       A.  Sorry.  No.
17       Q.  Did you say "no"?
18       A.  Yeah, no.
19       Q.  You have not paid dues?
20       A.  No.
21       Q.  Do you know any other members of the firearm
22   policy coalition?
23       A.  No.
24       Q.  Have you participated in any organizational
25   activities of the firearm policy coalition?

Page 31

1        A.  No.
2        Q.  Are you a member of any other associations
3    or organizations focused on second amendment related
4    issues as you understood them?
5        A.  No.
6        Q.  I'd like to once again show a copy of my
7    screen.  Are you able to see the document that I've
8    shared?
9        A.  Yeah.
10       Q.  Great.
11       And you see how at that bottom right it says
12   Meyer underscore zeros and then the number one?
13       A.  You said bottom right --
14       Q.  -- highlight that.
15       A.  Um, I'm not seeing it.
16       Q.  It would be at the bottom right.  Well, I
17   can tell you, this is a document Bates stamped Meyer
18   underscore 00001.
19       Do you see that at the top it's from someone
20   named William Sack (phonetic) to Meyer David 120201?
21       A.  Yeah.
22       Q.  And are you familiar with that email
23   address?
24       A.  Yes.  That is my email address.
25       Q.  So was this an email that you recall

Page 32

1    receiving?
2        A.  Now that I'm looking at it, yeah.
3        Q.  And who is this email from?
4        Do you know who this William Sack is?
5        A.  Appears that it's from Firearms Policy
6    Coalition.
7        Q.  And can you read what it says in the email.
8        A.  Says I understand that Cooper and Kirk has
9    not yet received your signed retainer agreement.
10   They need that in order to move forward with your
11   case -- strains on it.
12       Can you please check your inbox and get that
13   handled ASAP.
14       Q.  And is William Sack one of your attorneys or
15   no?
16       A.  I have not spoken with him since maybe this
17   email or a couple after.  But I've never conversed
18   with him other than -- I mean this.
19       Q.  But he's not an attorney that represents
20   you.  He's an employee of Firearm Policy Coalition;
21   is that correct?
22       A.  I believe so.
23       Q.  And Firearm Policy Coalition does not
24   represent you.  They're the organization we just
25   talked about; is that correct?

8 (Pages 29 to 32)

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

## Page 33

1   A. I believe so, yes.
2   Q. And do you remember why William Sack was
3   following up with you in this email?
4   A. Um, just as the employee trying to get
5   things running.
6   Q. And did you eventually send that document
7   that was requested?
8   A. Yes.
9   Q. And did he request any other information
10  that you recall via email -- and I'm talking about
11  William Sack -- did he request any information via
12  email, via phone, or in any other way?
13  A. I can't remember.
14  Q. That's fine.
15  I'm going to stop sharing now. Hold on one
16  second.
17  So I'm gonna share another document now on my
18  screen. Just let me know when it comes up.
19  Are you -- Mr. Meyer, are you able to see that
20  document?
21  A. Yes.
22  Q. So it might be blocked by your screen, but
23  this is the document bearing the Bates -- the Bates
24  stamp of Meyer underscore 000002.
25  And it's from William Sack to your knowledge --

## Page 34

1   and to also you. You were blind carbon copied on
2   this email.
3   A. Uh-huh.
4   Q. Did you know when Mr. Sack was sending this
5   out that he was sending the same email to someone
6   named Mitchell Nalley and someone named Eva?
7   A. I was not aware.
8   Q. And were you not aware because you were
9   blind carbon copied by Mr. Sack and therefor
10  couldn't see that was this from him to those people?
11  A. I'm not sure exactly what that means.
12  Q. So that BCC. You see how it says BCC?
13  A. Yes.
14  Q. When you BCC somebody on an email that per
15  -- other people might not know that -- or wouldn't
16  know that they got that email; right?
17  A. Yeah.
18  Q. And so in this case, when you got it, you
19  didn't know the exact same email to
20  someone called Mitchell Nalley and someone called
21  Eva; did you?
22  A. No.
23  Q. But he did tell you all that, quote, we are
24  making the final edits to your case now. You should
25  be getting it filed in the near future.

## Page 35

1   Mr. Sack though wasn't your attorney; right?
2   A. I'm -- I'm not for sure.
3   Q. Have you ever signed an agreement to retain
4   Mr. Sack as your attorney?
5   A. I'm -- I don't remember.
6   Q. And that's fair enough.
7   And then Mr. Sack asked you two questions. So
8   the first one he asked you is, quote, if you were
9   able to carry a handgun in public for self-defense,
10  what make and model firearm would you be interested
11  in carrying, question mark, end quote. Did you
12  respond to that question?
13  A. Yes, I remember -- I don't -- I remember
14  responding to a question like that at some point in
15  time, yeah.
16  Q. And -- and what was your answer to that --
17  what was your answer?
18  A. It was a Smith and Wesson MMP Shield.
19  Q. And why that make and model in particular?
20  A. Well, my dad has one. And he has let me
21  shoot it before. And it was -- it is -- it's a
22  small gun. You know, perfect for carrying
23  basically.
24  Q. And so that one goes to the second question
25  Mr. Sack asked you. And he said, quote, would you

## Page 36

1   acquire that handgun through a private sale or as in
2   a gift -- or as a gift from an immediate family
3   member? And then in parenthesis he said, if gift
4   specify from whom.
5   Did you respond to that part of the question?
6   A. I can't -- I -- I think I have. But I
7   cannot exactly remember my answer.
8   Q. Who do you think, if you were to receive a
9   gift, would you have gotten it from in that gift?
10  A. It would have been probably been my dad. If
11  I --
12  Q. But you don't remember for sure?
13  A. Yes, correct.
14  Q. Would you have gotten through a private sale
15  or definitely not?
16  A. If it was legal for me to do so.
17  Q. Got it.
18  I'm going to stop sharing.
19  So that's why it disappears in a second.
20  A. Okay.
21  Q. So you mentioned that -- a few moments ago,
22  Mr. Meyer, that you have -- actually backing up.
23  When you responded to that mail that I just
24  showed you or any other questions, would that have
25  been via email or on a phone call? What do you

**LEXITAS LEGAL**
**www.lexitaslegal.com        Phone: 1.800.280.3376        Fax: 314.644.1334**

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

---

Page 37

1  think?
2      A. I would assume email. Email back to them.
3      Q. Do you have remember having any phone calls
4  with Mr. Sack or someone in a similar position or
5  was it just emails?
6      A. The only phone calls I can think of off the
7  top of my head would be Will here.
8      Q. Got it.
9      And again, I'm not asking you to reveal the
10  contents of any conversations you might have had
11  with Will or his team. So just talking about those
12  other ones.
13      Q. You mentioned a second ago, Mr. Meyer, that
14  you fired your father's weapon a couple of times.
15      How many times have you fired a firearm?
16      A. That's not a number I can come off the top
17  of my head.
18      Q. Is it -- do you fire them frequently?
19  Infrequently? And when does -- how do you estimate
20  it?
21      A. Estimate of what?
22      Q. How frequently you fire a firearm. Is it
23  frequently? Infrequently?
24      A. I would say fairly frequently. Not every
25  day or every month. But at least once a month.

---

Page 38

1      Q. So estimated once a month is what you said?
2      A. Yes. At the very least.
3      Q. And when you fire a firearm, where are you
4  doing it?
5      A. In my back yard. I live in the middle of
6  the country.
7      Q. And are -- what -- what kind of firing are
8  you doing? Are -- is it target practice? What --
9  can you describe the circumstances in which you're
10  firing figure that weapon.
11      A. It's target practice.
12      Q. And what do you fire at as a target?
13      A. We have a large round hay bale with a target
14  on it. You would be surprised bullets don't go
15  through that, so.
16      Q. That's right.
17      And you're doing this in your -- on your own
18  property in your backyard; is that correct?
19      A. Yes.
20      Q. And can you describe that property to the
21  best of your ability, that backyard area.
22      A. It would be right behind my house.
23  Between -- it's between my house and my dad's hay
24  field. And then past that is wooded area. And then
25  after that is a neighbor's field, so.

---

Page 39

1      Q. And can you estimate about how big that
2  backyard area is.
3      A. Well, basically I live on -- I believe it's
4  about twenty acres. I say the yard itself -- the
5  yard alone is about a -- about an acre.
6      Q. And that's really inside that one acre area
7  is where that firing that we're talking about really
8  takes place; is that right?
9      A. Yeah. Uh, primarily.
10      Q. Does it take place in the wooded area, or
11  occasionally at least in any other portions of that
12  property?
13      A. Occasionally when I'm hunting white tail
14  deer during deer season.
15      Q. And how often do you hunt?
16      A. Usually I hunt on opening season. It's in
17  November. And then every now and often I'll go on
18  bow season if I can get tags for that and stuff so.
19      Q. And where are you hunting during those
20  events you're describing?
21      A. Well, like I said, I've got twenty acres
22  here at this house, where I live here. So I go in
23  the back. I got a couple of tree stands set up
24  there. And then about five miles north of us my dad
25  has another seven acres. Every now and again I hunt

---

Page 40

1  there.
2      Q. And have you ever conducted the target
3  practice we described or the hunting in other areas
4  besides the one we just discussed?
5      A. I have gone with friends to do their
6  property or property that they have permission to
7  hunt on.
8      Q. Also in Illinois?
9      A. Yes.
10      Q. -- outside --
11      (Multiple parties speaking at the same
12  time.)
13      Q. -- and where is that area? Is it nearby in
14  your same region, or are you traveling to that area?
15      A. I'd be in Fayette County. That's the only
16  place I have ever gotten the tags for, so.
17      Q. So is it safe to say that you've never fired
18  those firearms we just discussed outside of Fayette
19  County to -- to your memory?
20      A. Yes.
21      Q. And the only times that you're firing those
22  firearms is for target practice which could take
23  place on your one-acre area or possibly in wooded
24  area. And then occasionally for hunting when you
25  have the tags and are able to have that opportunity?

---

**LEXITAS LEGAL**
**www.lexitaslegal.com**        **Phone: 1.800.280.3376**        **Fax: 314.644.1334**

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

## Page 41

1  A. Yes.
2    Q. And then the hunting would also really only
3  take place in your property and possibly property
4  owned by other folks that you know in Fayette
5  County.
6  A. Yes.
7    Q. And what -- what weapons are you using when
8  you go hunting?
9  A. When I hunt I have a Remington 870. It's a
10  twelve-gauge shotgun. And generally that's about
11  all I hunt with.
12    Q. Why that gun in particular? What is the --
13  what is the benefit of using that weapon?
14  A. It's just a simple pump shotgun. Nothing
15  fancy. Not a lot of moving parts, per se. Very
16  simple. Easy to clean.
17    Q. And have you used any other firearm besides
18  that one when you've gone hunting in the past?
19  A. In the past, yeah.
20    My dad has let me use his single-shot
21  twenty-gauge shotgun. I can't exactly remember the
22  make on it. But it's another simple shotgun that I
23  used for a couple years before I got my Remington.
24    Q. And which do you prefer?
25  A. Definitely my Remington 870.

## Page 42

1    Q. Why?
2  A. It shoots a lot better, I think. And it's
3  not -- it's, like I said the, twenty -- gauge, the
4  one four single shot, so if I happen to miss a deer
5  or something I would have to crack it in half and
6  reload. My pump holds the maximum for State law,
7  which is three, while you're hunting.
8    Q. Absolutely.
9    And how do you transport the weapons that we're
10  talking about when you fire them at someone else's
11  property? For example, how do you get them three
12  from your own property?
13  A. Well, if I'm driving, I put them in a gun
14  case, transportable gun case. And that's about the
15  extent of that.
16    Q. Do you typically place them in your trunk?
17  Typically place them in the back seat? How do you
18  transport them once they're in the gun case?
19  A. Yeah, away from me. In -- in the trunk or
20  in the back seat. I -- I could be wrong. But to my
21  understanding, I believe it's -- it has to be out of
22  reach. And I'm just kind of -- something I've
23  heard. So that's what I try to do.
24    Q. And are you typically transporting them by
25  yourself, or do you usually -- ever have someone

## Page 43

1  else in that automobile with you?
2  A. I -- usually just me. I have FOID
3  (phonetic) card, so.
4    Q. And tell us, I guess a little bit more about
5  what you use for target practice. We shared that
6  there were two shotguns that -- that you use for
7  hunting. What are the firearms you use for this
8  target practice that we talked about?
9  A. It varies. I have a 223 cal ber rifle issue
10  bolt action with scope. So sometimes I shoot at 50
11  to 60 yards with that.
12    And then my dad has several other guns he lets
13  me shoot. He has an AR-15. He has couple of
14  shotguns. And like I mentioned earlier he has the
15  Smith and Wesson P Shield (phonetic.) It's a nine
16  millimeter pistol that I enjoy shooting too.
17    Q. And that's the same pistol that you'd
18  acquire if you were able to get a concealed carry
19  license?
20  A. Yeah.
21    Q. Would you seek to acquire any other rifles
22  if you -- or any other firearms -- excuse me.
23    Any other firearms if you were to receive the
24  concealed carry license?
25  A. Maybe a Sig Sauer P 360.

