DEFENDANT'S EXHIBIT F

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

David Meyer, Mitchell Nalley, Eva Davis,
Second Amendment Foundation, Illinois State
Rifle Association, and Firearms Policy Coalition,
Inc.,

      Plaintiffs,

      v.

Kwame Raoul, Brendan F. Kelly, Joshua C.
Morrison, James Gomric, Eric Weis, Christopher
Palmer, Richard Watson, and Dwight A. Baird,

      Defendants.

21-cv-518-SMY

Judge Staci M. Yandle

## <u>DECLARATION OF PROFESSOR SAUL CORNELL</u>

I, Saul Cornell, declare as follows:

1. I am at least 18 years old and have personal knowledge of the statements contained in this declaration;

2. The statements contained in the expert report I authored in this case, dated May 31, 2022, and attached hereto are true and accurate;

3. If called to testify at trial in this case, I would testify to the matters set forth in my expert report.

4. My testimony would be consistent with all of the statements included in the report, which contains a description of my qualifications as an expert witness, a complete statement of all opinions I would express at trial, the facts and data I considered in forming my opinions, the basis and reasons for my opinions, a statement of my compensation, and a list of all other cases from the previous four years where I testified as an expert at trial or by deposition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 31, 2022

/S/ Saul  Cornell
Saul Cornell

DEFENDANT'S EXHIBIT F

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

David Meyer, Mitchell Nalley, Eva Davis, Second
Amendment Foundation, Illinois State Rifle
Association, and Firearms Policy Coalition, Inc.,

        Plaintiff,

        v.

Kwame Raoul, Brendan F. Kelly, Joshua C.
Morrison, James Gomric, Eric Weis, Christopher
Palmer, Richard Watson, and Dwight A. Baird,

        Defendants.

21-CV-518-SMY

Judge Staci M. Yandle

## EXPERT REPORT OF PROFESSOR SAUL CORNELL

### I.    Assignment

I have been asked to provide an expert opinion on the history of firearms regulation in the
Anglo-American legal tradition, including the regulation of firearms in public and the history of
the regulation of minors' access to weapons and the ability to carry them in public. I have further
been asked to opine on how the Founding-era generation understood the right to bear arms, as well
as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth
Amendment to the United States Constitution. Finally, I was also asked to assess whether Illinois'
laws regulating the concealed carry of firearms in public places by 18-to-20 year-olds fall within
the historical scope of the right to bear arms as revealed by the history of the understanding of the
Second Amendment at the time of the Founding and the ratification of the Fourteenth Amendment.

### II.    Qualifications and Background

I am the Paul and Diane Guenther Chair in American History at Fordham University. The
Guenther chair is one of three endowed chairs in the history department at Fordham and the only
one in American history. In addition to teaching constitutional history at Fordham University to
undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have

DEFENDANT'S EXHIBIT F

been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts.[2] My scholarship on this topic has appeared in leading law reviews and top peer reviewed legal history journals. I authored the chapter on the right to bear arms in the Oxford Handbook of the U.S. Constitution and co-authored the chapter in The Cambridge History of Law in America on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined. I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.); *Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018), *Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.), *Miller, et al v Smith, et al.*, 2018 cv 3085 (C.D. Ill.); *Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); and *Worth v. Harrington,* 21-cv-1348 (D. Minn.).

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.
[2] For a list of court citations, *see* Exhibit 2.
[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

DEFENDANT'S EXHIBIT F

### III.    Retention and Compensation

I am being compensated for services performed in the above-entitled case at an hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports, $750 for depositions and court appearances, and an additional $100 per hour for travel time. My compensation is not contingent on the results of my analysis or the substance of any testimony.

### IV.    Basis for Opinion and Materials Considered

The opinion I provide in this report is based on my review of the May 27, 2021 complaint filed by Plaintiffs in the lawsuit pending in the United States District Court for the Southern District of Illinois as case number 21-CV-518 ("this lawsuit" or "Plaintiffs' complaint"); my review of the Illinois statutes at issue in this lawsuit; my education, expertise, and research in the field of legal history, and; my review and analysis of the primary sources, secondary sources, and other materials cited in the footnotes and text of this report and listed in the publications noted in my CV.

### V.    Summary of Opinion

Individuals under the age of twenty-one did not have a right to bear arms at the time of the ratification of the Second Amendment. Nor did such a right exist even at the time of the ratification the Fourteenth Amendment, almost one hundred years later. Rather, in the Founding era, individuals below the age of legal majority (i.e., twenty-one years) were infants in the eyes of the law.[4] Infants were not independent constitutional actors. The law accorded comparable rights and protections to those enjoyed by married women under the doctrine of coverture—a legal condition that rendered married women a legal nullity under common law and the early American law of domestic relations. This did not change until the latter half of the twentieth century, most

---

[4] For a good statement of how American law had adopted English common law's view of infants and the law, *see* Zephaniah Swift, 1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 213 (1795).  On the emergence of the category of young adult in modern legal theory, *see* Elizabeth S. Scott, Richard J. Bonnie, & Laurence Steinberg, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 FORDHAM L. REV. 641,658 (2016).

DEFENDANT'S EXHIBIT F

importantly, for example, with the ratification of the Twenty-Sixth Amendment during the Vietnam War era, which granted eighteen-year-olds the right to vote.[5]

In modern America, the category of "young adult" seems both natural and consistent with the expansion of civil rights more generally by the Warren Court, including the landmark decision in *Tinker v. Des Moines*.[6] But, this expansive conception of rights for minors did not exist at the time of the adoption of the Second Amendment. Therefore, the claim that infants had Second Amendment rights at the time of the Founding is historically incorrect. Indeed, the notion of treating infants as "young adults" at the Founding would have puzzled the enactors of the Second Amendment and most Americans. Thus, to speak of infants having a right to bear arms at the time of the Second Amendment is historically nonsensical.[7] American constitutional law in the Founding era did not treat infants—again, anyone below the age of twenty-one—as autonomous legal actors; they were dependents whose access to the courts and protections of law were primarily mediated through parents or guardians.[8] As such, the Second Amendment did *not* protect people between the ages of eighteen and twenty-one at the time of its enactment.[9]

Plaintiffs' complaint implies that the Second Amendment protected eighteen-to-twenty-year-olds because, "[h]undreds of statutes from the colonial and founding eras required 18-to-20-year-olds to keep and bear arms."[10] This confuses a basic distinction in American constitutional law between rights and duties. Historically and logically, rights are the correlatives of duties.[11] The

---

[5] Scott, *et al.*, *supra* note 4.
[6] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).
[7] Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 TUL. L. REV. 55 (2016).
[8] Minors were held responsible for some types of felonies under common law if they could demonstrate a capacity to distinguish between right and wrong, Craig S. Lerner, *Originalism and the Common Law Infancy Defense*, 67 AM. U. L. REV. 1577 (2018).
[9] As originally understood no feature of the first eight amendments applied to the states, but only bound the federal government.
[10] Complaint at ¶ 14.
[11] For a general overview of modern rights theory, *see* Leif Wenar, *Rights*, *in* THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., 2021), https://plato.stanford.edu/entries/rights [https://perma.cc/B7KH-GPTV]. On modern legal conceptions of rights, *see generally* the related article

DEFENDANT'S EXHIBIT F

existence of a right typically imposes on another actor, sometimes the government, a duty to respect the right claimed by the holder of the right.[12] Duties did not, and do not, create rights. The complaint treats the two concepts as synonyms, not correlatives, which is a serious legal, philosophical, and historical error. To illustrate, one need only look at the example of religious freedom. The notion that government could force any American to exercise their right of free exercise of religion is absurd. Yet, this is precisely the logic at the core of the argument that militia statutes offer positive proof of a right of minors to keep and bear arms. Although the federal government in the Founding era could require individuals to keep and bear arms, it was prohibited from proscribing any type of religious conduct. In the modern scheme of ordered liberty that defines American constitutionalism there is a strong presumption against government interference with the exercise of a constitutional right. In the case of Founding era militia laws, the opposite was the case: government was not constrained but was empowered to coerce Americans to keep and bear arms. It therefore makes little sense to claim that Founding era militia laws, which gave government enormous power over the lives of citizens, entrenched a right against government interference. Indeed, when properly framed, analyzed, and understood in historical context the claim is oxymoronic.

The original public understanding of the Second Amendment and its state constitutional analogs was inextricably linked to the goal of promoting a free state and preserving "the peace."[13]

---

by Kenneth Campbell, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., Fall 2021 Edition), https://plato.stanford.edu/archives/fall2021/entries/legal-rights/.

[12] There is a vast, erudite, and complex scholarly literature on the nature of legal rights in the modern Anglo-American legal tradition. *See, e.g.*, Joseph Raz, *Legal Rights*, 4 OXFORD J. LEGAL STUD. 1, 14 (1984). As Raz notes: "An individual has a right if an interest of his is sufficient to hold another to be subject to a duty. His right is a legal right if it is recognized by law, that is if the law holds his interest to be sufficient ground to hold another to be subject to a duty.

[13] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS. 11, 25 (2017). On the transfer of English common law, including the concept of the peace to early America, *see generally* Alfred L. Brophy, *"For the Preservation of the King's Peace and Justice": Community and English Law in Sussex County, Pennsylvania, 1682– 1696*, 40 AM. J. LEGAL HIST. 167 (1996). For the persistence of this fundamental legal concept after the

DEFENDANT'S EXHIBIT F

Historically, the power to regulate firearms and gunpowder is of ancient vintage and was central to the conception of ordered liberty that defined Anglo-American law from its earliest days.[14] At the very core of the early American understanding of the scope of liberty was the right of self-government and the right of the people themselves to regulate their internal police to promote public safety.[15] Thus, regulations of gunpowder and firearms, including the regulation of minors' use and possession of firearms, were at the very core of state police power from the colonial period forward.[16]

This robust conception of state authority to regulate firearms persisted into the early Republic, and, in fact, expanded substantially in the years following the adoption of the Fourteenth Amendment in 1868.[17] The language of arms-bearing provisions in state constitutions changed dramatically in this period and the number and range of firearms regulations, including regulations of minors, expanded exponentially.[18] The new state constitutions adopted during Reconstruction recast the language used to protect the right to keep and bear arms in terms that linked the exercise of this right with the right of legislatures to regulate guns. Many of the new constitutions adopted after the Civil War in Southern states, and the newly admitted western states, revised the Founding era formulation of the right to bear arms, expressly asserting that the right was subject to

---

American Revolution, *see generally* Laura F. Edwards, THE PEACE: THE MEANING AND PRODUCTION OF LAW IN THE POST-REVOLUTIONARY UNITED STATES, 1 U.C. Irvine L. Rev. 565 (2011).

[14] Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[15] On Founding era conceptions of liberty, *see* John J. Zubly, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937). For a more recent elaboration of the concept, *see generally* James E. Fleming & Linda C. McClain, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (2013); *see also* Jonathan Gienapp, *The Foreign Founding: Rights, Fixity, and the Original Constitution*, 97 TEX. L. REV. ONLINE 115, 118–26 (2019).

[16] *See generally*, William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061 (1994).

[17] On the change in the language of state constitutional arms bearing provisions, *see McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010).