## Page 44

1    Q. And why the Sig Sauer P 360?
2  A. Basically it's same thing as the MMP Shield.
3  But it's -- you know, again, small, compact, and you
4  know, built for everyday carry.
5    Q. And why in particular is it important for
6  you to carry the Shield weapon or another weapon you
7  might seek to acquire if you were allowed to have a
8  concealed carry license?
9  A. To well, to my understanding it has to be
10  concealed, so easier it is to conceal it better it
11  is for me and everyone else, so.
12    Q. And -- and maybe to restate the question.
13  Why do you want to carry it in a concealed fashion?
14  What -- what are you seeking to accomplish by doing
15  that?
16  A. Well, the conceal carry license so it has to
17  be concealed. And basically to protect myself for
18  self-defense. If -- if the occasion arises.
19    Q. And do you have any specific basis for
20  feeling a need for self-defense at this time or in
21  your past?
22  A. I've been lucky enough to never actually
23  come -- come across a situation like that. But, you
24  know -- I -- like I said, I'm in plumbing and HVAC.
25  I drive around a company truck. I do drive it to

11 (Pages 41 to 44)

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

## Page 45

1  home and back to work in the morning and of the
2  night.
3      You know, there's thousands of dollars of tools
4  and parts on that truck.  You know, that's
5  something, you know, the -- very valuable.
6      **Q.  And if -- if someone -- you're thinking that**
7  **if someone tried to rob you, or take that property**
8  **in some way they weren't entitled to, you'd be able**
9  **to use lethal force to stop that?**
10     A.  Yes.
11     **Q.  Does your company -- or would your company**
12  **allow you to carry the concealed weapon while you**
13  **have that equipment and are driving?**
14     A.  Yes.
15     **Q.  How do you know that your company would**
16  **allow you to do that?**
17     A.  My -- my boss is -- you know, I've ta ked to
18  him about, you know, kind of what I'm doing with
19  this case, within, you know, reason.  Nothing -- but
20  kind of tell what him I'm doing.  And he's very
21  supportive of it.  He's -- you know, I, ke me,
22  he's -- he supports the Second Amendment.  I don't
23  believe he's a member of anything.  But he supports
24  it.
25     **Q.  What is your boss's name?**

## Page 46

1      A.  ███████  ████
2      **Q.  And is Shane Taylor the owner of the company**
3  **or another employee of the company?**
4      A.  The owner.
5      **Q.  Under -- so his policy you're saying is you**
6  **would be allowed to carry that concealed weapon**
7  **while on the job?**
8      A.  Yes.
9      **Q.  Would you be able to carry that concealed**
10  **weapon into the homes of your customers, or would**
11  **you --**
12      (Multiple parties speaking at the same
13  time.)
14      A.  I would not carry it inside.  But at least
15  have it in my truck.
16      **Q.  So if you went inside to deal with the**
17  **customer in some way, who was employing your HVAC**
18  **services, what would you do with the weapon?**
19      A.  I would lock it in a safe space inside my
20  truck --
21      (Multiple parties speaking at the same
22  time.)
23      **Q.  -- what kind of safe space is inside your**
24  **truck that you could use to do that?**
25      A.  The glove compartment on the truck actually

## Page 47

1  locks, so.
2      **Q.  So you would take that off of your person,**
3  **place it in the glove compartment, and then you go**
4  **perform your job duties on someone else's property?**
5      A.  Yes.
6      **Q.  Would you ever take that firearm on to**
7  **someone else's property without notifying them?**
8      A.  Um, well, I would have to look at what is
9  required me to do.  If I -- if I have to let them
10  know or if not so --
11      (Multiple parties speaking at the same
12  time.)
13      **Q.  -- right now, to your knowledge, are you**
14  **allowed to take a firearm on to someone else's**
15  **property if you have a concealed carry license?**
16      MR. BERGSTROM:  Objection;
17  form.
18      A.  Do what?
19      MR. BERGSTROM:  I said,
20  objection form.
21      You can answer the question anyway, David what.
22      A.  What was the question?
23      **Q.  Certainly.  To your knowledge, are -- would**
24  **you be allowed to carry that concealed firearm on to**
25  **someone else's property if you had a concealed carry**

## Page 48

1  license?
2      MR. BERGSTROM:  Same objection.
3      A.  Again, I don't know.
4      **Q.  You don't know.  Fair enough.**
5  **All right.  I'm going to share another document**
6  **on your screen very quickly.  Let me know when it**
7  **comes up.**
8  **It's a little bit shiny.  So are you able to see**
9  **what I'm sharing with you?**
10     A.  Yes.
11     **Q.  And what are we looking at?**
12     A.  That is my driver's license.
13     **Q.  And when did you get this license?**
14     A.  Would have been when I turned 16.  ████
15  ████ of -- well, December 5th of 2017 I guess is when
16  it was issued.  So couple of days after I turned 16.
17     **Q.  Those are those three days; right?  When you**
18  **were able to get your license and your parents just**
19  **can't get to the DMV; right?**
20     A.  Yeah, I think it had to do with the -- when
21  I finished my Driver's Ed courses, so.
22     **Q.  And is this your -- your current license or**
23  **had this license been replaced in any way?**
24     A.  It's current.
25     **Q.  And everything to your knowledge on this**

**LEXITAS LEGAL**
www.lexitaslegal.com        Phone: 1.800.280.3376        Fax: 314.644.1334

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

Page 49

1    license is accurate including your birthday,
2    ███████████████?
3        A.  Yeah.
4            MR. FREILICH JONES:  Fantastic.
5    We've been going exactly an hour now.
6    Mr. Meyer, why don't we take a five-minute break, so
7    that everyone can take a moment.  And then
8    reconvene, if it's okay with you, at 10:05.
9        Does that sound okay to you, Mr. Bergstrom?
10           MR. BERGSTROM:  That sounds
11   good.  And, David, during the break, just turn off
12   your video and your audio.
13           (A break was taken.)
14       Q.  (MR. FREILICH JONES):  All right, Mr. Meyer,
15   restarting the conversation.  We spent a little bit
16   of time talking about all the firearms that you had
17   used in target practice and in hunting before the
18   break.
19       Could you tell us what firearms you currently or
20   consider yourself to own?
21       A.  None under my FOID Card.
22       Q.  So you do not own any firearms at this time?
23       A.  Personally, no.
24       Q.  And how many firearms are currently in the
25   household in which you reside, and what are they?

Page 50

1        A.  I can't give you an exact number.  But I'd
2    say my dad has an assortment of maybe about twenty or
3    so.
4        Q.  That includes the shotgun we discussed
5    that -- both shotguns that you use and the one you
6    prior -- previously used as well -- could you
7    describe any others that -- that he possesses, to
8    the best of your memory.
9        A.  Yeah.  He has an AR-15, a couple different
10   rifles, shooting 223s.  30-ought-6 rifle, couple
11   nine-millimeter pistols, a .22 pistol.  And a couple
12   other various different type shotguns.  And you
13   know, stuff like that, so.
14       Q.  And about how many of those firearms are
15   hand guns would you estimate?
16       A.  Three or -- three, yeah.
17       Q.  And about how many of them are shotguns
18   would you estimate?
19       A.  Probably, maybe 7 or 8.
20       Q.  And how would you describe what kind of
21   categories comprise the remaining, let's say dozen
22   or so that you estimated might be in there?
23       A.  He has a couple of .22 rifles, bolt action,
24   lever action, semiautomatic, 1022 Rugers.  A -- like
25   a couple bigger rifles.  Like a thirty-ought-six,

Page 51

1    223, bolt action.  Both of those are bolt action.
2    And then an -- two AR-15s actually.
3        Q.  And have you fired all of those firearms, or
4    most of them, or have you not fired all of those
5    firearms?  In the past.
6        A.  I would estimate most of 'em.  There's
7    probably a couple I have not.
8        Q.  But generally you have some experience on
9    most of those firearms we just discussed?
10       A.  Yes.
11       Q.  Great.  So I'd actually -- I'm gonna share
12   my screen with you one more time.  Let me know as we
13   have done previously when it comes through.
14       So is that coming through, Mr. Meyer, do you see
15   what I'm sharing?
16       A.  Yes.
17       Q.  And in case you can't see it, if it's cut
18   off at the bottom, this is the document labeled
19   Meyer underscore 000738.  And this is your Firearm
20   Owner Identification Card; right Mr. Meyer?
21       A.  Yup.
22       Q.  Is this your current card, or has any
23   subsequent card been issued?
24       A.  This is it.  This is current.
25       Q.  And it says that -- when did you receive

Page 52

1    this card?  What was the date of issuance, to your
2    recollection?
3        A.  Well, we've -- they got ten years on 'em.
4    So it would have been -- I believe that's 2024.  I
5    can't see past the side.
6        Q.  I can make it a little bigger if that would
7    help.
8        A.  Yes.  Okay.  So 2024.  Would have been
9    around 11-01 of 2014.
10       Q.  And how old were you when you received this
11   card, approximately?
12       A.  Would have been 13.
13       Q.  And do you remember getting this card?  Can
14   you describe the circumstances in which you got
15   issued this FOID card?
16       A.  If I remember correctly, that's -- we got it
17   at a Walmart.
18       Q.  And did someone help you?  You were 14 years
19   old you said, about 14 --
20       A.  Yes --
21       Q.  -- did you someone help you fill out the
22   application?  Can you talk about that part?
23       A.  Yeah, it -- it was my dad basically, I
24   guess, signed for it.  Again, I don't remember the
25   exact procedure.  But I -- I believe somebody has to

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

## Page 53

1   sign for it under a certain age, so I believe my dad
2   did.  Or I know my dad did if that's the case --
3       Q.  And I'm going use the term sponsor for --
4   for that person so you'll understand that when I say
5   sponsor, that's the person who sponsors your FOID
6   card if your under age, if that -- is that okay?
7       A.  Yes.
8       Q.  And so you just confirmed that it was your
9   father, your dad, who was your sponsor; is that
10  correct?
11      A.  Yes.
12      Q.  And can you remind us what is your dad's
13  full name and age currently?
14      A.  ████████ and he is 48.
15      Q.  And has your father ever been convicted of a
16  crime?
17      A.  Not that I'm aware of.
18      Q.  Has your father, to your knowledge, ever
19  used narcotics?
20      A.  No.
21      Q.  Have you ever witnessed your father use any
22  prescription or non-prescription drugs?
23      A.  No.
24      Q.  Has your father ever been admitted to a
25  mental institution or received care for a mental

## Page 54

1   illness?
2       A.  No.
3       Q.  Does your father to your knowledge have an
4   intellectual disability?
5       A.  (Indicating.)
6       Q.  You nodded.  But can you speak the answer.
7       A.  Sorry.
8   No.
9       Q.  And has your father ever been subject to an
10  order of protection?
11      A.  No.
12      Q.  And has your father ever committed an act of
13  domestic abuse?
14      A.  No.
15      Q.  To your knowledge, does your father have any
16  developmental disabilities, or has ever had aany
17  developmental disabilities?
18      A.  No.
19      Q.  And in 2014 or approximately 2014, when this
20  was issued, what was your father's address?
21      A.  It would have been 660 North 1200 Street
22  Shobonier, Illinois.
23      Q.  The exact same address you're currently at?
24      A.  Yes.
25      Q.  Great.

## Page 55

1       Have you ever been detained by police officers?
2   That didn't come through.  Say that one more
3   time.
4       A.  No.
5       Q.  Have you ever been cited for any sort of
6   violation by a police officer?
7       A.  Traffic violations.  That's about it.
8       Q.  When did those occur?  And how many were
9   there?
10      A.  When I was -- again, I can't remember the
11  exact day.  But I believe 17 that I was coming home
12  from football game and was pulled over for making a
13  rolling stop and a -- and I also got a curfew
14  ticket.
15      Q.  And did you pay that ticket?
16      A.  Yes.
17      I got the stop sign, the rolling stop off -- was
18  taken off my record.  And I went to court
19  supervision for the curfew ticket.
20      Q.  And what did that court supervision involve?
21      A.  Basically if, I remember correctly, I
22  couldn't get any more tickets, and I had to pay a
23  certain amount of money.
24      Q.  Did you pay that money?
25      A.  Yes.

## Page 56

1       Q.  Were you required to report to any
2   authorities on any basis or not?
3       A.  Not to report, yeah.
4       Q.  Did you comply with all the requirements of
5   your court supervision at all times?
6       A.  Yes.
7       Q.  And can you clarify your curfew violations
8   was because you had been driving after the curfew,
9   or was it related to some other incident?
10      (Multiple parties speaking at the same
11  time.)
12      A.  -- it was after the curfew, which I believe
13  was like eleven or -- yeah, eleven, because it was a
14  Friday night.
15      Q.  Was anyone else in that vehicle?
16      A.  No --
17      (Multiple parties speaking at the same
18  time.)
19      A.  -- just me.
20      Q.  And had you been drinking that day?
21      A.  No.
22      Q.  Had you been consuming any sort of
23  intoxicating substance that day?
24      A.  No.
25      Q.  Were you found by the court to have been

14 (Pages 53 to 56)

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

Page 57

1  consuming any substance that day including alcohol?
2      A.  No.
3      Q.  Have you ever had alcohol outside of a
4  religious ceremony?  Such as communion.
5      A.  Yeah, I drank a beer at my house before with
6  my dad, but.
7      Q.  And how frequently do you do that?
8      A.  Not frequently at all.
9      Q.  When was the last time that you recall doing
10 that?
11     A.  I think it may have been -- I -- I can't
12 remember when.
13     Q.  This year or earlier than that?
14     A.  Yeah, probably this year.
15     Q.  Okay.  And how frequently would you estimate
16 that you do that?
17     A.  Oh, not -- not very frequently.
18     Q.  Have you ever had an alcoholic drink outside
19 of your home?  For example, at a bar or restaurant?
20     A.  Not a bar or a restaurant, no.
21     Q.  In any other situation outside of your home?
22     A.  That not that I can remember.
23     Q.  So the only time that you ever had an
24 alcoholic beverage that you recall is in your home.
25 And how often does that happen?  And is that

Page 58

1  correct?
2      A.  Yeah, it's correct.
3  But I -- does not happen very frequently at all.
4  I -- I can't really guess, per se, how many times.
5      Q.  Circling back, why were you out after
6  curfew?
7      (Multiple parties speaking at the same
8  time.)
9      Q.  -- from that game or for some other reason?
10     A.  -- well, after the game -- well, after the
11 game, you know, it was when I was in high school.
12 I -- we had a pretty good win.  So me and my family
13 and a couple of friends went out to eat after that.
14     Q.  And they came home separately?
15 From you.
16     A.  Yes, I was already in town because it was
17 after school, so.
18     Q.  Great.  And just to confirm, you don't
19 recall if you ever had a drink at someone else's
20 house, or you've never had a drink at someone else's
21 house?
22     A.  I don't recall.  I'd say I don't.
23     Q.  Have you ever used marijuana or cannabis?
24 That didn't come through.  Can you confirm
25 again, have you ever used marijuana or cannabis?

Page 59

1      A.  No.
2      Q.  Never once?
3      A.  Never.
4      Q.  Have you ever used any prescription drugs in
5  a manner in which they were not prescribed?
6      A.  No.
7      Q.  And I'm turning off the screen sharing
8  because we are done with that.
9      Have you ever used cocaine?
10     A.  No.
11     Q.  Have you ever used prescription opioids?
12     A.  For prescription.  After a surgery.
13     Q.  And when was that?
14     A.  In '15, I believe I shatt -- or broke my
15 pinky, the ligaments on it.  And ripped a part of
16 the bone off or something, I believe.  And I had to
17 have pins put in my fingers for that, so.
18     Q.  And after that event, you were prescribed
19 prescription opioid pain killers; is that correct?
20     A.  Yes.
21     Q.  And did you use all of those pain killers?
22 Following the surgery to treat pain or did you
23 not?
24     A.  I can't remember.  I wanna -- I think I
25 didn't -- I don't think I used 'em all.  But I ke I

Page 60

1  said, I can't remember so.
2      Q.  So and Mr. Meyer, just to -- reminder to
3  speak up so that the court reporter can get what
4  you're saying.  But you're doing great.
5  So just to reiterate.  Just to confirm I
6  understood you don't recall if you used all of those
7  prescription pain killers to treat the -- the pain
8  you experienced.
9      A.  Correct.
10     Q.  Is that correct?
11     A.  Yeah, correct.
12     Q.  Do you recall what did you with whatever was
13 left over?
14     A.  Um, probably flushed them down the toilet if
15 I had to guess.
16 Mom probably took care of that, so.
17     Q.  Have you ever used any other substance for
18 you which would you need a prescription or that is
19 not lawful under Illinois or federal law?
20     A.  Not that I can remember.
21     Q.  Have you ever been subject to an order of
22 protection?
23     A.  No.
24     Q.  Have you ever been cited for stalking?
25     A.  No.