[18] On the inclusion of robust pro-regulation language in these new state constitutions and the consequent expansion of regulation, *see generally* Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65, 75–78 (2021).

DEFENDANT'S EXHIBIT F

regulation.[19] As *McDonald v. City of Chicago* makes clear, the scope of regulation during the era of the Fourteenth Amendment is the period most relevant to understanding challenges to state gun laws.[20] Gun regulation, including regulation of minors, expanded during this period.

Finally, the primary evidence in the complaint that serves as the alleged historical basis for Plaintiffs' claims comes from flawed research presented in a single law review article by two gun rights advocates—neither of whom have the requisite historical training to make authoritative judgments about the meaning of early American law or the many militia statutes enacted in the era of the Second Amendment.[21] Moreover, the article cited in Plaintiffs' complaint has been subjected to withering historical critique.[22] In short, there is no credible historical evidence that supports Plaintiffs' allegations that the historical scope of the Second Amendment extended to infants in the Founding era or the era of the Fourteenth Amendment. If this unsubstantiated claim were true then it would mean that arms bearing enjoyed constitutional protections that exceeded the scope of religious freedom and the rights of contract enjoyed by minors, a claim that strains credulity. This supposition rests on a major interpretive mistake: applying the expansive scope of First Amendment freedom articulated in landmark *modern* civil liberties cases, most notably *Tinker v. Des Moines*, to Founding era law.[23] Reading history backwards from *Tinker* not only makes little

---

[19] *Id.*

[20] *McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010). On the consensus that the era of the 14th Amendment is the one most relevant to understanding the scope of state gun regulation consistent with the Second Amendment, *see* Joseph Blocher & Darrell A. H. Miller, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF *HELLER 94–98, 129–30* (Cambridge Univ. Press 2018); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *Young v. Hawaii*, 992 F.3d 765, 824 (9th Cir. 2021).

[21] David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. UNIV. L.J. 495, 530–33 (2019). The Ninth Circuit mistakenly relied on this flawed analysis in *Jones v. Bonta*, --- F.4th ---- 2022, 2022 WL 1485187 (9th Cir., May 11, 2022). The article anachronistically uses the term "young adult," a legal category that did not exist at the time of the enactment of the Second Amendment and frames its entire analysis in presentist terms, assuming, rather than demonstrating the existence of a broad Second Amendment right in the Founding period.

[22] Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 39 YALE L. & POL'Y REV. INTER ALIA 1, 2 n.6 (2021).

[23] *Tinker v. Des Moines Indep. Cmty. Sch. Dist*., 393 U.S. 503 (1969); Justice Thomas was indisputably correct when he noted that there is no Founding era or originalist foundation for claims of the rights of minors, *Morse v. Frederic*k, 551 U.S. 393, 418–19 (2007) (Thomas, J., *dissenting*). Such rights can be

DEFENDANT'S EXHIBIT F

historical sense, but it is also precluded by the *Heller/McDonald* history, text, and tradition framework where courts investigate the public meaning of constitutional texts at the time of their enactment.

Consequently, it is my opinion that Illinois' current laws regulating the concealed carry of firearms by 18-to-20-year-olds do not conflict with the original public meaning of the Second Amendment. Illinois law does not trench on constitutionally protected conduct incorporated by the Fourteenth Amendment. Minors in the Founding era had a duty to bear arms, but not a free-standing right to do so. Vindicating such a claim on constitutional grounds today would require applying a modern living constitutional argument that was not articulated in American law until *Tinker* ushered in a new era of expanded rights for minors.[24]

## VI.    The Historical Inquiry Required by *District of Columbia v. Heller*

The United States Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008) directed courts to look to history for guideposts in evaluating the scope of permissible regulation under the Second Amendment. At the time *Heller* was decided there was relatively little scholarship on the history of gun regulation.[25] In the decade since *Heller* was decided, a burgeoning body of scholarship has uncovered a previously unknown history of arms regulation in the Anglo-American legal tradition and the Founding era.[26] Much of this material was largely unavailable to the *Heller* court because the sources were difficult to identify, search, and collect. The creation of powerful searchable digital "archives" has transformed this subfield and facilitated a more sophisticated understanding of the scope of gun regulation under Anglo-American law,

---

justified under other modes of constitutional analysis, but not originalism. For post-*Tinker* developments, *see* Mary-Rose Papandrea, *The Great Unfulfilled Promise Of Tinker* 105 VIRGINIA LAW REVIEW ONLINE 159 (2019).

[24] *See* Scott, *et al.*, *supra* note 4.

[25] For a notable exception, *see* Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[26] *See generally* Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

DEFENDANT'S EXHIBIT F

during the Founding era, and in subsequent periods of American history, including the era of the Fourteenth Amendment.[27] My report draws on this new body of digital sources and the scholarship that it has generated.[28]

Looking to history for guidance when evaluating modern gun laws requires a deeply contextualized understanding of the fundamental legal and philosophical principles underpinning the Second Amendment, including the common law understanding of the limits on the uses of dangerous or unusual weapons. Two types of inquiry are therefore necessary. First, one must gain some familiarity with Founding era rights theory, particularly as it related to the scope of state legislative authority under the police power.[29] Second, one must canvass the history of state and local regulations to establish the scope and types of laws that have been viewed as within the bounds of the lawful exercise of government power at different moments in American history. A properly contextualized historical inquiry must also recognize, as *Heller* did, that the specific protections associated with the right to keep and bear arms could lawfully evolve as firearms technology developed.[30] Obviously, laws against machine guns would have been unthinkable in

---

[27] Thus, the reliance on new digital sources characteristic of the new history of firearms regulation complements the methods of corpus linguistics which also make use of digital searching and database technology. *See* Dennis Baron, *Corpus Evidence Illuminates the Meaning of Bear Arms*, 46 HASTINGS CONST. L.Q. 509 (2019).

[28] *Compare* Cornell & DeDino, *supra* note 25 (published before the advent of the new digital tools and databases) *with* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017) (published after the creation of these databases). For an effort to synthesize the new scholarship and apply it using *Heller's* framework, *see* Joseph Blocher & Darrell A. H. Miller, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF HELLER (Cambridge Univ. Press 2018).

[29] *See generally* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW AND CONTEMP. PROBS. 31 (2020).

[30] Chief Justice John Roberts' important but under-appreciated comment in the Heller oral argument speaks to this point directly: "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well." Transcript of Oral Argument at 77, *Heller*, 554 U.S. 570 (No. 07-290). A similar view was endorsed by Justice Kavanaugh as Circuit Judge. *See Heller v. District of Columbia*, 670 F.3d 1244, 1274 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). A corollary of this observation is that the form taken by permissible regulations would also change in response to technological developments. Laws prohibiting machine guns, a type of regulation Heller recognized as constitutional, emerged in the early twentieth century. Such laws could not have been enacted before the invention of the machine gun. Nor would there have been a need to enact such laws until the machine gun had achieved a

the Founding era given that these types of weapons did not exist.[31] Thus, the inquiry into "longstanding regulation," necessarily extends beyond the Founding era and the era of the Fourteenth Amendment because many weapons technologies were not invented or had not penetrated the civilian market sufficiently to cause legislatures to regulate them.[32]

## VII.    Methodology

The analysis that I used in reaching my opinion draws on recent scholarship and employs the accepted historical and legal methodologies for interpreting such sources, including an analysis of the public meaning of the Second Amendment, various individual state constitutional provisions on the right to keep and bear arms, state statutes, local ordinances, court decisions, and popular and learned legal commentaries.[33] These methods of legal history require a deep immersion in the primary source materials, conscious attention to the limits and strengths of various types of legal sources, and a broad knowledge of related historical subfields, both within and outside of Anglo-American legal history.[34]

---

level of market penetration sufficient to cause a public safety issue. The example of laws limiting or prohibiting machine guns illustrates some regulations adopted in the twentieth century clearly are within *Heller*'s permissible category.

[31] Second Amendment theory and jurisprudence has not grappled with the evolving history of firearms technology.  For a preliminary effort to theorize how courts ought to address this problem, see Darrell A.H. Miller, *Second Amendment Equilibria*, 116 NW. U. L. REV. 239, 269–70 (2021).

[32] *Id.*

[33] Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 SUP. CT. REV. 119, 122 n.13 (1965). As Judge Bybee recently counseled in *Young v. Hawaii*, courts must proceed carefully when tackling complex historical questions, particularly those that span across more than five hundred years. Plaintiffs' argument rests on the type of flawed history that the *Young* court warned against. See *Young v. Hawaii*, No. 12-17808, 2021 U.S. App. LEXIS 8571 (9th Cir. Mar. 24, 2021) (*en banc*).

[34] For a discussion of the minimum standard for undergraduate history majors, see Mary Lynn Rampolla, A POCKET GUIDE TO WRITING IN HISTORY 18 (8th ed., 2015). For a primer written for graduate students, *see* Martha Howell & Walter Prevenier, FROM RELIABLE SOURCES: AN INTRODUCTION TO HISTORICAL METHODS 128 (2001). On the methods of professional legal history, *see* THE OXFORD HANDBOOK OF LEGAL HISTORY (Markus Dirk Dubber and Christopher L. Tomlins, eds., 2018). On the methods of originalism, *see* Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375 (2013). On the proper role of history in constitutional law, *see* Richard H. Fallon Jr., *The Many and Varied Roles of History in Constitutional Adjudication*, 90 NOTRE DAME L. REV. 1753 (2015).

DEFENDANT'S EXHIBIT F

To avoid approaching history, text, and tradition with an "ahistorical literalism" it is vital to survey historical scholarship across a broad range of subfields.[35] Social history, cultural history, economic history, and military history all shed important light on the original meaning of the Second Amendment. One must avoid the common tendency to treat sources in isolation, decontextualized, floating freely, detached from the web of historical meaning that originally made them comprehensible to Americans in 1791. Nor can one ignore the need to understand the way specific pieces of evidence fit together to form a coherent whole.[36]

Modern legal history—the methodology I employed in this report—approaches the past with a holistic model of meaning. Ascertaining legal meaning, including those relevant to understanding the history of the Second Amendment, the various state constitutional arms-bearing provisions, and gun regulation, requires rigorous contextualization .[37] Any effort to understand the Second Amendment and the history of gun regulation must therefore canvass a variety of historical topics, including such diverse subfields as legal history, social history, cultural history, economic history, and military history.

## VIII.  Opinion

### A.  Infants and Arms Bearing in the Founding Era and Early Republic

Under English common law, individuals under the legal age of majority—twenty-one years—were subsumed under the authority of their parents (usually their fathers) or other guardians.[38] The situation of minors, i.e., those under the legal age of majority, was comparable to

---

[35] *Franchise Tax Bd. of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019).

[36] J.H. Hexter, REAPPRAISALS IN HISTORY 194–45 (1961).

[37] The best illustration of the modern legal history method applied to the United States is the three volume Cambridge History of Law in America. *See* THE CAMBRIDGE HISTORY OF LAW IN AMERICA (Michael Grossberg & Christopher L. Tomlins eds., 2008).