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

Page 61

1      Q.  Have you ever been subject to a no-contact
2   order?
3      A.  No.
4      Q.  Have you ever been detained or investigated
5   for battery or assault or a similar violation?
6      A.  No.
7      Q.  Were you born a U.S. citizen?
8      A.  Yes.
9      Q.  So you are not naturalized.  You have been a
10  citizen since birth?
11     A.  Yeah.
12     Q.  And have you ever taken a drug test?
13     A.  Yeah.
14     Q.  When did you take those drug tests?
15     A.  At school for -- our school required it for
16  sports.
17     Q.  And do you know what you were tested for?
18     A.  I mean, I guess marijuana and -- or type of
19  drugs, opiods, whatnot.
20     Q.  Did you pass that test or did you fail that
21  test or these tests?
22     A.  I passed every one of them, so.
23     Q.  And can you clarify, how tests are we
24  talking?  Was it every year?  Was it some other
25  number of tests?

Page 62

1      A.  It was -- it was random.  But probably once
2   a year, so.
3      Q.  For how many tests do you think it was?
4   Over what period of time was it about a once a year?
5      A.  I think it there may have been three or four
6   tests.
7      Q.  And is this primarily during high school
8   approximately or prior --
9      A.  Yeah.  Yeah, during high school.
10     Q.  So it's fair to say that you had a drug test
11  about four times once a year during high school
12  primarily or entirely for sports?
13     A.  Yes.
14     Q.  Can you recall any other drug test you might
15  have taken other than the ones we've just discussed?
16     A.  Um, not I can recall.
17     Q.  You mentioned that you had been cited for a
18  rolling stop.  Is that your only interaction with
19  police in which you'd been cited, or are there any
20  other interactions you've had with police?
21     A.  I've had speeding ticket.
22     Q.  And when was that?
23     A.  That would have been sometime while I was --
24  the end of my, um, time at Woolsey's, so would have
25  been before November of 2020.

Page 63

1      Q.  And how fast were you going and where did
2   this occur?
3      A.  I believe it was 76 in a 70 in Bond County
4   in Greenville.
5      Q.  Got it.
6      And what were -- what was the result of that
7   citation, were assessed a fine, or did something
8   else occur?
9      A.  Just a fine.
10     Q.  Do you recall what the fine was?
11     A.  Like 160 maybe.
12     Q.  And did you contest the ticket or -- or not?
13     A.  No.  Just paid it.
14     Q.  You paid the full fine?
15     A.  Yeah.
16     Q.  Great.
17     I have my -- my favorite question during this
18  entire -- I have to ask this one.
19     Have you ever been a fugitive from justice?
20     A.  No.
21     Q.  Good.
22     That one we had to get in there.
23     You shared with us what your birthday was.  Can
24  you remind us what -- what your birthday is.
25     A.  ███████ ██ ████

Page 64

1      Q.  And have you been -- ever been treated for
2   any sort of mental illness?
3      A.  No.
4      Q.  Have you ever gone to any sort of treatment
5   at -- at school?  Again, at any other situation for
6   mental illness at all --
7      A.  No --
8      Q.  -- no?
9      Never.
10     That includes -- well, have you ever been or
11  have you ever been considered to be intellectually
12  disabled?
13     A.  No.
14     Q.  Have you ever been considered to be, by
15  anyone, developmentally disabled?
16     A.  No.
17     Q.  Have you ever been adjudicated by a court as
18  mentally defective?
19     A.  No.
20     Q.  Have you ever been adjudicated by a court as
21  being required to get mental health treatment of any
22  kind?
23     A.  No.
24     Q.  Have you ever driven while or after
25  drinking?

16 (Pages 61 to 64)

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

Page 65

1    A. No.
2    Q. Have you ever driven while intoxicated in
3  any way?
4    A. No.
5    Q. Have you ever been subject to an arrest
6  warrant of any kind?
7    A. No.
8    Q. Have you ever been subject to any kind of
9  criminal investigation by any government office?
10    A. No.
11    Q. Have you ever received any treatment at all
12  of any kind for alcohol consumption?
13    A. No.
14    Q. Have you ever received any treatment of any
15  kind for the use of drugs or narcotics?
16    A. No.
17    Q. Can you say that one more time.
18    A. No.
19    Q. Have you ever been ordered by a court to
20  receive treatment for alcohol use?
21    A. No.
22    Q. Have you ever been ordered by a court to
23  receive treatment for drug use?
24    A. No.
25    Q. Have you ever taken any trainings in the use

Page 66

1  or maintenance of firearms?
2    A. Yes.
3    Q. And can you talk about those trainings.
4  What were they?
5    A. I took my hunter safety course when I was
6  younger.
7    That's about it.
8    Q. And when did you take that course?
9    A. I -- I -- I don't even know if I could give
10  you an exact year.
11    Q. Estimate. Estimation is fine.
12    A. Probably around the time I got my FOID card.
13  Maybe a couple years after. Or a year or so after.
14    Q. So you would have been 14, 15, 16? Would
15  that be a good estimate?
16    A. Yeah 14 or 15. Definitely not 16.
17    Q. So it was your before your 16th birthday
18  before but after you got the FOID card?
19    A. Approximately.
20    Q. And is that the only firearm training that
21  you've taken?
22    A. Yes.
23    Officially, yeah.
24    Q. And can you tell us what is -- what was
25  covered in that training?

Page 67

1    A. Basically the basics of being a safe hunter.
2  I guess. What to do and what not to do.
3    Q. Can you give us just a little bit more than
4  that. What does it mean to say the basics of being
5  a safe hunter?
6    A. Well, basically, watch where your gun's
7  pointed. You know, don't point it as anything you
8  don't intend to shoot. Make sure your safety's on,
9  unless you're gonna shoot. Make sure, you know,
10  nobody is behind what you're shooting at.
11    Basically how to safely carry it up your ladder
12  on your deer stand. Basically how to treat your --
13  your surroundings with respect and safety, so.
14    Q. And that's important stuff no doubt about
15  it.
16    (Multiple parties speaking at the
17  same time.)
18    Q. Do you recall about how long that training
19  was --
20    A. Sorry.
21    It was two days. I wanna say maybe three or
22  four maybe an hour or two more every day. I'm
23  not -- again I'm not for sure. But it was a two-day
24  course.
25    Q. And just make sure I understood, your

Page 68

1  estimate was that it was three to four hours in
2  total over two days or --
3    A. No, each day.
4    Q. Each day. So would it -- is it fair to
5  estimate that it was 6 to 8 hours of training over
6  two days?
7    A. Yeah. Yeah.
8    Q. You would agree that -- with that estimate?
9    A. Uh-huh.
10    Q. Do you recall who provided the training?
11    A. I do not remember the name. But it was in a
12  fire station in Ashley, Illinois.
13    Q. Was it provided by employees of the fire
14  department, or -- to your recollection, or was it
15  provided by someone else?
16    A. I don't remember.
17    Q. Did it cover marksmanship at all?
18    A. Not particularly. It kind of talked about
19  it a bit, if I remember correctly. But nothing in
20  particular.
21    Q. Did it cover -- did it include any live fire
22  activities?
23    A. No.
24    Q. Did it address the proper way of interacting
25  with law enforcement if that were to happen while

17 (Pages 65 to 68)

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

## Page 69

1   carrying a firearm?
2       A. Um, no.
3       Q. Did it cover the cleaning and care of a
4   firearm?
5       A. I think to a certain extent. I don't think
6   they dived too deeply into that.
7       Q. Did it cover the loading and unloading of
8   the firearm?
9       A. Yeah.
10      Q. And you shared already it covered aspects of
11  firearm safety.
12      Do I remember that correctly?
13      A. Yeah.
14      Q. Did it cover the rules or laws that apply to
15  transporting a firearm?
16      A. Uh, yeah.
17      Q. In a vehicle or -- or in particular; do you
18  recall?
19      A. I think it probably covered both. Just in
20  particular in a vehicle.
21      Q. Got it.
22      I'd like to share my screen one more time. So
23  bear with me while I do that.
24      All right, Mr. Meyer, are you able to see what
25  I've shared?

## Page 70

1       A. Yes.
2       Q. And so what we're looking at is labeled
3   plaintiff David Meyer's responses and objections to
4   state defendant's first interrogatories.
5       Do you see that as well?
6       A. Yes.
7       Q. All right. I'm just gonna slow -- scroll
8   down. Excuse me. Scroll down very slowly.
9       Do you recognize this document?
10      A. Yes.
11      Q. What do you know about this document? What
12  are we looking at?
13      A. It's a series of questions I was asked, um,
14  if I remember correctly, that -- it's from the State
15  Illinois attorneys. But my attorney, I believe,
16  asked me.
17      Q. And again I'm not asking you to disclose
18  anything you spoke about with your attorney, so.
19  I'm going to scrolling down.
20      So you see it. Did you review this document
21  before it -- it went out?
22      A. Yes. I --
23      Q. Did you approve the document before it went
24  out?
25      A. Yes. I signed it -- a paper for it.

## Page 71

1       Q. And is this -- I'm showing you right now the
2   last page. It says verification of interrogatory
3   answers.
4       Is that your name and signature?
5       A. Yes.
6       Q. Dated July 24 of this year.
7       A. Uh-huh.
8       Q. That's correct?
9       A. (There was no discernible response.)
10      Q. Did you draft the answers that are included
11  in this document?
12      A. I spoke the answers.
13      Q. Okay. And is it correct that you spoke
14  to -- again just picking this out, Defendant Joshua
15  Morrison, respondent county state attorney following
16  the citation for that rolling stop we discussed?
17      A. Yeah.
18      Q. And everything in this document is accurate
19  currently and in addition was accurate on July 24th?
20      A. Yes.
21      Q. Great.
22      I'm going to stop sharing the screen. So that
23  should have come down.
24      I will take -- I'd request just a five-minute
25  break -- a second quick five-minute break or four-

## Page 72

1   minutes maybe if it's okay with everybody we could
2   come back at 10:40 and reconvene.
3       Does this sound okay, Mr. Bergstrom?
4           MR. BERGSTROM: Sounds good.
5           MR. FREILICH JONES: Great.
6   Thank you.
7           (A break was taken.)
8       Q. (MR. FREILICH JONES) All right, Mr. Meyer.
9           So Mr. Meyer, just a few additional
10  quick things.
11          First, did you talk to anybody
12  during the break that we just had?
13      A. Nope.
14      Q. Great.
15      How much have you paid your attorneys so far in
16  this case?
17      A. Zero. Nothing.
18      Q. Has anyone else paid your attorneys in this
19  case?
20      A. I'm not aware.
21      Q. And so you've -- you have no knowledge of
22  any arraignment for the payment of your attorneys?
23      A. No.
24      Q. Has anyone ever discussed that with you from
25  any of the parties of the case including the -- the

**LEXITAS LEGAL**
**www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334**

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

Page 73

```
1   Second Amendment Foundation or the other foundations
2   involved?
3            MR. BERGSTROM:  Just to clarify
4   to the extent that you're asking about discussions
5   with his attorney himself, and then I'm gonna object
6   to that.
7       Q.  And I am not asking you about discussions
8   you might have with Mr. Bergstrom or Mr. Bergstrom's
9   team.  Only communications with Second Amendment
10  Foundation Firearm Policy Counsel and Illinois State
11  Rifle association?
12      A.  The only thing I can remember, I believe
13  from the FPC, is that this is gonna cost me nothing,
14  so.
15      Q.  Do you remember when they told you that?
16      A.  At the beginning of this.
17      Q.  And do you remember who told you that?
18      A.  Not in particular.
19      Q.  Was it Bill Sack, the person whose email we
20  saw or was it someone else?
21      A.  Can't remember.
22      Q.  Okay.  But your understanding is, is that
23  this would cost you no money at all; is that right?
24      A.  Correct.
25      Q.  And that is the only communications that
```

Page 74

```
1   you've had relating to the payment of the -- of
2   legal fees in this case?
3       A.  Correct.
4       Q.  You said "correct" right?
5       A.  Yeah, correct.
6       Q.  Great.
7           What do you want to get out of this case?
8       A.  Um, basically get it to where 18-year-olds
9   can carry if they have the -- if they can, so.
10      Q.  What does it mean to you when you say "if
11  they can"?
12      A.  You know, if they legally can, you know,
13  based on if it's legal for them to do so.  If they
14  are fit to do so.  And are trained to do so as well.
15      Q.  What do you mean again by fitness to do so,
16  fit to do so?
17      A.  Mentally, um, pretty well mentally if they
18  have the capacity to do so.
19      Q.  So that's the only kind of fitness that in
20  your personal view matters is whether your -- have
21  the mental capacity?  Or is there any other kind of
22  fitness that matters?
23      A.  Well, physically you have to be able to
24  control the gun -- the weapon.
25      Q.  So it's physical capacity to the extent to
```

Page 75

```
1   which can you control the weapon.  And mental
2   fitness.
3       Is there any other type of fitness that you talk
4   -- mean, when you talk about fitness?
5       A.  Um, not off the top of my head.
6   That's.
7       Q.  So am I correctly understanding your goal is
8   all 18, 19, and 20-year-olds who have physical
9   fitness, meet physical fitness requirements, and
10  meet mental fitness requirements should be allowed
11  to have a concealed carry license.
12      Is that correct?  Or is there anything else
13  you'd like to add to that in terms of your goals?
14          MR. BERGSTROM:  Object to form.
15  You can answer, David.
16          THE WITNESS:  That's it.
17      Q.  Great.  Thank you.  We are completed for
18  now.  Answering questions.  Reserve the right to ask
19  a few more if other defendants -- after other
20  defendants have a chance.  And wanted to yield the
21  opportunity to other defendants in case they have
22  questions; Mr. Hunter, Mr. Bracey, I don't know if
23  you do.
24          MR. BRACEY:  I have just a few.
25          CROSS-EXAMINATION
```

Page 76

```
1   BY MR. BRACEY:
2       Q.  Mr. Meyer, my name's Joe Bracey.  I'm a
3   attorney who represents the Kendall County and
4   Fayette County defendants.
5       Am I correct that you live in Fayette County
6   Illinois currently?
7       A.  Yes.
8       Q.  And are you aware that Christopher Palmer is
9   one of the named defendants in this lawsuit?
10      A.  Yes.
11      Q.  And do you know who Christopher Palmer is or
12  what role he serves in Fayette County?
13      A.  Um, to my understanding he's -- the sheriff
14  or was the sheriff.  I know just had the elections.
15  Somebody else was elected.
16      If I remember correctly though, I believe he's
17  stepped down.
18      Q.  Do you know the name of the current sheriff
19  for Fayette County?
20      A.  I know Ronny Stephens I believe was elected.
21      Q.  Have you ever had any interactions with the
22  Fayette County sheriff's office?
23      A.  Um, not in a -- I guess you would say legal
24  manner.  I've talked to a couple of the deputies a
25  time or two.  Just, you know, here and there.
```

19 (Pages 73 to 76)

**DEFENDANT'S EXHIBIT E**
**DAVID MEYER  7/28/2022**

|  |  |
|---|---|

### Page 77

1    Q. Do you know which deputies you spoke with?
2    A. I can't remember their names.
3    Q. When you say you spoke with some deputies a
4    time or two, what were you speaking to them about?
5    A. Nothing in particular just.
6    Q. Did those conversations involve threats to
7    prosecute you in any way?
8    A. No.
9    Q. Have you ever been arrested or charged with
10   a crime by the Fayette County sheriff's office?
11   A. No.
12   Q. Have you ever lived in Kendall County
13   Illinois?
14   A. No.
15        MR. BRACEY:  Thank you,
16   Mr. Meyer.  That's it for me.
17        THE WITNESS:  Great.  Thank
18   you.
19        CROSS-EXAMINATION
20   BY MR. HUNTER:
21   Q. Mr. Meyer, I'm Tom Hunter.  I represent
22   the -- (audio issues) --
23        Mr. Meyer, have you had any
24   interactions with the Saint Claire County sheriff's
25   department.