[38] Corinne T. Field, THE STRUGGLE FOR EQUAL ADULTHOOD: GENDER, RACE, AGE, AND THE FIGHT FOR CITIZENSHIP IN ANTEBELLUM AMERICA (2014); Jeffrey Shulman, THE CONSTITUTIONAL PARENT: RIGHTS, RESPONSIBILITIES, AND THE ENFRANCHISEMENT OF THE CHILD (2014); Holly Brewer, BY BIRTH OR CONSENT: CHILDREN, LAW, AND THE ANGLO-AMERICAN REVOLUTION IN AUTHORITY (2012).

married women under the legal doctrine of coverture. A married woman ceased to exist as a legal entity and her entire legal persona was subsumed within her husband's authority.[39] Sir William Blackstone summarized the doctrine in his *Commentaries*:

> By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and cover, she performs every thing; and is therefore called in our law-French a feme-covert.[40]

The comparison between a femme covert and minors was frequently made by writers on domestic law. As one eighteenth-century author on the law of domestic relations observed: "Feme Covert in our Books is often compared to an Infant, both being persons being disabled in the Law."[41] This observation cuts to the core historical problem with Plaintiffs' complaint; minors were legally "disabled" in the eyes of the law and thus could not claim any Second Amendment right in the Founding period or during the era of the Fourteenth Amendment. Unlike modern America, there was no legal category of "young adult" in the Founding era.[42] In virtually every aspect of their legal identity, minors were creatures of their parents or legal guardians.

The American Revolution set in motion a process of change that reformed aspects of the traditional patriarchal model of legal authority governing minors. Although American law was republicanized in this process, the transformation of American domestic law did not recognize minors as legally autonomous individuals, but rather gave society, acting through courts and

---

[39] J.H. Baker, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 483–84 (4th ed. 2002); Allison Anna Tait, *The Beginning of the End of Coverture: A Reappraisal of the Married Woman's Separate Estate*, 26 YALE JOURNAL OF LAW AND FEMINISM 165,167 (2014).

[40] 1 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND *431, https://avalon.law.yale.edu/ subject menus/blackstone.asp.

[41] Anon., BARON AND FEME: A TREATISE OF LAW AND EQUITY CONCERNING HUSBANDS AND WIVES 8 (1738).

[42] *Contra* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S.ILL.U.L.J. 495, 530 (2019). The article's references to the "Rights of Young Adults" is premised on an anachronistic understanding of the legal status of infants in Anglo-American law.

DEFENDANT'S EXHIBIT F

legislatures, greater authority to intervene to protect and promote the well-being of those under the age of majority. Despite the many reforms inaugurated by the American Revolution, minors remained "infants" in the eyes of the law.[43]

The subject of minors' legal status was explored at considerable length by Connecticut jurist Zephaniah Swift, who published a legal treatise four years after the adoption of the Second Amendment: "Persons within the age of twenty-one, are, in the language of the law denominated infants, but in common speech—minors."[44] Swift noted: "by common law an infant can bind himself by his contract for necessaries, for diet, apparel, education and lodging," but little else.[45] In short, infants were severely circumscribed by law and enjoyed a narrow range of legal autonomy. After the American Revolution courts became more involved in monitoring contractual arrangements concerning minors and adopted a more aggressive role in protecting the interests of minors, even if it meant voiding contracts. This new supervisory role narrowed the range of contractual freedom of minors acting without parental consent or a guardian's approval. Thus, minors were subject to far greater state supervision than any other legal entity involved in the marketplace during the early years of the republic.[46] The right of contract was among the most important liberties protected by American law in the early Republic.[47] Yet, the unique legal status of minors meant that even this cherished right's scope was severely curtailed in Founding era law.

In *Jones v. Bonta*, United States Court of Appeals for the Ninth Circuit found that 18-to-20-year-olds had a Second Amendment right to bear arms at the time of the Founding, based on a mistaken finding that minors in the Founding era also would have enjoyed the same scope of

---

[43] John E.B. Myers, *A Short History of Child Protection in America*, 42 FAM. L.Q. 449 (2008); Elizabeth Pleck, DOMESTIC TYRANNY: THE MAKING OF AMERICAN SOCIAL POLICY AGAINST FAMILY VIOLENCE FROM COLONIAL TIMES TO THE PRESENT (Univ. of Ill. Press 1987).

[44] Swift, 1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT, 213.

[45] *Id.*

[46] Holly Brewer, BY BIRTH OR CONSENT: CHILDREN, LAW, AND THE ANGLO-AMERICAN REVOLUTION IN AUTHORITY (2012).

[47] Leonard and Cornell, *supra* note 3 at 188–89.

DEFENDANT'S EXHIBIT F

religious freedom as adults.[48] In fact, minors had no independent claim of religious freedom or autonomy until the age of legal majority in the Founding period. Infants' religious choices during this period were entirely controlled by parents or guardians.[49] Two early nineteenth century legal custody battles involving the Shakers, a utopian religious sect that practiced a form of Christian communism and rejected the traditional model of the nuclear family, bring into sharp focus the problem with the ahistorical assumptions guiding the court in *Jones*.[50] The Shaker controversies became newsworthy events and were resolved by legislatures, not courts. Both cases involved fathers who joined the Shaker community and took their children with them against the wishes of their mother. In each case  distraught mothers had no course of action in court but had to appeal to the legislatures for a resolution, because neither wives nor children had any legal standing  to challenge the complete authority that fathers had over the religious life of minors within their household. The children involved in the cases enjoyed even less legal status than their mothers. The only option under American law was divorce, but the grounds for obtaining one were exceedingly narrow in antebellum America. Thus, both aggrieved mothers in these custody

---

[48]*Jones v. Bonta*, --- F.4th at 13. The *Jones* court cites the erroneous claims made in the vacated ruling in *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 422 (4th Cir.), as amended (July 15, 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021), *cert. denied sub nom. Marshall v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 142 S. Ct. 1447 (2022). The *Hirschfield* decision rested its conclusions about the scope of Founding era minors' rights on the holding in *Tinker*, not on Founding era sources.

[49] Toby L. Ditz, *Ownership and Obligation: Inheritance and Patriarchal Households in Connecticut*, 1750–1820, 47 WM. & MARY Q. 235, 236 (1990).

[50] Eunice Chapman, NO. 2D. BEING AN ADDITIONAL ACCOUNT OF THE CONDUCT OF THE SHAKERS, IN THE CASE OF EUNICE CHAPMAN AND HER CHILDREN, 25, 37–38 (Albany, N.Y. 1818); Mary M. Dyer, REPLY TO THE SHAKERS' STATEMENTS, CALLED A REVIEW OF THE PORTRAITURE OF SHAKERISM, WITH AN ACCOUNT OF THE SICKNESS AND DEATH OF BETSY DYER (Concord, N.H. 1824); *see also* Richard D. Brown, SELF-EVIDENT TRUTHS: CONTESTING EQUAL RIGHTS FROM THE REVOLUTION TO THE CIVIL WAR 113 (2017) (providing overview of the Shaker custody disputes); Janet Sarbanes, *Domestic Broils: Shakers, Antebellum Marriage, and the Narratives of Mary and Joseph Dyer* 29 LEGACY: A JOURNAL OF AMERICAN WOMEN WRITERS 329 (2012) (discussion of the issues raised in one of the two Shaker custody disputes). For a concise summary of Shaker history and belief, *see* Robert S. Fogarty, *Religious Inventions in America: New Religious Movements* 22 OAH MAGAZINE OF HISTORY 19 (2008).

disputes were forced to petition their legislatures for a special legislation permitting a divorce. [51] In each instance, the legislature expressed reluctance to intervene in the decisions of a father regarding the religion of a minor in his care. This was the only religious freedom claim the law recognized as legally relevant. The protection of religious freedom was a paramount constitutional value, and this meant that the patriarchal authority of the Shaker fathers, not the religious beliefs of mothers or children, controlled. The orthodox view of free exercise favored the rights of the fathers, minors had no standing or claim to challenge that authority. Ultimately, one of the mothers seeking custody of her offspring was able to obtain a divorce, but the grounds for the divorce was abandonment, not an assertion of religious freedom.[52] In short, not only were "Second Amendment" freedoms not available to minors in the Founding era, but neither were the core "First Amendment" freedom of religious liberty so esteemed by modern Americans.[53] As was true for wives under the doctrine of coverture, early American law treated minors as legally disabled and entirely under the authority of the patriarchal power of male head of households or other guardians.[54]

---

[51] Sarbanes, *supra* note 50. On the limited grounds for divorce in pre-Civil War America, *see* Elizabeth B. Clark, *Matrimonial Bonds: Slavery and Divorce in Nineteenth-Century America*, 8 LAW & HIST. REV. 25 (1990); Norma Basch, FRAMING AMERICAN DIVORCE: FROM THE REVOLUTIONARY GENERATION TO THE VICTORIANS 168–72 (1999); Naomi Cahn, *Faithless Wives and Lazy Husbands: Gender Norms in Nineteenth Century Divorce Law,* 2002 U. ILL. L. REV. 651 (2002).

[52] Brown, *supra* note 50 at 113 (discussing the limited nature of the rights of wives and minors and illustrating the ongoing power of patriarchal authority in the early republic).

[53] Provisions of the Bill of Rights were not applicable to the states until the adoption of the Fourteenth Amendment, but many states had provisions in their own constitutions protecting the free exercise of religion and the right to bear arms. Minors would have been unable to effectuate claims of religious freedom by either invoking federal protections or analogous protections under state constitutional law because they were legally subsumed under the legal identity of their parents or guardians, typically men.

[54] The legislatures' resolution of these cases followed the same logic that shaped the Massachusetts Supreme Court in *Martin v. Commonwealth*, 1 Mass. (1 Will.) 260 (1805). In that case the state's highest court ruled that a woman's estate was not legally forfeited because she fled America with her loyalist husband during the American Revolution. Applying the doctrine of coverture, the court ruled that a married women had no independent will so the decision to flee America was her husband's alone, effectively absolving the wife of any legal liability under the confiscation statute. Although her husband's property was legally confiscated by the state, any property she owned prior to her marriage was exempt and passed on to her heirs, see Linda K. Kerber, *The Paradox of Women's Citizenship in the Early Republic: The Case of Martin vs. Massachusetts*, 1805, 97 AM. HIST. REV. 349 (1992).

DEFENDANT'S EXHIBIT F

Additional confirmation that minors were not entitled to assert independent claims of religious freedom outside of the authority of parents or guardians is provided by the stringent regulation of religious behavior in private and public colleges in the Founding era. College was one of the very few situations where minors lived outside of a traditional household. Minors attending college did not become autonomous individuals who enjoyed broad religious freedom but instead traded strict parental authority for an equally restrictive rule of in *loco parentis*.[55] As was true for nearly every aspect of undergraduate life in the Founding era, students were closely supervised. Prescribed prayer was compulsory as was attendance at chapel.[56] The suggestion that these minors could have asserted a legal claim of religious freedom to challenge these requirements would have astonished and bewildered members of the Founding generation.