### Page 78

1    A. No.
2    Q. Have you had any interactions with the Saint
3    Claire County State's attorney's office?
4    A. No.
5    Q. Have you ever been threatened to be
6    prosecuted by any entity from Saint Claire County?
7    A. No.
8        MR. HUNTER:  Thank you,
9    Mr. Meyer.
10       UNIDENTIFIED SPEAKER:  The
11   State parties to the lawsuit have no additional
12   questions following the questions for the local
13   officials.  So from our perspective, we are
14   complete.
15       MR. BERGSTROM:  I've got just I
16   think maybe one or two quick questions if that's all
17   right.
18       CROSS-EXAMINATION
19   BY MR. BERGSTROM:
20   Q. I'm gonna share my screen very briefly here.
21   And can you tell me, can you see my Meyer
22   000740, David?
23   A. Yeah.
24   Q. Do you recognize this document?
25   A. Yeah.

### Page 79

1    Q. Did you receive this document -- the Second
2    Amendment Foundation?
3    A. Yea.
4        MR. BERGSTROM:  Okay.  That
5    is -- I'm gonna stop my share.  That's it for me.
6        Anything else from the State?
7        MR. FREILICH JONES:  Nothing
8    from us.
9        But we will be ordering the
10   transcript.
11       MR. BERGSTROM:  We'd I ke a
12   copy too.  And we will review and sign.
13       THE COURT REPORTER:  Thomas, do
14   you want a copy?
15       MR. HUNTER:  I'll take an
16   electronic copy, E-Tran.
17       THE COURT REPORTER:  Thank you.
18   Joe?
19       MR. BRACEY:  Same.  Electronic
20   copy, please.
21       THE COURT REPORTER:  Anyone
22   else?
23       (There was no discernible
24   response.)
25       (Witness excused.)

### Page 80

1            LEXITAS LEGAL
2
3    August 11, 2022
4
5    WILL BERGSTROM, ESQ.
     COOPER & KIRK, PLLC
6    1523 NEW HAMPSHIRE AVE., NW
     WASHINGTON, D.C. 20036
7    IN RE: DAVID MEYER, MITCHELL NALLEY, EVA DAVIS,
     SECOND AMENDMENT FOUNDATION, ILLINOIS STATE
8    RIFLE ASSOCIATION, FIREARMS POLICY
     COALITIONS, INC. v. KWAME RAOUL, BRENDAN F.
9    KELLY, JOSHUA C. MORRISON, JAMES GOMRIC,
     ERIC WEIS, CHRISTOPHER PALMER, RICHARD
10   WATSON, and DWIGHT A. BAIRD
11   Dear Mr. Bergstrom:
12   Please find enclosed your copies of the deposition of
     DAVID MEYER taken on July 28, 2022 in the
13   above-referenced case. Also enclosed is  he original
     signature page and errata sheets.
14   Please have  he witness read your copy of the
15   transcript, indicate any changes and/or corrections
     desired on the errata sheets, and sign the signature
16   page before a notary public.
17   Please return the errata sheets and notarized
     signature page wi hin 30 days to our office at 711 N
18   11th Street, St. Louis, MO 63101 for filing.
19
20   Sincerely,
21
22
23   Lexitas Legal
24
25   Enclosures

**LEXITAS LEGAL**
www.lexitaslegal.com    Phone: 1.800.280.3376    Fax: 314.644.1334

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

## Page 81

1    ERRATA SHEET
    Witness Name: DAVID MEYER
2    Case Name: DAVID MEYER, MITCHELL NALLEY, EVA DAVIS,
        SECOND AMENDMENT FOUNDATION, ILLINOIS STATE
3        RIFLE ASSOCIATION, FIREARMS POLICY
        COALITIONS, INC. v. KWAME RAOUL, BRENDAN F.
4        KELLY, JOSHUA C. MORRISON, JAMES GOMRIC,
        ERIC WEIS, CHRISTOPHER PALMER, RICHARD
5        WATSON, and DWIGHT A. BAIRD
    Date Taken: JULY 28, 2022
6
    Page #_____ Line #_____
7    Should read: _____
    Reason for change: _____
8
9    Page #_____ Line #_____
10   Should read: _____
11   Reason for change: _____
12
13   Page #_____ Line #_____
14   Should read: _____
15   Reason for change: _____
16
17   Page #_____ Line #_____
18   Should read: _____
19   Reason for change: _____
20
21   Page #_____ Line #_____
22   Should read: _____
23   Reason for change: _____
24
25   Witness Signature: _____

## Page 83

1        C E R T I F I C A T E
2
3    STATE OF OKLAHOMA      )
4                          )
5    COUNTY OF TULSA       )
6
7        I, Deborah S. (Debi) Reinhardt, Certified
8    Shorthand Reporter, for the State of Oklahoma,
9    certify that the above-named David Meyer, was by me
10   first duly sworn to testify the truth; that the
11   above and foregoing deposition was by me taken in
12   stenotype and thereafter transcribed and is a true
13   and correct transcription of the testimony of the
14   witness; that the deposition was taken on July 28th,
15   2022, via Zoom; that I am not an attorney for nor
16   relative of any of said parties, nor otherwise
17   interested in the event of said action.
18        IN WITNESS WHEREOF, I have hereunto set my
19   hand and seal of office this 7th day of August,
20   2022.
21
22
23        _____
24        Deborah S. (Debi) Reinhardt, CSR #1807
25        For the State of Oklahoma

## Page 82

1    STATE OF _____)
2
3    COUNTY OF _____)
4
5    I, DAVID MEYER, do hereby certify:
6        That I have read the foregoing deposition;
7        That I have made such changes in form
8    and/or substance to the within deposition as might
9    be necessary to render the same true and correct;
10       That having made such changes thereon, I
11   hereby subscribe my name to the deposition.
12       I declare under penalty of perjury that the
13   foregoing is true and correct.
14       Executed this _____ day of _____,
15   20___, at _____.
16
17
18
19   _____
20   DAVID MEYER
21
22   _____
23   NOTARY PUBLIC
24   My Commission Expires:
25

**LEXITAS LEGAL**
**www.lexitaslegal.com**    **Phone: 1.800.280.3376**    **Fax: 314.644.1334**

DEFENDANT'S EXHIBIT E
**DAVID MEYER  7/28/2022**

| **A** | | | |
| aany 54:16 | 26:18 | 26:4,7,16 | approxim... | 31:2 |
| Aaron 2:21 | 29:16 | 26:20 27:3 | 52:11 | assortment |
| ability | 30:25 | 27:25 28:4 | 54:19 62:8 | 50:2 |
| 38:21 | 68:22 | 29:8,13,25 | 66:19 | assume 6:12 |
| able 6:1 | add 75:13 | 31:3 45:22 | AR-15 43:13 | 24:11 37:2 |
| 13:23 | addition | 73:1,9 | 50:9 | attorney |
| 21:23 31:7 | 71:19 | 79:2 80:7 | AR-15s 51:2 | 2:12 4:8,9 |
| 33:19 35:9 | additional | 81:2 | area 38:21 | 32:19 35:1 |
| 40:25 | 12:4 19:10 | amount 55:23 | 38:24 39:2 | 35:4 70:15 |
| 43:18 45:8 | 20:12 72:9 | Amy 8:13,16 | 39:6,10 | 70:18 |
| 46:9 48:8 | 78:11 | and/or 80:15 | 40:13,14 | 71:15 73:5 |
| 48:18 | address 7:6 | 82:8 | 40:23,24 | 76:3 83:15 |
| 69:24 | 31:23,24 | answer 5:13 | areas 40:3 | attorney's |
| 74:23 | 54:20,23 | 5:23 6:4 | arises 44:18 | 17:9 78:3 |
| above-named | 68:24 | 6:11 19:16 | arms 27:8 | attorneys |
| 83:9 | adjudicated | 19:20 | arraignment | 18:12,16 |
| above-re... | 64:17,20 | 35:16,17 | 72:22 | 18:18 |
| 80:13 | admitted | 36:7 47:21 | arrest 65:5 | 19:24 20:7 |
| Absolutely | 53:24 | 54:6 75:15 | arrested | 32:14 |
| 42:8 | advertis... | answering | 77:9 | 70:15 |
| abuse 54:13 | 15:12 | 6:13,24,24 | ASAP 32:13 | 72:15,18 |
| acceptance | Ag 10:24 | 75:18 | Ashley 68:12 | 72:22 |
| 17:17 19:3 | age 17:1 | answers 71:3 | asked 17:1 | audio 49:12 |
| accepted | 53:1,6,13 | 71:10,12 | 19:19 35:7 | 77:22 |
| 19:11 28:8 | ago 36:21 | anybody 8:6 | 35:8,25 | August 80:3 |
| accomplish | 37:13 | 26:12 | 70:13,16 | 83:19 |
| 44:14 | agree 68:8 | 72:11 | asking 6:9,9 | authorities |
| account | agreement | anyway 47:21 | 15:13 | 56:2 |
| 23:23 | 32:9 35:3 | APPEARANCES | 18:15 | automated |
| accurate | al 4:11,11 | 2:1 | 19:22 37:9 | 12:14 |
| 14:22 | alcohol 57:1 | appeared | 70:17 73:4 | automati... |
| 20:22 49:1 | 57:3 65:12 | 2:23 | 73:7 | 17:15 |
| 71:18,19 | 65:20 | Appears 32:5 | aspects | automobile |
| accurately | alcoholic | application | 69:10 | 43:1 |
| 5:3 | 57:18,24 | 52:22 | assault 61:5 | AVE 2:3 80:5 |
| acquire 36:1 | alive 22:11 | applied 19:5 | assessed | aware 34:7,8 |
| 43:18,21 | allow 45:12 | 19:6 | 63:7 | 53:17 |
| 44:7 | 45:16 | apply 30:8 | assistant | 72:20 76:8 |
| acre 39:5,6 | allowed 44:7 | 69:14 | 4:8 | |
| acres 39:4 | 46:6 47:14 | apprentice | association | **B** |
| 39:21,25 | 47:24 | 9:13,14,16 | 1:4 16:9 | back 37:2 |
| act 54:12 | 75:10 | 9:19 10:9 | 20:11 | 38:5 39:23 |
| action 16:21 | amendment | 10:12 | 26:24 | 42:17,20 |
| 43:10 | 1:3 16:8 | approve | 27:10,19 | 45:1 58:5 |
| 50:23,24 | 17:12,13 | 14:19 | 27:23 29:1 | 72:2 |
| 51:1,1 | 20:10 21:8 | 70:23 | 29:8,12,17 | backing |
| 83:17 | 21:9,12,13 | approximate | 73:11 80:8 | 36:22 |
| activities | 21:17 22:8 | 17:24 | 81:3 | backyard |
| | 23:7 25:23 | 20:20 | associat... | 38:18,21 |

DAVID MEYER  7/28/2022

39:2
**BAIRD** 1:10
  80:10 81:5
**bale** 38:13
**bar** 57:19,20
**based** 74:13
**basically**
  10:9 11:2
  11:6,17,21
  11:22
  12:12 13:2
  15:10,14
  17:1 18:19
  20:9 21:10
  23:21,22
  26:25 27:7
  29:23
  35:23 39:3
  44:2,17
  52:23
  55:21 67:1
  67:6,11,12
  74:8
**basics** 67:1
  67:4
**basis** 44:19
  56:2
**Bates** 22:1
  31:17
  33:23,23
**battery** 61:5
**Bautista**
  2:21
**BCC** 34:12,12
  34:14
**bear** 27:8
  69:23
**bearing** 22:1
  33:23
**BECKER** 2:17
**beer** 57:5
**beginning**
  73:16
**behalf** 1:14
  23:2,18
  28:1,13,16
**believe**
  12:18
  23:24

24:20 25:3
27:11,16
32:22 33:1
39:3 42:21
45:23 52:4
52:25 53:1
55:11
56:12
59:14,16
63:3 70:15
73:12
76:16,20
**BELLEVILLE**
  2:18
**benefit**
  41:13
**benefits**
  26:15
**Bergstrom**
  2:2 3:5
  7:19 19:13
  19:19
  47:16,19
  48:2 49:9
  49:10 72:3
  72:4 73:3
  73:8 75:14
  78:15,19
  79:4,11
  80:4,11
**Bergstrom's**
  73:8
**best** 38:21
  50:8
**bet** 5:11
**better** 42:2
  44:10
**beverage**
  57:24
**big** 28:20
  39:1
**bigger** 50:25
  52:6
**Bill** 73:19
**bin** 11:2,19
  13:9
**bins** 11:3,7
  11:8,17
**birth** 61:10

**birthday**
  18:2,3,4
  49:1 63:23
  63:24
  66:17
**bit** 9:17
  27:5 43:4
  48:8 49:15
  67:3 68:19
**blind** 34:1,9
**blocked**
  33:22
**bolt** 43:10
  50:23 51:1
  51:1
**Bond** 63:3
**bone** 59:16
**born** 61:7
**boss** 11:6
  45:17
**boss's** 45:25
**bottom** 22:2
  31:11,13
  31:16
  51:18
**bow** 39:18
**Bracey** 2:6
  3:3 75:22
  75:24 76:1
  76:2 77:15
  79:19
**break** 6:20
  6:21,22
  7:1 49:6
  49:11,13
  49:18
  71:25,25
  72:7,12
**breaks** 6:17
**Brendan** 1:8
  14:10 80:8
  81:3
**briefly** 21:1
  21:7 78:20
**broke** 12:24
  59:14
**brother** 8:18
  8:22
**brother's**

8:20
**brothers**
  8:11
**build** 11:9
**built** 11:13
  44:4
**bullets**
  38:14
**business**
  6:19

———————
          **C**
———————
**C** 1:8 80:9
  81:4 83:1
  83:1
**C-C-R-K-B-A**
  25:5
**caliber** 43:9
**call** 36:25
**called** 34:20
  34:20
**calls** 37:3,6
**cannabis**
  58:23,25
**capacity**
  74:18,21
  74:25
**carbon** 34:1
  34:9
**card** 43:3
  49:21
  51:20,22
  51:23 52:1
  52:11,13
  52:15 53:6
  66:12,18
**care** 6:19
  53:25
  60:16 69:3
**carry** 35:9
  43:18,24
  44:4,6,8
  44:13,16
  45:12 46:6
  46:9,14
  47:15,24
  47:25
  67:11 74:9
  75:11