American constitutional law evolved in the early decades of the nineteenth century, but the disabled status of minors was unchanged. The best evidence of this fact is the treatment of the status of minors in James Kent influential treatise *Commentaries on American* law (1836). In Kent's view: "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years."[57] When some radical Jacksonian Democrats suggested that the age of majority for voting ought to be lowered for those who had served in the militia, leading Federalists in the New York state constitutional convention mocked them. Federalist Elisha Williams, a delegate from Columbia County, wondered if his democratic opponents wished to enfranchise

---

[55] *See generally*, Brian Jackson, *The Lingering Legacy of "In Loco Parentis": An Historical Survey and Proposal for Reform*, 44 VAND. L. REV.1135 (1991).

[56] Religious affiliated schools such as Yale had such regulations as did public university such as the University of North Carolina, *see* THE LAWS OF YALE-COLLEGE, IN NEW-HAVEN, IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A.D. 1795, AT 26 (Thomas Green & Son ed., 1800) and ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH-CAROLINA 15 (Raleigh, Off. of the Raleigh Reg. 1838).

[57] James Kent, 2 COMMENTARIES ON AMERICAN LAW 259 (3d ed., 1836).

16

DEFENDANT'S EXHIBIT F

"brave infants" by giving them the right to vote.[58] Extending full rights to minors was literally treated as a joke in early nineteenth century America.

John Bouvier, author of the first American law dictionary, shared the views of Swift and Kent, and his 1858 explanation of the legal significance of the age of majority followed their lead: "The rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights."[59] Thus, there was a broad consensus among legal commentators and the "sages of the law" that minors were legally disabled and could not claim legal autonomy until they reached the legal age of majority.[60]

### B.  Minors and Guns: Military Discipline and *In Loco Parentis*

Minors serving in the militia were subject to military order, discipline, and law. Militia statutes were among the lengthiest laws enacted in the Founding era. Few members of the Founding era believed that young men below the age of majority could be trusted with firearms without proper supervision in most circumstances.

The militia laws in the Revolutionary era not only defined who was in the militia; they also specified the types of weapons that were required to meet this civic obligation and imposed fines and other punishments on those who failed to show up to mandatory musters properly armed.[61] American citizens did not decide which weapons to bring to muster.  Failure to acquire the

---

[58] Corinne T. Field, THE STRUGGLE FOR EQUAL ADULTHOOD: GENDER, RACE, AGE, AND THE FIGHT FOR CITIZENSHIP IN ANTEBELLUM AMERICA (2014) at 58.

[59] John Bouvier, 1 INSTITUTES OF AMERICAN LAW 148 (1858).

[60] A standard legal maxim derived from Lord Coke held that "great regard, in the exposition of statutes ought to be paid to the construction that sages of the law, who lived about the time." Coke's legal maxim was familiar to lawyers and judges in the early Republic, *see* E. Fitch Smith, COMMENTARIES ON STATUTES AND CONSTITUTIONS 739 (1848). On Smith's significance to antebellum legal culture, *see* William D. Popkin, STATUTES IN COURT: THE HISTORY AND THEORY OF STATUTORY INTERPRETATION 69 (Duke Univ. Press 1999).

[61] Act of Dec. 20, 1791, 1791 S.C. Acts 16, (amending and putting into force an earlier act entitled "an Act for the regulation of the Militia of this state, passed the 26th day of March 1784"); *see also* Act of Jan. 18, 1815, ch. 131, 1815 Mo. Laws 360 (condensing the several Militia laws into a single act).

DEFENDANT'S EXHIBIT F

officially prescribed type of weaponry could result in fines.[62]  As far as the militia was concerned, all guns were not created equal in the eyes of the law.  Government policy was designed to force Americans, in some cases minors under 21, to acquire the type of weapons the government deemed essential for the militia.[63]  These laws not only prescribed the types of armaments needed to participate in the militia; they also described the range of penalties for those who did not acquire or maintain the weapons in good working order.[64]

The fact that early American governments enacted militia laws to compel some infants to keep and bear arms did not establish a right that minors could claim against government. Indeed, some militia statutes expressly recognized this and made parents or guardians liable for any penalty that accrued because an infant failed to acquire suitable weapons to meet the obligation to serve in the militia. As Table One, below, shows, during the Founding era almost half the states passed militia laws expressly stating that parents, not infants, were responsible for obtaining the required firearms needed for militia service for any minors in their household.

---

[62] For a sampling of Founding-era militia statutes, *see* Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 136 (raising a thousand men to defend the state); Act of Apr. 14, 1778, ch. 21, 1778 N.J. Laws 41, 2d. Gen. Assembly (regulating, training, and arraying the militia); Act of Feb. 16, 1779, 1779 Vt. Acts & Resolves 57 (forming and regulating the militia; encouraging military skill for state defense); Act of 1786, ch. 1, 1786 N.C. Sess. Laws 407 (raising troops to protect the inhabitants of Davidson county).

[63] An Act for Formulating and Regulating the Militia, New Hampshire Session Laws 27–42 (1776).

[64] 1821 Tenn. Pub. Acts 63, An Act To Amend The Militia Laws Of This State, chap. 55, §§ 2–3; Act effective May 5th, 1794, § 10, 1794 R.I. Pub. Laws 14, 21; *see generally*, Cornell & DeDino, *supra* note 25 at 508–10.

DEFENDANT'S EXHIBIT F

**Table One: Founding Era Laws Requiring**
**Parents to Supply Militia Arms for Minors in their Household**

| State | Year | Source | Statutory Text |
|---|---|---|---|
| New Hampshire | 1776 | An Act For forming and regulating the Militia within the State of New Hampshire, in New-England, and for repealing all the Laws heretofore made for that Purpose, Acts & Laws of the Colony of N.H., 39 (1776). | And be it further Enacted by the Authority aforesaid, That each and every Officer and private Soldier of said Militia, not under the control of Parents, Masters, or Guardians, and being of sufficient Ability therefore, in the Judgment of the Select-men of the Town wherein he has his usual place of Abode, shall equip himself and be constantly provided with a good Fire Arm . . . . |
| Delaware | 1785 | An Act for establishing a Militia, § 7, 2 Military Obligation: The American Tradition 13 (1947). | [E]very apprentice, or other person of the age of eighteen and under twenty-one years, who hath an estate of the value of eighty pounds, or whose parent shall pay six pounds annually towards the public taxes, shall by his parent or guardian respectively be provided with a musket or firelock . . . . |

19

DEFENDANT'S EXHIBIT F

| | | | |
|---|---|---|---|
| Massachusetts | 1793 | An Act for regulating and governing the Militia of the Commonwealth of Massachusetts, Massachusetts Acts and Laws, May Session, ch. 1, § XIX (1793). | [A]ll parents, masters and guardians shall furnish those of the said Militia who shall be under their care and command, with the arms and equipment's aforementioned . . . . |
| Vermont | 1797 | An Act, for regulating and governing the militia of this State, ch. LXXXI, No. 1, § 15, 2 Laws Of The State Of Vermont Digested And Compiled 122, 131- 32 (1808). | And all parents, masters or guardians, shall furnish those of the said militia who shall be under their care and command, with the arms and equipment's above mentioned . . . . |
| North Carolina | 1806 | 2 William T. Dortch, John Manning, John S. Henderson, The Code Of North Carolina § 3168, at 346–47 (1883). | And all parents and masters shall furnish those of the militia, who shall be under their care or command, with the arms and equipment's above mentioned . . . |

Early American law also drew a sharp distinction between compelled service in the militia, which was described as a duty, not a right, and a separate right to voluntarily enlist in the army, navy or contract to serve as a substitute for someone seeking to hire a replacement for militia service.[65] Although compulsory service in the militia was required, those below the age of legal

---

[65] *Grace v. Wilber*, 10 Johns. 453 (1813). The hiring of substitutes to serve in place of those liable to perform militia service was common in early America, *see* Arthur J. Alexander, *Service by Substitute in the Militia of Lancaster and Northampton Counties (Pennsylvania) during the War of the Revolution*, 9 MILITARY AFFAIRS 278 (1945). During the Civil War period substitutes were also used by, see William L. Shaw, *The*

DEFENDANT'S EXHIBIT F

majority could not volunteer for military service without seeking permission from a parent or legal guardian, a fact that only underscores that militia duty was not seen as conferring a free standing right.[66] In short, the duties created by state and colonial militia laws requiring those eighteen-to-twenty-one to bear arms by serving in the militia did not create a corresponding *right* for such minors to bear arms outside of this context.

Once they had mustered, members of the militia were subject to military discipline and punishment.[67] Indeed, eighteenth century military discipline was exceedingly harsh, including corporal punishment such as whipping.[68] During this era, the goal of achieving good military discipline justified a range of discipline and punishment for failure to comply with mandatory *duties* that is hard to reconcile with the idea that these laws offer evidence of a *right* that might be asserted against government. According to the logic set forth in Plaintiffs' complaint one could be whipped by agents of the government for failing to exercise a "right" according to the government's dictates. As this example illustrates, it makes little sense to treat a government mandate as a right as this term is typically used in modern law. It is certainly true that minors enrolled in the militia would have also participated in community-based law enforcement such as the "hue" and "cry," but such actions would have been supervised by adults. A popular South

---

*Civil War Federal Conscription and Exemption S stem*, 32 JUDGE ADVOCATE JOURNAL 32 16 (1962). Minors could not volunteer for military service without parental consent (or that of a legal guardian), but could be forced even over the objections of their parents to serve in the militia, a fact that further undermines the claim about minors broad Second Amendment rights in the Founding era.

[66] The Americanization of English common law after Independence led to a more democratic conception of law in the decades after the adoption of the Constitution, *see* Gerald Leonard and Saul Cornell, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS CONSTITUTION, 1780S-1830S (2019). The main consequence of this constitutional transformation for those below the age of majority was an expansion of court involvement in guarding the interests of minors, *see* Holly Brewer, *The Historical Links between Children, Justice, and Democracy* 28 HAMLINE JOURNAL OF PUBLIC LAW & POLICY 339 (2006). Thus, American constitutional law continued to treat minors as dependents, not autonomous legal actors long after Independence from Great Britain.

[67] *Houston v. Moore*, 18 U.S. 1 (1820).

[68] Laws To authorize a detachment from the militia of the United States., Chapter 55, § 6, 12 Congress, Public Law 12-55. 2 Stat. 705 (1812) (prohibiting whipping, a common form of punishment used by the military in the eighteenth century).

DEFENDANT'S EXHIBIT F

Carolina justice of the peace manual published in 1788, the year the Constitution was adopted, makes clear the limits imposed on minors' law enforcement functions. The author of this popular legal guide, John Fauchereaud Grimké, was among the state's most distinguished and influential jurists. He described the categories of person "who shall not be a constable" as including "infants," "madmen," and "idiots."[69] The fact that he included infants old enough to participate in the militia and local law enforcement in the same category as those the law considered to be incapable of asserting their legal will independently only underscores the absurdity of treating those under 21 as having a robust, freestanding right to keep, bear, and freely acquire whatever arms they desired at the time of the Founding. Any assertion that infants below the age of majority could claim the right to bear arms outside of the militia or related peacekeeping activities, without the authority of parents or a guardian, rests on an anachronistic interpretation of early American militia statutes, ignorance of Founding-era domestic law, and disregard of the social realities of domestic life at the Founding.[70]

For additional confirmation that the Founding generation did not believe that arming unsupervised minors was a good idea, one need only consider the stringent rules prohibiting firearms ownership and use enacted by colleges in the era of the Second Amendment. Yale College prohibited students from possessing any guns or gun powder.[71] Nor were such restrictions exclusively the province of private institutions. The University of Georgia, one of the nation's oldest public institutions of higher education, also forbade guns on campus. The rule was sweeping: "no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any

---

[69] John Fauchereaud Grimké, THE SOUTH CAROLINA JUSTICE OF THE PEACE 117 (1788). Grimké was one of the state's most eminent lawyers and became one of its most influential jurists. For biographical background on his life, see Eli A. Poliakoff, *Grimké, John Faucheraud*, SOUTH CAROLINA ENCYCLOPEDIA (May 17, 2016), *available at* https://www.scencyclopedia.org/sce/entries/grimke-john-faucheraud/.