**carrying**
  35:11,22
  69:1
**case** 4:10
  14:11
  16:12
  17:17
  18:19
  20:13 21:7
  28:8 32:11
  34:18,24
  42:14,14
  42:18
  45:19
  51:17 53:2
  72:16,19
  72:25 74:2
  74:7 75:21
  80:13 81:2
**categories**
  50:21
**CCR** 1:19
**ceased** 26:13
**cell** 7:14
**ceremony**
  57:4
**certain**
  10:12
  11:20,23
  53:1 55:23
  69:5
**Certainly**
  47:23
**Certified**
  83:7
**certify** 82:5
  83:9
**chance** 20:15
  75:20
**change** 81:7
  81:11,15
  81:19,23
**changes**
  80:15 82:7
  82:10
**charged** 77:9
**check** 32:12
**CHICAGO** 2:13
**chosen** 18:19

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

Christopher
1:9  76:8
76:11  80:9
81:4
Circling
58:5
circumst...
6:14  38:9
52:14
citation
63:7  71:16
cited 55:5
60:24
62:17,19
citizen 61:7
61:10
Claire 77:24
78:3,6
clarific...
6:10
clarify 56:7
61:23  73:3
clean 12:13
41:16
cleaning
69:3
clear 19:22
28:5
clicked
16:22
closest 9:15
Club 23:4
24:10
clue 25:10
co-plain...
21:6
coalition
16:14,16
17:9  23:25
29:21,22
30:3,6,12
30:15,22
30:25  32:6
32:20,23
COALITIONS
1:5  80:8
81:3
cocaine 59:9
collect

20:12
college 9:23
Collision
30:9
come 13:6
15:8,25
37:16
44:23,23
55:2  58:24
71:23  72:2
comes 33:18
48:7  51:13
coming 13:22
21:21
51:14
55:11
Commission
82:24
committed
54:12
communic...
19:23  20:1
20:6  25:22
73:9,25
communion
57:4
community
9:10,23
compact 44:3
company 9:21
9:24,25
10:2,5,8
44:25
45:11,11
45:15  46:2
46:3
compartment
46:25  47:3
complaint
14:8,13,20
17:1  20:16
complete 9:3
9:5,8
78:14
completed
75:17
completely
5:3
comply 56:4

comprise
50:21
conceal
44:10,16
concealed
43:18,24
44:8,10,13
44:17
45:12  46:6
46:9  47:15
47:24,25
75:11
concerned
23:8
conducted
40:2
confirm
58:18,24
60:5
confirmed
53:8
consider
49:20
considered
64:11,14
constitu...
29:25
consuming
56:22  57:1
consumption
65:12
contents
37:10
contest
63:12
contract
11:9
control
74:24  75:1
conversa...
49:15
conversa...
19:15
37:10  77:6
conversed
32:17
convicted
53:15
COOK 2:7

cooling
10:15
Cooper 2:3
20:7  32:8
80:5
copied 34:1
34:9
copies 24:21
80:12
copy 24:5,17
31:6  79:12
79:14,16
79:20
80:14
corner 22:2
25:12
correct 22:4
24:25
32:21,25
36:13
38:18
53:10  58:1
58:2  59:19
60:9,10,11
71:8,13
73:24  74:3
74:4,5
75:12  76:5
82:9,13
83:13
corrections
80:15
correctly
12:21
52:16
55:21
68:19
69:12
70:14  75:7
76:16
cost 73:13
73:23
Council 16:5
18:11,17
Counsel
73:10
country 23:4
24:9  38:6
county 40:15

40:19  41:5
63:3  71:15
76:3,4,5
76:12,19
76:22
77:10,12
77:24  78:3
78:6  82:3
83:5
couple 4:19
5:6,6  17:5
29:19
32:17
37:14
39:23
41:23
43:13
48:16  50:9
50:10,11
50:23,25
51:7  58:13
66:13
76:24
course 29:4
66:5,8
67:24
courses
48:21
court 1:1
2:23  4:21
5:16,20,25
6:5  55:18
55:20  56:5
56:25  60:3
64:17,20
65:19,22
79:13,17
79:21
cover 68:17
68:21  69:3
69:7,14
covered
66:25
69:10,19
cows 12:12
crack 42:5
crew 11:2
crime 53:16
77:10

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

criminal
 65:9
CROSS-EX...
 3:3,4,5
 75:25
 77:19
 78:18
CSR 1:19
 83:24
curfew 55:13
 55:19 56:7
 56:8,12
 58:6
current
 48:22,24
 51:22,24
 76:18
currently
 9:11 10:4
 25:8 49:19
 49:24
 53:13
 54:23
 71:19 76:6
cursor 22:9
customer
 46:17
customers
 46:10
cut 51:17

————————
         D
D.C 2:4 80:6
dad 8:15
 35:20
 36:10
 39:24
 41:20
 43:12 50:2
 52:23 53:1
 53:2,9
 57:6
dad's 8:25
 38:23
 53:12
dairy 12:6,7
 12:8,11,16
 12:25
 13:15

date 17:23
 17:25 19:5
 20:17,20
 52:1 81:5
Dated 71:6
David 1:3,13
 4:1 8:13
 8:15 14:5
 14:9 19:15
 22:4 24:11
 31:20
 47:21
 49:11
 53:14 70:3
 75:15
 78:22 80:7
 80:12 81:1
 81:2 82:5
 82:20 83:9
Davis 1:3
 2:21 15:18
 15:20,22
 16:1 80:7
 81:2
day 37:25
 55:11
 56:20,23
 57:1 67:22
 68:3,4
 82:14
 83:19
days 48:16
 48:17
 67:21 68:2
 68:6 80:17
deal 46:16
Dear 80:11
Debi 1:19
 83:7,24
Deborah 1:19
 83:7,24
Decatur 23:4
December
 48:14,15
 49:2 63:25
declare
 82:12
deeply 69:6
deer 39:14

39:14 42:4
 67:12
defective
 64:18
Defendant
 71:14
defendant's
 70:4
defendants
 1:11,14
 2:6,11,16
 14:11
 75:19,20
 75:21 76:4
 76:9
definitely
 17:13
 36:15
 41:25
 66:16
degree 9:3,6
department
 68:14
 77:25
deposed 4:13
 4:15
deposition
 1:13 3:6
 80:12 82:6
 82:8,11
 83:11,14
deputies
 76:24 77:1
 77:3
describe
 38:9,20
 50:7,20
 52:14
described
 40:3
describing
 39:20
desired
 80:15
detail 18:21
detained
 55:1 61:4
developm...
 54:16,17

developm...
 64:15
different
 50:9,12
DIRECT 3:2
 4:4
director
 4:10
disabili...
 54:16,17
disability
 54:4
disabled
 64:12,15
disappears
 36:19
discernible
 24:16 71:9
 79:23
disciplined
 13:12
disclose
 70:17
discussed
 13:12 40:4
 40:18 50:4
 51:9 62:15
 71:16
 72:24
discussions
 73:4,7
displayed
 25:8,11
DISTRICT 1:1
 1:2
dived 69:6
DMV 48:19
document
 22:1 25:8
 27:12 31:7
 31:17 33:6
 33:17,20
 33:23 48:5
 51:18 70:9
 70:11,20
 70:23
 71:11,18
 78:24 79:1
doing 38:4,8

38:17
 44:14
 45:18,20
 57:9 60:4
dollars
 22:20,23
 28:22 45:3
domestic
 54:13
donate 22:12
 22:14,17
 22:20
donated
 22:23
 27:22 29:5
 29:7
donation
 23:1,18
 24:19
 27:25 28:2
 28:12,16
 28:21
donations
 29:2 30:11
doubt 67:14
dozen 50:21
draft 71:10
drains 10:13
drank 57:5
drink 57:18
 58:19,20
drinking
 56:20
 64:25
drive 44:25
 44:25
driven 64:24
 65:2
driver's
 48:12,21
driving
 42:13
 45:13 56:8
drug 61:12
 61:14
 62:10,14
 65:23
drugs 53:22
 59:4 61:19

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

65:15
dry 11:20,21
  11:21
dryness
  11:23
dues 28:25
  30:14,19
duly 4:2
  83:10
DUNDEE 2:7
duties 47:4
DWIGHT 1:10
  80:10 81:5

─────── E ───────

E 83:1,1
E-Tran 79:16
earlier 19:9
  43:14
  57:13
early 28:9
earns 13:9
easier 5:24
  44:10
easy 4:20
  41:16
eat 58:13
Ed 48:21
edits 34:24
education
  9:1,11
elected
  76:15,20
elections
  76:14
electronic
  79:16,19
eleven 56:13
  56:13
else's 42:10
  47:4,7,14
  47:25
  58:19,20
em 11:11,12
  12:13 51:6
  52:3 59:25
email 17:6,7
  31:22,24
  31:25 32:3

32:7,17
33:3,10,12
34:2,5,14
34:16,19
36:25 37:2
37:2 73:19
emails 17:14
  37:5
embarras...
  7:12
employed
  10:4,17
employee
  10:8 32:20
  33:4 46:3
employees
  68:13
employer
  10:18
employing
  46:17
employment
  10:23 12:4
  13:16
enclosed
  80:12,13
Enclosures
  80:25
enforcement
  68:25
enjoy 43:16
enrolled
  9:11
entire 8:3,5
  63:18
entirely
  62:12
entities
  16:16
entitled
  45:8
entity 78:6
entry-level
  13:3
equipment
  11:25
  45:13
ERIC 1:9
  80:9 81:4

Erin 2:21
errata 80:13
  80:15,17
  81:1
Esq 2:2,6,11
  2:16,21,21
  80:4
estimate
  10:21
  17:24 28:5
  28:6,20
  37:19,21
  39:1 50:15
  50:18 51:6
  57:15
  66:11,15
  68:1,5,8
estimated
  38:1 50:22
Estimation
  66:11
et 4:11,11
Eva 1:3
  15:18,20
  15:22 16:1
  34:6,21
  80:7 81:2
event 59:18
  83:17
events 6:18
  39:20
eventually
  33:6
everybody
  6:18 72:1
everyday
  44:4
exact 17:23
  19:5 20:17
  24:2 34:19
  50:1 52:25
  54:23
  55:11
  66:10
exactly 5:10
  5:14 34:11
  36:7 41:21
  49:5
EXAMINATION

3:2 4:4
example 5:2
  42:11
  57:19
excuse 43:22
  70:8
excused
  79:25
Executed
  82:14
EXHIBITS 3:6
experience
  51:8
experienced
  26:16 60:8
Expires
  82:24
explain 9:20
extent 19:14
  42:15 69:5
  73:4 74:25

─────── F ───────

F 1:8 80:8
  81:3 83:1
fact 29:14
fail 61:20
fair 4:17
  20:25
  23:15 26:6
  28:9 35:6
  48:4 62:10
  68:4
fairly 37:24
familiar
  24:13
  31:22
family 36:2
  58:12
fancy 41:15
Fantastic
  49:4
far 23:8
  27:24
  29:25
  72:15
farm 12:6,7
  12:12,16
  13:15

farmer 11:18
farmers
  11:24
fashion
  44:13
fast 63:1
father 53:9
  53:15,18
  53:21,24
  54:3,9,12
  54:15
father's
  37:14
  54:20
favorite
  63:17
Fayette
  40:15,18
  41:4 76:4
  76:5,12,19
  76:22
  77:10
Fed 12:13
federal
  60:19
feel 6:20
  14:2
feeling
  44:20
fees 74:2
field 11:18
  38:24,25
fifty 22:23
  28:22
fifty-do...
  23:17
  24:19
figure 38:10
filed 14:14
  19:1,3,12
  20:18,19
  20:21
  34:25
filing 14:19
  80:18
fill 52:21
fill-in 7:19
filled 16:22
final 34:24

DEFENDANT'S EXHIBIT E
**DAVID MEYER  7/28/2022**

finally 6:17
find 24:24
  25:1 80:12
fine 6:11
  7:1,16
  28:19
  33:14 63:7
  63:9,10,14
  66:11
fingers
  59:17
finish 6:24
  6:25
finished
  5:12,13
  48:21
fire 37:18
  37:22 38:3
  38:12
  42:10
  68:12,13
  68:21
firearm
  18:17 30:2
  30:6,9,12
  30:14,21
  30:25
  32:20,23
  35:10
  37:15,22
  38:3 41:17
  47:6,14,24
  51:19
  66:20 69:1
  69:4,8,11
  69:15
  73:10
firearms 1:4
  16:9,13,15
  17:9 18:11
  23:24
  29:21,22
  32:5 40:18
  40:22 43:7
  43:22,23
  49:16,19
  49:22,24
  50:14 51:3
  51:5,9

66:1 80:8
  81:3
fired 13:12
  37:14,15
  40:17 51:3
  51:4
firing 38:7
  38:10 39:7
  40:21
first 4:23
  7:5 8:15
  13:18
  28:10 35:8
  70:4 72:11
  83:10
fit 74:14,16
fitness
  74:15,19
  74:22 75:2
  75:3,4,9,9
  75:10
five 39:24
five-minute
  6:22 49:6
  71:24,25
fixing 11:24
flushed
  60:14
focused 31:3
FOID 43:2
  49:21
  52:15 53:5
  66:12,18
folks 41:4
following
  33:3 59:22
  71:15
  78:12
follows 4:3
football
  55:12
force 45:9
foregoing
  82:6,13
  83:11
forget 6:2
  7:8
forgot 7:11
form 16:23

16:25
  47:17,20
  75:14 82:7
forward
  32:10
found 56:25
foundation
  1:4 16:8
  17:12,13
  20:10 21:8
  21:9,11,14
  21:17 22:8
  23:7 25:23
  26:4,7,16
  26:20,25
  27:25 28:4
  29:8,13
  73:1,10
  79:2 80:7
  81:2
foundations
  73:1
four 12:17
  12:18 42:4
  62:5,11
  67:22 68:1
four- 71:25
FPC 73:13
free 6:20
Freilich
  2:11 3:2
  4:5,9 49:4
  49:14 72:5
  72:8 79:7
frequently
  37:18,22
  37:23,24
  57:7,8,15
  57:17 58:3
Friday 56:14
friends 40:5
  58:13
front 14:8
fugitive
  63:19
full 8:14
  53:13
  63:14
future 34:25

**G**

game 55:12
  58:9,10,11
gauge 42:3
GEITNER 2:7
general 2:12
  4:8,9 9:19
generally
  41:10 51:8
getting 19:2
  34:25
  52:13
gift 36:2,2
  36:3,9,9
give 5:23
  17:23,24
  19:5 24:17
  50:1 66:9
  67:3
given 24:21
  25:2
glove 46:25
  47:3
go 4:18
  10:15
  11:10
  12:19 13:8
  38:14
  39:17,22
  41:8 47:3
goal 75:7
goals 75:13
goes 19:15
  35:24
going 6:12
  10:10
  11:10
  33:15
  36:18 48:5
  49:5 53:3
  63:1 70:19
  71:22
GOMRIC 1:9
  80:9 81:4
gonna 13:20
  14:3 16:5
  18:25
  19:14 21:1
  33:17