[70] For a more elaborate argument about the dangers of interpreting the Second Amendment with an ahistorical understanding of rights, *see generally* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31 (2020).

[71] THE LAWS OF YALE-COLLEGE, IN NEW-HAVEN, IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A.D. 1795 26 (1800).

other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[72]  A similar law governed students at the University of North Carolina, another public university chartered in the same period:  "No Student shall keep a dog, or firearms, or gunpowder.  He shall not carry, keep, or own at the College, a sword, dirk, sword-cane."[73] The rules and regulations of American colleges in the era of the Second Amendment further support the conclusion that, for individuals below the age of majority, there was no unfettered right to purchase, keep, or bear arms.  Rather, access to, and the ability to keep or bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them:  fathers, guardians, constables, justices of the peace, or militia officers.  None of the examples cited to support the proposition minors enjoyed an unqualified right to keep and bear arms acknowledges that the exercise of this right was always tied to supervision of parental authority or some form of military or legal authority.

## C.  The Police Power, Minors, and Firearms Regulation, 1776-1900

Laws signaling the dangers of allowing minors unsupervised access to guns are also deeply rooted in the American legal tradition.  In 1803, New York city singled out guardians for punishment for firearms infractions committed by minors under their charge.[74] In 1817, Columbia, South Carolina enacted a law that allowed for the seizure of weapons used by minors within the city limits.[75] And in 1857, the city of Louisville, Kentucky passed an ordinance stating that "[n]o

---

[72] *The Minutes of the Senate Academicus* 1799–1842, UNIVERSITY OF GEORGIA LIBRARIES (1976), https://www.libs.uga.edu/hargrett/archives/senatus/senatus%20academicus%201799- 1811.pdf.

[73] Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North-Carolina 15 (1838).

[74] Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803).

[75] An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817), Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto 61-61 (1823); Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1, Edward

DEFENDANT'S EXHIBIT F

person shall retail gunpowder to minors" but included an exception for those who had "authority from his parent or guardian."[76] As these laws suggest, minors were far more limited in their ability to acquire and use weapons than adults.

Context is key to understanding firearms regulation in the early republic. The primary goal of government policy was to force Americans to procure the types of weapons needed to arm the militia. America was far better armed than any other society in the Anglo-American world, but American consumer preferences favored guns most useful to life in an agrarian society. Lighter hunting muskets and fowling pieces were more practical for farmers than heavy Brown-Bess muskets. The former weapons were better suited to ridding fields of vermin or putting food on the table. By contrast, the latter class of firearms were better suited to the demands of eighteenth-century land warfare. Military muskets could be fitted with a bayonet, an indispensable tool in hand-to-hand fighting. Finally, a military-quality musket had to be sturdy enough to serve as an effective club in close in combat, where a sturdy weapon might need to serve as a bludgeon.

Although eighteenth-century military muskets were effective tools on the battlefield, they were not well adapted to farm life and were seldom used in crime or interpersonal violence in the era of the Second Amendment.[77] Flintlocks and muzzle loading weapons took too long to load and were too inaccurate to make them effective instruments of anti-social violence or criminal activity. Ohio State historian Randolph Roth's recent work on the history of homicide demonstrates clearly that interpersonal gun violence was simply not a serious problem in the era of the Second

---

Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803). DIGEST OF THE CHARTER AND ORDINANCES OF THE CITY OF MEMPHIS 50 (1857).

[76] *No. 68. An Ordinance as to Retailing Gun Powder*, in Oliver H. Strattan, A COLLECTION OF THE STATE AND MUNICIPAL LAWS, IN FORCE, AND APPLICABLE TO THE CITY OF LOUISVILLE, KY 175 (1857).]

[77] For a useful discussion of eighteenth-century firearms that explains why military muskets were less useful to farmers than other types of long guns, s*ee* "Firing a Musket," NCpedia, https://www.ncpedia.org/media /video/firing- musket-18th.

Amendment.[78] Given that gun violence was not a pressing issue of public concern at the time that the Second Amendment was enacted, and the ongoing problems of properly arming the militia, neither the federal government nor the states had any interest or need to enact modern-style gun control laws aimed at reducing the stock of weapons in circulation. Given these facts, it is hardly surprising that government arms policy was not designed to restrict access to weapons. In fact, the opposite goal was the driving force behind much government regulation: government policy aimed to encourage the ownership of military quality weapons needed for militia service and regulation was designed to further this objective.[79] There was no need to pass laws discouraging households from acquiring muskets, given that there was a pressing need to get Americans to acquire these weapons for militia service.[80]

Modern-style arms control measures targeting weapons better suited for crime and interpersonal violence, and not especially useful for militia service, did not emerge in American law until technological changes, economic efficiencies, and changing consumer preferences made these weapons more common.[81] The market revolution of the Jacksonian period transformed American life, making a host of consumer goods—from wooden clocks to firearms—widely available for the first time.[82] The impact of this interconnected set of changes in production,

---

[78] Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History*, in A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 113, 117 (Jennifer Tucker et al. eds., 2019).

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] Historians use the term "market revolution" to describe the interrelated changes in technology, culture, and the economy that led to an expansion of consumer goods in pre-Civil War era, *see* John Lauritz Larson, *Foreword: The Market Revolution in Early America: An Introduction* 19 OAH MAGAZINE OF HISTORY 4 (2005). On the importance of the market revolution to the development of the American firearms industry, *see generally* Joshua L. Rosenbloom, *Anglo-American Technological Differences in Small Arms Manufacturing* 23 J. OF INTERDISCIPLINARY HISTORY 683 (1993); Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion* 92 BUSINESS HISTORY REVIEW 57 (2018). Although Samuel Colt's innovations are closely identified with the market revolution there were important improvements in firearms production prior to his entrance into the firearms industry. Government investment and innovation in arms production spilled over into private arms makers and

DEFENDANT'S EXHIBIT F

consumption, and technology transformed gun culture by making a variety of weapons, including pistols, more common. At the time of the Second Amendment, 90% of the guns owned by Americans were long guns; handguns were relatively rare, expensive, and not very accurate.[83] The market revolution of the early nineteenth century made cheaper handguns widely available for the first time in American history. In response to the perception that handguns posed a grave danger to public safety, states began passing laws to deal with the negative consequences of these weapons, including the first laws targeting concealed weapons.[84]

In addition to enacting a variety of general firearms regulations, the antebellum era also witnessed a growing concern over the dangers posed by firearms, particularly to minors.[85] In 1856, Alabama adopted a provision focusing on the specific problem posed by the sale of such weapons to minors:

> That anyone who shall sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars."[86]

Tennessee passed a similar law: "That any one who shall sell or give or lend, to any male minor, a . . . air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars."[87] Kentucky also enacted a similar law, but carved out an exception when a minor was supervised by an adult:

---

manufactures, gun smiths also took advantage of new techniques and technology to improve weapons and make them more affordable.

[83] Kevin Sweeney, *Firearms Ownership and Militias* in A RIGHT TO BEAR ARMS? THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 63-66 (Jennifer Tucker et al. eds., 2019).

[84] *See* Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS. 73 (2020); for a good example of such a law, *see* Of Miscellaneous Offences, ch. 7, § 4, 1841 Ala. Acts 148, 148–49.

[85] Cornell and DeDino, *supra* note 25.

[86] Act of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Acts 17, 17.

[87] An Act to Amend the Criminal Law, No. 26.

DEFENDANT'S EXHIBIT F

> If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.[88]

The fact that the Kentucky statute expressly mentioned a prohibition on giving or loaning weapons to slaves or free persons of color highlights the complicated connection between slavery and guns in pre-Civil War America. The Slave South was the most violent region of the nation in the period before the Civil War. The violence associated with slavery and the high levels of gun ownership also resulted in this region taking the lead in enacting a variety of gun control measures, including laws aimed at preventing minors from acquiring and using dangerous weapons.[89]

### D. The Expansion of Firearms Regulation in the Era of the Fourteenth Amendment

The problem of gun violence intensified in post-Civil War America. In response to this expanding threat, states and localities enacted a range of new gun laws, including the regulation of minors. This period also witnessed a profound change in the constitutional treatment of the right to bear arms. Enacting new laws focused on the growing problem of gun violence was facilitated by a wave of state constitution-making after the Civil War. Many of these new constitutions adopted after the Civil War in Southern states, and in the newly admitted western states, revised the Founding era formulation of the right to bear arms to expressly assert that the right was subject to regulation. Gun rights and gun regulation were literally fused together in new state constitutions

---

[88] 1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.

[89] *See generally* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F. 121(2015), http://www.yalelawjournal.org/forum/firearm-regionalism-and-public-carry. On southern homicide rates, *see* Randolph Roth, AMERICAN HOMICIDE 180-249 (2009). It is important to distinguish between laws primarily aimed at disarming African Americans, including slaves, and laws aimed at preventing minors from acquiring guns or race neutral laws aimed at the problem of gun violence, on the importance of this distinction and the confusion arising from failing to make it, *see generally* Mark A Frassetto, *The Nonracist and Antiracist History of Firearms Public Carry Regulation*, 74 SMU L. REV. F. 169 (2021); Patrick Charles, *Racist History and the Second Amendment: A Critical Commentary* 43 CARDOZO L. REV., Issue 4 (2022, Forthcoming).

DEFENDANT'S EXHIBIT F

during Reconstruction.[90] In Table Two, below, Georgia's formulation of the right to bear arms—among the most robust of the new post-Civil War provisions—is compared with Pennsylvania's 1776 arms bearing provision, the first one adopted after American Independence.

**Table Two**

| Pennsylvania 1776[91] | Georgia 1868[92] |
|---|---|
| That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power. | [T]he right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be borne. |

The language employed by Georgia, and sixteen other state arms-bearing provisions adopted after the Civil War forged a tight link between the right to regulate and to bear arm. This change in constitutional language, one of the most striking features of post-Civil War constitutionalism, drew on well-established antebellum views of the robust scope of the police power.[93] The new formulation of the right to keep and bear arms included in these constitutions underscored the breadth of the state's police power authority in arms regulation.

The issue of minors and arms bearing even drew comment in at least one state constitutional convention: Utah's. The convention considered changing the age to participate in the militia to twenty-one. Although there was some disagreement over the wisdom of changing the policy, there was little disagreement that if such a policy was desirable the state had ample authority to make the change. The contours of the debate in Utah make clear that the there was no constitutional necessity compelling states to either require or prohibit minors from participating in

---

[90] *See generally* Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2021).
[91] PA. DECLARATION OF RIGHTS, cl. XIII.
[92] GA. CONST. of 1868, art. I, § 14:
[93] *See* Cornell, *supra* note 13.