51:11 67:9
  70:7 73:5
  73:13
  78:20 79:5
good 15:2
  49:11
  58:12
  63:21
  66:15 72:4
Google 16:22
gotten 36:9
  36:14
  40:16
government
  65:9
grain 11:2,3
  11:7,8,17
  11:18,19
  11:19 13:9
great 6:7,17
  21:4 25:4
  26:22
  31:10
  51:11
  54:25
  58:18 60:4
  63:16
  71:21 72:5
  72:14 74:6
  75:17
  77:17
greater
  18:21
Greenville
  63:4
ground 4:19
  5:7,20
guess 26:5
  27:1,2,13
  43:4 48:15
  52:24 58:4
  60:15
  61:18 67:2
  76:23
gun 25:11
  35:22
  41:12
  42:13,14
  42:18

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

74:24
**gun's** 67:6
**guns** 25:14
  43:12
  50:15

---

**H**

**half** 28:10
  42:5
**HAMPSHIRE**
  2:3 80:5
**hand** 12:12
  50:15
  83:19
**handgun** 35:9
  36:1
**handled**
  32:13
**happen** 42:4
  57:25 58:3
  68:25
**happened**
  15:15 17:4
  18:23
**happens** 6:3
**happy** 11:24
**harvest**
  11:18
**hay** 38:13,23
**head** 26:8
  37:7,17
  75:5
**health** 64:21
**hear** 6:10
  25:17
**heard** 42:23
**heating**
  10:14
**help** 52:7,18
  52:21
**hereunto**
  83:18
**hey** 6:21
**high** 9:2,3,5
  9:8,10
  12:5 13:3
  58:11 62:7
  62:9,11
**highest** 9:1

**highlight**
  14:3 16:5
  19:1 31:14
**highlighted**
  25:15
**highligh...**
  16:6
**HOERNER** 2:17
**Hold** 33:15
**holds** 42:6
**home** 7:5
  45:1 55:11
  57:19,21
  57:24
  58:14
**homes** 46:10
**hour** 49:5
  67:22
**hours** 68:1,5
**house** 38:22
  38:23
  39:22 57:5
  58:20,21
**household**
  49:25
**huh-uh** 5:22
**hunt** 39:15
  39:16,25
  40:7 41:9
  41:11
**hunter** 2:16
  3:4 66:5
  67:1,5
  75:22
  77:20,21
  78:8 79:15
**hunting**
  39:13,19
  40:3,24
  41:2,8,18
  42:7 43:7
  49:17
**HVAC** 10:14
  13:9 44:24
  46:17

---

**I**

**idea** 23:12
**Identifi...**

51:20
**Illinois** 1:2
  1:4 2:8,12
  2:13,18
  7:7,25
  16:8 20:11
  23:4 26:23
  27:1,1,2,8
  27:9,18,23
  28:25 29:7
  29:12,16
  40:8 54:22
  60:19
  68:12
  70:15
  73:10 76:6
  77:13 80:7
  81:2
**illness** 5:2
  54:1 64:2
  64:6
**immediate**
  36:2
**important**
  44:5 67:14
**inbox** 32:12
**incident**
  56:9
**include**
  68:21
**included**
  71:10
**includes**
  50:4 64:10
**including**
  2:23 49:1
  57:1 72:25
**Incorpor...**
  29:21
**INDEX** 3:1
**indicate**
  80:15
**indicated**
  22:18,21
**Indicating**
  54:5
**indication**
  27:17,20
**indiscer...**

8:9 11:3
**information**
  16:24 17:3
  18:15
  19:11
  20:13 33:9
  33:11
**Infreque...**
  37:19,23
**inside** 39:6
  46:14,16
  46:19,23
**Instagram**
  15:11
  16:11,19
  17:20,21
  18:7
**institution**
  9:23 53:25
**institut...**
  16:4 20:2
**intellec...**
  54:4
**intellec...**
  64:11
**intend** 67:8
**interacted**
  15:22
**interacting**
  68:24
**interaction**
  62:18
**interact...**
  15:5 62:20
  76:21
  77:24 78:2
**interested**
  35:10
  83:17
**interrog...**
  70:4
**interrog...**
  71:2
**intoxicated**
  65:2
**intoxica...**
  56:23
**intrepid**
  4:21

**investig...**
  61:4
**investig...**
  65:9
**involve**
  55:20 77:6
**involved**
  16:16 73:2
**Isaac** 2:11
  4:8
**ISAAC.FR...**
  2:14
**issuance**
  52:1
**issue** 5:4
  43:9
**issued** 48:16
  51:23
  52:15
  54:20
**issues** 31:4
  77:22

---

**J**

**J** 2:16
**JAMES** 1:8
  80:9 81:4
**JBRACEY@...**
  2:9
**job** 13:3,8
  13:18 46:7
  47:4
**jobs** 13:11
**Joe** 2:6 76:2
  79:18
**John** 8:15
  53:14
**join** 15:14
  16:11 19:6
**joined** 21:15
**joining**
  17:16
**Jones** 2:11
  3:2 4:5,9
  49:4,14
  72:5,8
  79:7
**Joshua** 1:8
  71:14 80:9

DAVID MEYER  7/28/2022

| | | | | |
|---|---|---|---|---|
| 81:4 | 26:6,10,12 | **Laura** 2:21 | 48:18,22 | **Luke** 8:16 |
| **July** 1:15 | 27:8,24 | **law** 42:6 | 48:23 49:1 | **Lynn** 8:16 |
| 71:6,19 | 28:2,12 | 60:19 | 75:11 | ——————— |
| 80:12 81:5 | 29:11,14 | 68:25 | **licensed** | **M** |
| 83:14 | 30:21 32:4 | **lawful** 60:19 | 9:22 | **mail** 36:23 |
| **justice** | 33:18 34:4 | **laws** 69:14 | **life** 8:3,5 | **MAIN** 2:17 |
| 63:19 | 34:15,16 | **lawsuit** 14:8 | **ligaments** | **maintenance** |
| ——————— | 34:19 | 15:8,25 | 59:15 | 66:1 |
| **K** | 35:22 41:4 | 19:6 20:4 | **line** 29:24 | **making** 11:8 |
| **K** 2:21 | 44:3,4,24 | 21:15 76:9 | 81:6,9,13 | 34:24 |
| **keep** 14:24 | 45:3,4,5 | 78:11 | 81:17,21 | 55:12 |
| 29:24 | 45:15,17 | **lawyers** 22:6 | **link** 16:22 | **manner** 59:5 |
| **Kelly** 1:8 | 45:18,19 | 24:18,22 | **listed** 25:14 | 76:24 |
| 4:10,11 | 45:21 | 25:2 27:15 | **litigation** | **marijuana** |
| 14:10 80:9 | 47:10 48:3 | **learn** 9:25 | 20:8 | 58:23,25 |
| 81:4 | 48:4,6 | **learning** | **little** 9:17 | 61:18 |
| **Kendall** 76:3 | 50:13 | 10:11,15 | 13:4 27:5 | **mark** 35:11 |
| 77:12 | 51:12 53:2 | **leave** 12:25 | 43:4 48:8 | **market** 11:22 |
| **killers** | 58:11 | 13:7 | 49:15 52:6 | **marksman...** |
| 59:19,21 | 61:17 66:9 | **leaving** 13:1 | 67:3 | 68:17 |
| 60:7 | 67:7,9 | **left** 29:3 | **live** 7:5,7 | **matter** 4:13 |
| **kind** 9:19 | 70:11 | 60:13 | 7:23,24 | **matters** |
| 11:7,8,10 | 74:12,12 | **legal** 36:16 | 8:4,6,8 | 74:20,22 |
| 38:7 42:22 | 75:22 | 74:2,13 | 38:5 39:3 | **maximum** 42:6 |
| 45:18,20 | 76:11,14 | 76:23 80:1 | 39:22 | **mean** 32:18 |
| 46:23 | 76:18,20 | 80:23 | 68:21 76:5 | 61:18 67:4 |
| 50:20 | 76:25 77:1 | **legally** | **lived** 8:1 | 74:10,15 |
| 64:22 65:6 | **knowledge** | 74:12 | 77:12 | 75:4 |
| 65:8,12,15 | 24:21 | **let's** 17:19 | **lives** 8:7 | **means** 25:12 |
| 68:18 | 29:17 | 17:19 21:5 | **loading** 69:7 | 25:15 |
| 74:19,21 | 33:25 | 50:21 | **local** 78:12 | 34:11 |
| **Kirk** 2:3 | 47:13,23 | **lethal** 45:9 | **lock** 46:19 | **medication** |
| 20:7 32:8 | 48:25 | **letter** 21:18 | **locks** 47:1 | 5:2 |
| 80:5 | 53:18 54:3 | 23:20 24:5 | **Logan** 8:21 | **meet** 75:9,10 |
| **know** 5:10 | 54:15 | 24:17 | **long** 6:18 | **member** 17:16 |
| 6:17,21 | 72:21 | 27:12,14 | 8:1 10:17 | 21:13,16 |
| 9:20,25 | **known** 24:3 | 27:17,21 | 18:23 19:2 | 21:19 |
| 10:10 11:7 | **KOSOFF** 2:7 | 28:15 | 67:18 | 22:16 23:1 |
| 13:3,21 | **Kwame** 1:8 | **letters** 23:9 | **look** 47:8 | 23:6,23 |
| 14:1,16,24 | 4:9 14:6,9 | 24:22 26:1 | **looking** 7:9 | 25:25 26:3 |
| 14:25 15:3 | 80:8 81:3 | **level** 9:1 | 7:14 15:1 | 26:12 27:9 |
| 15:13,18 | ——————— | **lever** 50:24 | 32:2 48:11 | 27:18 30:2 |
| 17:2 18:25 | **L** | **Lexitas** 80:1 | 70:2,12 | 30:6 31:2 |
| 19:15 | **labeled** | 80:23 | **looks** 22:23 | 36:3 45:23 |
| 20:21 21:2 | 51:18 70:2 | **license** | **lot** 10:16 | **members** 26:7 |
| 21:11,16 | **ladder** 67:11 | 43:19,24 | 13:9 29:3 | 26:9 29:11 |
| 23:20 24:1 | **Land** 12:8,11 | 44:8,16 | 41:15 42:2 | 30:21 |
| 24:8,9 | 12:16,25 | 47:15 48:1 | **Louis** 80:18 | **membership** |
| 25:5,11,14 | **large** 38:13 | 48:12,13 | **lucky** 44:22 | 22:7 26:15 |

**DAVID MEYER  7/28/2022**

30:8
memory 40:19
  50:8
mental 53:25
  53:25 64:2
  64:6,21
  74:21 75:1
  75:10
mentally
  64:18
  74:17,17
mentioned
  5:7 36:21
  37:13
  43:14
  62:17
met 15:4,20
  26:9,11
Meyer 1:3,13
  4:1,6,11
  7:10,15
  8:15,16,21
  11:4 14:5
  14:9 19:22
  22:2,4,10
  23:6 24:12
  25:7 31:12
  31:17,20
  33:19,24
  36:22
  37:13 49:6
  49:14
  51:14,19
  51:20
  53:14 60:2
  69:24 72:8
  72:9 76:2
  77:16,21
  77:23 78:9
  78:21 80:7
  80:12 81:1
  81:2 82:5
  82:20 83:9
Meyer's 70:3
middle 6:23
  6:24 38:5
miles 39:24
Milk 12:12
millimeter

43:16
minutes 72:1
mission 27:5
Mitchell 1:3
  15:3 34:6
  34:20 80:7
  81:2
MMP 35:18
  44:2
MO 80:18
model 35:10
  35:19
mom 8:15,25
  60:16
moment 49:7
moments
  36:21
money 11:22
  13:5 27:22
  55:23,24
  73:23
month 17:5
  18:10
  37:25,25
  38:1
months 19:4
  20:19
morning 4:6
  4:7 45:1
Morrison 1:8
  71:15 80:9
  81:4
move 32:10
moving 26:23
  41:15
Multiple
  7:17 12:22
  19:17
  40:11
  46:12,21
  47:11
  56:10,17
  58:7 67:16
myselves
  10:12
_____
N
N 80:17
Nalley 1:3

15:3,6,9
  16:2 34:6
  34:20 80:7
  81:2
name 8:14,20
  10:2 22:4
  24:2 26:10
  45:25
  53:13
  68:11 71:4
  76:18 81:1
  81:2 82:11
name's 4:8
  76:2
named 24:11
  31:20 34:6
  34:6 76:9
names 8:12
  77:2
narcotics
  53:19
  65:15
naturalized
  61:9
near 34:25
nearby 40:13
necessarily
  15:11
  17:16
necessary
  82:9
need 6:20
  7:20 32:10
  44:20
  60:18
needs 6:18
  6:19
neighbor's
  38:25
never 15:4
  26:2 32:17
  40:17
  44:22
  58:20 59:2
  59:3 64:9
NEW 2:3 80:5
news 26:1
newsletters
  20:9

night 45:2
  56:14
nine 43:15
nine-mil...
  50:11
no-contact
  61:1
nod 5:22 6:2
nodded 5:25
  54:6
non-atto...
  20:5
non-atto...
  20:2
non-pres...
  53:22
Nope 5:5
  13:17 15:7
  15:21,24
  26:21
  30:10
  72:13
north 7:24
  23:4 24:9
  39:24
  54:21
NORTHBROOK
  2:8
notarized
  80:17
notary 80:16
  82:23
notice 19:3
noticed
  17:21
notifying
  47:7
November
  10:19,20
  39:17
  62:25
number 31:12
  37:16 50:1
  61:25
NW 2:3 80:5
_____
O
O'HALLORAN
  2:7

oath 4:2,24
object 73:5
  75:14
objection
  19:13
  47:16,20
  48:2
objections
  70:3
occasion
  44:18
occasion...
  39:11,13
  40:24
occur 55:8
  63:2,8
occurred
  28:2
office 2:12
  17:10 65:9
  76:22
  77:10 78:3
  80:17
  83:19
officer 55:6
officers
  55:1
official
  27:12
Officially
  66:23
officials
  78:13
Oh 57:17
okay 4:17,18
  5:18 6:6,8
  6:15 7:2
  17:18
  19:25
  24:17 25:9
  25:19
  36:20 49:8
  49:9 52:8
  53:6 57:15
  71:13 72:1
  72:3 73:22
  79:4
Oklahoma
  83:3,8,25

DAVID MEYER  7/28/2022

old 8:22,24
  22:10
  52:10,19
once 31:6
  37:25 38:1
  42:18 59:2
  62:1,4,11
one-acre
  40:23
ones 24:24
  37:12
  62:15
opened 23:22
opening
  39:16
opiods 61:19
opioid 59:19
opioids
  59:11
opportunity
  13:8,10
  40:25
  75:21
order 32:10
  54:10
  60:21 61:2
ordered
  65:19,22
ordering
  79:9
organiza...
  29:20,24
  32:24
organiza...
  30:24
organiza...
  16:4 21:6
  31:3
organized
  29:16
original
  80:13
ostensibly
  22:7
outside
  40:10,18
  57:3,18,21
owned 41:4
owner 46:2,4