DEFENDANT'S EXHIBIT F

the militia. The decision about the composition of the militia remained one that was dictated by military necessity, not constitutional imperative.[94]

Major constitutional commentators during Reconstruction (1865-1877) agreed that the scope of legitimate police power regulation of arms was considerable. John Norton Pomeroy, one of the era's most distinguished constitutional authorities writing in this period, observed that the right to keep and bear arms posed no barrier to government authority to regulate or limit persons from "carrying dangerous or concealed weapons."[95]

Indeed, the Republicans who wrote the Fourteenth Amendment championed an expanded police power to effectuate their vision of a well-regulated society.[96] Among the most pressing concerns of Republicans in the era of the Fourteenth Amendment was the problem of protecting the lives and rights of African Americans in the South, including the right to keep and bear arms.[97] Support for this goal did not mean that Republicans opposed strong gun regulations.[98] Quite the opposite was the case across the South. In fact, rather than mark a retreat from robust gun regulation, Reconstruction marked an intensification of efforts to regulate firearms—a development spurred in part by the rise of para-military groups such as the KKK.[99]

---

[94] Official Report of the Debates and Proceedings of the Convention Assembled at Salt Lake City 815–19 (1898).

[95] John Norton Pomeroy, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES: ESPECIALLY DESIGNED FOR STUDENTS, GENERAL AND PROFESSIONAL 152–53 (1868); Lewis Hochheimer, THE LAW RELATING TO THE CUSTODY OF INFANTS, 4 (3ed. 1899).

[96] For a more detailed discussion, *see* Laura F. Edwards, *The Reconstruction of Rights: The Fourteenth Amendment and Popular Conceptions of Governance* 41 J. OF SUP. CT. HIST. 310 (2016). For a discussion of how the courts wrestled with the meaning of the Amendment, *see* William E. Nelson, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[97] Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARVARD L. REV. FORUM 238, 241–42 (2014).____

[98] *See generally* Ronald M. Labbé & Jonathan Lurie, THE SLAUGHTERHOUSE CASES: REGULATION, RECONSTRUCTION, AND THE FOURTEENTH AMENDMENT (Univ. Press of Kansas 2003).

[99] *See generally* Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South*, 17 STAN. L. & POL'Y REV. 615 (2006). One of the most horrifying examples was the Colfax massacre, *see* Leeanna Keith, THE COLFAX MASSACRE: THE UNTOLD STORY OF BLACK POWER, WHITE TERROR, AND THE DEATH OF RECONSTRUCTION (2008).

DEFENDANT'S EXHIBIT F

The robust regulation of firearms during Reconstruction, including regulations on sale or access to firearms for those under the age of majority, was not a novel application of the police power, but simply an example of the flexibility inherent in this legal concept. Exercises of the police power were seen as consistent with the scope of the Second Amendment's reach understood at the time. The author of Section One of the Fourteenth Amendment, John Bingham, expressly affirmed the state's ability to promote public safety and welfare during the public campaign to ratify the amendment, assuring Ohioans in Cincinnati that the states would continue to be responsible for all issues of "local administration and personal security."[100] As long as laws were racially neutral and favored no person over any other, the states were free to enact whatever reasonable measures were necessary to promote public safety and promote the common good.[101]

The general expansion of firearms regulation during Reconstruction included a spate of new laws governing minors and guns.[102] Individual states and localities responded to the proliferation of weapons among unsupervised minors by adopting a range of age-specific limits on the purchase and use of firearms by those under the age of legal majority (which remained twenty-one during this period). The provision adopted by the city of Fresno, California just before the turn of the century is illustrative of these laws: "No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of eighteen years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon."[103] Some of these laws targeted children younger than sixteen, but others singled out anyone below the age of twenty-one. For example, Indiana's law cast a broad net, prohibiting "The Sale, Gift or Bartering of Deadly Weapons or Ammunition to Minors":

---

[100] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).
[101] Michael Les Benedict, *Preserving Federalism: Reconstruction and the Waite Court*, 1978 SUP. CT. REV. 39, 40-41, 47 (1978).
[102] Cornell and Florence, *supra* note 100; Cornell, *supra* note 13.
[103] Misdemeanors. Section 53., *in* L. W. Moultrie, CHARTER AND ORDINANCES OF THE CITY OF FRESNO 37 (1896).

DEFENDANT'S EXHIBIT F

> Be it enacted by the General Assembly of the State of Indiana, That it shall be unlawful for any person to under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol. § 2. Be it further enacted, that any person who shall violate any of the provisions of the foregoing section shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum not less than five dollars, nor more than fifty dollars.[104]

Wisconsin also prohibited minors from going armed or acquiring pistols and revolvers:

> SECTION 1: It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor, any pistol or revolver, found in his possession.
>
> SECTION 2: It shall be unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state[105].

Henry Campbell Black, the author of *Black's Law Dictionary* and a leading post-Civil War legal authority, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined, and that determination of its limits was best left to courts on a case-by-case basis.[106] Christopher G. Tiedeman, a conservative critic of the police power, nonetheless acknowledged the scope of its legitimate purview: "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[107] Other Reconstruction-era commentators on the scope of the police power were more explicit about the reach of the police power over firearms.

---

[104] Act of Feb. 27, 1875, ch. 40, 1975 Ind. Acts 59.
[105] 1883 Wis. Sess. Laws 290.
[106] Henry Campbell Black, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).
[107] Christopher G. Tiedeman, A TREATISE ON THE LIMITATIONS OF POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149–50 (1854)).

DEFENDANT'S EXHIBIT F

In the case of minors, the police power was at its summit. Lewis Hochheimer, one of the leading authorities on the rights of infants in this period, noted that the regulation of firearms and minors was an area of the law in which the police power was at its apex.[108] Infants, he conceded, were not entirely beyond the protection of the Bill of Rights, but he was equally quick to point out that the need to protect those below the age of majority meant some regulations that were otherwise impermissible if applied to adults were perfectly legal when placing limits on infants.[109] Total prohibitions on the sale of dangerous weapons were one such an example. In this instance, the broad power to protect the welfare of minors gave government extraordinary latitude in regulating their conduct.[110] In fact, the scope of state regulatory authority was at its zenith when regulating arms and minors. This principle is evident in a Missouri statute from 1883 that banned weapons in places where young people might gather, such as schools, places of worship, and other venues in which people gathered for "education, literary, or social purposes." In addition, the law also expressly prohibited loaning, giving, or selling any "deadly weapon" to a minor.

> If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for education, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any unlawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than

---

[108] Lewis Hochheimer, THE LAW RELATING TO THE CUSTODY OF INFANTS 4 (3ed. 1899).
[109] *Id.*
[110] *Id.*

DEFENDANT'S EXHIBIT F

> twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.[111]

A Kansas statute prohibited selling, trading, giving, or loaning pistols or revolvers to minors:

> Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.[112]

The language of a Louisiana law was more comprehensive: "That, hereafter, it shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years.[113] Some states followed Nevada's lead and focused on the particular danger posed by minors carrying guns in public:

> Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.[114]

In his review of the history of gun regulation during this period, political scientist Robert Spitzer concluded that laws limiting the ability of minors to obtain and use arms without

---

[111] Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

[112] 1883 Kan. Sess. Laws 159, § 1

[113] 1890 La. Acts 39, § 1; 1882 Md. Laws 656, § 2.

[114] 1885 Nev. Stat. 51, § 1 (approved March 4, 1881, THE GENERAL STATUTES OF THE STATE OF NEVADA. IN FORCE. FROM 1861 TO 1885, INCLUSIVE. 1077 THE GENERAL STATUTES OF THE STATE OF NEVADA: IN FORCE, FROM 1861 TO 1885, INCLUSIVE : WITH CITATIONS OF THE DECISIONS OF THE SUPREME COURT RELATING THERETO 1077 ( David E. Baily and John D. Hammond, 1885).

DEFENDANT'S EXHIBIT F

appropriate supervision were among the most common firearms regulations in the post-Civil War period. After surveying dozens of laws across the nineteenth century, Spitzer concluded that "numerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one—arose in the late 1800s."[115] In fact, he concluded that restrictions on minors were more common than limits on felons.[116]

Table Three, below, contains a sample of the different types of laws enacted in the post-Civil War period regulating minors and guns.

**Table Three**
**Selected Firearms Laws Limiting Minors enacted between 1875-1900**

| State | Year | Provision |
| --- | --- | --- |
| Indiana | 1875 | Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59 (making it unlawful to sell, barter, or give a pistol or other deadly weapon to any person under twenty-one). |
| Georgia | 1876 | Act of Feb. 17, 1876, no. 128, § 1, 1876 Ga. Laws 112, 112 (making it unlawful to sell, give, lend, or furnish any pistol or other deadly weapons to a minor). |
| Mississippi | 1878 | Act of Feb. 28, 1878, ch. 66, §§ 2, 1878 Miss. Laws 175, 175 (making it unlawful to sell a pistol or other similarly deadly weapon to a minor). |
| Delaware | 1881 | Act of Apr. 8, 1881, ch. 548, § 1, 1881 Del. Laws 716 (making it unlawful to sell a deadly weapon to a minor). |
| Florida | 1881 | Act of Feb. 4, 1881, ch. 3285, §§ 1–2, 1881 Fla. Laws 87, 87 (making it unlawful to sell, hire, barter, lend, or give a pistol or other arm or weapon, with certain exceptions, to minors under sixteen). |
| Illinois | 1881 | Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73, 73 (making it unlawful for any person other than a parent, guardian, or employer to sell, give, loan, hire, or barter a pistol, revolver, or other deadly weapon to a minor). |
| Pennsylvania | 1881 | Act of June 10, 1881, no. 124, § 1, 1881 Pa. Laws 111, 111–12 (making it unlawful to sell a revolver, pistol, or other deadly weapon, to a person under sixteen). |
| Maryland | 1882 | Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656, 656 (making it unlawful to sell, barter, or give away any firearm or other deadly weapons, with some exceptions, to a minor under the age of twenty-one). |

---

[115] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55, 60 (2017).