51:20

———————

**P**

**P** 2:21 43:15
  43:25 44:1
page 3:2,3,4
  3:5 71:2
  80:13,16
  80:17 81:6
  81:9,13,17
  81:21
paid 30:14
  30:19
  63:13,14
  72:15,18
pain 59:19
  59:21,22
  60:7,7
Palmer 1:9
  76:8,11
  80:9 81:4
paper 70:25
parent's
  8:12
parenthesis
  36:3
parents 8:8
  8:24 48:18
part 24:22
  36:5 52:22
  59:15
particip...
  26:20
particip...
  26:19
  29:15
  30:24
particular
  35:19
  41:12 44:5
  68:20
  69:17,20
  73:18 77:5
particul...
  29:9,10
  68:18
parties 2:23
  7:17 12:22
  19:17 20:3

40:11
  46:12,21
  47:11
  56:10,17
  58:7 67:16
  72:25
  78:11
  83:16
parts 41:15
  45:4
pass 61:20
passed 61:22
pay 28:25
  55:15,22
  55:24
payment
  72:22 74:1
PC 2:17
penalty
  82:12
people 11:9
  14:5 15:14
  27:7 34:10
  34:15
percentage
  11:20,23
perfect
  35:22
perfectly
  6:11 7:1
  28:19
perform 47:4
period 12:15
  62:4
perjury
  82:12
permission
  40:6
person 15:20
  24:1,3
  47:2 53:4
  53:5 73:19
personal
  74:20
Personally
  49:23
perspective
  78:13
phone 7:14

33:12
  36:25 37:3
  37:6
phonetic
  8:16 9:10
  10:13,24
  31:20 43:3
  43:15
physical
  74:25 75:8
  75:9
physically
  74:23
picking
  71:14
pinky 59:15
pins 59:17
pistol 43:16
  43:17
  50:11
pistols
  50:11
place 39:8
  39:10
  40:16,23
  41:3 42:16
  42:17 47:3
plaintiff
  70:3
Plaintiffs
  1:6 2:2
please 32:12
  79:20
  80:12,14
  80:17
PLLC 2:3
  80:5
plumber 9:22
  10:10
plumbing
  9:14,16
  13:9 44:24
point 35:14
  67:7
pointed 67:7
police 55:1
  55:6 62:19
  62:20
policy 1:5

16:9,13,15
  17:9 18:11
  18:17
  23:25
  29:21,22
  30:2,6,9
  30:12,15
  30:22,25
  32:5,20,23
  46:5 73:10
  80:8 81:3
portions
  39:11
position
  37:4
possesses
  50:7
possible
  4:20 22:25
  26:11
possibly
  40:23 41:3
post 17:2,22
  18:8
posts 15:12
  16:11
potentially
  23:17
practice
  38:8,11
  40:3,22
  43:5,8
  49:17
prefer 41:24
prepared
  1:19 20:4
prescribed
  59:5,18
prescrip...
  53:22 59:4
  59:11,12
  59:19 60:7
  60:18
Present 2:21
pretty 12:14
  58:12
  74:17
prevent 5:2
previous

DEFENDANT'S EXHIBIT E

DAVID MEYER  7/28/2022

|  |  |  |  |  |
|---|---|---|---|---|
| 13:16 | protection | **R** | received | 35:5,13,13 |
| **previously** | 54:10 | **R** 83:1 | 17:20 32:9 | 36:7,12 |
| 8:4 50:6 | 60:22 | **RANDOLPH** | 52:10 | 37:3 41:21 |
| 51:13 | **provide** 8:14 | 2:12 | 53:25 | 52:13,16 |
| **primarily** | **provided** | **random** 62:1 | 65:11,14 | 52:24 |
| 39:9 62:7 | 68:10,13 | **Raoul** 1:8 | **receiving** | 55:10,21 |
| 62:12 | 68:15 | 4:10 14:6 | 32:1 | 57:12,22 |
| **prior** 50:6 | **public** 35:9 | 14:10 80:8 | **recognize** | 59:24 60:1 |
| 62:8 | 80:16 | 81:3 | 70:9 78:24 | 60:20 |
| **private** 36:1 | 82:23 | **RD** 2:7 | **recollec...** | 68:11,16 |
| 36:14 | **pulled** 55:12 | **reach** 16:20 | 52:2 68:14 | 68:19 |
| **privileged** | **pump** 41:14 | 42:22 | **reconvene** | 69:12 |
| 18:15 | 42:6 | **reach-out** | 49:8 72:2 | 70:14 |
| **probably** | **purpose** | 18:10 | **record** 22:6 | 73:12,15 |
| 9:14 17:5 | 26:14 | **reacted** | 23:10,13 | 73:17,21 |
| 19:8 28:9 | **put** 11:19 | 16:11 | 26:2,5 | 76:16 77:2 |
| 36:10 | 16:10 | **read** 32:7 | 30:5 55:18 | **remind** 6:2 |
| 50:19 51:7 | 42:13 | 80:14 81:7 | **referenced** | 14:15 |
| 57:14 | 59:17 | 81:10,14 | 23:16 | 53:12 |
| 60:14,16 |  | 81:18,22 | **regarding** | 63:24 |
| 62:1 66:12 | **Q** | 82:6 | 17:2,17 | **reminder** |
| 69:19 | **question** 6:9 | **reading** 25:7 | **regards** 30:1 | 7:22 60:2 |
| **problem** 6:8 | 6:12,24,25 | **really** 5:8 | **region** 40:14 | **Remington** |
| 25:21 | 7:22 11:4 | 9:20 13:14 | **Reinhardt** | 41:9,23,25 |
| **procedure** | 19:15 | 20:17 | 1:19 4:21 | **remotely** |
| 52:25 | 35:11,12 | 26:17 39:6 | 5:7 83:7 | 2:23 |
| **process** 6:25 | 35:14,24 | 39:7 41:2 | 83:24 | **render** 82:9 |
| 18:24 | 36:5 44:12 | 58:4 | **reiterate** | **repeat** 6:9 |
| 24:23 | 47:21,22 | **reason** 45:19 | 19:14 60:5 | **replaced** |
| **program** 9:16 | 63:17 | 58:9 81:7 | **related** 31:3 | 48:23 |
| 9:19 | **questions** | 81:11,15 | 56:9 | **report** 56:1 |
| **programs** | 19:23 | 81:19,23 | **relating** | 56:3 |
| 9:12,13 | 29:20 35:7 | **reasons** 5:1 | 74:1 | **reporter** |
| **proper** 68:24 | 36:24 | **recall** 31:25 | **relative** | 2:23 4:21 |
| **property** | 70:13 | 33:10 57:9 | 83:16 | 5:16,21,25 |
| 38:18,20 | 75:18,22 | 57:24 | **religious** | 6:5 60:3 |
| 39:12 40:6 | 78:12,12 | 58:19,22 | 57:4 | 79:13,17 |
| 40:6 41:3 | 78:16 | 60:6,12 | **reload** 42:6 | 79:21 83:8 |
| 41:3 42:11 | **quick** 5:20 | 62:14,16 | **remainder** | **represent** |
| 42:12 45:7 | 71:25 | 63:10 | 14:10 | 4:9 32:24 |
| 47:4,7,15 | 72:10 | 67:18 | **remaining** | 77:21 |
| 47:25 | 78:16 | 68:10 | 50:21 | **represen...** |
| **prosecute** | **quickly** | 69:18 | **remember** | 17:10 |
| 77:7 | 13:21 21:5 | **receive** | 12:21 17:8 | **represents** |
| **prosecuted** | 21:20 48:6 | 25:22 36:8 | 17:10,20 | 32:19 76:3 |
| 78:6 | **quit** 12:19 | 43:23 | 18:20 | **request** 5:12 |
| **protect** | **quite** 6:10 | 51:25 | 20:17,19 | 6:3,22 |
| 21:11 27:2 | **quote** 34:23 | 65:20,23 | 28:18,20 | 16:25 33:9 |
| 27:7 44:17 | 35:8,11,25 | 79:1 | 33:2,13 | 33:11 |

71:24

**requested**
33:7

**required**
47:9 56:1
61:15
64:21

**requirem...**
56:4 75:9
75:10

**Reserve**
75:18

**reside** 23:3
49:25

**resided** 8:17
23:3

**resides** 24:9

**respect**
67:13

**respond**
35:12 36:5

**responded**
36:23

**respondent**
71:15

**responding**
35:14

**response**
24:16 71:9
79:24

**responses**
70:3

**responsi...**
10:7 12:11

**rest** 20:8

**restarting**
49:15

**restate**
44:12

**restaurant**
57:19,20

**result** 63:6

**resulted**
12:25

**retain** 35:3

**retainer**
32:9

**return** 80:17

**reveal** 18:15

37:9

**review** 14:13
20:15
70:20
79:12

**RICHARD** 1:9
80:9 81:4

**rifle** 1:4
16:9 20:11
26:23
27:10,19
27:23
28:25 29:7
29:12,16
43:9 50:10
73:11 80:8
81:3

**rifles** 43:21
50:10,23
50:25

**right** 4:24
7:9,15,21
9:12 10:5
12:8 13:20
13:24
20:18
21:12,21
22:2,8
25:15 27:3
29:19
31:11,13
31:16
34:16 35:1
38:16,22
39:8 47:13
48:5,17,19
49:14
51:20
69:24 70:7
71:1 72:8
73:23 74:4
75:18
78:17

**right-hand**
25:12

**rights** 27:7

**ripped** 59:15

**Road** 23:4
24:10

**rob** 45:7

**role** 76:12

**rolling**
55:13,17
62:18
71:16

**Ronny** 76:20

**round** 38:13

**Rugers** 50:24

**rule** 5:20
12:24

**rules** 4:19
5:7 69:14

**running**
11:13 33:5

**runs** 26:20

___

## S

**S** 1:19 26:15
83:7,24

**S-A-F** 22:9

**S-H-O-B-I**
7:7

**SA** 10:3

**Sack** 31:20
32:4,14
33:2,11,25
34:4,9
35:1,4,7
35:25 37:4
73:19

**safe** 40:17
46:19,23
67:1,5

**safely** 67:11

**safety** 66:5
67:13
69:11

**safety's**
67:8

**Saint** 77:24
78:2,6

**sale** 36:1,14

**Sales** 10:3

**satisfied**
14:25

**Sauer** 43:25
44:1

**saw** 16:19

17:21 18:7
73:20

**saying** 15:12
46:5 60:4

**says** 22:9
31:11 32:7
32:8 34:12
51:25 71:2

**school** 9:2,3
9:5,9,10
12:5 13:4
58:11,17
61:15,15
62:7,9,11
64:5

**scope** 43:10

**scratch**
15:16

**screen** 13:21
21:20 24:8
26:13 31:7
33:18,22
48:6 51:12
59:7 69:22
71:22
78:20

**scroll** 14:4
14:15 70:7
70:8

**scrolling**
14:25
15:10
70:19

**se** 23:23
41:15 58:4

**seal** 83:19

**season** 39:14
39:16,18

**seat** 42:17
42:20

**second** 1:3
5:20 16:8
17:12,13
20:10 21:8
21:9,12,13
21:17 22:7
23:7 25:23
26:3,7,15
26:20 27:3

27:25 28:4
29:8,13,25
31:3 33:16
35:24
36:19
37:13
45:22
71:25 73:1
73:9 79:1
80:7 81:2

**see** 5:25
13:23 16:6
18:25 20:3
21:23 22:8
31:7,11,19
33:19
34:10,12
48:8 51:14
51:17 52:5
69:24 70:5
70:20
78:21

**seeing** 31:15

**seek** 43:21
44:7

**seeking**
44:14

**seen** 14:2
15:11
16:17 23:9
26:2 27:12
30:5

**self-def...**
35:9 44:18
44:20

**sell** 11:22

**semiauto...**
50:24

**send** 33:6

**sending** 34:4
34:5,19

**sent** 17:3
21:18

**separated**
13:13

**separately**
58:14

**series** 70:13

**serves** 76:12

DEFENDANT'S EXHIBIT E

**DAVID MEYER 7/28/2022**

| | | | | |
|---|---|---|---|---|
| **service** 10:3 | 67:8,9 | **slowly** 70:8 | **specific** | 71:15 |
| 10:16 11:3 | **shooting** | **small** 35:22 | 44:19 | 73:10 |
| **serviced** | 43:16 | 44:3 | **specify** 36:4 | 78:11 79:6 |
| 11:12 | 50:10 | **Smith** 35:18 | **speeding** | 80:7 81:2 |
| **services** | 67:10 | 43:15 | 62:21 | 82:1 83:3 |
| 46:18 | **shoots** 42:2 | **smoothly** | **spell** 7:12 | 83:8,25 |
| **servicing** | **Shorthand** | 11:11,13 | **spelling** 7:8 | **State's** 78:3 |
| 10:13 11:7 | 83:8 | **sold** 11:8 | 7:11,20 | **States** 1:1 |
| 11:16 | **shot** 42:4 | **somebody** | **spent** 49:15 | 29:24 |
| **set** 39:23 | **shotgun** | 16:21 | **spoke** 70:18 | **station** |
| 83:18 | 41:10,14 | 23:24 | 71:12,13 | 68:12 |
| **seven** 39:25 | 41:21,22 | 24:11 | 77:1,3 | **stenotype** |
| **Shane** 46:1,2 | 50:4 | 26:11 | **spoken** 32:16 | 83:12 |
| **share** 13:20 | **shotguns** | 27:25 | **sponsor** | **step** 17:19 |
| 21:20 | 43:6,14 | 34:14 | 10:11 53:3 | 17:19 |
| 33:17 48:5 | 50:5,12,17 | 52:25 | 53:5,9 | **Stephens** |
| 51:11 | **show** 31:6 | 76:15 | **Sponsored** | 76:20 |
| 69:22 | **showed** 36:24 | **sorry** 7:11 | 9:22 | **stepped** |
| 78:20 79:5 | **showing** | 7:12,21 | **sponsors** | 76:17 |
| **shared** 26:19 | 13:23 26:3 | 8:10 12:24 | 53:5 | **stop** 21:1 |
| 27:14 31:8 | 30:5 71:1 | 20:5 23:21 | **sports** 61:16 | 33:15 |
| 43:5 63:23 | **side** 52:5 | 25:20 | 62:12 | 36:18 45:9 |
| 69:10,25 | **Sig** 43:25 | 30:16 54:7 | **St** 2:12,17 | 55:13,17 |
| **sharing** 21:1 | 44:1 | 67:20 | 80:18 | 55:17 |
| 21:23 24:8 | **sign** 53:1 | **sort** 55:5 | **stalking** | 62:18 |
| 26:13 | 55:17 | 56:22 64:2 | 60:24 | 71:16,22 |
| 33:15 | 79:12 | 64:4 | **stalls** 12:13 | 79:5 |
| 36:18 48:9 | 80:15 | **sound** 6:6,15 | **stamp** 22:2 | **straight...** |
| 51:15 59:7 | **signature** | 7:2 49:9 | 33:24 | 29:9 |
| 71:22 | 71:4 80:13 | 72:3 | **stamped** | **strains** |
| **shatt** 59:14 | 80:15,17 | **sounds** 6:7 | 31:17 | 32:11 |
| **SHEET** 81:1 | 81:25 | 49:10 72:4 | **stand** 67:12 | **Street** 7:24 |
| **sheets** 80:13 | **signed** 32:9 | **SOUTHERN** 1:2 | **stands** 25:5 | 54:21 |
| 80:15,17 | 35:3 52:24 | **space** 46:19 | 25:10 | 80:18 |
| **sheriff** | 70:25 | 46:23 | 39:23 | **stuff** 10:11 |
| 76:13,14 | **similar** 37:4 | **speak** 27:5 | **started** | 10:14,16 |
| 76:18 | 61:5 | 54:6 60:3 | 10:20 | 12:13 |
| **sheriff's** | **simple** 41:14 | **SPEAKER** | 12:21 | 17:14 |
| 76:22 | 41:16,22 | 78:10 | **state** 1:4 | 20:10 23:9 |
| 77:10,24 | **Sincerely** | **speaking** 5:8 | 9:13,18,19 | 26:1 39:18 |
| **Shield** 35:18 | 80:20 | 5:13 7:17 | 16:8 20:11 | 50:13 |
| 43:15 44:2 | **single** 42:4 | 12:22 | 26:23,25 | 67:14 |
| 44:6 | **single-shot** | 19:17 | 26:25 27:1 | **subject** 54:9 |
| **shiny** 48:8 | 41:20 | 40:11 | 27:2,9,18 | 60:21 61:1 |
| **Shobonier** | **situation** | 46:12,21 | 27:23 | 65:5,8 |
| 7:7,24,25 | 44:23 | 47:11 | 28:25 29:7 | **subscribe** |
| 12:9 54:22 | **slow** 14:16 | 56:10,17 | 29:12,16 | 82:11 |
| **shoot** 35:21 | 70:7 | 58:7 67:16 | 42:6 70:4 | **subsequent** |
| 43:10,13 | | 77:4 | 70:14 | 51:23 |