[116] *Id.*

| West Virginia | 1882 | Act of Mar. 24, 1882, ch. 135, § 7, 1882 W. Va. Acts 421, 421–22 (making it unlawful to furnish a revolver, pistol, or other dangerous and deadly weapon, to a person under twenty-one). |
|---|---|---|
| Kansas | 1883 | Act of Mar. 1, 1883, ch. 105, §§ 1–2, 1883 Kan. Sess. Laws 159, 159 (making it unlawful to furnish a pistol, revolver, toy pistol, or other dangerous weapon to a minor, and making it unlawful for any minor to possess such weapons). |
| Missouri | 1883 | Act of Mar. 5, 1883, § 1, 1883 Mo. Laws 76, 76 (making it unlawful to sell, deliver, loan, or barter a firearm or other deadly weapon to a minor without their parents' or guardians' consent). |
| Wisconsin | 1883 | Act of Apr. 3, 1883, ch. 329, §§ 1–2, 1883 Wis. Laws 290, 290 (making it unlawful for any person to sell, loan, or give a pistol or revolver to a minor, and making it unlawful for any minor to go armed with any pistol or revolver). |
| Iowa | 1884 | Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86, 86 (1884) (making it unlawful to sell, present, or give any pistol, revolver, or toy pistol to a minor). |
| Nevada | 1885 | Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51, 51 (making it unlawful for any person under twenty-one to wear or carry any concealed pistol or other dangerous or deadly weapon). |
| Louisiana | 1890 | Act of July 1, 1890, § 1, 1890 La. Acts 39, 39 (making it a misdemeanor to sell, lease, or give any pistol or other dangerous weapon to any person under twenty-one). |
| Oklahoma | 1890 | Penal Code of the Territory of Oklahoma, ch. 25, art. 47, § 3, 1890 Okla. Laws 495, 495 (making it unlawful to sell or give to any minor one of the designated arms or weapons provided in the article). |
| Wyoming | 1890 | Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Sess. Laws 127, 140 (making it unlawful to sell, barter, or give a pistol or other deadly weapon to any person under twenty-one). |
| North Carolina | 1893 | Act of Mar. 6th, 1893, ch. 514, § 1, 1893 N.C. Sess. Laws 468, 468–69 (making it unlawful to sell, give, or in any way dispose of a pistol or pistol cartridge to any minor). |
| Nebraska | 1895 | Ordinance of August 26, 1895, art. XXVI, § 2, 1895 Neb. Laws Relating to the City of Lincoln 237, 237 (making it unlawful to sell, loan, or furnish any gun, fowling-piece, or other firearm to a minor). |
| Texas | 1897 | Act of May 14, 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221, 221–22 (making it unlawful to sell, give, or barter any pistol or other dangerous weapon to a minor without the written consent of their parent or guardian). |

## E. The Modern Paradigm Emerges: Gun Regulation 1900–1938

At the dawn of the twentieth century, Congress took up the task of militia reform. The Dick Act of 1903 and the National Defense Act of 1916 transformed the organization of the militia.

35

DEFENDANT'S EXHIBIT F

In place of the model of the militia favored by the Founding generation—one that was suffused with traditional Whig fears of powerful standing armies—a new National Guard system was created. The new militia would be professionalized and—most importantly—controlled more tightly by the federal government.[117]

The newly structured militia was divided into the organized militia, the National Guard, and a more amorphous, unorganized Militia. In an influential article published in the *Yale Law Journal* in 1917, Brigadier General Samuel T. Ansell, a senior officer in the Office of the Judge Advocate General, reviewed the legal changes that facilitated this transformation.[118] One key development was the change in the policy preferences of the individual states about how to structure the militia. Among the most noteworthy changes discerned by Ansell, was the increasing popularity of laws that required parental permission for minors to participate in the militia. Among the states enacting such laws were Connecticut, Idaho, Louisiana, Illinois, Maryland, Nebraska, North Carolina, New Hampshire, New York, South Dakota, Texas, Oregon, West Virginia. The decisions of these states underscore what previous history had made clear: there was no set age requirement for the militia hardwired into the American constitutional system. States were perfectly at liberty to raise or lower the age threshold, require parental consent, or prohibit the participation of minors as they deemed necessary. Defining who would participate in the militia remained a practical policy choice, not a constitutional imperative.[119]

The pace and scope of gun regulation outside of militia regulation also quickened in the twentieth century. New laws were introduced to address novel problems created by advances in firearms technologies, rising levels of gun crime, and perceptions of gun violence, including

---

[117] For a discussion of how the modern national guard replaced the ideals at the core of the Founding era militia, *see generally* Richard R. Uviller R & William Merkel, THE MILITIA AND THE RIGHT TO ARMS: OR, HOW THE SECOND AMENDMENT FELL SILENT (Duke Univ. Press Books 2002).

[118] S. T. Ansell, *Legal and Historical Aspects of the Militia*, 26, YALE L.J. 471, 476 (1917).

[119] *Id.*

DEFENDANT'S EXHIBIT F

increased threats to minors.[120]  Although the right to keep and bear arms continued to be a venerated constitutional value, states and localities vigorously exercised their police power authority to address new problems created by changes in technology and behavior.[121]

Addressing sales and private transfers, Oregon made it "unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years."[122]  An Indiana law took a similarly broad approach to limiting minors' access to dangerous weapons prohibiting the sale, barter, or gift to persons:

> under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell¸ barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol or revolver.[123]

In his classic treatise *The Police Power* (1904), the distinguished legal scholar, Ernst Freund, noted that the scope of the police power in relation to minors was extensive, and he singled out limits on access to firearms as an illustration of this power.[124]  And in *Glenn v. State* (1911), the Georgia Court of Appeals observed that "the police power of the states makes a special charge of minors."[125]

In fact, the police power's scope was at its greatest when the health and safety of minors was at issue, a fact evident in this 1917 Oregon law:

---

[120] On changes in technology and perceptions of crime and gun regulation, Spitzer, *supra* note 115 at 60.  On the perception of growing threats to minors, *see* Jennifer Carlson and Jessica Cobb, *From Play to Peril: A Historical Examination of Media Coverage of Accidental Shootings Involving Children*, 98 SOCIAL SCIENCE QUARTERLY 397, 404-406 (2017).  The data for the essay is available online at https://onlinelibrary .wiley.com/doi/full/10.1111/ssqu.12416#reference.

[121] Ernst Freund, THE POLICE POWER 246–47 (1904).

[122] Act of Feb. 21, 1917, ch. 377, § 10, 1917 Or. Laws 804, 808.

[123] Weapon— Furnishing to Minor, § 450, 1905 Ind. Acts 688 (1905).

[124] Freund, *supra* note 121 at 187, 247.

[125] *Glenn v. State*, 72 S.E. 927 (Ga. Ct. App. 1911).

DEFENDANT'S EXHIBIT F

> Section 10. It shall be unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years. A violation of this section is a misdemeanor and punishable by imprisonment in the county jail for a period not exceeding six months, or by a fine not exceeding Five Hundred Dollars, or both such fine and imprisonment.[126]

Localities also exercised their ample police power authority to pass laws aimed at limiting the access of minors to guns. For example, the city of Chicago forbade issuing firearms permits to all minors:

> It shall be the duty of the general superintendent of police to refuse such permit to
> (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the general superintendent of police to grant such permit upon the payment of a fee of one dollar.[127]

The city of Joplin, Missouri banned weapons in places that minors frequented, and prohibited the sale, loan, or gift firearms to minors.  The law placed minors in similar category with intoxicated persons, and the statute characterized prohibited persons as "irresponsible," thus textually underscoring the danger of allowing minors easy and unsupervised access to guns:

> If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or

---

[126] 1917 Or. Sess. Laws 804–08, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms.
[127] Cook County Ordinance chap. 53 of Chicago Code of 1911: § 6.

threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.[128]

Harkening back to exceptions based on the concept of traditional parental authority, some jurisdictions allowed minors to use guns while under the supervision of a parent. For example, a 1903 South Dakota law made it "unlawful for any person under the age of fifteen years to carry, use or discharge any rifle, shot gun, revolver or other firearms except with the consent and knowledge of their parents or guardians."[129] But these exceptions were premised on the view that minors were not fully independent legal actors who could claim Second Amendment rights on their own.

### F.  Firearms Regulation and Minors, 1938-2021

The very first issue of the Duke law journal, *Law and Contemporary Problems* (published in 1934), focused on crime and included a comprehensive review of firearms regulation in America. It explained that the most common forms of regulation were restrictions on public carry, restrictions on the purchase of arms (including purchase by minors, who still included those aged 18–20 at that time), and prohibitions on dangerous or unusual weapons.[130] The essay also noted that the use of license or permit requirements for purchase of a firearm expanded in the post-Civil War era and became a standard feature of gun regulation in the twentieth century.[131] Indeed, by 1938, another comprehensive review of firearms regulation concluded that the vast majority of

---

[128] Joplin Code of 1917, Art. 67, § 1201, Brandishing, Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible.

[129] Act of Mar. 10, 1903, 1903 S.D. Sess. Laws ch. 144, §§ 1–3, 168, 168–69.

[130] *See generally* John Brabner-Smith, *Firearm Regulation*, 1 LAW & CONTEMP. PROBS. 400 (1934).

[131] *Id.*

states had either banned the public carry of concealed weapons or adopted a restrictive permitting scheme similar to New York's Sullivan Law.[132]  In particular localities, especially large urban areas, in the final decades of the nineteenth century and the early decades of the next century increased the level of regulation of arms, including limits on minors.  And another wide-ranging legal survey of firearms regulation published in 1950 found little had changed in the ensuing decades between the publication of the two comprehensive reviews discussed above and post War World Two-era gun regulation.[133]

One of the most significant developments in gun regulation in the twentieth century was the growth of federal firearms regulation, beginning with the New Deal. As with the state measures addressed above, the threat posed by organized crime and the proliferation of dangerous "gangster weapons," most notably the machine gun, increased public enthusiasm for additional gun control measures.  Repeated popular demands for some type of federal involvement finally bore fruit in 1934, when Congress enacted the first comprehensive federal firearms law.  In contrast to traditional state police power-driven legislation, federal regulation of firearms after the New Deal necessarily focused on interstate commerce. The National Firearms Act of 1934 regulated firearms dealers and imposed a series of taxes on classes of weapons, including machine guns.  The Act sought to limit access to this class of weapons, which was closely identified with criminal behavior.[134]

Later in the twentieth century, popular concern over crime and civil unrest led to the passage of the federal Gun Control Act of 1968.[135]  In addition to revising the federal licensing scheme for the manufacture, importation, and sale of firearms, the act prohibited a variety of

---

[132] *See generally* Sam B. Warner, *Uniform Pistol Act,* 29 AM. INST. CRIM. L. & CRIMINOLOGY 529 (1938).

[133] *See generally* F.J.K., *Restrictions on the Right to Bear Arms: State and Federal Firearms Legislation*, 98 U. PA. L. REV. 905 (1950).

[134] National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at I.R.C. §§ 5801–5872 (2012); The Federal Firearms Act of June 30, 1938, 15 U.S.C. §§ 901–09. On the history of gun regulation up to and including the act, *see* Alexander DeConde, GUN VIOLENCE IN AMERICA (2001).

[135] *See generally* William J. Vizzard, *The Gun Control Act of 1968*, 18 ST. LOUIS UNIV. PUB. L. REV. 79 (1999).