DEFENDANT'S EXHIBIT E
**DAVID MEYER  7/28/2022**

| | | | | |
|---|---|---|---|---|
| **substance** | 49:13 | **terminated** | **third** 6:8 | **times** 37:14 |
| 56:23 57:1 | 55:18 | 13:13 | 29:20 | 37:15 |
| 60:17 82:8 | 61:12 | **terms** 5:7 | **thirty-o...** | 40:21 56:5 |
| **sued** 4:10 | 62:15 | 75:13 | 50:25 | 58:4 62:11 |
| 14:9 | 65:25 | **test** 61:12 | **Thomas** 2:16 | **tired** 6:18 |
| **SUITE** 2:7 | 66:21 72:7 | 61:20,21 | 79:13 | **TJH@BHYL...** |
| **supervision** | 80:12 81:5 | 62:10,14 | **thousands** | 2:19 |
| 55:19,20 | 83:11,14 | **tested** 61:17 | 45:3 | **today** 4:12 |
| 56:5 | **takes** 39:8 | **testified** | **threatened** | 4:20 5:1 |
| **supportive** | **talk** 16:10 | 4:2 | 78:5 | **toilet** 60:14 |
| 45:21 | 21:5,7 | **testify** | **threats** 77:6 | **toilets** |
| **supports** | 52:22 66:3 | 83:10 | **three** 13:11 | 10:13 |
| 45:22,23 | 72:11 75:3 | **testifying** | 20:2 21:5 | **told** 73:15 |
| **sure** 11:8,10 | 75:4 | 4:24 5:3 | 42:7,11 | 73:17 |
| 11:12 23:6 | **talked** 32:25 | **testimony** | 48:17 | **Tom** 77:21 |
| 30:4 34:11 | 43:8 45:17 | 83:13 | 50:16,16 | **tools** 45:3 |
| 35:2 36:12 | 68:18 | **tests** 61:14 | 62:5 67:21 | **top** 26:8 |
| 67:8,9,23 | 76:24 | 61:21,23 | 68:1 | 31:19 37:7 |
| 67:25 | **talking** | 61:25 62:3 | **ticket** 55:14 | 37:16 75:5 |
| **surgery** | 33:10 | 62:6 | 55:15,19 | **total** 68:2 |
| 59:12,22 | 37:11 39:7 | **Thank** 21:4 | 62:21 | **town** 58:16 |
| **surprised** | 42:10 | 72:6 75:17 | 63:12 | **Traffic** 55:7 |
| 38:14 | 49:16 | 77:15,17 | **tickets** | **trained** |
| **surround...** | 61:24 | 78:8 79:17 | 55:22 | 74:14 |
| 67:13 | **target** 38:8 | **therefor** | **time** 5:9,11 | **training** |
| **sworn** 4:2 | 38:11,12 | 34:9 | 6:20 7:18 | 66:20,25 |
| 83:10 | 38:13 40:2 | **thereon** | 8:10 12:2 | 67:18 68:5 |
| | 40:22 43:5 | 82:10 | 12:23 | 68:10 |
| ——————— | 43:8 49:17 | **they's** 11:13 | 16:17 | **trainings** |
| **T** | **tasks** 10:12 | **thing** 5:14 | 19:18 | 65:25 66:3 |
| **T** 83:1,1 | 12:10 | 9:15 27:24 | 21:21 | **transcribed** |
| **tags** 39:18 | **Taylor** 10:3 | 28:22 44:2 | 22:24 28:3 | 83:12 |
| 40:16,25 | 46:1,2 | 73:12 | 28:7 29:5 | **transcript** |
| **tail** 39:13 | **team** 20:8 | **things** 5:6 | 29:7 35:15 | 79:10 |
| **take** 5:8,21 | 37:11 73:9 | 5:21 33:5 | 40:12 | 80:15 |
| 5:22 6:1 | **tell** 9:17 | 72:10 | 44:20 | **transcri...** |
| 6:19,20,21 | 11:15 | **think** 18:11 | 46:13,22 | 83:13 |
| 6:25 11:18 | 18:14 | 19:7 22:8 | 47:12 | **transport** |
| 17:19 | 23:14 | 23:21 36:6 | 49:16,22 | 42:9,18 |
| 18:24 19:2 | 31:17 | 36:8 37:1 | 51:12 55:3 | **transpor...** |
| 39:10 | 34:23 43:4 | 37:6 42:2 | 56:11,18 | 42:14 |
| 40:22 41:3 | 45:20 | 48:20 | 57:9,23 | **transpor...** |
| 45:7 47:2 | 49:19 | 57:11 | 58:8 62:4 | 42:24 |
| 47:6,14 | 66:24 | 59:24,25 | 62:24 | 69:15 |
| 49:6,7 | 78:21 | 62:3,5 | 65:17 | **traveling** |
| 61:14 66:8 | **telling** | 69:5,5,19 | 66:12 | 40:14 |
| 71:24 | 21:18 | 78:16 | 67:17 | **treat** 59:22 |
| 79:15 | **ten** 52:3 | **thinking** | 69:22 | 60:7 67:12 |
| **taken** 1:14 | **term** 53:3 | 45:6 | 76:25 77:4 | **treated** 64:1 |
| 17:15 | | | | |

DEFENDANT'S EXHIBIT E

DAVID MEYER  7/28/2022

treatment
  64:4,21
  65:11,14
  65:20,23
tree 39:23
Tremendous
  7:4
tried 45:7
tries 21:11
  29:24
truck 44:25
  45:4 46:15
  46:20,24
  46:25
true 82:9,13
  83:12
trunk 42:16
  42:19
truth 83:10
try 13:20
  42:23
trying 23:21
  33:4
TULSA 83:5
turn 13:6
  49:11
turned 48:14
  48:16
turning 59:7
twelve-g...
  41:10
twenty 8:2
  39:4,21
  42:3 50:2
twenty-g...
  41:21
two 10:19
  35:7 43:6
  51:2 67:21
  67:22 68:2
  68:6 76:25
  77:4 78:16
two-day
  67:23
type 50:12
  61:18 75:3
typically
  42:16,17
  42:24

**U**

U.S 61:7
uh 8:2,23
  11:17
  16:13 23:8
  39:9 69:16
uh-huh 5:23
  10:6,22
  21:24 34:3
  68:9 71:7
um 10:19
  14:2 17:5
  17:8 19:4
  20:21
  23:21
  26:17
  27:24
  31:15 33:4
  47:8 60:14
  62:16,24
  69:2 70:13
  74:8,17
  75:5 76:13
  76:23
unclogging
  10:13
underscore
  22:2 31:12
  31:18
  33:24
  51:19
understand
  4:12,23
  6:13 27:4
  32:8 53:4
understa...
  21:10 25:1
  29:23
  42:21 44:9
  73:22 75:7
  76:13
understa...
  4:19
understood
  31:4 60:6
  67:25
UNIDENTI...
  78:10
UNITED 1:1

unloading
  69:7
upper 25:12
use 41:20
  43:5,6,7
  45:9 46:24
  50:5 53:3
  53:21
  59:21
  65:15,20
  65:23,25
usually 29:3
  39:16
  42:25 43:2

**V**

v 1:7 4:11
  80:8 81:3
valuable
  45:5
Vandalia
  9:10 10:25
varies 43:9
various 26:1
  50:12
vehicle
  56:15
  69:17,20
verifica...
  71:2
versus 14:5
video 49:12
VIDEOCON...
  1:13
view 74:20
violation
  55:6 61:5
violations
  55:7 56:7
voluntee...
  29:6

**W**

W 2:12,17
wait 5:12,15
walk 18:24
Walmart
  52:17
wanna 59:24

67:21
want 44:13
  74:7 79:14
wanted 75:20
warrant 65:6
WASHINGTON
  2:4 80:6
wasn't 35:1
watch 67:6
WATSON 1:9
  80:10 81:5
way 15:23
  16:2,3
  23:22
  33:12 45:8
  46:17
  48:23 65:3
  68:24 77:7
WBERGSTR...
  2:4
we're 6:23
  15:1 39:7
  42:9 70:2
we've 13:11
  49:5 52:3
  62:15
weapon 37:14
  38:10
  41:13 44:6
  44:6 45:12
  46:6,10,18
  74:24 75:1
weapons 41:7
  42:9
week 25:11
weeks 17:5
WEIS 1:9
  80:9 81:4
went 11:6
  13:4 46:16
  55:18
  58:13
  70:21,23
Wenzloff
  2:21
weren't 45:8
Wesson 35:18
  43:15
wetness

11:20
whatnot
  11:14
  12:14
  61:19
WHEREOF
  83:18
white 39:13
William
  31:20 32:4
  32:14 33:2
  33:11,25
win 58:12
witness
  75:16
  77:17
  79:25
  80:14 81:1
  81:25
  83:14,18
witnessed
  53:21
women 25:14
wooded 38:24
  39:10
  40:23
Woolsey's
  10:24 11:1
  11:5 12:3
  12:20 13:4
  13:7 62:24
words 5:24
  6:5
work 9:21
  12:15
  13:10 45:1
worked 10:24
  12:3,5
working 10:1
  13:15
wouldn't
  34:15
wrong 42:20

**X**

**Y**

yard 38:5
  39:4,5

DEFENDANT'S EXHIBIT E

**DAVID MEYER  7/28/2022**

**yards** 43:11
**Yea** 79:3
**yeah** 5:19
 6:7  7:3,16
 8:8  10:6
 10:22,24
 11:6  12:5
 13:19,25
 14:7,18
 16:3  19:8
 20:9,22
 21:3,22
 24:7  25:18
 26:5  28:11
 28:24
 30:18  31:9
 31:21  32:2
 34:17
 35:15  39:9
 41:19
 42:19
 43:20
 48:20  49:3
 50:9,16
 52:23  56:3
 56:13  57:5
 57:14  58:2
 60:11
 61:11,13
 62:9,9
 63:15
 66:16,23
 68:7,7
 69:9,13,16
 71:17  74:5
 78:23,25
**year** 22:17
 57:13,14
 61:24  62:2
 62:4,11
 66:10,13
 71:6
**years** 8:2
 10:19
 12:18,18
 25:24
 41:23  52:3
 52:18
 66:13

**yield** 75:20
**younger** 66:6
**YSURSA** 2:17
**Yup** 6:16
 51:21

_____

**Z**

**Zero** 72:17
**zeros** 31:12
**Zoom** 2:23
 83:15

_____

**0**

**000002** 33:24
**00001** 31:18
**000726** 22:3
**000738** 51:19
**000740** 78:22

_____

**1**

**10:05** 49:8
**10:40** 72:2
**100** 2:12
**1022** 50:24
**11** 80:3
**11-01** 52:9
**11th** 80:18
**1200** 7:24
 54:21
**120201** 31:20
**13** 52:12
**14** 52:18,19
 66:14,16
**15** 59:14
 66:14,16
**150** 22:17
**1523** 2:3
 80:5
**16** 48:14,16
 66:14,16
**160** 63:11
**16th** 66:17
**17** 8:23
 55:11
**18** 18:7  75:8
**18-** 15:13
**18-year-...**
 74:8
**1807** 83:24

**18th** 18:2,3
**19** 75:8
**1994** 22:10
 22:12
**19th** 18:4

_____

**2**

**2** 63:25
**20** 82:15
**20-year-...**
 75:8
**2000** 22:17
**2001** 49:2
 63:25
**20036** 2:4
 80:6
**2014** 52:9
 54:19,19
**2016** 12:20
**2017** 22:20
 48:15
**2019** 22:14
 22:15
**2020** 9:7
 10:20
 12:19  19:7
 62:25
**2021** 19:1,7
 19:9  22:24
 28:9,10
**2022** 1:15
 80:3,12
 81:5  83:15
 83:20
**2024** 52:4,8
**21-cv-51...**
 1:7
**21-year-...**
 15:13
**22** 50:11,23
**223** 43:9
 51:1
**223s** 50:10
**24** 71:6
**240** 23:4
 24:9
**24th** 71:19
**25** 22:20
**27** 19:1

**28** 80:12
 81:5
**28th** 1:15
 83:14
**2nd** 48:15
 49:2

_____

**3**

**30** 80:17
**30-ought-6**
 50:10
**312.814....**
 2:13
**360** 43:25
 44:1

_____

**4**

**4** 3:2
**46** 8:25
**475** 2:7
**48** 8:25,25
 53:14

_____

**5**

**50** 43:10
**5111** 2:17
**5th** 48:15

_____

**6**

**6** 68:5
**60** 43:11
**60062** 2:8
**60601** 2:13
**618.235....**
 2:18
**62226** 2:18
**63101** 80:18
**650** 2:7
**660** 7:24
 54:21

_____

**7**

**7** 50:19
**70** 63:3
**711** 80:17
**726** 25:7
**75** 3:3
**76** 63:3
**77** 3:4

**78** 3:5
**7th** 83:19

_____

**8**

**8** 50:19  68:5
**847.291....**
 2:8
**870** 41:9,25