DEFENDANT'S EXHIBIT F

persons from purchasing handguns, including minors, who continued to be defined as those below the age of twenty-one. In addition, federal licensees were prohibited from selling firearms to out-of-state residents, minors, felons, persons under indictment for felonies, fugitives, and certain other categories of persons.[136]

The Firearm Owners' Protection Act of 1986 loosened some restrictions on ammunition and prohibited the creation of a federal firearms registry, but it added additional categories of persons who were barred from possessing firearms, including illegal aliens, dishonorably discharged members of the armed forces, and U.S. citizens who renounce their citizenship.[137] The Brady Handgun Violence Protection Act of 1993 (Brady Act) created a background check system for the purchase of firearms from federally licensed dealers.[138] Notably, neither the 1986 nor the 1993 federal legislative amendments lowered the age for sale of handguns to those under 21, even after the Twenty-Sixth Amendment was adopted and ratified in 1971, setting the voting age at 18. The next major turning point in the debate over firearms regulation focused on "assault weapons," and was closely connected to the rise of mass shootings.[139] California led the way with its ban on assault weapons enacted after the Stockton School Massacre in 1989.[140] Currently, eight states have passed similar laws.[141]

Current efforts to improve the effectiveness of firearms regulation include additional regulation—by California and other states—focused on limiting the access to firearms by those under the age of 21, on top of those regulations already imposed by the 1968 federal Gun Control

---

[136] 18 U.S.C. § 922(b)(1) and 922(c).

[137] Firearm Owners' Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449 (1986).

[138] Brady Handgun Violence Protection Act of 1993, Pub. L. No. 103–59, 110 Stat. 3009 (1993).

[139] *See generally* Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut, et.al, *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction* 68 EMORY L.J. 1043 (2020).

[140] Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115.

[141] *See generally* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 LAW & CONTEMP. PROBS. 231 (2020).

DEFENDANT'S EXHIBIT F

Act.[142]  A recent survey of age restrictions on the acquisition of guns by minors reported the following conclusions:

> As of January 1, 2020, 17 states and the District of Columbia have minimum age requirements that exceed the federal minimum for the purchase of a handgun from unlicensed persons, and eight states and the District of Columbia have minimum age requirements that exceed the federal minimum for handgun possession. Several states also have minimums that are higher than the federal law for long gun purchase and possession.[143] *(Footnotes omitted).*

The scope of the police power regarding firearms and gunpowder has been among the most expansive in any area of the law.  In the case of minors, the legitimate reach of the police is at its peak.  For more than a century, state and federal judges have recognized that minors are among the categories of persons whose access to guns must be carefully regulated.  More recently, the United States Court of Appeals for the Fifth Circuit observed that "[f]rom the mid-19th century through the early 20th century, twenty-one other States imposed age qualifications on the purchase or use of certain firearms."[144] Federal courts have concluded that laws restricting minors' access to firearms are deeply rooted in American history and tradition.[145]

## IX.    CONCLUSION

A review of the historical record demonstrates conclusively that "infants"—i.e., those individuals who are below the legal age of majority (which has been 21 years of age for most of American history)—have never had an unfettered constitutional right to keep, bear, or acquire arms.  This was true in the era of the Second Amendment's adoption and has continued to be true in subsequent periods of American history.  For most of the pre-Civil War period in American history, minors only had legal access to arms when under the patriarchal authority of a head of

---

[142] https://www.rand.org/research/gun-policy/analysis/minimum-age.html.
[143] *Id.*
[144] *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 202 n.16 (5th Cir. 2012).
[145] *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013); *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 185.

DEFENDANT'S EXHIBIT F

household, when assisting sheriffs, justices of the peace or constables to preserve the peace, or when performing militia duties and supervised by militia officers. The adoption of the Fourteenth Amendment did not alter these facts. Firearms regulation, including regulations of minors, intensified after the Civil War as Americans enacted a variety of different types of laws to deal with the grown danger of gun violence. Thus, asserting a constitutional right of those under 21 to keep, bear, and acquire arms rests on a serious misunderstanding of a core principle of Anglo-American law regarding the status of those below the age of legal majority.

The central fact asserted by Plaintiffs in this case is uncontroversial: in the Founding era and for much of American history, governments compelled some minors under 21 to serve in the militia and participate in related forms of community-based law enforcement. But the existence of such duties does not provide any concomitant evidence of the existence of a constitutional *right* to keep, bear, or acquire firearms for those under the age of 21. Rather, it demonstrates that governments have imposed a constitutional duty and obligation upon generations of Americans, including some minors, to contribute to public defense and preserve the peace.

Plaintiffs' argument not only confuses rights with obligations, but it conflates specific public policy choices made by states and the federal government about the composition of the militia with fixed constitutional principles about the role of the military in the American constitutional scheme of government and the scope of individual rights. State and local governments were free to expand or contract the age restrictions on participation in the militia in response to the needs of public defense and safety. When it proved advantageous to include males below 21 in the militia, governments adopted regulations to achieve that policy goal. If public defense or other policy goals were better served by excluding this portion of the population from militia service, legislatures enacted laws to implement that policy objective.

The regulation of gun powder and firearms has always been understood to be a core feature of the state's considerable police powers. The scope of state police power is greatest when protecting the health and safety of minors. Given these two facts, it is not surprising that there is a long history of state regulations covering minors and guns. Most states have had laws regulating

DEFENDANT'S EXHIBIT F

arms, including regulations of minors, for more than a century.  Many of these laws date to the era of the Fourteenth Amendment and regulate the conduct of those under 21.  Public perception that minors were especially at risk to harm from firearms intensified in the post-Civil War era.  As has been true for the entire arc of American legal history, government efforts to regulate dangerous conduct increase when the public perception that such activity poses a threat to safety and welfare reaches a threshold.  By the start of Reconstruction, American concerns over gun violence, including the danger guns posed to minors, had reached a new level and states and localities acted accordingly, enacting a wide range of laws to address this problem.

Thus, firearms regulation, including limits on the ability of minors under 21 to access and use arms, clearly falls within long-standing American historical and legal traditions.  In short, Plaintiffs' contention that individuals under the age of 21 have always enjoyed a robust Second Amendment right to purchase, receive, transfer, and carry firearms has no foundation in history, text, or tradition.  The Illinois statutes at issue in this case are consistent with this historical tradition and would not have violated the Second Amendment or the right to bear arms as understood at the Founding, in the antebellum era, or at the time of ratification of the Fourteenth Amendment.

_Saul  Cornell_

Saul Cornell, Ph.D.
Redding, CT
Dated: May 31, 2022

44

DEFENDANT'S EXHIBIT F

# EXHIBIT 1

DEFENDANT'S EXHIBIT F

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✱ Bronx, NY 10458 ✱ 203 826-6608 (c) ✱ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

DEFENDANT'S EXHIBIT F

| **Prizes and Awards** |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| **Publications, Presentations and Media Appearances** |
|---|

### Books:

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000) (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Interviews, Editorials, Essays, Podcasts:

"The Right Found a New Way to Not Talk About a School Shooting, SLATE May 25, 2022"

"The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022

"Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse,"  New York Daily News Apr 17, 2022

"The Supreme Court's Latest Gun Case Made a Mockery of Originalism"  *Slate* November 10, 2021

"'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021

DEFENDANT'S EXHIBIT F

Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms, *Slate* November 02, 2021

Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism? *Slate* November 1, 2021

"Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021

"Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate

"What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021

"Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019

"Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019

"The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019

"The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.

"Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018

"Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017

"The State of the Second Amendment," National Constitution Center, Podcast October, 2017

"Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017

"Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017

"Half Cocked," *Book Forum* April 2016

"Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016

"Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015

"The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]

PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013

"All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

"What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010

"Gun Points," *Slate*, March 8, 2010 (With Justin Florence, and Matt Shors)

"What's Happening to Gun Control," *To the Point, NPR*. March 11, 2010

"Getting History Right," *National Law Journal*, March 1, 2010

"History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008

"The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR) March 17, 2008

DEFENDANT'S EXHIBIT F

"Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007

"A Well Regulated Militia," *The Diane Rehm Show*, WAMU (NPR)  Broadcast on Book TV  ( 2006)

"Taking a Bite out of the Second Amendment," *History News Network,* January 30, 2005

"Gun Control," Odyssey, Chicago NPR September 8, 2004

"Loaded Questions," *Washington Post Book World*  February 2, 2003

"The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002

"Real and Imagined," *New York Times*, June 24, 1999

## Scholarly Articles, Book Chapters, and  Essays:

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*,* 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and *C*ontemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The  1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

DEFENDANT'S EXHIBIT F

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review *Res Gestae*  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism" Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities" Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal  56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal  69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of  A merican Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law  Review  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion," Chicago-Kent Law Review  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," Law and History Review  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  Stanford Law and Policy Review  (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  Fordham Law Review 73 (2004):  487-528 [With Nathan DeDino]

DEFENDANT'S EXHIBIT F

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed:  The Bill of Rights (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:  The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

DEFENDANT'S EXHIBIT F

"The Changing Historical Fortunes of the Anti-Federalists," <u>Northwestern University Law Review</u> (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," <u>The Pennsylvania Magazine of History and Biography</u> (1988): 103-130

### Book Reviews:

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>American Studies</u> <u>Journal of the Early Republic</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>American Quarterly</u>
- <u>American Journal of Legal History</u>
- <u>Law and History Review</u>

### Journal Manuscript Referee:

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>Diplomatic History</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>Law and History Review</u>
- <u>Harvard Law Review</u>
- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

### Book Manuscript Reviewer:

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

### Invited Lectures:

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

DEFENDANT'S EXHIBIT F

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

DEFENDANT'S EXHIBIT F

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

DEFENDANT'S EXHIBIT F

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C.  (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

DEFENDANT'S EXHIBIT F

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders," NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

DEFENDANT'S EXHIBIT F

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

### Amicus Briefs:

- Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]
- Amicus Brief, *Young v. State of Hawaii*  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]
- Amicus Brief*, Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]
- Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]
- Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]
- Amicus Brief*, Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]
- Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]
- Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]
- Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]
- Amicus Brief, *Silvera*  v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]
- Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]
- Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

## Expert Witness Testimony

- Expert Witness, Chambers v. City of Boulder (Colorado Appeals Court 2020)
- Expert Witness, Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper, (Colorado District Court, 2016)
- Expert Witness, Zeleny v. Newsom, No. 17-CV-07357-RS (TSH) (N.D. Cal. 2020)

## Other Professional Activities

- Editorial Board, Constitutional Study, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, American Quarterly (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004

DEFENDANT'S EXHIBIT F

- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004, 2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

---

## Court Citations

### US Supreme Court:

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44 (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

### Federal Courts:

*Young v. Hawaii*, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

DEFENDANT'S EXHIBIT F

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

DEFENDANT'S EXHIBIT F

# EXHIBIT 2

DEFENDANT'S EXHIBIT F

**Saul Cornell**
**Court Citations**

**Supreme Court**

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts**

Duncan v. Bonta, 19 F.4th  2021.

Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives, 5 F.4th 407 (4th Cir.), as amended (July 15, 2021), vacated as moot, 14 F.4th 322 (4th Cir. 2021), cert. denied sub nom. Marshall v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 142 S. Ct. 1447 (2022).

Nat'l Rifle Ass'n of Am., Inc. v. Swearingen, 545 F. Supp. 3d 1247 (N.D. Fla. 2021).

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

DEFENDANT'S EXHIBIT F

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom. United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom. United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts**

State v. Christen, 2021 WI 39, 396 Wis. 2d 705, 958 N.W.2d 746, cert. denied, 142 S. Ct. 1131, 212 L. Ed. 2d 20 (2022).

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

DEFENDANT'S EXHIBIT F

State v. Christen, 2021 WI 39, 958 N.W.2d 746