DEFENDANT'S EXHIBIT G

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

David Meyer, Mitchell Nalley, Eva Davis, Second Amendment Foundation, Illinois State Rifle Association, and Firearms Policy Coalition, Inc.,

Plaintiffs,

v.

Kwame Raoul, Brendan F. Kelly, Joshua C. Morrison, James Gomric, Eric Weis, Christopher Palmer, Richard Watson, and Dwight A. Baird,

Defendants.

21-cv-518-SMY

Judge Staci M. Yandle

**DECLARATION OF PROFESSOR JOHN J. DONOHUE**

I, John J. Donohue, declare as follows:

1. I am at least 18 years old and have personal knowledge of the statements contained in this declaration;

2. The statements contained in the expert report I authored in this case, dated May 31, 2022, and attached hereto are true and accurate;

3. If called to testify at trial in this case, I would testify to the matters set forth in my expert report.

4. My testimony would be consistent with all of the statements included in the report, which contains a description of my qualifications as an expert witness, a complete statement of all opinions I would express at trial, the facts and data I considered in forming my opinions, the basis and reasons for my opinions, a statement of my compensation, and a list of all other cases from the previous four years where I testified as an expert at trial or by deposition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 31, 2022

John J. Donohue III

John J. Donohue

DEFENDANT'S EXHIBIT G

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

David Meyer, Mitchell Nalley, Eva Davis, Second Amendment Foundation, Illinois State Rifle Association, and Firearms Policy Coalition, Inc.,

Plaintiffs,

v.

Kwame Raoul, Brendan F. Kelly, Joshua C. Morrison, James Gomric, Eric Weis, Christopher Palmer, Richard Watson, and Dwight A. Baird,

Defendants.

21-cv-518-SMY

Judge Staci M. Yandle

**EXPERT REPORT OF PROFESSOR JOHN J. DONOHUE**

## I. ASSIGNMENT

I have been asked to provide an expert opinion on the relationship between Illinois statutes that regulate the concealed carry of firearms by adults aged 18 to 20 found in 720 Ill. Comp. Stat. 5/24-1(a)(4)(iv), 720 Ill. Comp. Stat. 5/24-1(a)(10)(iv), 720 Ill. Comp. Stat. 5/24-1.6(a)(3)(I), and 430 Ill. Comp. Stat. 66/25(1) and public health and safety, as well as the nature of that relationship. In particular, I was asked to review and opine on the social science and criminology research literature that addresses the risks of criminal violence presented by the age group of people 18 to 20 years old. I was further asked to both review and opine on any neurobiological and behavioral factors revealed by that literature and the relationships of such factors to policy decisions such as the state of Illinois' adoption of the age-based restrictions on firearm carrying that are challenged in the *Meyer, et al. v. Raoul, et al.* lawsuit pending in the United States District Court for the Southern District of Illinois as case number 21-cv-518.

## II. QUALIFICATIONS AND BACKGROUND

I am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School. (A copy of my complete *curriculum vitae* (CV) is attached as Exhibit 1.) I earned a law degree from Harvard and a Ph.D. in economics from Yale and have been a member of the legal academy since 1986. I have previously held tenured positions as a chaired professor at both Yale Law School and Northwestern Law School. I have also been a visiting professor at a number of law schools, including Harvard, Yale, the University of Chicago, Cornell, the University of Virginia, Oxford, Toin University (Tokyo), St. Gallens (Switzerland), and Renmin University (Beijing).

I am a Research Associate of the National Bureau of Economic Research, and a member of the American Academy of Arts and Sciences. I was a Fellow at the Center for Advanced Studies in Behavioral Sciences in 2000-2001 and served as the co-editor of the American Law and Economics Review for six years. I have served as the President of the American Law and Economics Association and as Co-President of the Society of Empirical Legal Studies. At Stanford, I regularly teach a course on empirical law and economics involving crime and criminal justice, and I have previously taught similar courses at Yale Law School, Tel Aviv University Law School, the Gerzensee Study Center in Switzerland, St. Gallen University School of Law in Switzerland, and the Universidad del Rosario in Bogota, Colombia. From 2011-2018, I served on the Committee on Law and Justice of the National Research Council (NRC), which "reviews, synthesizes, and proposes research related to crime, law enforcement, and the administration of justice, and provides an intellectual resource for federal agencies and private groups."[1]

Since gun crime is an important aspect of American crime, my courses evaluate both the nature of gun regulations in the United States and the impact of gun regulations on crime. This topic is an important part of my research, about which I have published extensively (as reflected in my CV). I have also consistently taught courses on law and statistics for over two decades.

---

[1] *See* National Academies, Committee on Law and Justice, https://www.nationalacademies .org/claj/committee-on-law-and-justice, for more information about this NRC committee.

I filed an expert declaration in two cases challenging city restrictions on the possession of large-capacity magazines: *Fyock v. City of Sunnyvale*, Case No. C-13-5807-RMW, United States District Court (N.D. Cal.), January 2014; *Herrera v. San Francisc*o, Case No. CV 13-5351 WHA, United States District Court (N.D. Cal.), January 2014.

I also filed an expert declaration in a case involving a challenge to Maryland's restrictions on assault weapons and large-capacity magazines: *Tardy v. O'Malley*, Case No. 1:13-cv-02841-CCB, United States District Court (D. Maryland), February 2014. I filed an expert declaration, and provided live expert witness testimony, in response to a motion for a preliminary injunction in a case challenging New Jersey's restrictions on large-capacity magazines: *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, Case No. 3:18-cv-10507-PGS-LHG, United States District Court (D.N.J.), August 2018.

I also submitted an expert declaration on June 1, 2017 in a case involving a challenge to California's restrictions on the carrying of weapons in public: *Flanagan v. Becerra*, Case No. 2:16-cv-06164-JAK-AS, United States District Court (C.D. Cal.); expert declarations on June 4, 2017 and June 16, 2017 in two separate cases challenging California's ban on the possession of large-capacity magazines: *Duncan v. Becerra*, Case No. 17-cv-1017-BEN-JLB, United States District Court (S.D. Cal.), and *Weise v. Becerra*, Case No. 2:17-cv-00903-WBS-KJN, United States District Court (E.D. Cal.); and expert declarations on October 25, 2018 and November 21, 2018 in *Rupp v. Becerra*, Case No. 8:17-cv-00746-JLS-JDE, United States District Court (E.D. Cal.), and in January 2020 in *Miller v. Becerra*, Case No. 19-cv-1537-BEN-JLB, United States District Court (S.D. Cal.), two cases challenging California's restrictions on rifles classified as assault weapons. I also provided live expert witness testimony in *Miller v. Becerra* in October 2020. On June 2, 2021, I submitted an expert report on behalf of the state of California in *Jones v. Bonta*, Case No. 3:19-cv-01226-L-AHG, United States District Court (S.D. Cal.), which involved a challenge to age-based restrictions on sale of guns to those under 21.

I filed an expert declaration in October 2018 in a case involving a challenge to Vermont's restrictions on large-capacity magazines in *Vermont Federation of Sportsmen's Clubs v. Birmingham*, Case No. 224-4-18 Wncv (Vermont Superior Court, Washington Unit). I also filed an expert declaration in *Chambers v. City of Boulder*, Case No. 2018-CV-30581, in the District Court of Boulder County in September 2020, involving a challenge to the City of Boulder's restrictions on assault weapons.

At the request of the United States Department of Justice, I filed an expert declaration in July 2020 and testified at trial in April 2021 in a case arising out of the Sutherland Springs mass shooting that killed 26 people in November 2017: *Holcombe, et al. v. United States*, Case No. 5:18-CV-555-XR (W.D. Tex.).

I was the main author of the Brief of Amici Curiae Social Scientists And Public Health Researchers In Support of Respondents, submitted to the United States Supreme Court on September 21, 2021 in *New York State Rifle & Pistol Association v. Bruen*, Case No. 20-843.

In January, 2022, I submitted an expert declaration in *Worth v. Harrington,* a lawsuit in the District of Minnesota (Case No. 21-cv-1348) challenging how Minnesota regulates the concealed carry of firearms by individuals aged 18 to 20. I was deposed in that case on March 28, 2022.

## III. RETENTION AND COMPENSATION

I am being compensated for my time on this case on an hourly basis at the rate of $850 per hour. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## IV. BASIS FOR OPINION AND MATERIAL CONSIDERED

The opinion I provide in this expert report is based on:

- My review of the complaint filed in this lawsuit;
- My review of the statutory provisions relevant to this lawsuit;
- My review of the Plaintiffs' motion for summary judgment filed in this lawsuit on September 17, 2021, and the materials it references;
- My education, expertise, experience, and research in the fields of law, criminal justice, econometrics, statistics, and policy evaluation; and,
- My review and analysis of the materials cited in the footnotes and text of this report and the materials listed in my c.v. in Exhibit 1 on the relationship between guns and crime.

## V. SUMMARY OF OPINION

It is my opinion that the age-based restrictions on gun carrying adopted by Illinois and challenged in this case promote public health and safety by generating meaningful reductions in violent crime, firearm accidents, gun theft, and suicide.

## VI. METHODOLOGY

The opinions expressed in this report are based on decades of research that I have personally conducted with various coauthors and a talented team of researchers working at my direction, as well as my own extensive review of the best available research by others using appropriate data that has been analyzed with scientifically valid methods. In particular, I have published extensively on the impact of gun carrying on crime, with the work predominantly appearing in peer-reviewed journals and other academic venues using the most rigorous and up-to-date econometric methods for estimating the impact of legal changes on violent crime, such as the proliferation of laws allowing citizens to carry concealed weapons. This scientific approach to data analysis and evaluation is widely accepted as an appropriate methodology for estimating the impact of law and public policy.

## VII.    ILLINOIS' REGULATION OF CONCEALED CARRY BY 18-20 YEAR OLDS

Illinois enacted a right-to-carry law in 2013 and began issuing concealed carry licenses in early 2014. Plaintiffs' lawsuit challenges four Illinois statutes: 430 ILCS 66/25(1), 720 ILCS 5/24-1.6(a)(3)(I), 720 ILCS 5/24-1(a)(4)(iv), and 720 ILCS 5/24-1(a)(10)(iv). Together these statutes place certain restrictions on issuing concealed carry licenses to individuals under the age of 21 and impose certain criminal penalties on individuals who unlawfully carry a concealed firearm.

In general, an individual seeking to carry a concealed firearm in Illinois must apply for and obtain a concealed carry license. 430 ILCS 66/10, 66/25, 66/40. An Illinois resident applying for a concealed carry license must meet certain statutory prerequisites, including that they be at least 21 years of age. 430 ILCS 66/25. Applicants must also meet several other statutory conditions: they must possess a valid Firearm Owner's Identification Card ("FOID Card"); meet the requirements for the issuance of a FOID Card; not be prohibited under the FOID Card Act or federal law from possessing or receiving a firearm; have completed certain required firearms trainings; and not have been convicted or found guilty of certain criminal offenses, be subject to a pending arrest warrant or certain criminal proceedings, or have been placed in residential or court-ordered treatment for alcoholism, alcohol detoxification, or drug treatment within the 5 years immediately preceding the date of the license application. 430 ILCS 66/25.

Individuals with a valid concealed carry license are permitted to "carry a loaded or unloaded concealed firearm, fully concealed or partially concealed, on or about his person" and to "keep or carry a loaded or unloaded concealed firearm on or about his or her person within a vehicle," so long as they are not in a prohibited area such as a school or a hospital. Id. 66/10(c), 66/65. Licenses are valid for five years, but may be revoked if, among other reasons, the licensee is found to be ineligible for a concealed carry license under the Concealed Carry Act or ineligible for a FOID card under the FOID Card Act. Id. 66/10(c), 66/70(a).

Individuals who unlawfully carry a concealed firearm may be subject to criminal prosecution. *See* 720 ILCS 5/24-1(a)(4); 5/24-1(a)(10); 5/24-1.6(a)(3)(I). The criminal

prohibitions against unlawful concealed carry of a firearm, however, are subject to numerous exceptions. First, the state laws that Plaintiffs challenge in this lawsuit (*i.e.*, 720 ILCS 5/24-1(a)(4); 5/24-1(a)(10); 5/24-1.6(a)(3)(I)) establish no criminal penalties for carrying a concealed firearm—even without a valid concealed carry license—on an individuals' own land, abode, or fixed place of business; or in the legal dwelling of another person with that person's permission. Second, these criminal penalties also do not apply to various officials or employees, typically while performing duties in their official capacity, including: peace officers or anyone asked by a peace officer to assist in making arrests or preserving the peace; current or retired law enforcement officers; prison wardens and similar officials at institutional detention facilities (including while commuting between home and their place of employment); members of the Armed Services, Reserves, National Guard, or Reserve Officers Training Corps; special agents employed by railroads and public utility companies; licensed private security guards, private detectives, and private alarm contractors in certain circumstances, as well as various other exempted persons engaged in certain activities. 720 ILCS 5/24-2. Criminal penalties also do not apply to members of any target shooting club or organization while such members are using their firearms on those target ranges, as well as licensed hunters, trappers, or fishermen while engaged in hunting, trapping, or fishing. Id.

## VIII. OPINION AND ANALYSIS

It is my opinion that the age-based restrictions on concealed firearm carrying adopted by Illinois promote public health and safety by generating meaningful reductions in violent crime, firearm accidents, gun theft, and suicide. The literature on public policy, criminology and social science has identified a number of factors that increase the risk of gun violence, violent conduct, and other harms caused by firearms by young adults in the absence of restrictions on the carrying of firearms. These factors include the incomplete maturation of neurobiological systems associated with decision-making for the 18-20-year-old age group, as well as high levels of untreated mental illness, stress, and risky behavior, including heightened susceptibility to alcohol and drug abuse.

Illinois' firearm rules are effective at mitigating the harms caused by these factors, given the high levels of homicidal and suicidal behavior of this age group, and the demonstrated links between gun carrying and violent crime and access to guns and suicide. Additionally, violent crime and suicides in Illinois would rise if the state's right-to-carry ("RTC") law permitted 18-20-year-olds to carry weapons outside the home.

**A. Neurobiological and Behavioral Factors of the 18-20-year-old Age Group Increase the Risks of Gun Violence**

There is considerable evidence that 18-20-year-olds are impulsive, immature, and prone to making poor or unreasoned decisions for a number of reasons, including underdeveloped cognitive abilities and mental health issues, such as depression, anxiety, and suicidality. Neuroscience and social science data support the conclusion that 18-20-year-olds pose a considerable risk of increased danger to themselves and others if they possess firearms. This risk is due to three main factors: (1) the still-developing cognitive systems of 18-20-year-olds increases their risk of impulsive behavior; (2) the onset of mental illness during emerging adulthood is correlated with self-harm and suicide attempts; and (3) the frequency of binge drinking during emerging adulthood is a stimulant to violence that is more dangerous when accompanied with gun possession.[2]

When one considers that the majority of 18-20-year-olds struggle with some form of untreated mental illness, stress, and/or risky behavior with alcohol and illegal drugs,[3] it is advisable that greater restrictions on gun use apply to this age group to protect them from harming themselves and others. The state of Illinois has not imposed a blanket prohibition on gun acquisition but rather

---

[2] *See* Daniel Webster, John Donohue et al., Johns Hopkins Bloomberg School of Public Health, *Firearms on College Campuses: Research Evidence and Policy Implications* (2016), https://bit.ly/33WaMPp (hereinafter Webster, *Firearms on College Campuses*).

[3] Well over half of 18-20-year-olds suffer from mental illness, engage in illicit substance abuse, binge drinking or heavy alcohol use, or have serious thoughts of suicide. Moreover, this age group had the highest need for substance abuse treatment, and, with less than 5 percent of those with a substance abuse disorder receiving treatment, it had the lowest percentage receiving treatment of any age group. Substance Abuse and Mental Health Services Administration, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2020 National Survey on Drug Use and Health*, Publication Number PEP21-07-01-003, October 2021.

has provided a more targeted restriction on gun-carrying outside the home for this vulnerable age group. Because this is the period when so many of these pathologies first present themselves, the opportunities to identify *in advance* those who will commit suicidal and homicidal acts is far more limited than for those who are 21 or older, by which time a greater history of potential or actual pathology will have been established and observed. This information can then be used to limit all access to weapons by those whose prohibiting behavior will be entered into the national firearm background check system.

**1. The Observed Pattern of Young Adult Violence Is Consistent with the Neurobiological Development of 18-20-year-olds.**

Young adults are at an increased risk of violence and misuse of firearms in part because emerging adulthood is a time of considerable change in the neurobiological systems that support decision-making, emotional and behavioral regulation, and motivation.[4] Indeed, the brain's higher association areas continue to develop well into the third decade of life.[5] One of the last parts of the brain to mature—and which continues to develop into the mid-twenties—is the prefrontal cortex, which supports self-control, including judgment, impulse control and inhibition, and long-range planning.[6] The limbic system, which controls basic emotions like anger, pleasure, and fear, develops well before the prefrontal cortex, meaning that until the cerebral cortices can catch up with the limbic system, the desire for rewards and susceptibility to social pressures can, at times, lead to an overriding of rational thinking by more impulsive, emotional, or irrational behavior.[7]

[4] *See generally* Jay N. Giedd et al., *Brain development during childhood and adolescence: a longitudinal MRI study*, 2 Nature Neuroscience 861 (1999), https://go.nature.com/3hEOJoc. The "higher association areas" of the brain are "parts of the cerebral cortex that receive inputs from multiple areas; association areas integrate incoming sensory information, and also form connections between sensory and motor areas. Because they are involved in organizing information that comes from various other areas of the brain, association areas are often linked to complex functions." *See*, https://www.neuroscientificallychallenged.com/glossary/association-areas.

[5] BJ Casey, *et al.*, *The Adolescent Brain*, 1124 Annals of the N.Y. Academy of Sciences 111, 120 (2008), https://bit.ly/2ScxOyz.

[6] Mariam Arain, et al., *Maturation of the Adolescent Brain*, 9 Neuropsychiatric Disease & Treatment 449, 453, 456 (2013), https://bit.ly/3bGgw3N.

[7] *Id.* at 453.

As a result of the limbic system developing faster than the cerebral cortex, adolescents (including older adolescents aged 18-20) and young adults in their early- to mid-twenties are more likely to act on negative emotions like stress or rage and are thus more prone to using firearms impulsively and dangerously.[8] Studies in psychology and neuroscience confirm that members of this age group typically have lower self-control and react more impulsively to perceived threats than do their younger counterparts and older adults.[9] This explains some adolescents' and young adults' proclivity toward more risky and violent behavior, and explains why gun possession among 18-20-year-olds correlates with such high rates of firearm violence, as discussed in detail below.

The ability to responsibly carry a gun outside the home for protection is dependent upon a complicated assessment of the likely costs and benefits of such behavior, which is beyond the capacity of a substantial number of individuals under 21. One reflection of the drastically inadequate competence in risk assessment for this age group was captured by the National Longitudinal Study of Youth, which asked 17- and 18-year-olds about their risk of dying in the next year. The black youthful respondents predicted their chance of death was 22 percent, while white youth estimated the risk of death in the next year to be 16 percent. As Nobel economist James Heckman noted in commenting on these responses, "Both numbers are absurdly high."[10] Such gross misperceptions of risk are incompatible with sensible decisions about carrying guns outside the home.

---

[8] *Id.*

[9] *See, e.g.*, Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 Developmental Neuroscience 220 (2014), https://bit.ly/33Z0nT6 (finding that adolescents—particularly males—were more likely to react impulsively to threat cues than their older and younger peers); Laurence Steinberg et al., *Age Differences in Sensation Seeking and Impulsivity as Indexed by Behavior and Self-Report: Evidence for a Dual Systems Model*, 44 Developmental Psychology 1764, 1766 (2008), https://bit.ly/2RvXu9y (finding that adolescents are vulnerable to risk taking because of a combination of higher inclination to seek excitement and immature capacities for self-control).

[10] Pedro Carneiro, James J. Heckman, Dimitriy V. Masterov, *Understanding the Sources of Ethnic and Racial Wage Gaps and their Implications for Policy*, 99, 126 in Handbook of Employment Discrimination Research: Rights and Realities (2005), edited by Laura Beth Nielsen and Robert L. Nelson.

**2. The Onset of Mental Illness During Emerging Adulthood Is Correlated with Self-harm and Suicide Attempts, Which Has an Established Link to Violence That Can Only be Exacerbated by Access to Firearms**

The stresses associated with the life transitions inherent in this age group place adolescents and young adults at an increased risk of conditions like depression and anxiety.[11] According to a 2019 study conducted across two large national datasets of U.S. college students from 2007 to 2018, about 41 percent of college students exhibited symptoms of moderate to severe depression, and about 34 percent exhibited symptoms of moderate to severe anxiety.[12]

Further, many major psychiatric conditions unrelated to life transitions, such as bipolar disorder, depression, and schizophrenia, develop in adolescence.[13] Because the link between these disorders and violence has been found to be high and because the onset of violent crime among such individuals is reduced by restricting gun access via mental health prohibitions,[14] it is of particular concern that despite the high prevalence of mental health issues among college age adolescents, most go untreated.[15] One study of random samples of students on 26 U.S. college

---

[11] *See* Justin Hunt & Daniel Eisenberg, *Mental Health Problems and Help-Seeking Behavior Among College Students*, 46 J. Adolescent Health, 3, 5 (2010), https://bit.ly/3f5nzFB ("Mental disorders are as prevalent among college students as same-aged non-students, and these disorders appear to be increasing in number and severity").

[12] Mary E. Duffy et al., *Trends in Mood and Anxiety Symptoms and Suicide-Related Outcomes Among U.S. Undergraduates, 2007–2018: Evidence from Two National Surveys*, 65 J. Adolescent Health 590, 593 (2019), https://bit.ly/3yvk42D.

[13] Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 Nature Reviews Neuroscience 947, 952 (2008), https://go.nature.com/2RrsnvZ ("Anxiety disorders, bipolar disorder, depression, eating disorder, psychosis including schizophrenia and substance abuse all most commonly emerge during adolescence.").

[14] A study of 23,292 adults with schizophrenia, bipolar disorder, or major depressive disorder who had been hospitalized in a state psychiatric found that a large proportion of these individuals (39.0 percent) was convicted of a violent crime during the study period, with the younger individuals in the sample more likely to be convicted. Importantly, "having a mental health adjudication record archived in the [federal background check system, significantly] reduce[d] the risk of a first violent crime" by 31 percent. Jeffrey Swanson et al., *Preventing Gun Violence Involving People with Serious Mental Illness, in* Reducing Gun Violence in America 49 (Daniel Webster & Jon Vernick, eds., 2013).

[15] *See* Daniel Eisenberg et al., *Mental Health Service Utilization Among College Students in the United States*, 199 J. Nervous & Mental Diseases 301 (2011), https://bit.ly/3wmzhRY.

campuses in both 2007 and 2009 found that, on average, only 36 percent of students who had one or more mental illnesses had received treatment in the previous year.[16]

The combination of impulsivity, low emotional regulation, and the onset of mental illness in the 18-20-year-old cohort also contributes to high rates of suicide and suicide attempts in that age group. In fact, suicide is the second leading cause of death in the U.S. among this age group.[17] In the American College Health Association's National College Health Assessment for Spring 2019, which surveyed 54,497 undergraduate students, 9.3 percent of students reported "seriously considering suicide" and 1.6 percent reported attempting suicide within the previous 12 months.[18] Suicide attempts resulting in death or hospital treatment "remains high through age 25."[19] Taken as a whole, these statistics are of particular relevance to the present case because most gun deaths are by suicides and firearms are the most common means of suicide in the United States.[20]

**3. The 18-20-Year-Old Cohort Is Susceptible to Heavy Alcohol Use, Which Has an Established Link to Violence That Can Only Be Exacerbated by Access to Firearms.**

18-20-year-olds are known to frequently drink heavily at a higher rate than other groups, and there is a close association between alcohol use and violence.[21] Indeed, my own research has highlighted that increases in alcohol consumption in a state is one of the strongest factors associated with higher homicide rates.[22] According to a 2019 national survey of approximately

[16] *See id.*
[17] Melonie Heron, *Deaths: Leading Causes for 2017*, 68 Nat'l Vital Statistics Reports 1, 11 (2019), https://bit.ly/3oxWz4C.
[18] Am. College Health Ass'n, Nat'l College Health Assessment, Executive Summary: Undergraduate Student Reference Group (Spring 2019), https://bit.ly/3fBVzbl.
[19] Webster, *Firearms on College Campuses*, *supra* note 2 at 3.
[20] Suicide Prevention Resource Center, "Means of Suicide," https://bit.ly/3wnzXGB.
[21] *See* Charles C. Branas et al., *Alcohol Use and Firearm Violence*, 38 Epidemiologic Revs. 32, 42-43 (2016), https://bit.ly/2Rs9PvC (alcohol and firearm use "studies consistently reported that alcohol use was significantly associated with the possession of firearms, the ownership of firearms, and the use of firearm as a suicide means, and that the association was stronger for heavy alcohol use").
[22] *See* John J. Donohue & Steven Levitt, *The Impact of Legalized Abortion on Crime over the Last Two Decades*, 22 Am. Law & Econs. Rev. 241, 256 tbl. 4 (2020), https://bit.ly/3oAyfyR.

34,000 college-age students from across the U.S., almost 53 percent of college students ages 18 to 22 reported drinking alcohol in the past month, and about 33 percent engaged in binge drinking during the same time frame.[23] An evaluation of data from the National Highway Traffic Safety Administration, the Centers for Disease Control and Prevention, national coroner studies, census and college enrollment data for 18-24-year-olds, the National Household Survey on Drug Abuse, and the Harvard College Alcohol Survey estimated that, over a three-year period, more than 600,000 students aged 18 to 24 had been assaulted by another student who had been drinking.[24] The Bureau of Justice Statistics of the U.S. Department of Justice reported that in a year-long period, alcohol was involved in 41 percent of on-campus acts of violence for students living on campus, and 18 percent of on-campus acts of violence for students living off campus.[25] Off-campus acts of violence involving students were shown to have a similarly high association with alcohol use: 37 percent for students living on campus, and 31 percent for students living off campus.[26]

The link between alcohol and violence is unmistakable in the crime literature, and an important study by Phillips, *et al.*, suggests that removing firearms from those abusing alcohol should lessen the social harm from the alcohol-violence link. This study focused on male-male violence and finds that greater alcohol intoxication is associated with the violence escalating to a lethal level. Crucially, the study found that the greater the level of intoxication, the more likely that one will have a gun, and it is the presence of the gun that leads to the more homicidal outcome.[27]

---

[23] Substance Abuse and Mental Health Services Administration (SAMHSA), Results from the 2019 National Survey on Drug Use and Health: Percentages, 2018 and 2019, https://bit.ly/3bKgKXT.
[24] *See* Ralph Hingson et al., *Magnitude of Alcohol-Related Mortality and Morbidity Among U.S. College Students Ages 18-24: Changes from 1998 to 2001*, 26 Ann. Rev. of Pub. Health 259 (2005).
[25] Lawrence A. Greenfeld, *Alcohol and Crime: An Analysis of National Data on the Prevalence of Alcohol Involvement in Crime*, U.S. Dep't of Justice, Bureau of Justice Statistics (1998), https://bit.ly/3ysMWsn.
[26] *Id.*
[27] Scott Phillips et al., *Reconsidering the Relationship Between Alcohol and Lethal Violence*, 22 J. Interpers. Violence 66 (2007). In response to the question of why drinking increases the chance of carrying a gun, the

Professor Garen J. Wintemute has reviewed the "existing research on the relationships between alcohol misuse; ownership, access to, and use of firearms; and the commission of firearm violence, and discusses the policy implications of these findings."[28] This research establishes that "Acute and chronic alcohol misuse is positively associated with firearm ownership, risk behaviors involving firearms, and risk for perpetrating both interpersonal and self-directed firearm violence…. For men, deaths from alcohol-related firearm violence equal those from alcohol-related motor vehicle crashes." Moreover, in one study, "frequent and heavy alcohol consumption was directly associated with plans to acquire a 'concealed gun license.'"[29] Since "carrying firearms in public has been linked to both alcohol misuse and criminal activity,"[30] evidence supports that keeping guns away from alcohol abusers would be "an effective violence prevention measure."

**B. Illinois' Limitations Are Effective At Addressing, And Are Carefully Tailored To Address, The Specific Harms Caused By Firearm Use By 18-20-Year-Olds.**

The following sub-sections make four major points. First, 18-20-year-olds are consistently the most homicidal age groups in America, so, all things being equal, successful efforts to restrain violent crime in this group will generate disproportionate social benefits. Second, the best empirical research has established that efforts to restrict gun access for those at elevated risk of engaging in criminal activity effectively reduces violent crime. Third, the best empirical evidence also shows that restricting gun carrying outside the home reduces violent crime. Fourth, beneficial protective gun use by carriers is rare and does not even remotely approximate the array of harmful consequences that would flow from gun carrying by 18-20-year olds. Consequently, limiting the

---

authors state: "It seems plausible that moderate to substantial amounts of alcohol could produce feelings of bravado, but that extreme amounts of alcohol could produce feelings of vulnerability." Id. at 79.

[28] Garen Wintemute, *Alcohol Misuse, Firearm Violence Perpetration, and Public Policy in the United States*, 79 Preventive Med. 15 (2015).

[29] Schwaner, S.L., Furr, L.A., Negrey, C.L., Seger, R.E., 1999. *Who wants a gun license?* J. Crim. Just. 27 (1), 1–10.

[30] Wintemute, *supra* note 28.

ability of the most homicidal age group to carry guns outside the home can be expected to reduce gun violence.

**1. lllinois' Firearm Limitations Are Effective at Addressing Disproportionately Higher Rates at Which 18-20-Year-Olds Commit Homicide and Other Violent Crime.**

One of the most consistent facts of crime over time, both in Illinois and the United States, is that 18-20-year-olds commit homicide at disproportionately high rates. Therefore, legislative efforts to reduce homicides appropriately focus on this age group and are likely to generate beneficial results. Figure 1 presents murder arrest rates by age for the U.S. for 2019 (the last year for which murder arrests by age are available for the nation). Figure 1 shows that the 18-20-year-old age group is the most homicidal. Specifically, in 2019, the single most homicidal age group in the nation was age 19, with both 18- and 20-year-olds having higher murder arrest rates than any other age groups except for age 19. [31]

[31] U.S. Fed. Bureau of Investigation, Uniform Crime Reports, 2019 (2021), Table 38, available at https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topicpages/tables/table-38. It should also be noted that the FBI violent crimes data for the nation also confirms that 18-20-year-olds consistently have the highest rates of rape and robbery, as well as homicides. The total number of arrests presented in the FBI Table 38 is based on data from law enforcement agencies that cover 229,735,355 people out of the 329,474,910 total US population in 2019.

**Figure 1**
**The Most Homicidal Three-Year Age Group for the U.S. is 18-20-Year-Olds, 2019**

To highlight this enduring feature of homicide, Figure 2 depicts murder arrest rates in Illinois by age for the five-year period from 2011-2015 (2015 is the last year the FBI has relatively complete arrest data from the state). The figure confirms that no other three-year age group above or below age 21 is as homicidal as 18-20-year olds. Therefore, the restrictions at issue in this case appropriately limit firearm-related activities to the age group carrying the greatest homicide risk. In other words, if one wants to reduce homicidal violence in a targeted fashion, one should focus on age groups that exhibit the highest rates of homicide—namely, 18-20-year-olds—as Illinois and a substantial majority of states have done.

**Figure 2**
**The Most Homicidal Three-Year Age Group is 18-20-Year-Olds**
**Illinois Arrest Data, 2011-2015**

In the United States, most murders are committed with firearms. Specifically, in 2020, 79 percent of homicides were committed with firearms, and this number has increased by 15 percentage points since 2014.[32] The 18-20-year-old cohort has not only established an enduring pattern of elevated risk for homicide, but it has long been recognized as the most likely to use firearms to commit homicides and other violent crimes. Specifically, a 1999 joint report of the Department of the Treasury and Department of Justice ("Joint Report") stated:

> Among murderers, 18 to 20 year olds were more likely to use a firearm than adults 21 and over. More specifically, in 1997, 74 percent of the homicides committed by 18 to 20 year old offenders involved firearms. In contrast, only 61 percent of homicides committed by offenders 21 or over involved firearms. (Table 1). The under-21 offender age groups showed a significant shift toward the use of firearms in committing homicides by the mid-1980's. By the 1990's, these offender groups

[32] Statista, Percentage of Homicides by Firearm in the United States from 2006 to 2019 (2021), https://bit.ly/3uAOe1m. *See* Ridley, Joi. 2021. "EFSGV Analysis of 2020 CDC Data." The Educational Fund to Stop Gun Violence. December 16, 2021. https://efsgv.org/press/efsgv-analysis-of-2020-cdc-data/.

> were using firearms to commit homicides more than 70 percent of the time. Although the proportion of 18 to 20 year olds who use firearms to commit homicides has declined since the 1994 peak, it remains higher than levels recorded before 1990. (Figure 2). Similarly, in non-lethal crimes, including assault, rape, and robbery, 18 to 20 year old offenders were more likely to use guns than both younger and older offender age groups.[33]

Figure 3, below, reproduces a chart (Figure 1 from the Joint Report) showing that the 18-20-year-old cohort dominates in the commission of gun homicides: no three-year age group above age 20 is as homicidal. According to the data, the cohort of 18-20-year-olds commits firearm murder and other non-lethal crimes at a substantially higher rate than other age groups. Thus, targeting effective gun safety measures at this group is likely to generate crime reduction benefits for all violent crime. The Joint Report concludes:

> The significant role that 18 to 20 year olds have in gun crime and violence in our Nation demands that we make changes in the legal regulation of their access to guns. A further benefit to restricting possession of firearms by 18 to 20 year olds will be to decrease the likelihood that younger family members, friends, and classmates will be able to obtain guns illegally.[34]

---

[33] Dep't of the Treasury & Dep't of Justice, *Gun Crime in the Age Group 18–20* (1999), https://bit.ly/3hBjp9R.

[34] *Id.* at 4. Studies of high school students show that a non-trivial number will gain access to guns within the household, and that such "youth reporting gun possession have the strongest associations with alcohol, tobacco, and other drug use overall." Kelly Ruggles & Sonali Rajan, *Gun Possession Among American Youth: A Discovery-Based Approach to Understand Gun Violence*, PLoS One (2014), available at https://bit.ly/3yxKf9d.

**Figure 3**
**The 18-20-year-old Cohort Dominates in the Commission of Gun Homicides.**

Source: Table from Report of the Department of the Treasury and Department of Justice (*see* footnote 33, *supra*), Supplemental Homicides Report, 1997.

**2. Efforts To Restrict Gun Access for Those at Elevated Risk of Engaging In Criminal Activity Effectively Reduces Crime**

Decades of research has shown that while anything from sticks to knives to firearms can be used in assaults, there is considerable variation in the survivability of assault depending on the instrument used. Since firearms are much more lethal, greater restrictions on access to firearms by those in the high-crime 18-20-year-old age cohort are likely to reduce firearm deaths and injuries.

Consistent empirical evidence has established that there is a strong instrumentality effect in violent activity. A seminal 1972 study by UC Berkeley Professor Frank Zimring found "that the outcome of gun assaults had a large random element, and that the power of the firearm was one systematic factor influencing the likelihood that an individual with a gunshot injury would

survive."[35] Phil Cook and Anthony Braga conducted a study of files of 511 gunshot victims kept by the Boston Police Department and similarly found that survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound. The authors calculated that switching to less deadly firearm options could reduce the homicide rate substantially.[36]

Based on decades of compelling evidence and research, "It is widely accepted among medical and public health professionals that the likelihood of death in an assault increases with the power of the gun."[37] In 2020, Frank Zimring and Duke economist Phil Cook shared the Stockholm Prize in Criminology based in part on their work confirming this effect.[38] For this reason, restricting access to firearms in the hands of those most likely to misuse them would be expected to diminish firearm homicides and injuries.

The best research consistently shows that legislative efforts to keep guns away from higher risk individuals, such as young adults, are beneficial. For example, in 1991, California expanded the list of conditions that prohibited an individual from legally purchasing a firearm to include the commission of a violent misdemeanor (the prohibition was for a period of 10 years). Professor Garen Wintemute and a team of researchers did a careful study that showed that the 1991 law reduced criminal offending for the covered group by roughly 22 percent.[39] Specifically, the researchers examined the criminal records of two groups over a three-year period: the treatment group consisted of 927 persons aged 21 to 34 years who attempted to purchase a handgun in

---

[35] Zimring FE. *The medium is the message: firearm caliber as a determinant of death from assault.* J. Legal Stud. 1972;1:97-124. doi:10.1086/467479. The description of the Zimring study comes from Anthony A. Braga and Philip J. Cook, The Association of Firearm Caliber with Likelihood of Death From Gunshot Injury in Criminal Assaults, JAMA Netw. Open. 2018; 1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833.

[36] Anthony A. Braga & Philip J. Cook, *supra* 35.

[37] *Id.*

[38] Stockholm Univ., 2020 Winners of the Stockholm Prize in Criminology (Sept. 13, 2020), https://bit.ly/3fIbiHr.

[39] Garen J. Wintemute et al., *Subsequent Criminal Activity Among Violent Misdemeanants Who Seek to Purchase Handguns: Risk Factors and Effectiveness of Denying Handgun Purchase*, 285 JAMA 1019 (2001), https://bit.ly/3fy6Rh2.

California in 1991 but were denied because of prior convictions for violent misdemeanors. The control group included 787 persons who also had prior convictions for misdemeanor violence but legally purchased handguns in 1989 or 1990 (prior to the law's adoption) and were of the same age range as the group denied in 1991. The control group, which was able to buy firearms, had a 29 percent higher rate of future criminal offending involving guns and/or violence than the treatment group that was prohibited from purchasing weapons.[40] Moreover, the two groups did not differ in terms of future criminal offending that did not involve firearms or violence.

This well-crafted study illustrates that when California restricted the ability of certain high-risk individuals to purchase guns, there is a documented reduction in violent crime among those individuals. By looking at roughly comparable individuals before and after California began barring individuals with convictions for misdemeanor violence from gun possession, the researchers could estimate whether the background check system curtailed the violence of the newly banned individuals. The study concluded that denying firearm purchases to this category of applicants reduced "future criminal offending involving firearms and/or violence" by 22 percent (=29/129). This finding was statistically significant at the .05 level.

A second study by Professor Wintemute and his fellow researchers similarly documented that California's efforts to keep guns away from higher-risk individuals are effective and generate a substantial and statistically significant reduction in crime.[41] This study looked at individuals who were both arrested for felonies and later sought to buy guns. The treatment group was composed of 177 individuals who were stopped from doing so by background checks because they had been convicted of the felony for which they were arrested, and thus were prohibited from purchasing a firearm. The control group was composed of 2,470 individuals who succeeded in buying guns because they were not convicted of any felony (despite the felony arrest). As between the two

---

[40] The authors controlled for age, sex, and prior criminal history in this analysis.

[41] M. A. Wright et al., *Effectiveness of Denial of Handgun Purchase to Persons Believed to Be At High Risk for Firearm Violence*, 89 Am. J. Pub. Health 88 (1999), https://bit.ly/3bE1go8.

groups, one would imagine, if anything, the group of those arrested but not convicted would be less likely to commit crime. Instead, this control group had a higher crime rate by virtue of their ability to legally purchase and possess firearms (adjusting for the nature and extent of their prior criminal history). The law preventing the felons from buying guns led to a 19.4 percent (=24/124) statistically significant reduction in their future violent criminality.

Because the best evidence indicates that 18-20-year-olds are the most homicidal age group and because the best empirical evidence finds that allowing concealed carry of guns increases violent crime through a number of different pathways—as discussed in the following section—it is a widely accepted and adopted approach to public safety to limit gun carrying to those who are 21 or older. Thus, the Illinois legislature had strong and compelling reasons to conclude that measures to prohibit concealed carry of firearms by this age group would promote public safety by reducing violent crime.

### 3. Without Illinois' Limitations on Concealed Carry by 18-20 Year Olds, Recent Increases in Violent Crime Would have Been Even More Significant.

A strong body of evidence finds that increased gun carrying outside the home increases violent crime.[42] More recent research has also better elucidated the various pathways by which RTC laws lead to greater violence, ranging from the increased deadliness of road rage and angry confrontations, the escalation of the lethality of arguments, enormous increases in gun thefts that arm criminals, the increased tendency of criminals to arm themselves, and the negative

[42] With more years of data and more states passing RTC laws, researchers are able to generate more accurate predictions of the impact of these laws. Also, the tools of econometrics have advanced over the last 25 years, and therefore the later studies are more likely to use the newer and better techniques for estimating standard errors (a key input in establishing statistical significance) as well as to understand the threats to validity of the relevant empirical approaches.

consequences for effective policing when officers fear an increased threat from a more actively armed population.[43]

In the last four years alone, fourteen journal articles, listed below, have concluded that RTC laws increase violent crime.[44] Eleven of these articles have already been published in peer-reviewed journals, and three more are in the publication pipeline, authored by economists at Duke University, the University of Colorado at Boulder, the University of Virginia, and Texas A&M University:

---

[43] Gun carrying by citizens increases crime by impairing police effectiveness in a variety of ways. First, "anything that RTC laws do to occupy police time, from processing permit applications to checking for permit validity to dealing with gunshot victims, inadvertent gun discharges, and the staggering number of stolen guns is likely to have an opportunity cost expressed in higher violent crime." Donohue, John J., Abhay Aneja, and Kyle D. Weber. *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis.* Journal of Empirical Legal Studies 16, no. 2 (2019b): 198–247. https://doi.org/10.1111/jels.12219. Moreover, just as American criminals shoot faster because of the dangers posed by an armed population, so do American police, who legitimately fear the prospect of facing an armed assailant. As a result, American police officers kill at rates 50-100 times that of their counterparts in other affluent nations. Consider this striking fact: in the first twenty-four days of 2015, police in the United States fatally shot fifty-nine individuals, which was greater than the comparable number of fifty-five shot by police in England and Wales over the past twenty-four years. Jamiles Lartey, *By the Numbers: US Police Kill More in Days than Other Countries Do in Years*, GUARDIAN (Jun. 9, 2015), https://www.theguardian.com/us-news/2015/jun/09/the-counted-policekillings-us-vs-other-countries [https://perma.cc/3USA-XNKA]. Indeed, the D.C. Circuit recognized the elevated dangers from gun carrying outside the home in *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller IV*") when it suggested that requiring individuals to bring firearms into the police station for in-person inspection created "a threat to public safety [because] there is a risk that the gun may be stolen en route or that the would-be registrant may be arrested or even shot by a police officer seeing a 'man with a gun.'" *Id*. at 277 (internal citation and quotation omitted).

[44] While some early studies suggested that right-to-carry (RTC) laws might have some beneficial effects in reducing homicide—John R. Lott & David B. Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. of Legal Studies 1 (1997)—a distinguished panel of the National Research Council examined this evidence and in 2005 issued a statement endorsed by 15 of the 16 committee members stating that "the scientific evidence does not support [t]his position." Nat'l Research Council, Firearms and Violence: A Critical Review (2005), at App. B (Committee Response to Dissent from James Q. Wilson), https://bit.ly/36QGL4G. Wilson's role as a dissenter from some of the top econometricians in the country on the NRC panel on the econometric evaluation of RTC laws is quite remarkable, especially since he acknowledged in the second sentence of his dissent that he was "not an econometrician." Nat'l Research Council, Firearms and Violence: A Critical Review (2005), at App. A, 269 (Dissent), https://bit.ly/3xRRW9j.

1. Donohue, John J., Abhay Aneja, and Kyle D. Weber. "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis." Journal of Empirical Legal Studies 16, no. 2 (2019b): 198–247, *available at* https://doi.org/10.1111/jels.12219;

2. Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923 (2017) (finding that RTC laws increase overall homicides by 6.5 percent and firearm homicides by 8.6 percent), *available at* https://bit.ly/3Bqd9JK;

3. Mark Gius, *Using the Synthetic Control Method to Determine the Effects of Concealed Carry Laws on State-Level Murder Rates*, 57 Int'l Rev. Law & Econ. 1 (2019) ("[S]tates that changed from 'prohibited' to 'shall issue' experienced a 12.3% increase in gun-related murder rates and a 4.9% increase in overall murder rates."), *available at* https://bit.ly/3eEFK4a;

4. John J. Donohue, *Laws Facilitating Gun Carrying and Homicide*, 107 Am. J. Pub. Health 1864, 1865 (2017) (noting that RTC laws increased firearm homicides by 9.5 percent during the 2000-2014 period), *available at* https://stanford.io/2UYDCNR;

5. Michael Siegel et al., *The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991–2016: A Panel Study*, J. Gen. Intern. Med. 34 (10): 2021–8 (2019), DOI: 10.1007/s11606-019-04922-x. ("After simultaneously controlling for … 10 firearm laws, … 'shall issue' laws were associated with 9.0% higher homicide rates.");

6. Cassandra K. Crifasi et al., *Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. Urban Health 383 (2018) ("Right-to-carry laws are associated with increases in firearm homicide"), *available at* https://bit.ly/3iBgux4;

7. Erika L. Sabbath et al., *State-Level Changes in Firearm Laws and Workplace Homicide Rates: United States, 2011 to 2017*, 110 Am. J. Pub. Health 230 (2020) (restricting the ability to carry concealed weapons "was associated with a 5.79% reduction" in workplace homicide rates), *available at* https://bit.ly/3BsQfkU;

8. Doucette, M. L., Crifasi, C. K., & Frattaroli, S., *Right-to-carry laws and firearm workplace homicides: A longitudinal analysis* (1992-2017). Am. J. of Pub. Health, 109 (2019), 1747–1753. doi:10.2105/AJPH.2019.305307 ("[f]rom 1992 to 2017, the average effect of having an RTC law was significantly associated with 29% higher rates of firearm" workplace homicides);

9. Emma E. Fridel, *Comparing the impact of household gun ownership and concealed carry legislation on the frequency of mass shootings and firearms homicide*. 38 Justice Quarterly, 892 (2020) ("More permissive concealed carry legislation was associated with a 10.8% increase in the firearms homicide incidence rate.");

10. Emma E. Fridel, *The futility of shooting down strawmen: A response to Kleck* (2020). 38 Justice Quarterly 925 (2021) (after showing the robustness of her findings that RTC laws increase firearm homicides, she concludes "it is imperative that firearms research prioritizes the use of contemporary data and methods to shape policies for contemporary problems");

11. Anita Knopov, *et al.*, *The Impact of State Firearm Laws on Homicide Rates among Black and White Populations in the United States, 1991–2016*, Health & Social Work (2019), Volume 44, Issue 4, Nov. 2019, Pages 232–40, *available at* https://doi.org/10.1093/hsw/hlz024. (Examining "the relationship between state firearm laws and homicide victimization rates … in 39 states during the period between 1991 and 2016, [the study found that] 'shall issue' laws were associated with [5.7 percent] higher homicide rates among both white and black populations.");

12. Marjorie B. McElroy and Peichun Wang, *Do Concealed Gun Permits Deter Crime? Dynamic Insights from State Panel Data*, SSRN Elec. J., Jan. 7, 2018, *available at* DOI:10.2139/SSRN.2469534 (Their model indicates that RTC laws increase violent crime and "strongly rejects Lott and Mustard (1997)'s famous deterrence hypothesis.");

13. Stephen B. Billings, *Smoking Gun? Linking Gun Ownership to Neighborhood Crime*, SSRN Elec. J., Mar. 9, 2021 (finding "strong evidence that increases in CHPs [concealed handgun permits] coincide with large increases in stolen guns…. Stolen guns increased immediately following increases in CHPs [followed by] an increase in violent crimes as well as an increase in the share of violent crime using guns. This is consistent with a mechanism of stolen guns being transferred to criminals that are using guns to commit violent crimes.");

14. Jonathan Colmer and Jennifer L. Doleac, *Access to Guns in the Heat of the Moment: The Effect of Gun Laws on Violent Crime*, April 23, 2021 (submitted for revision and resubmission, Rev. Econ. & Stat.) ("We find consistent evidence that gun laws that limit residents' rights to carry firearms mitigate the effect of temperature spikes on violence. In places with strict gun laws, a one-degree Celsius increase in daily average temperature is associated with a 0.388% increase in homicides. By contrast, in places with more lenient gun laws, a one degree increase in daily average temperature is associated with a 0.957% increase in homicides; the difference is

statistically significant. In other words, higher temperatures increase homicides more in places with lenient gun laws than in places with strict gun laws.").

It is helpful to provide some detail about how the most comprehensive of these studies—the first listed above—by Donohue, John J., Abhay Aneja, and Kyle D. Weber[45]—was conducted. My research team gathered information on violent crime across all 50 states and the District of Columbia from the FBI Uniform Crime Reports over the period from 1979-2014 to explore what happened to the violent crime rate in each jurisdiction that adopted RTC laws over this period. Because we had data across 51 jurisdictions as well as 36 years of data from each jurisdiction, we were able to use the traditional panel data econometric methodology as well as the more recent synthetic control methodology—and importantly, they both supported the finding that RTC laws substantially elevated violent crime.

Essentially, the panel data methodology estimates how the average pattern of violent crime changes in the years following RTC adoption, controlling for overall trends in crime in the nation, as well as a host of other factors that influence crime, including the economic conditions within a state (per capita income, poverty rate, unemployment rate), the level of police and incarceration, alcohol consumption, changing demographic and urbanization rates, and other enduring features of the individual states that persist over time. Figure 4 shows the effect on violent crime of laws allowing citizens to carry concealed weapons derived from this panel data model. It shows that such RTC laws generate higher levels of violent crime, increasing by roughly 15 percent after ten years, with the rise in crime beginning with the initial year of RTC adoption.[46]

This is a substantial increase in crime, which would lead to many thousands of additional violent crimes each year in a state the size of Illinois. One way to convey a sense of the magnitude

---

[45] Donohue, John J., Abhay Aneja, and Kyle D. Weber, *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*. Journal of Empirical Legal Studies 16, no. 2 (2019b): 198–247, https://doi.org/10.1111/jels.12219.

[46] Figure 4 also usefully shows that the panel data model predicts that RTC laws have no impact on crime in the years prior to adoption – which is necessarily true but serves to validate that the statistical model is working properly. The numbers at the top of each year's estimate shows how many RTC laws were evaluated for each particular year.

of this level of crime increase is that a rough, consensus estimate from the crime literature is that a doubling of the prison population leads to about a 15 percent decrease in violent crime.[47] In other words, to offset the 15 percent violent crime increase from adopting a RTC law, a state would need to roughly double its prison population. Most RTC states have recognized that this pattern would only be worse if the most homicidal age group (those 18 to 20 years old) were allowed to carry concealed weapons, and therefore have restricted the right to carry to those who are 21 or older.

**Figure 4: Violent Crime Starts Rising When RTC Laws Are Adopted (1979-2014)**

NOTE: We regress crime on dummies for pre– and post–passage years and DAW covariates. Reference year is year before adoption and adoption year is first year with RTC in place at any time, meaning that in states that adopt after January 1, this will capture only a partial effect of RTC laws. We display the 95 percent confidence interval for each estimate using cluster-robust standard errors and show the number of states that contribute to each estimate.

The pattern of violent crime since Illinois implemented its RTC law in 2014 has broadly conformed to the predictions of these fourteen papers. As seen in Figure 5, Illinois had enjoyed a decade of substantially declining aggravated assault, which was reversed after the 2014 implementation of the state's RTC law. Over the next five years, the rate of aggravated assault in

---

[47] John J. Donohue, *Assessing the Relative Benefits of Incarceration: The Overall Change Over the Previous Decades and the Benefits on the Margin* in Steven Raphael and Michael Stoll, eds., *Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom*, pp. 269-341 (2009).

Illinois rose 19.1 percent (from 213 per 100,000 in 2014 to 254 per 100,000 in 2019).[48] Figure 5 shows a broadly similar pattern for the state of Wisconsin: a declining trend in aggravated assault was reversed when Wisconsin's RTC law went into effect in 2011—three years earlier than the Illinois law. By 2019, Wisconsin's rate of aggravated assault was substantially higher than it had been when that state's RTC law was implemented.

**Figure 5**

Figure 6 shows the rates of firearm homicide for the two states, and again we see a pattern consistent with the large body of literature on the impact of RTC laws on violent crime. Specifically, Illinois's rate of firearm homicide had been stable for a decade, but rose sharply after the 2014 adoption of its RTC law. After 2014, firearm homicide rose by 32.7 percent in Illinois

[48] The Illinois increase in aggravated assault over the 2014-2019 period was more than twice the 8.5 percent increase in the rest of the country.

(from 4.6 per 100,000 in 2014 to 6.2 per 100,000 in 2019), which was 5 percentage points higher than the 27.7 percent rise in the rest of the country.

In addition, Figure 6 reveals that the adverse trend in firearm homicide in Wisconsin began in 2011, the year that it implemented its RTC law. As with Illinois, the rate of firearm homicide in Wisconsin was much higher after RTC adoption. As 2021 evaluation of Wisconsin's adoption of right-to-carry concludes that:

> an analysis of publicly available data from local agencies, the FBI, and other national databases suggests that [Wisconsin's RTC] law has led to negative consequences for safety in the state. Three categories of violent gun-related crime have increased since its implementation: gun homicides, aggravated assaults that involve a gun, and gun-related homicides and assaults against law enforcement officers. In addition, gun theft in Wisconsin has increased dramatically. The law is also associated with a significant rise in gun sales, particularly handguns, in the state, suggesting that it may have incentivized more Wisconsin residents to become gun owners.[49]

Thus, the damaging violent crime rise in Illinois and Wisconsin would almost certainly have been greater if their RTC laws permitted 18-20-year-olds to carry weapons outside the home.

---

[49] Center for American Progress, *Concealed Carry Is Linked to Increased Gun Violence in Wisconsin*, September 1, 2021, https://www.americanprogress.org/issues/guns-crime/reports/2021/09/01/503127/concealed-carry-linked-increased-gun-violence-wisconsin/.

**Figure 6**

**4. Any Protective Benefits from Gun Carrying by Young Adults are Likely Dwarfed by the Social Harms from Such Gun Carrying.**

Some might conjecture that gun carrying by 18-20-year-olds could confer some protective benefits, but there is little reason for optimism on this front. First, the fourteen studies described above all estimate the net effect of RTC laws. Therefore, they collectively establish that any benefits from increased gun carrying are clearly outweighed by the crime-inducing effect of more gun carrying. Second, the fourteen studies showing that RTC laws lead to increases in violent crime do not capture the additional harms of greater gun accidents and suicides that follow from greater gun carrying, so the true cost-benefit calculus around additional gun carrying tips even further against these laws. When one narrows the focus to restraining the most homicidal, accident prone, and impetuous category of 18-20-year-olds, the cost-benefit scale tips even further in support of the Illinois restrictions.

Indeed, while anecdotes of instances when guns have been used for protection can perpetuate the myth that gun carrying might provide benefits to offset its large costs, the empirical

evidence does not support this view. A study of gun carriers in Philadelphia from 2003–2006, who almost all said they carried to protect against crime, found that gun possession was associated with a significantly *increased* risk of being shot in an assault. On average, guns did not seem to protect those who possessed them from being shot in an assault. Although successful defensive gun uses can and do occur, this study challenges the view that gun carrying is on balance protective.[50]

While the Philadelphia study focused on those over 21, a recent study has looked at younger gun carriers in Phoenix and Philadelphia from 2000 – 2010 and found that at times when they were carrying guns they were at vastly higher rates of being shot than when they were not carrying:

> The key finding is that even among populations with chronic exposure to gun violence, **gun carrying is associated with increased risk of gun violence victimization** and exposure, while even the temporary cessation of gun carrying is associated with the reduction of such risks.[51]

Moreover, evidence from the National Crime Victimization Survey ("NCVS") has consistently shown that people who are confronted by a criminal are able to try to defend with a gun less than 0.9 percent of the time that. One sees in Figure 7, below, that this identical percentage was observed when looking at NCVS data for 1992-2001 as well as for 2007-2011.

The persistence of this tiny percentage over a roughly two-decade time period during which time RTC laws expanded greatly across the nation underscores the low level of effectiveness of gun carrying to protect against crime. If greater authorized gun carrying enabled greater lawful defensive gun use, one would have expected the percentage of times that those confronted by criminals would respond with a gun would rise. Instead, there was absolutely no increase in the likelihood that a potential victim would defend against crime with a gun over the two identified time periods, even as RTC laws expanded throughout the country. Specifically, in the first period

---

[50] Charles C. Branas *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, Am J Public Health. 2009; 99: 2034–2040. doi:10.2105/AJPH.2008.143099).

[51] David Hureau and Theodore Wilson, *The Co-occurrence of Illegal Gun Carrying and Gun Violence Exposure: Evidence for Practitioners from Young People Adjudicated for Serious Involvement in Crime*, forthcoming 2021 at American Journal of Epidemiology: https://academic.oup.com/aje/advance-article/doi/10.1093/aje/kwab188/6311494?guestAccessKey=fc0cb67b-f839-4da3-bba7-42c0a8bc9e57.

DEFENDANT'S EXHIBIT G

from 1992-2001, 41 percent of the U.S. population lived in states with RTC (or permitless carry) laws. By, the second period of 2007-2011, this percentage had jumped to 67 percent—a 63% increase in the proportion of the country living in RTC states. And yet this massive increase in gun carrying did *nothing* to elevate the likelihood of defensive gun use, which was at exactly the same low rate it had been in the earlier period. In other words, against the host of ills that have been documented to flow from the adoption of RTC laws, we see no sign of any increase in effectiveness in using guns to confront criminals, even as gun carrying has proliferated.

**Figure 7**

Defensive Gun Use Is Rare and Does Not Increase as RTC Laws Proliferate (NCVS data)
Violent crime rate in RTC/permitless states (per 1,000 population)
5.2 5.0 4.9 4.5 4.1 4.4 4.3 3.9 3.8 4.1 4.0 3.8 3.7 3.8 3.9 3.8 3.7 3.5 3.2 3.1
Violent crime rate in states that never adopted RTC or permitless carry laws* (per 1,000 population)
8.4 7.9 7.3 6.6 6.1 5.2 4.6 4.0 4.1 4.1 3.8 3.6 3.5 3.6 3.7 3.5 3.4 3.2 3.1 3.0
Percent of US population living in RTC/permitless states
90%
60%
30%
0%
1992 1993 1994 1995 1996 1997 1998 1999 2000 2001 2002 2003 2004 2005 2006 2007 2008 2009 2010 2011
Year
DGU < 0.9%
DGU < 0.9%
Note: In both periods examined by the National Crime Victimization Survey, individuals confronted by criminals responded using a gun defensively (DGU) less than 0.9 percent of the time with no apparent benefit to their personal safety.
*Never adopter states through 2011: California, Delaware, District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, and Rhode Island

Note the period after 1992 was one of declining crime for a variety of reasons, but the growth in RTC laws was clearly not one of them. The first two rows of Figure 7 highlight that the 64.3 percent drop in violent crime in Illinois and the eight other states and the District of Columbia that had no RTC law at any time over this period 1992-2011 was vastly greater than the crime drop in RTC states.

32

Effective gun use in response to criminal threat is rare for many reasons. First, criminals will have the first-mover advantage on potential victims, thereby greatly limiting the possibility of using a gun for defense even when one is armed. Second, a gun can only be useful for self-defense if it is in one's possession when the infrequent need for it arises—and typically less than 1 percent of the population experiences threatened or actual violent crime each year. But carrying a gun typically involves some inconvenience and discomfort, since most guns have the weight of at least 3 or 4 iPhones strapped together. Not surprisingly, many will find this burden prompts them to leave the gun at home or in their car rather than carry it about. Moreover, in the course of a day's activity outside the home, gun carriers are frequently inclined to put the gun down. When you are in the park or playing basketball with friends, or engaging in any of the myriad recreational activities of 18-20-year-olds, the weight of 3 or 4 cellphones is not particularly comfortable—nor is the thought of what happens if you fall and land on your gun. The consequence is that an enormous number of guns are lost and stolen when left behind in cars or other places. Guns left behind are useless when needed and a stimulant to crime when taken by criminals.

Hence, a gun carried for self-defense is rarely needed, and it is worthless unless it is carried and accessible when the rare event occurs. That guns are used so infrequently in response to crime establishes that either the carrier frequently will not have or will be unable to access the gun when it is needed, or the carrier will often realize that the gun will not improve the likely outcome of a crime confrontation because of the first-mover advantage of the criminal. In other words, gun carrying is generally needless or ineffectual, while raising the risk of a non-trivial array of fatal or harmful adverse outcomes.

Furthermore, even the rare instances of successful defensive gun use can be misleading, since the evidence from the NCVS suggests that other measures designed to avoid the harms of violent crime, such as running away or calling the police, are roughly comparable to defensive gun use in protecting against injury. What matters for reducing crime is not that a gun was shown and a potential criminal ran away but only whether the gun provides better crime outcomes than other

alternative measures, which generate fewer socially harmful outcomes. Here, the evidence suggests that defensive gun use does not provide added protection against violent crime.

The best evidence on this comes from the analysis of NCVS data by Hemenway and Solnick,[52] which finds that in five years of data from the NCVS there were 14,145 crime incidents in which the victim was present and a victim used a gun to threaten or attack the perpetrator in only 127 incidents—just under 0.9 percent. Moreover, half of these self-defense gun uses were in response to verbal threats and other non-violent crimes. Amazingly, 89 percent of the victims who took *no* action in response to the threat escaped injury and 89 percent of those who used a gun escaped injury. Among those who took some action in response to the attack, the percent injured was virtually identical if one defended with a gun (4.1 percent) or took some other evasive action (4.2 percent). This evidence led Hemenway and Solnick to conclude that "Compared to other protective actions, the National Crime Victimization Surveys provide little evidence that [self-defense gun use] is uniquely beneficial in reducing the likelihood of injury…."[53]

Indeed, guns are stolen far more frequently than they are even attempted to be used for defensive purposes, and there is considerable evidence that gun carrying outside the home leads to higher levels of gun thefts.[54] Donohue, *et al*., estimated that the increased gun carrying by roughly 16 million permit holders induced by RTC laws has increased the number of gun thefts by roughly 100,000 per year since guns left in cars and elsewhere by permit holders are an easy target for thieves.[55] The recent empirical literature on the link between stolen guns and crime powerfully highlights the importance of this pathway in elevating violent crime. Stephen Billings (2021)

---

[52] David Hemenway and Sara J. Solnick, *The epidemiology of self-defense gun use: Evidence from the National Crime Victimization Surveys 2007–2011*, Preventive Medicine. Volume 79, October 2015, Pages 22-27, https://www.sciencedirect.com/science/article/abs/pii/S0091743515001188.

[53] *Id.*

[54] David Hemenway *et al.*, *Whose Guns are Stolen? The Epidemiology of Gun Theft Victims*, 4 Injury Epidemiology 1, 3 (2017) (people who carried firearms at least once in the past month were three times more likely to have a firearm stolen than other gun owners).

[55] Donohue, John J., Abhay Aneja, and Kyle D. Weber. *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*. Journal of Empirical Legal Studies 16, no. 2 (2019b): 198–247 at 207. https://doi.org/10.1111/jels.12219.

examines an extraordinarily rich data set from 2007-2011 in Charlotte, NC and concludes that there is a strong link between RTC permits leading to increased gun thefts and then to increased violent crime.[56] Similarly, Khalil (2017) analyzes crime data from the FBI's National Incident-Based Reporting System ("NIBRS") for over 400 jurisdictions from 34 different states from 1993–2010 and finds that the number of firearms reported stolen in each police jurisdiction leads to statistically significant increases in homicide, aggravated assault, and robbery.[57]

In my opinion, limiting gun carrying by 18-20-year-olds would generate benefits in reduced gun crime in the same way that efforts to restrict access to firearms for other high-risk groups have proven to be effective.

**5. The Plaintiffs Mischaracterize Crime by Gender and Fail to Realize That Allowing 18-20 Year Olds to Carry Guns Would Increase Female Victimization**

While the evidence is clear that the 18-20 age group is the most homicidal age group, Plaintiffs have also argued in this case that Illinois' restrictions on gun carrying are indefensible because females in the 18-20 age group are less homicidal than their male counterparts. Specifically, the Plaintiffs present 2016 NIBRS data showing greater victimization for 18-20 year old women than men. Numerous problems with this data make the Plaintiffs' arguments wrong and misleading.

To begin, the cited 2016 NIBRS data is not data for Illinois, but rather an amalgam of data from numerous police agencies across many states around the country. Many large states did not report to NIBRS that year and the only reporting agency in Illinois was the city of Rockford (roughly a population of 145,000 compared to the total Illinois population of 12.8 million).

---

[56] Billings, Stephen B., *Smoking Gun? Linking Gun Ownership to Neighborhood Crime* (March 9, 2021), https://ssrn.com/abstract=3588439 or http://dx.doi.org/10.2139/ssrn.3588439.

[57] Khalil, U., 2017, *Do more guns lead to more crime? Understanding the role of illegal firearms*, Journal of Economic Behavior & Organization 133, 342–361, https://www.sciencedirect.com/science/article/abs/pii/S0167268116302669.

Overall, for 2016, NIBRS reporting agencies represented only 31.2% of the total US population of 322,941,311.

Even if one were to accept the Plaintiffs' NIBRS data, it is presented in a misleading way. The two biggest categories in which women in this age group are more frequently victimized than men are simple assault (38,901 v. 20,010) and intimidation (10,376 v. 5,092). These are typically not crimes for which defensive gun use would be legally sanctioned under Illinois law because they do not pose a threat of death or serious bodily harm. If one instead looked at the FBI Index I crimes—murder, rape, robbery, and aggravated assault—the NIBRS numbers presented by the Plaintiff would show that total Index I male victimization rates in this age group are higher for men (16,478) than for women (15,566). Indeed, if one looked only at complete 2016 Illinois data for homicides among 18-20 year olds—the most serious crime and the only crime for which Illinois victimization data by age and sex is available—men were murdered at a rate more than 10 times that of women: 126 male victims versus 12 female victims.[58] Thus, the alleged disparity disappears with a more accurate focus on serious violent crime, and the Plaintiffs' statistics grossly overstate the frequency of crimes that could conceivably be lawfully addressed by gun carrying.

Moreover, the Plaintiffs fail to address how these crime victimization numbers would change if 18-20 year olds had the right to carry guns. Of the 68,009 18-to-20-year-old women who were victims of violent crime in the NIBRS dataset in 2016, 72.5 percent (49,277) were for the crimes of intimidation and simple assault. More guns in circulation outside the home among 18-20 year olds (and those who steal these more exposed guns) would turn many of these less serious crimes into aggravated assaults and murders.

Indeed, there is no empirical basis for claiming that allowing 18-to-20-year-olds—whether male or female—to carry guns would reduce their crime victimization and indeed much evidence

[58] The NIBRS data for 2016 that the Plaintiff cites, also shows that many more 18-20 year old men than women are murdered (304 versus 81), although the 3.75 ratio for these disproportionately smaller states is not as great as the 10 to 1 ratio in Illinois – again highlighting the lower relevance of the Plaintiff's crime statistics.

indicating it would increase it, as the evidence cited in this report has shown is the consequence from increased carrying of guns outside the home. This is because defensive gun use is rare, as noted above—consistently less than 9/10 of 1 percent of criminal victimizations lead to defensive gun use. But, in addition, the one serious Index I crime that is more numerous for women than men—the crime of rape—is almost never stopped by, or even attempted to be stopped by, a victim with a gun. Specifically, of the 337 cases of actual or attempted sexual assault identified from 2007 to 2011 in the best national survey of crime victimization—the National Crime Victimization Survey—no victims ever attacked or threatened an offender with a gun.[59] There is no evidence that permitting 18-20-year-old women to carry firearms outside of the home would lead to more defensive gun uses in instances of attempted sexual assaults or reduce their likelihood of becoming a victim of sexual assault.

### C. Illinois' Limitations On Concealed Carry By 18-20 Year Olds Are Beneficial in Addressing the Increased Risk of Suicide Of Young Adults

While the dominant purpose and effect of restricting carry permits to those who are 21 and older is to reduce deaths and injuries from gun violence and accidents by an unusually high-risk age group, these age restrictions will also save lives by decreasing suicides by adolescents and young adults. Of course, more suicides by 18-20-year-olds, who are prone to harming themselves given their particular vulnerability to a range of mental health issues, could be prevented by restricting all gun access for this age group. Nonetheless, the more limited restrictions on gun

[59] Hemenway D, Solnick SJ. *The epidemiology of self-defense gun use: Evidence from the National Crime Victimization Surveys 2007-2011*. Preventive Medicine. 2015; 79: 22-27, https://pubmed.ncbi.nlm.nih.gov /25910555/. As the authors note, "The National Crime Victimization Survey (NCVS) is the primary source of information in the United States on the nature and extent of criminal victimization. The NCVS collects information on nonfatal personal crimes (rape or sexual assault, robbery, aggravated and simple assault, and personal larceny) and household property crimes (burglary, motor vehicle theft, and other theft) both reported and not reported to police. It is conducted by the U.S. Census Bureau for the Bureau of Justice Statistics [interviewing roughly 160,000 individuals in a nationally representative sample twice a year]."

carrying at issue in this case will also reduce suicides, for the reasons set forth in detail below. To adumbrate the more detailed discussion, one must keep in mind the following factors:

1. The link between gun access and suicide is clearly established because suicide attempts by gun are dramatically more successful, thereby forestalling the effective treatment that often follows unsuccessful attempts.

2. Limiting the amount of gun access—even for those who have guns—has been shown to reduce suicides since the amount of time between suicidal ideation and suicide attempt is often quite short.

3. 18-20-year-olds are particularly vulnerable and their rates of suicide have been rising in recent years.

4. The literature confirms that wholesale restrictions on gun access for 18-20-year-olds reduce suicide.

5. Allowing 18-20-year-olds to carry guns increases the percentage of 18-20-year-olds who acquire guns, thereby increasing overall gun access by this vulnerable age group and their siblings, with an attendant increased suicide risk.

6. Guns carried outside the home are far more at risk of theft and loss, thus putting guns in the hands of (typically) youthful thieves, thereby exacerbating the risks of criminal use of these stolen gun as well as elevating the risks of accidents and suicide. For example, a gun brought to a college dorm by a youthful gun carrier may well pose a higher level of risk than a gun stored in the home. Given the impulsive and generally more risky behavior of 18-20-year-olds, gun carrying by this group is expected to have a higher-than-average risk of fireman loss and theft.

The link between access to guns and suicide is clearly established in the literature. Briggs and Tabarrok describe their work as follows: “This study investigates the relationship between firearm prevalence and suicide in a sample of all US states over the years 2000–2009. We find

strong, positive effects of gun prevalence on suicide…."[60] A study of 26 million Californians over the age of 21 found that, despite "lower rates of all-cause mortality than nonowners" of firearms, handgun owners committed suicide at much higher rates than nonowners. The authors of the study conclude: "Handgun ownership is associated with a greatly elevated and enduring risk of suicide by firearm."[61] While there are many ways to end one's life, those who attempt suicide with a gun are far more likely to die. The major study on this point in the *American Journal of Psychiatry* found that "Regardless of sex, those using firearms had 140 times the risk of dying [from a] suicide attempt than those using other methods."[62]

Jeffrey Swanson, one of the top researchers on issues of guns and mental health, emphasizes the considerable risk of firearm suicide among young adults, noting that background checks designed to weed out those with the most serious depression are not likely to adequately address this problem on their own:

> Suicide is the third leading cause of death in Americans age 15 to 24, perhaps not coincidentally the age group when young people go off to college, join the military, and experience a first episode of major mental illness….Depression is the particular psychiatric illness most strongly associated with suicide. …. Depression is not, however, a disorder that gets most individuals a gun-disqualifying record of involuntary commitment. In other words, people suffering from the one mental health condition that is most closely and frequently linked to suicidality are unlikely to show up in a gun background check.[63]

60 Justin Thomas Briggs & Alexander Tabarrok, *Firearms and Suicides in US States*, 37 Int'l Rev. of Law & Econ. 180 (2014), https://bit.ly/3wkew9r.

61 David M. Studdert *et al.*, *Handgun Ownership and Suicide in California*, 382 New Eng. J. Med. 2220, 2220, 2224 (2020) ("Handgun ownership is associated with a greatly elevated and enduring risk of suicide by firearm"), https://bit.ly/2VUfoEG.

62 J. Michael Bostwick *et al.*, *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 American Journal of Psychiatry 1094 (2016), https://doi.org/10.1176/appi.ajp.2016.15070854.

63 Jeffrey Swanson *et al.*, *Preventing Gun Violence Involving People with Serious Mental Illness*, *in* Reducing Gun Violence in America 49 (Daniel Webster & Jon Vernick, eds., 2013).

As the American Public Health Association (APHA) recognizes, access to firearms is a key risk factor for suicide, with particularly high risk for young adults.[64] This APHA policy statement notes:

> While suicide affects all individuals, males are four times more likely than females to die by suicide, and the prevalence of suicidal thoughts, planning, and attempts is significantly higher among younger age groups (18–29 years) than older age groups….
>
> There is ample evidence that suicidality is transitory. Should a person survive a suicidal impulse, his or her prognosis is quite good. The results of a meta-analysis of nearly 100 studies of suicide attempters showed that 90% of attempters who survive do not go on to die by suicide. In fact, many suicide attempts occur with little planning, often in response to a short-term crisis. However, if a person attempts suicide through a means that is highly lethal, such as a firearm, the odds of survival are quite low.
>
> One must not opt to make a suicide attempt using a highly lethal means such as a firearm if there is to be any opportunity to obtain mental health treatment or endure a painful short-term crisis.[65]

Notably, a cross-sectional study conducted between 2007 and 2014 based on suicidal acts resulting in an emergency room visit, a hospitalization, or death, found that about 90 percent of suicide attempts with a firearm during that period resulted in a fatality compared to 4 percent of all attempts not involving a firearm.[66] Immediate access to firearms during a suicide attempt often determines whether an individual attempting suicide will die or recover. A failed suicide attempt is often the entree into effective psychological counseling that reduces the subsequent risk of suicide. But when a gun is immediately available when the passing state of hopelessness grips a young individual, this avenue for healing treatment is largely foreclosed:

> A suicidal act is the result of a temporary state of the mind. Once initiated, it is of uttermost importance to win time in order to allow the condition to improve by itself or through treatment. A low case-fatality rate indicates

---

[64] Am. Pub. Health Ass'n, Reducing Suicides by Firearms (2018), https://bit.ly/2RqBiOd.
[65] *Id.*
[66] Andrew Conner et al., *Suicide Case-Fatality Rates in the United States, 2007 to 2014: A Nationwide Population-Based Study*, 172 Annals of Internal Medicine 885, 890 (2019).

> that there is a low probability that the suicidal act will end as a fatal event; in other words, chances that the person will get help are good. Most often, firearms do not allow for a change of mind or medical attention to arrive in time.[67]

Daniel Webster, John Donohue, et al. (2016) summarized the research concerning access to guns on college campuses, noting:

> A large body of literature clearly shows that firearm access is associated with increased rates of suicide, suggesting that increased access to firearms on college campuses could significantly increase suicide in this vulnerable group. [*See*, Miller M., Azrael D., and Barber, C., *Suicide mortality in the United States: the importance of attending to method in understanding population-level disparities in the burden of suicide.* Annual Review of Public Health. 2012; 33:393-408.]
>
> The combination of challenges with impulse control, emotional regulation, and onset of mental illness contribute to high rates of suicide and suicide attempts among adolescents and young adults….
>
> The lethality of a given means or method of suicide attempt accounts for a substantial portion of the variation observed in suicide mortality and points to the unrealized potential for means restrictions strategies to reduce suicide. The method used for a suicide attempt depends on availability; there is a strong association between the availability of firearms in households and death by suicide. Having ready access to firearms is linked with suicide not only for the gun owner but for all members of the household, especially for children and adolescents.[68]

Similar findings have emerged from examination of age restriction laws in the United States. For example, a 2004 study by Daniel Webster and coauthors documented a significant decline in suicides in the 18-20-year-old group following implementation of age restriction statutes limiting access to firearms.[69]

---

[67] Merete Nordentoft *et al.*, *You Seldom Get a Second Chance With a Gunshot: Lethality of Suicidal Acts*, 173 American Journal of Psychiatry 1069 (2016), https://doi.org/10.1176/appi.ajp.2016.16080943.

[68] Daniel Webster *et al.*, Johns Hopkins Bloomberg School of Public Health, Firearms on College Campuses: Research Evidence and Policy Implications 21 (2016), https://bit.ly/3p9CeD3 (internal citations omitted).

[69] Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004).

In 1994, the federal government prohibited handgun possession for those under age 18. A 2015 study by Mark Gius concluded that this federal minimum-age restriction on firearm possession contributed to a "very significant decline" in youth firearm suicide and unintentional death rates.[70] While it is challenging to ascertain the impact of a federal law, since there is no obvious comparison group, the data presented in the Gius study—which I depict in Figures 8 and 9 below—provides visual support for his conclusion that the federal law did curtail both suicides and unintentional firearm deaths in this age group. Note that in Figure 8, we see that the youth firearm suicide rate had been rising, but this upward trend is abruptly reversed following the adoption of the federal law. Similarly, Figure 9, which depicts the national youth unintentional firearm death rate over time, reveals another abrupt improvement starting at the time of adoption of the federal gun restriction in 1994, when we see a very substantial drop in youth unintentional firearm deaths.

[70] Mark Gius, *The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths*, 52 Soc. Sci. J. 168, 173 (2015).

**Figure 8**

**The Rising Trend in Youth Firearm Suicides was Sharply Reversed in 1994 When the Federal Government Imposed Minimum Age Requirements for Handgun Possession**

Source: M. Gius / The Social Science Journal 52 (2015) 168–175, Chart 1.

**Figure 9**

**The Youth Unintentional Firearm Death Rate Fell Sharply After 1994 When the Federal Gov't Imposed Minimum Age Requirements for Handgun Possession**

Source: M. Gius / The Social Science Journal 52 (2015) 168–175, Chart 2.

Four studies cited by RAND describe the strong link between firearms and suicides by youth under 21:

1. Johnson, R. M., C. Barber, D. Azrael, D. E. Clark, and D. Hemenway, "Who Are the Owners of Firearms Used in Adolescent Suicides?" Suicide and Life-Threatening Behavior, Vol. 40, No. 6, 2010, pp. 609–611.

2. Wright, M. A., G. J. Wintemute, and B. E. Claire, "Gun Suicide by Young People in California: Descriptive Epidemiology and Gun Ownership," Journal of Adolescent Health, Vol. 43, No. 6, 2008, pp. 619–622.

3. Shah, S., R. E. Hoffman, L. Wake, and W. M. Marine, "Adolescent Suicide and Household Access to Firearms in Colorado: Results of a Case-Control Study," Journal of Adolescent Health, Vol. 26, No. 3, 2000, pp. 157–163.

4. Kellermann, A. L., F. P. Rivara, G. Somes, D. T. Reay, J. Francisco, J. G. Banton, J. Prodzinski, C. Fligner, and B. B. Hackman, "Suicide in the Home in Relation to Gun Ownership," New England Journal of Medicine, Vol. 327, No. 7, 1992, pp. 467–472. K

The most recent study that explores the effect on suicide rates of state restrictions on handgun purchases to those who are 21 and older was conducted by Julia Raifman and her colleagues ("the Raifman study").[71] This study used a sophisticated and compelling methodology and the most up-to-date data, and thus, provides more useful insights than earlier studies on this topic. The Raifman study clearly found that these restrictions limiting the sale of handguns to individuals aged 21 and older reduce suicides among those in the 18-20-year-old age group.

The Raifman study makes use of a particularly valuable methodological approach called a "regression discontinuity" analysis to more precisely evaluate the patterns of suicide in 46 states during the time period from 2001 to 2017.[72] These authors leverage the fact that in the states that set the minimum age for handgun purchase at 18 years old, there is a sudden "discontinuity" in an adolescent's access to firearms when they turn 18.[73] The Raifman study's regression discontinuity modeling showed that states with these more relaxed restrictions experienced a jump in suicides at 18 when gun access-through purchase first became available that was not seen in the states that

[71] Julia Raifman, *et al.*, *State Handgun Purchase Age Minimums in the US and Adolescent Suicide Rates: Regression Discontinuity and Difference-in-Differences Analyses*, 370 BMJ 1 (2020), https://www.bmj.com/content/370/bmj.m2436

[72] For this regression discontinuity analysis, the Raifman study excluded four states that experienced policy changes during the period: Missouri, South Carolina, West Virginia, and Wyoming. *Id.*

[73] Standard observational studies (such as panel data studies) do not come as close to mimicking the benefits of randomization (with randomized studies being the gold standard in empirical evaluation when they can be implemented appropriately) as regression discontinuity studies, and therefore a well-done regression discontinuity study using good data will usually be superior to a similarly adept panel data analysis. Michael Bailey, *Real Econometrics* 375 (2020).

delayed access until 21. The study describes the conclusion of their regression discontinuity analysis as follows:

> Based on the predicted probabilities of suicide at ages 18 to 20, an average of 344 adolescent suicide deaths would have been averted in each state with a minimum handgun purchaser age of 21 compared with age 18 from 2001 to 2017.[74]

This is the single most methodologically sound assessment of the impact of state laws restricting handgun access to those in the precise age category addressed by the Illinois restrictions at issue in this litigation.

The Raifman study also provides an illuminating discussion of an earlier minimum-age purchase study by Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004). The Raifman study describes and evaluates this study as follows:

> [Webster et al.] evaluated the link between suicides and laws for minimum purchase age passed in 29 states between 1976 and 2001 and found that the policies for limiting handgun sales to those aged 21 or older were associated with statistically significant reductions in firearm related suicides but not in overall suicides. This study was based on a difference-in-differences design but did not examine pre-period trends in all cause suicide to assess the suitability of the comparison group. We conducted an analysis based on more recent data most relevant to the current policy environment, including a difference-in-differences analysis in which we evaluated parallel trends.

Utilizing advances in econometric methodology (with a "regression discontinuity" analysis) and more current data, the Raifman study buttressed the link Webster identified in 2004 between firearm-related suicides and age restrictions on the ability to purchase handguns, finding that limiting firearm access to those who were 21 or older led to a large and statistically significant decline in suicides for those aged 18-20.

---

[74] *Raifman*, *supra* note 71, at 4.

One might think that, if one has access to a gun, then merely restricting the ability to *carry* guns cannot reduce suicides, since one can just use the gun kept at home. This conclusion is wrong for three reasons:

First, we have already noted that suicidal thoughts are often transient and having access to a gun when the suicidal thought emerges can make a fatal difference. Since gun carrying increases the amount of time someone has immediate access to a gun, suicide risk is commensurately increased. In other words, gun carrying increases gun access on the intensive margin (existing gun owners have a greater intensity of use and possession since they can have their guns when away from home).

The APHA policy statement referenced above highlights the results of an intervention that only partially reduced gun access for young adults but nonetheless led to substantial reductions in firearm suicides:

> Between 2003 and 2005, about 90% of all suicides in the Israeli Defense Force (IDF), a mandatory population-based army drafting all youths 18–21 years of age, were firearm suicides. Since many IDF soldiers go home on the weekends, the IDF changed its weapons policy in 2006 to require that firearms remain on base when soldiers take a weekend leave. After this policy change, the overall IDF suicide rate decreased by 40% in 2007–2008. Most of this decrease was due to a reduction in weekend firearm suicides; there was no significant change in weekday suicide rates.[75]

Of course, if suicide intention were constant, then restricting weekend access to guns would have had no effect since the soldiers had access to their guns all week long. But the 40 percent reduction in suicides reveals that restricting access during the fleeting periods of suicidal thinking that could quickly become lethal with a gun present was sufficient to reduce suicides—even for those with access to guns at other times in the week. Thus, even 18-20-year-olds who might have access to guns will have lowered risk if they are not allowed to carry those guns outside the home.

---

[75] APHA, *supra* note 65.

This research on Israeli data supports the U.S. research indicating that restricting firearm access is effective in decreasing overall suicide rates.

Second, allowing 18-20-year-olds to carry guns increases the number of 18-20-year-olds who acquire guns, thus directly increasing their access to firearms, which the evidence above has shown increases the risk of suicide for this vulnerable age group.[76] In other words, gun carrying increases gun access on the extensive margin (a greater proportion of 18-20-year-olds will have guns if this age group is permitted to carry guns outside the home). This follows directly from consumer theory because as the number of potentially attractive features of a consumer product grows, the demand for the product grows. Thus, as the gun industry clearly knows, more 18-20-year-olds will acquire guns if they can not only keep them at home but carry them outside the home as well.

Third, as previously discussed, 18-20-year-olds are less mature, more impulsive, and more careless than older individuals. Every auto insurance company and rental car company knows this fact, and either refuses to deal with individuals of that age (rental car companies) or charges substantially higher premiums to these youthful drivers to reflect their higher risk of careless behavior (auto insurance companies). Since one of the consequences of carrying guns outside the home is that the risk of loss and theft is greatly increased, and since 18-20-year-olds are more prone to careless and reckless behavior, allowing this age group to carry guns outside the home will lead to a disproportionate increase in gun thefts and losses, which directly leads to more criminal use of guns as well as gun accidents and suicides.

Considering the APHA findings, and the extensive literature linking gun access to firearm suicides in general and specifically among 18-20-year-olds, the restrictions at issue in this litigation are likely to prevent avoidable deaths in this vulnerable age group, given the growing

[76] As noted in footnote 34 above, the increased gun possession by 18-20-year-olds that would result from allowing them to carry guns would contribute to another problem: it would also provide greater access to underage members of the household, thereby elevating risks of crime, accidents, and suicides.

stresses and increased levels of suicidality among 18-20-year-olds, which have experienced a massive 32.2 percent increase in firearm suicides among over the period from 2005-2018 (according to the CDC).

**D. Age-Based Restrictions on Firearms are Overwhelmingly Endorsed by the Public**

The wisdom and value of age restrictions on firearms is widely recognized by the public, as reflected in a national poll of 1,960 registered voters polled by Politico from August 5-7, 2019.[77] This poll showed that 83 percent of voters support limiting gun purchases to those 21 and older. The intensity of this preference is also striking, as seen in the following results to this question in the poll:

> Below is a list of policies surrounding gun ownership in the United States? How much do you support or oppose each of the following?
>
> Requiring a person to be 21 in order to purchase a gun

| | |
|---|---|
| Strongly support | 69% |
| Somewhat support | 14% |
| Somewhat oppose | 6% |
| Strongly oppose | 6% |
| Don't Know / No Opinion | 5% |

The fact that 69% of Americans "strongly support" limiting gun purchases to those who are at least 21 is noteworthy. Indeed, only two other gun measures generate higher levels of "strong support:" 1) "universal background checks" which are wildly popular (80 percent strongly support) and 2) "Preventing sales of all firearms to people who have been reported as dangerous to law enforcement by a mental health provider" (75 percent strongly support).

[77] Steven Shepard, *Poll: Most Republicans Support Assault Weapons Ban, Despite Trump Saying 'No Appetite'*, Politico, Aug. 7, 2019, https://politi.co/341xQfp.

## IX.    CONCLUSION

Based upon the many studies that I have conducted, the studies I have reviewed, additional data I have analyzed, and the knowledge I have acquired during a 45-year career of studying guns and crime, I conclude that the gun safety measures at issue in this litigation are appropriately targeted to the 18-20 year age group because that group is at heightened risk of committing firearm homicide and other violent crime. Due to challenges of underdeveloped neurobiological function and worsening levels of stress and mental health issues, this age group is at increased risk of making poor decisions and acting impulsively (in general and in connection with alcohol and drug consumption), which is why in so many dimensions of life, governments and businesses will pursue strategies to reduce the damage that can follow from this incomplete brain maturation by imposing an array of age-based restrictions for those under age 21.

In addition, this age group is suffering from a growing problem of firearm suicide. Moreover, the concerns about the increased risk of violence and suicide raises additional concerns of mass violence by 18-20-year-olds, given the growing problem of public mass shootings.

In my expert opinion, the challenged measures designed to limit gun carrying by the 18-20-age cohort will further Illinois' compelling interest in reducing firearm deaths and injuries from assaultive crimes and suicide. The recent example of Kyle Rittenhouse, who killed two people and maimed a third during a protest in Kenosha, Wisconsin in August 2020, highlights that a gun taken outside the home by even a well-intentioned young man considerably elevates the danger to the public over those left in a residence.[78]

In addition, reduced firearm access by 18-20-year-olds can only reduce accidental firearm deaths and injuries. Indeed, young people appear to be far more likely to be injured or die in firearm accidents than older adults.[79]

---

[78] Charles Homans, Kyle Rittenhouse and the New Era of Political Violence, *The New York Times*, October 26, 2021, https://www.nytimes.com/2021/10/26/magazine/kyle-rittenhouse-kenosha-wisconsin.html?referringSource=articleShare.

[79] *See* Sarah J. Solnick & David Hemenway, *Unintentional Firearm Deaths in the United States 2005-2015*, 6 Inj. Epidemiology 1, 3-4 (2019) (finding that "children and teens, ages 10 to 19," and "young adults, aged

Date: May 31, 2022

John J. Donohue

20 to 29," have an elevated risk of dying in a gun accident than older adults), available at https://bit.ly/3zowb14; Victor Lee *et al.*, *Emergency Department Visits for Firearm-Related Injuries Among Youth in the United States*, 2006-2015, 48 J.L., Med. & Ethics 67, 70 (2020) (finding that, between 2006 and 2015, 36,780 18-20-year-olds reported to a hospital emergency room for unintentional firearm injury and an additional 2,399 reported for firearm injury caused by a suicide attempt or self-harm), https://bit.ly/3isoUGR.

DEFENDANT'S EXHIBIT G

# EXHIBIT 1

# JOHN J. DONOHUE III

Stanford Law School
Stanford, CA 94305
Phone: 650 721 6339
E-mail: jjd@stanford.edu
Web pages:
http://works.bepress.com/john_donohue/
https://law.stanford.edu/directory/john-j-donohue-iii/

**EMPLOYMENT**

## Full-time Positions

- Stanford Law School, C. Wendell and Edith M. Carlsmith Professor of Law, September 2010 to the present.
- Yale Law School, Leighton Homer Surbeck Professor of Law, July 2004 to August 2010.
- Stanford Law School, Professor of Law, September 1995 to June 2004.
  - William H. Neukom Professor of Law, February 2002 – June 2004.
  - John A. Wilson Distinguished Faculty Scholar, March 1997 – January 2002.
  - Academic Associate Dean for Research, since July 2001 – July 2003.
  - Stanford University Fellow, September 2001 – May 2003.
- Northwestern University School of Law:
  - Class of 1967 James B. Haddad Professor of Law, September 1994-August 1995
  - Harry B. Reese Teaching Professor, 1994-1995
  - Professor of Law, May 1991-September 1994
  - Associate Professor, May 1989-May 1991
  - Assistant Professor, September 1986-May 1989.
- Research Fellow, American Bar Foundation, September 1986-August 1995.
- Associate Attorney, Covington & Burling, Washington, D.C., October 1978-July 1981 (including last six months as Attorney, Neighborhood Legal Services)
- Law Clerk to Chief Justice T. Emmet Clarie, U.S. District Court, Hartford, Connecticut, September 1977-August 1978.

## Temporary Appointments

- Affiliated Research Professor, American Bar Foundation, September 2020 – August 2025.
- Visiting Professor, Tel Aviv University School of Law, May 2022.
- Lecturer on the Economics of Crime, Bogota Summer School in Economics, Universidad del Rosario, Bogota, Colombia, June 2020.
- Visiting Professor, Bocconi University, Milan, Italy, October- November 2012, April 2014, and June 2015.
- 2011 Faculty Scholar in Residence, University of Denver Sturm College of Law, April 21-22, 2011.

- Visiting Fellow, The Milton Friedman Institute for Research in Economics, University of Chicago, October 2009.
- Schmidheiny Visiting Professor of Law and Economics, St. Gallen University, November – December, 2007.
- Visiting Lecturer in Law and Economics, Gerzensee Study Center, Switzerland, June 2007.
- Visiting Professor, Tel Aviv University School of Law, May 2007.
- Herbert Smith Visitor to the Law Faculty, University of Cambridge, England, February 2006.
- Visiting Professor, Harvard Law School, January 2003.
- Fellow, Center for Advanced Studies in the Behavioral Sciences, Stanford, California, Academic year 2000-01.
- Visiting Professor, Yale Law School, Fall, 1999.
- Professor, Center for the Study of American Law in China, Renmin University Law School, Beijing, July 1998.
- Visiting Professor of Law and Economics, University of Virginia, January 1997.
- Lecturer, Toin University School of Law, Yokohama, Japan, May-June 1996.
- Cornell Law School, Distinguished Visiting Fellow in Law and Economics, April 8-12, 1996 and September 25-29, 2000
- Visiting Professor, University of Chicago Law School, January 1992-June 1992.
- Visiting Professor of Law and Economics, University of Virginia Law School, January 1990-May 1990.
- Fellow, Yale Law School Program in Civil Liability, July 1985-August 1986.
- Private Practice (part-time), New Haven, Connecticut, September 1981-August 1986.
- Instructor in Economics, Yale College, September 1983-August 1985.
- Summer Associate, Donovan Leisure Newton & Irvine, New York, Summer 1982.
- Summer Associate, Perkins, Coie, Stone, Olsen & Williams, Seattle, Washington, Summer 1976.
- Research Assistant, Prof. Laurence Lynn, Kennedy School of Government, Harvard University, Summer 1975.
- LSAT Tutor, Stanley Kaplan Education Center, Boston, Massachusetts; Research Assistant, Prof. Philip Heymann, Harvard Law School; Research Assistant, Prof. Gordon Chase, Harvard School of Public Health. (During Law School).

**EDUCATION**

## Yale University, 1981-1986

- University Fellow in Economics; M.A. 1982, M. Phil. 1984, Ph.D. 1986.
  - Dissertation: "A Continuous-Time Stochastic Model of Job Mobility: A Comparison of Male-Female Hazard Rates of Young Workers." Awarded with Distinction by Yale.
  - Winner of the Michael E. Borus Award for best social science dissertation in the last three years making substantial use of the National Longitudinal Surveys--awarded by the Center for Human Research at Ohio State University on October 24, 1988.
- National Research Service Award, National Institute of Health.
- Member, Graduate Executive Committee; Graduate Affiliate, Jonathan Edwards College.

## Harvard Law School, 1974-1977 (J.D.)

- Graduated Cum Laude.

- Activities: Law Clerk (Volunteer) for Judge John Forte, Appellate Division of the District Court of Central Middlesex; Civil Rights, Civil Liberties Law Review; Intra-mural Athletics; Clinical Placement (Third Year): (a) First Semester: Massachusetts Advocacy Center; (b) Second Semester: Massachusetts Attorney General's Office--Civil Rights and Consumer Protection Divisions. Drafted comments for the Massachusetts Attorney General on the proposed U.S. Department of Justice settlement of its case against BechtelCorporation's adherence to the Arab Boycott of Israeli companies.

### Hamilton College, 1970-1974 (B.A.)

- Departmental Honors in both Economics and Mathematics
  - Phi Beta Kappa (Junior Year)
- Graduated fourth in class with the following academic awards:
  - Brockway Prize (Highest GPA Freshman Year)
  - Edwin Huntington Memorial Mathematical Scholarship
  - Fayerweather Prize Scholarship
  - Oren Root Prize Scholarship in Mathematics
- President, Root-Jessup Public Affairs Council.

## PUBLICATIONS

### Books and Edited Volumes:

- Law and Economics of Discrimination**,** Edward Elgar Publishing, 2013.
- Employment Discrimination: Law and Theory, Foundation Press, 2005, 2009 (2d edition) (with George Rutherglen).
- Economics of Labor and Employment Law: Volumes I and II, Edward Elgar Publishing, 2007. http://www.e-elgar.co.uk/bookentry_main.lasso?id=4070
- Foundations of Employment Discrimination Law, Foundation Press, 2003 (2d edition).
- Foundations of Employment Discrimination Law, Oxford University Press, 1997 (Initial edition).

### Book Chapters:

- "Drug Prohibitions and Its Alternatives." Chapter 2 in Cook, Philip J., Stephen Machin, Olivier Marie, and Giovanni Mastrobuoni, eds, *Lessons from the Economics of Crime: What Reduces Offending?* MIT Press. 45-66 (2013).
- "The Death Penalty" Chapter in Encyclopedia of Law and Economics, Spring (2013) and in Alain Marciano & Giovanni Battista Ramello eds., Encyclopedia of Law and Economics (2019).
- "Rethinking America's Illegal Drug Policy," in Philip J. Cook, Jens Ludwig, and Justin McCrary, eds, Controlling Crime: Strategies and Tradeoffs (2011), pp.215-289 (with Benjamin Ewing and David Peloquin).
- "Assessing the Relative Benefits of Incarceration: The Overall Change Over the Previous Decades and the Benefits on the Margin" in Steven Raphael and Michael Stoll, eds., “Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom,” pp. 269-341 (2009).

- "Does Greater Managerial Freedom to Sacrifice Profits Lead to Higher Social Welfare" In Bruce Hay, Robert Stavins, and Richard Vietor, eds., Environmental Protection and the Social Responsibility of Firms: Perspectives from Law, Economics, and Business (2005).
- "The Evolution of Employment Discrimination Law in the 1990s: A Preliminary Empirical Evaluation" (with Peter Siegelman), in Laura Beth Nielsen and Robert L. Nelson, eds., Handbook of Employment Discrimination Research (2005).
- "The Impact of Concealed Carry Laws" in Jens Ludwig and Philip Cook, Evaluating Gun Policy: Effects on Crime and Violence (Washington D.C.: Brookings, 2003).

**Articles:**

- "Increasing murders but overall lower crime suggests a growing gun problem," Am J Public Health. (2022).
- "An expert draws 7 lessons about US gun laws from the murder of Ahmaud Arbery and the Rittenhouse verdict," The Conversation (December 6, 2021), https://theconversation.com/an-expert-draws-7-lessons-about-us-gun-laws-from-the-murder-of-ahmaud-arbery-and-the-rittenhouse-verdict-172741.
- Lisa Vicen, Samuel Levander, & John J. Donohue III, 'NYSRPA v. Bruen': Studies Show Direct Link Between Right-to-Carry and Violent Crime Increase, The National Law Journal, November 4, 2021. https://www.law.com/nationallawjournal/2021/11/04/nysrpa-v-bruen-studies-show-direct-link-between-right-to-carry-and-violent-crime-increase/.
- "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf. This is part of the Brennan Center for Justice *Protests, Insurrection, and the Second Amendment* series.
- "We Must Confront the Threats to America's Democracy" 56 *Idaho Law Review* 119 (2020)."
- The Impact of Legalized Abortion on Crime over the Last Two Decades" *American Law and Economics Review* (Fall 2020)(with Steven Levitt), Volume 22, Issue 2, Pages 241–302. https://academic.oup.com/aler/article/22/2/241/5973959?guestAccessKey=917acf36-918d-4310-9d22-73c713757238
  - NBER Working Paper No. 25863, May 2019, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3391510.
    - Featured on Freakonomics Radio, "Abortion and Crime, Revisited." https://podcasts.apple.com/us/podcast/freakonomics-radio/id354668519?i=1000444184627."
- "The Swerve to 'Guns Everywhere:' A Legal and Empirical Evaluation" 83 *Law and Contemporary Problems* 117-136 (2020). https://scholarship.law.duke.edu/lcp/vol83/iss3/7.
- Daniel Cerqueira, Danilo Santa Cruz Coelho, John J. Donohue, Marcelo Fernandes & Jony Arrais Pinto, A Panel-Based Proxy for Gun Prevalence in the US (Nat'l Bureau of Econ. Research, Working Paper No. 25530, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3332277.
- "That Assault Weapon Ban? It Really Did Work" *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html?action=click&module=Opinion&pgtype=Homepage.

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis" *Journal of Empirical Legal Studies*, April 2019 (with Abhay Aneja and Kyle Weber), https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.
- "RTC Laws Increase Violent Crime: Moody and Marvell Have Missed the Target," *Econ Journal Watch*, Vol. 16, No. 1, 97-113, March 2019 (with Abhay Aneja and Kyle Weber), https://econjwatch.org/File+download/1103/DonohueAnejaWeberMar2019.pdf?mimetype=pdf
- "It's Going to Take More Than Background Checks and AR-15 Bans to Stop Mass Shootings," *Time.com*, November 16, 2018. http://time.com/5456015/gun-control-background-checks-ar15-mass-shootings/
- "What's in a denial? Bayesian Analysis shows that Kavanaugh lied about denials under oath and Trump was foolish to believe MBS," November 2, 2018 (with Aaron Edlin). https://works.bepress.com/john_donohue/176/
- "Brett Kavanaugh won't keep Americans safe," CNN.com, September 5, 2018. https://www.cnn.com/2018/09/05/opinions/kavanaugh-wont-keep-america-safe-donohue/
- "More Gun Carrying, More Violent Crime," *Econ Journal Watch*, Vol. 15, No. 1, 67-82, January 2018. https://econjwatch.org/articles/more-gun-carrying-more-violent-crime
- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis" NBER Working Paper w23510, www.nber.org/papers/w23510, January 2018 (with Abhay Aneja, and Kyle Weber).
- "Saving lives by regulating guns: Evidence for policy," *Science* Dec. 8, 2017, Vol. 358, Issue 6368, pp. 1259-1261, http://science.sciencemag.org/content/358/6368/1259.full (with Phil Cook).
- "Laws Facilitating Gun Carrying and Homicide," American Journal of Public Health, Vol 107, No. 12, 1864-1865, December 2017, http://ajph.aphapublications.org/doi/10.2105/AJPH.2017.304144.
- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," 117 Columbia Law Review 1297 (2017). http://columbialawreview.org/content/comey-trump-and-the-puzzling-pattern-of-crime-in-2015-and-beyond/.
- "Did Jeff Sessions forget wanting to execute pot dealers?" The Conversation, January 23, 2017 (with Max Schoening), https://theconversation.com/did-jeff-sessions-forget-wanting-to-execute-pot-dealers-71694
  - Reprinted in Huffington Post, http://www.huffingtonpost.com/the-conversation-us/did-jeff-sessions-forget_b_14344218.html
  - Reprinted in Salon, http://www.salon.com/2017/01/30/jeff-sessions-forgetting-he-once-wanted-to-execute-pot-dealers/#comments
- "Jeff Sessions, The Grim Reaper of Alabama," The New York Times, January 9, 2017 (with Max Schoening), http://www.nytimes.com/2017/01/08/opinion/jeff-sessions-the-grim-reaper-of-alabama.html
- "Testing the Immunity of the Firearm Industry to Tort Litigation," JAMA Intern Med. Published online November 14, 2016. http://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2582991 (with David Studdert and Michelle Mello).
- "Empirical Analysis and the Fate of Capital Punishment," 11 Duke Journal of Constitutional Law and Public Policy 51-106 (2016). Available at: http://scholarship.law.duke.edu/djclpp/vol11/iss1/3
- "Firearms on College Campuses: Research Evidence and Policy Implications," Johns Hopkins Bloomberg School of Public Health, (October 15, 2016)(with Daniel Webster et al). http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/_pdfs/GunsOnCampus.pdf

- "Be skeptical about claims of benefits of concealed carry permits." Sacramento Bee, (October 6, 2016), http://www.sacbee.com/opinion/op-ed/soapbox/article106329677.html
- "The Death Penalty Does Not Add Up to Smart Justice," California State Treasurer Intersections (September 2016), http://treasurer.ca.gov/newsletter/2016/201609/conversation.asp
- "Reducing civilian firepower would boost police and community safety, Stanford expert says," Stanford News (July 2016), http://news.stanford.edu/2016/07/15/reducing-civilian-firepower-boost-police-community-safety/review/
- "Domestic Violence and Effectively Terminating the Gun Rights of the Dangerous," Legal Aggregate – Stanford Law School (June 2016), https://law.stanford.edu/2016/06/28/domestic-violence-and-effectively-terminating-the-gun-rights-of-the-dangerous/
- "4 Gun Control Steps U.S. Needs Now," CNN.com (June 2016), http://www.cnn.com/2016/06/23/opinions/gun-control-donohue/index.html
- "The Demise of the Death Penalty in Connecticut," Legal Aggregate - Stanford Law School (June 2016),

  https://law.stanford.edu/2016/06/07/the-demise-of-the-death-penalty-in-connecticut/
- “On Justice Scalia’s Legacy,” Legal Aggregate - Stanford Law School (February 14, 2016) https://law.stanford.edu/2016/02/15/stanford-law-faculty-on-justice-scalia/
- "Empirical Evaluation of Law: The Dream and the Nightmare," 17 American Law and Economics Review 313 2015.
- “Capital Punishment Does not Deter Homicides,” Casetext, August 30, 2015, https://casetext.com/posts/capital-punishment-does-not-deter-homicides
- "There's no evidence that death penalty is a deterrent against crime," The Conversation, August 8, 2015. http://theconversation.com/theres-no-evidence-that-death-penalty-is-a-deterrent-against-crime-43227
  - Reprinted under the title “Does the Death Penalty Deter Killers?” Newsweek, August 19, 2015.

    https://www.newsweek.com/does-death-penalty-deter-killers-364164
- "Glossip v. Gross: Examining Death Penalty Data for Clarity," Stanford Lawyer, June 29, 2015. http://stanfordlawyer.law.stanford.edu/2015/06/glossip-v-gross-examining-death-penalty-data-for-clarity/
- "How US Gun Control Compares to the Rest of the World," The Conversation, June 24, 2015. http://theconversation.com/how-us-gun-control-compares-to-the-rest-of-the-world-43590
  - Reprinted in slightly modified form under the title "Ban guns, end shootings? How evidence stacks up around the world," in CNN.com on August 27, 2015 http://www.cnn.com/2015/08/27/opinions/us-guns-evidence/
- “The 10 day period is reasonable,” San Francisco Daily Journal, September 3, 2014.
- “An Empirical Evaluation of the Connecticut Death Penalty System Since 1973: Are There Unlawful Racial, Gender, and Geographic Disparities?” 11 Journal of Empirical Legal Studies 637 (2014).
- “The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy,” NBER Working Paper 18294. Revised November 2014 (with Abhay Aneja and Alexandria Zhang), http://www.nber.org/papers/w18294

- "Do Police Reduce Crime? A Reexamination of a Natural Experiment," in Yun-Chien Chang, ed., Empirical Legal Analysis: Assessing the Performance of Legal Institutions, London: Routledge, Chapt. 5, pp. 125-143, 2014 (with Daniel E. Ho & Patrick Leahy)
- "Reflections on the Newtown Shooting One Year Later," Stanford Lawyer, December 5, 2013. http://stanfordlawyer.law.stanford.edu/2013/12/reflections-on-the-newtown-shooting-one-year-later/
- Outlier Nation: Homicides, Incarceration, Guns and Gun Culture, TAR 9 (Verona, Italy: 2013).
- "Gun lunacy rides high in America," Special to CNN, September 13, 2013. http://www.cnn.com/2013/09/13/opinion/donohue-gun-control/index.html?iref=allsearch
- "Why the NRA fights background checks," Special to CNN, Wed April 10, 2013. http://www.cnn.com/2013/04/10/opinion/donohue-background-checks/index.html
- "Substance vs. Sideshows in the More Guns, Less Crime Debate: A Comment on Moody, Lott, and Marvell" (with Abhay Aneja, and Alexandria Zhang) ECON JOURNAL WATCH 10(1) January 2013: 32-39
- "More Guns, Less Crime Thesis," Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law (volume 2:G-Q, at page 585) (2012).
- "Jury Nullification in Modified Comparative Negligence Regimes," 79 The University of Chicago Law Review 945 (2012)(with Eli K. Best).
- "What Can Be Done to Stem Gun Violence?" San Francisco Chronicle, December 21, 2012. http://www.sfgate.com/opinion/article/What-can-be-done-to-stem-gun-violence-4139575.php#ixzz2G4qIkJJ2
- "When Will America Wake Up to Gun Violence?" CNN opinion, July 21, 2012. Posted to: http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/.
- "Time To Kill The Death Penalty?" The California Progress Report, June 28, 2012.
- "Assessing Post-ADA Employment: Some Econometric Evidence and Policy Considerations." Journal of Empirical Legal Studies Vol. 8: No. 3, September 2011, pp. 477-503 (with Michael Ashley Stein, Christopher L. Griffin, Jr. and Sascha Becker).
- "The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," American Law and Economics Review (Fall 2011) 13 (2): 565-631 (with Abhay Aneja and Alex Zhang). See January 2014 Revision released as an NBER working paper above.
- "Punishment is a Cost, Not a Benefit," Review of Mark A. R. Kleiman's "When Brute Force Fails: How to Have Less Crime and Less Punishment," XLVII Journal of Economic Literature (March 2010), 168-172.
- "The Politics of Judicial Opposition: Comment," Journal of Institutional and Theoretical Economics, 166(1), 108—114 (2010).
- "Introduction to the Death Penalty Symposium," 11 American Law and Economics Review. (Fall 2009) (with Steve Shavell).
- "Estimating the Impact of the Death Penalty on Murder," 11 American Law and Economics Review 249 (Fall 2009) (with Justin Wolfers).
- "The Impact of the Death Penalty on Murder," Criminology & Public Policy (November 2009, Volume 8, Issue 4) at pp. 795-801.
- "The Impact of Legalized Abortion on Teen Childbearing," 11 American Law and Economics Review 24 (2009) (with Jeff Grogger and Steven Levitt).

- "More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006," 6 Econ Journal Watch 218-233 (May 2009)(with Ian Ayres).
- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell," 6 Econ Journal Watch 35-59 (January 2009)(with Ian Ayres).
- "Measurement Error, Legalized Abortion, and the Decline in Crime: A Response to Foote and Goetz," The Quarterly Journal of Economics (2008) 123 (1): 425-440 (with Steven Levitt). http://qje.oxfordjournals.org/content/123/1/425.abstract
- "AntiDiscrimination Law," in Steven Durlauf and Lawrence Bloom, eds., The New Palgrave Dictionary of Economics, 2d Edition, 2008.
- "Murder in Decline in the 1990s: Why the U.S. and N.Y.C. Were Not That Special," Punishment and Society 10: 333 (2008) at http://pun.sagepub.com
- "Understanding the 1990s Crime Drops in the U.S. and Canada," Canadian Journal of Criminology and Criminal Justice, Vol 49, No. 4, p. 552 (October 2007).
- "The Law and Economics of Antidiscrimination Law," A. M. Polinsky and Steven Shavell, eds., Handbook of Law and Economics, Volume 2 (2007), Pages 1387-1472.
- "Economic Models of Crime and Punishment," Social Research, Vol. 74: No. 2, Summer 2007, pp. 379-412.
- "Rethink the War on Drugs," Yale Law Reports, Summer 2007, pp. 46-47.
- "More Cops," Brookings Policy Brief #158, March 2007 (with Jens Ludwig), http://www.brookings.edu/papers/2007/03crime_john-j--donohue-iii.aspx.
- "Studying Labor Market Institutions in the Lab: Minimum Wages, Employment Protection, and Workfare: Comment," Journal of Theoretical and Institutional Economics, 163(1), 46—51 (March 2007).
- "The Impact of Damage Caps on Malpractice Claims: Randomization Inference with Difference-in-Differences," (with Daniel Ho), 4 Journal of Empirical Legal Studies 69 (2007).
- "The Discretion of Judges and Corporate Executives: An Insider's View of the Disney Case," The Economists' Voice: Vol. 3: No. 8, Article 4. Available at: http://www.bepress.com/ev/vol3/iss8/art4
- "The Knicks Boldly Go Where Companies Have Not," The New York Times, July 2, 2006 Sunday (with Ian Ayres).
- "The Death Penalty: No Evidence of Deterrence," The Economists' Voice, (with Justin Wolfers) (April 2006), http://bpp.wharton.upenn.edu/jwolfers/Press/DeathPenalty(BEPress).pdf.
  - Reprinted in Stiglitz, Edlin, and DeLong (eds), The Economists' Voice: Top Economists Take on Today's Problems (2008).
- "The Costs of Wrongful-Discharge Laws," 88 Review of Economics and Statistics (with David Autor and Stewart Schwab)(2006), pp. 211-31.
- "Security, Democracy, and Restraint," 1 Opening Argument 4 (February 2006).
  - Reprinted in Loch Johnson and James Wirtz, Intelligence and National Security: An Anthology 406-407 (2d ed. 2008).
- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," 58 Stanford Law Review 791 (2005) (with Justin Wolfers).

- Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).
- Reprinted in Robert Cooter and Francesco Parisi, eds., Foundations of Law and Economics, Edward Elgar Publishing (2010)

- “Does Terrorism Increase Crime? A Cautionary Tale,” (with Daniel Ho), 2005.
- “Fighting Crime: An Economist’s View,” 7 The Milken Institute Review 46 (2005).
  - Reprinted in Kurt Finsterbusch, ed., Social Problems (McGraw-Hill, 2006).
- “Guns, Crime, and the Impact of State Right-to-Carry Laws,” 73 Fordham Law Review 623 (2004).
- "Clinton and Bush's Report Cards on Crime Reduction: The Data Show Bush Policies Are Undermining Clinton Gains", The Economists' Voice: Vol. 1: No. 1, Article 4. 2004, http://www.bepress.com/ev/vol1/iss1/art4
- “The Employment Consequences of Wrongful-Discharge Laws: Large, Small, or None at All?” American Economic Review: Papers and Proceedings May, 2004 (with David Autor and Stewart Schwab).
- “Further Evidence that Legalized Abortion Lowered Crime: A Reply To Joyce,” 39 Journal of Human Resources 29 (Winter 2004)(with Steven Levitt).
- “A Clarification on Data Availability,” Science: Vol. 301: No. 5641. (September 26, 2003), p. 1849, http://www.jstor.org/stable/3835157.
- “The Final Bullet in the Body of the More Guns, Less Crime Hypothesis,” Criminology & Public Policy (July 2003, Volume 2, Issue 3) at pp. 397-410.
- “Shooting Down the ‘More Guns, Less Crime’ Hypothesis,” 55 Stanford Law Review 1193 (2003)(with Ian Ayres).
- “The Latest Misfires in Support of the ‘More Guns, Less Crime’ Hypothesis,” 55 Stanford Law Review 1371 (2003)(with Ian Ayres).
- “Can Guns, Or Gun Violence, Be Controlled?” (Reviewing James Jacobs, Can Gun Control Work?), The American Prospect (December 16, 2002), p. 35, http://prospect.org/article/books-review-4.
- “The Search for Truth: In Appreciation of James J. Heckman,” 27 Law and Social Inquiry 23 (2002).
- ″The Schooling of Southern Blacks: The Roles of Social Activism and Private Philanthropy, 1910-1960,″ Quarterly Journal of Economics (Feb. 2002), (with James Heckman and Petra Todd), pp. 225 – 268.
  - Reprinted in Legal Decisionmaking section of the American Bar Foundation Anthology, ABF Press (2007).
  - Reprinted in American Bar Foundation, Anaylyzing Law’s Reach: Empirical Research on Law and Society (2008)
- “The Impact of Race on Policing and Arrests,” Journal of Law and Economics, vol. XLIV October 2001)(with Steven Levitt), pp. 367 – 394.
- “The Impact of Legalized Abortion on Crime,” Quarterly Journal of Economics (Vol. CXVI, Issue 2, May 2001)(with Steven Levitt) pp. 379-420.
  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

- Reprinted in Robert Cooter and Francesco Parisi, eds., Recent Developments In Law And Economics, Edward Elgar Publishing (2010).

- "Understanding the Reasons for and Impact of Legislatively Mandated Benefits for Selected Workers," 53 Stanford Law Review 897 (2001).
  - Reprinted in Michael Zimmer, Charles Sullivan et al, Cases and Materials on Employment Discrimination (6th edition)(2003).
- "Nondiscretionary Concealed Weapons Law: A Case Study of Statistics, Standards of Proof, and Public Policy," American Law and Economics Review 436 (1999)(with Ian Ayres).
  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).
- "Why We Should Discount the Views of Those Who Discount Discounting," 108 Yale Law Journal 1901 (1999).
- "Understanding the Time Path of Crime," 88 Journal of Criminal Law and Criminology 1423 (1998).
- "Discrimination in Employment," The New Palgrave Dictionary of Law and Economics (1998).
  - Excerpted in Lynne Dallas, Law and Public Policy: A Socio-Economic Approach at page 261 (2003).
- "The Legal Response to Discrimination: Does Law Matter?" in Bryant Garth, Austin Sarat, eds., How Does Law Matter? Pp. 45 – 75 (Northwestern University Press, 1998).
- "Some Thoughts on Law and Economics and the Theory of the Second Best," 73 Chicago-Kent Law Review 257 (1998).
- "Allocating Resources Among Prisons and Social Programs in the Battle Against Crime," 27 Journal of Legal Studies 1 (1998) (with Peter Siegelman).
  - Excerpted in Sanford Kadish & Stephen Schulhofer, Criminal Law and Its Processes (8th ed. 2007),
- "Guns, Violence, and the Efficiency of Illegal Markets," 88 American Economic Review 463 (May 1998)(with Steve Levitt).
- "Did *Miranda* Diminish Police Effectiveness?" 50 Stanford Law Review 1147 (1998).
- "Some Thoughts on Affirmative Action," 75 Washington University Law Quarterly 1590 (1997).
- "Executive Compensation," 3 Stanford Journal of Law, Business & Finance 1 (1997).
- "Some Perspective on Crime and Criminal Justice Policy," Lawrence Friedman and George Fisher, eds., The Crime Conundrum: Essays on Criminal Justice 45 (1997). Reissued by Routledge eBooks 2019.
- "The Selection of Employment Discrimination Disputes for Litigation: Using Business Cycle Effects to Test the Priest/Klein Hypothesis," 24 Journal of Legal Studies 427 (1995) (with Peter Siegelman).
- "Employment Discrimination Law in Perspective: Three Concepts of Equality," 92 Michigan Law Review 2583 (1994).
- Reprinted in Frank Ravitch, Janis McDonald, and Pamela Sumners, Employment Discrimination Law (2004).
  - Translated into Chinese and published in Peking University Law Review (2007).
- "The Effects of Joint and Several Liability on Settlement Rates: Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," 23 Journal of Legal Studies 543 (1994).

- "Liberal Law and Economics," (reviewing Rethinking the Progressive Agenda by Susan Rose-Ackerman), 13 Journal of Policy Analysis and Management 192 (1994).
- Review of Richard Epstein's Forbidden Grounds: The Case Against Employment Discrimination Laws, 31 Journal of Economic Literature 1477 (1994).
- "Law and Macroeconomics: Employment Discrimination Over the Business Cycle," 66 University of S. Calif. L. Rev. 709 (1993) (with Peter Siegelman).
- "Advocacy Versus Analysis In Assessing Employment Discrimination Law," 44 Stanford Law Review 1583 (1992).
  - Reprinted in Christopher McCrudden, Anti-Discrimination Law (2003).
- Excerpted in Professors Michael J. Zimmer, Charles A. Sullivan, & Rebecca Hanner White, Cases and Materials on Employment Discrimination (Seventh Edition 2008).
- "The Changing Nature of Employment Discrimination Litigation," 43 Stanford Law Review 983 (1991) (with Peter Siegelman).
- "The Effects of Fee Shifting on the Settlement Rate: Theoretical Observations on Costs, Conflicts, and Contingency Fees," 54 Law and Contemporary Problems 195 (1991).
- "Re-Evaluating Federal Civil Rights Policy," 79 Georgetown Law Journal 1713 (1991) (with James Heckman).
- "Opting for the British Rule; Or, If Posner and Shavell Can't Remember the Coase Theorem, Who Will?" 104 Harvard Law Review 1093 (1991).
  - Reprinted in Saul Levmore, Foundations of Tort Law 160 (1994).
- "Continuous versus Episodic Change: The Impact of Civil Rights Policy on the Economic Status of Blacks," 29 Journal of Economic Literature 1603 (December 1991) (with James Heckman).
  - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De Gruyter, New York (1994).
- "The Impact of Federal Civil Rights Policy on the Economic Status of Blacks," 14 Harvard Journal of Law and Public Policy 41 (1991).
- "Studying the Iceberg From Its Tip: A Comparison of Published and Unpublished Employment Discrimination Cases," 24 Law and Society Review 1133 (1990) (with Peter Siegelman).
- "Prohibiting Sex Discrimination in the Workplace: An Economic Perspective," 56 University of Chicago Law Review 1337 (1989).
- "The Law & Economics of Tort Law: The Profound Revolution," 102 Harvard Law Review 1047 (1989).
- "Using Market Incentives to Promote Auto Occupant Safety," 7 Yale Law and Policy Review 449 (1989).
- "Diverting the Coasean River: Incentive Schemes to Reduce Unemployment Spells," 99 Yale Law Journal 549 (1989).
  - Winner of the 1989 Scholarly Paper Competition, Association of American Law Schools.
- "Reply to Professors Ellickson and Stigler," 99 Yale Law Journal 635 (1989).
- "Law and Economics: The Road Not Taken," 22 Law and Society Review 903 (1988).
- "Further Thoughts on Employment Discrimination Legislation: A Reply to Judge Posner," 136 U. Pa. L. Rev. 523 (1987).

DEFENDANT'S EXHIBIT G

- "Judge Bork, Anti-Trust Law, and the Bending of 'Original Intent'," Chicago Tribune, sec.1, pg. 15, July 22, 1987.
- "Posner's Third Symphony: Thinking about the Unthinkable," 39 Stanford Law Review 791 (1987)(with Ian Ayres).
- "Determinants of Job Turnover of Young Men and Women in the U.S.--A Hazard Rate Analysis," in Schultz, T.P., ed., Research in Population Economics, vol.6, Greenwich, Conn.: JAI Press (1987).
- "A Comparison of Male-Female Hazard Rates of Young Workers, 1968-1971," Working Paper #48, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).
- "Hazard Rates of Young Male and Female Workers--Recent Developments," Working Paper #51, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).
- "Is Title VII Efficient?" 134 U. Pa. L. Rev. 1411 (1986).
  - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De Gruyter, New York (1994).
- "Section I Cases," Sherman's Summations, Vol.3, No.2, Sherman Act Committee of the A.B.A. Antitrust Section, Fall, 1982, at 49.
- "An Evaluation of the Constitutionality of S. 114, The Proposed Federal Death Penalty Statute," Hearings before the U.S. Senate Judiciary Committee, April 27, 1981, at 151.
- "Godfrey v. Georgia: Creative Federalism, the Eighth Amendment, and the Evolving Law of Death," 30 Catholic University Law Review 13 (1980).
- "Criminal Code Revision--Contempt of Court and Related Offenses," Hearings before the Subcommittee on Criminal Justice of the House Judiciary Committee, July 18, 1979, at 1087.

**Blog Posts:**

- "Guns, Mass Shootings, and the Law in the U.S.," *Stanford Law School Legal Aggregate Blog* (Dec. 10, 2021), https://law.stanford.edu/2021/12/10/stanfords-john-donohue-on-guns-mass-shootings-and-the-law-in-the-u-s/.
- "Stanford's John Donohue on One Tragic Week, Two Mass Shootings, and the Uniquely American Gun Problem," *Stanford Law School Legal Aggregate Blog* (March 25, 2021), https://law.stanford.edu/2021/03/25/stanfords-john-donohue-on-one-tragic-week-with-two-mass-shootings-and-the-uniquely-american-gun-problem
- "Open Carry Laws, Guns on Capitol Hill, and a Police Force Outgunned by Militias," *Stanford Law School Legal Aggregate Blog* (January 19, 2021), https://law.stanford.edu/2021/01/19/open-carry-laws-guns-on-capitol-hill-and-a-police-force-outgunned-by-militias/.
- "Remembering Justice Ginsburg," *Stanford Law School Legal Aggregate Blog* (September 19, 2020), https://law.stanford.edu/2020/09/19/stanford-laws-john-donohue-remembers-justice-ginsburg/.
- "The Assault Weapon Ban Saved Lives," (with Theodora Boulouta), *Stanford Law School Legal Aggregate Blog*, October 15, 2019, https://stanford.io/2MWNsrV.
- "Stanford Law's John Donohue on Mass Shootings and Gun Regulation in the U.S.," *Stanford Law School Legal Aggregate Blog*, August 6, 2019, https://law.stanford.edu/2019/08/06/stanford-laws-john-donohue-on-mass-shootings-and-gun-regulation-in-the-u-s/.
- "Stanford Law Faculty Remember Justice Stevens." *Stanford Law School Legal Aggregate Blog*, July 18, 2019, https://law.stanford.edu/2019/07/18/stanford-law-faculty-remember-justice-stevens/.

- "Arming Teachers Is Not a Good Option," *Scientific American*, February 28, 2018, https://blogs.scientificamerican.com/observations/arming-teachers-is-not-a-good-option/.
- "Another Mass Shooting: An Update on U.S. Gun Laws," *Stanford Law School Legal Aggregate Blog*, February 18, 2018, https://law.stanford.edu/2018/02/18/another-mass-shooting-qa-us-gun-laws/.
- "Orlando to Las Vegas: Guns, Law, and Mass Shootings in the U.S.," Stanford Law School Legal Aggregate Blog, October 3, 2017, https://law.stanford.edu/2017/10/03/orlando-to-las-vegas-guns-and-law/.
- "*Moore v. Texas* and the Pathologies that Still Mar Capital Punishment in the U.S.," *Stanford Law School Legal Aggregate Blog*, March 29, 2017, https://law.stanford.edu/2017/03/29/moore-v-texas-and-the-pathologies-that-mar-capital-punishment-in-the-u-s/.
- "Trump and Gun Policy," *Stanford Law School Legal Aggregate Blog*, November 12, 2016, http://stanford.io/2eoWnna.
- "Facts Do Not Support Claim That Guns Make Us Safer" *Stanford Law School Legal Aggregate Blog*, October 12, 2015, https://law.stanford.edu/2015/10/12/professor-john-donohue-facts-do-not-support-claim-that-guns-make-us-safer/.
- "When will America wake up to gun violence?" *CNN.com*, July 20, 2012, http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/index.html.
- "It Takes Laws to Control the Bad Guys," The New York Times -- Room For Debate: http://www.nytimes.com/roomfordebate/2011/01/11/more-guns-less-crime (January 11, 2011).
- "Have "Woman-Protective" Studies Resolved the Abortion Debate? Don't Bet on It," http://balkin.blogspot.com/2008/09/have-woman-protective-studies-resolved.html (September 2008).
- "Dodging the Death Penalty Bullet On Child Rape," http://balkin.blogspot.com/2008/07/dodging-death-penalty-bullet-on-child.html (July 2008).
- "Why I'd Stick With Yale Clerks-- Some Econometric Ruminations," http://balkin.blogspot.com/2008/04/why-id-stick-with-yale-clerks-some.html (April 2008).

## WORKSHOPS AND ADDRESSES:

- "Effectiveness of Permissive Gun Laws: Carry Laws, Stand Your Ground," Annals Authors' Conference, **University of Connecticut**, Hartford, April 7, 2022.
- "Permissive Gun Carrying Laws and Violent Crime," ETH, Zurich, April 6, 2022; Law and Economics Workshop, **Tel Aviv University School of Law**, May 11, 2022.
- "Guns and Crime in American Life and Law," **University of Zurich**, April 5, 2022.
- "Do Permissive Gun Carrying Laws Increase Violent Crime?" Applied Webinar at the **Sao Paulo School of Economics**, November 17, 2021.
- "Mass Shootings, Gun Laws and the Evolution of the Second Amendment – Where Do We Go from Here?" Minnesota Continuing Legal Education Webcast, November 2, 2021.
- Discussant of Richard Berk, "Firearm Sales in California Through the Myopic Vision of an Interrupted Time Series Causal Analysis," Online Causal Inference Seminar, **Stanford University**, April 6, 2021.
- "The Impact of Legalized Abortion on Crime over the Last Two Decades," American Law and Economics Association Meetings, **NYU School of Law**, May 18, 2019; Department of Economics, **University of California, Irvine**, October 13, 2020; **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021.

- Discussant of Chika Okafor, "Prosecutor Politics: The Impact of Election Cycles on Criminal Sentencing in the Era of Rising Incarceration," **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021.
- "Guns and Crime," Economic Analysis of Crime course, **Bocconi University**, Dept. of Social and Political Sciences, March 8, 2021.
- Discussant, "How the Massachusetts assault weapons ban enforcement notice changed firearm sales," Firearms and Policy session, **Assoc. for Public Policy Analysis and Management (APPAM) Virtual Fall Research Conference**, November 12, 2020.
- "We Must Confront the Threats to America's Democracy," Idaho Law Review Election Law Symposium, **University of Idaho College of Law**, October 20, 2020.
- "The Impact of Legalized Abortion on Crime over the Last Two Decades," Department of Economics, **University of California, Irvine**, October 13, 2020.
- "The Death Penalty: Informing Policy Through Empirical Research," Program in Criminal Law and Policy, **University of Arizona College of Law**, October 6, 2020.
- Discussant, "Mandatory Retirement Improved Performance on State Supreme Courts," Law and Economics Session, **NBER Summer Institute**, July 22, 2020.
- Discussant, "Measuring Racial Discrimination in Bail Decisions," Crime Session, **NBER Summer Institute**, July 15, 2020.
- "Guns and Empirical Evidence in Second Amendment Litigation," **Columbia Law School**, March 24, 2020; **Yale Law School**, March 25, 2020 (Zoom Presentation).
- Panelist, "Guns, Schools, and Adolescents: A Disaster Waiting to Happen," Psychiatry Grand Rounds,
- Sapp Center for Science Teaching and Learning, **Stanford University School of Medicine**, February 20, 2020.
- "The Power of Data to Change Hearts, Minds, and Public Policy," Law and Policy Lab, **Stanford Law School**, February 13, 2020.
- "The Move to 'Guns Everywhere'," Inaugural Cooter-Rubinfeld Lecture, **University of California, Berkeley, Law School**, February 6, 2020.
- "The Swerve: A Legal and Empirical Evaluation of the Move to 'Guns Everywhere,'" Law and Economic Studies Workshop, **Columbia Law School**, September 23, 2019; Conference on Gun Rights and Regulations Outside the Home, **Duke Law School**, September 27, 2019.
- "Evidence to Guide Gun-related Public Policy," Conference on Gun Violence Epidemic, **Stanford Medical School**, September 16, 2019; Lecturer, Physicians and Social Responsibility Course, **Stanford Medical School**, October 7, 2019; Lecturer, Data Science Course, **Department of Statistics, Stanford University**, November 1, 2019.
- "The Legal and Political Battle over Gun Policy in America," **Hamilton College**, June 7, 2019.
- "Impact of Right to Carry Laws on Violent Crime," Public Policy colloquium, **Stanford Economics Department**, January 22, 2018; SPILS Methods Workshop, **Stanford Law School**, January 25, 2018; Quantlaw, **University of Arizona Law School**, March 2, 2018; Stanford/Berkeley Causal Inference Conference, **Stanford Graduate School of Business**, April 23, 2019; **Baldy Center/Law School Distinguished Speaker Series**, University at Buffalo School of Law, May 3, 2019; Conference on "Synthetic Controls and Related Methods," **Institute for Data, Systems, and Society, MIT**, May 21, 2019.

- "Guns, Abortion, and the Death Penalty: Informing Policy Through Empirical Research," Politics and Public Policy Lecture Series, **Stanford University**, April 1, 2019.
- "Dangers of Guns Carried Outside the Home for Protection," **GVPedia Conference**, Denver, Colorado, April 6, 2019.
- "Understanding California's Red Flag Law: How to Remove Guns from People Who Are a Threat to Themselves or Others," **Stanford Law School**, February 12, 2019.
- "Guns and Crime: Current Empirical and Legal Debates," **Fellowship Forum**, January 22, 2019.
- "Gun Policy in America at a Critical Juncture," SAFE, **Stanford Medical School**, September 17, 2018.
- "Empirical Evaluation of Law and Policy: The Battle for Truth," **Woodside Rotary Club**, September 12, 2018.
- "Discussing America's Second Amendment," **San Jose Museum of Quilts & Textiles**, July 15, 2018.
- "The Legal Battle to End the Death Penalty in Connecticut," **Law School of the University of Reggio Calabria,** Italy, June 15, 2018.
- Panelist, "Newtown and Gun Violence in the US, Humanity is Indivisible Series, **Stanford University**, May 31, 2018.
- "Gun Policy In California and the US," Human Rights Seminar; **Stanford Medical School**, May 29, 2018.
- "Gun Policy in the Wake of Parkland," Sigma Alpha Epsilon Leadership Speaker Series, **Stanford Law School**, March 13, 2018; Stanford in Government event, Haas Center, **Stanford University**, April 20, 2018.
- Panelist, Town Hall Meeting on Gun Violence with Congresswoman Jackie Speier, **Burlingame High School**, April 14, 2018.
- Moderator, In Studio Conversation with Berkeley Law School Dean Erwin Chemerinsky: "Defining the Limits of Free Speech," **Palo Alto League of Women's Voters**, March 27, 2018. https://youtu.be/cqHEIAVoTLY
- "More than Thoughts & Prayers," **American Constitution Society** and the **Federalist Society, U.C. Hastings School of Law**, March 14, 2018.
- Panelist, "Addressing Gun Violence," **American Constitution Society**, Stanford Law School, March 8, 2018.
- Panelist, "Public Carry: Defending Against Efforts to Expand Carry Laws," **National Gun Violence Prevention Meeting**, Washington, D.C., October 18, 2017.
- "Keynote Presentation: Right-to-Carry Laws and Violent Crime," Second Amendment Litigation & Jurisprudence Conference, **The Law Center to Prevent Gun Violence**, October 16, 2017.
- "The Latest Evidence on Abortion Legalization and Crime," Conference on Empirical Legal Studies, **Cornell University**, October 13, 2017.
- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," **University of Texas School of Law and Economics Seminar,** April 24, 2017, Faculty Workshop, **UC Davis School of Law**, April 10, 2017; Law and Social Science Seminar, **Texas A&M University School of Law**, March 6, 2017; Quantlaw, **University of Arizona Law School**, February 17, 2017.
- Debate with Kent Scheidegger on Capital Punishment, Philosophy of Punishment Seminar, **JFK University School of Law,** March 18, 2017.
- "The Evidence on Guns and Gun Laws," **Federal Bar Council Program on Guns and Gun Laws** -- Rancho Mirage, California, February 23, 2017.

- "Guns, Crime and Race in America," Stanford's Center for Population Health Sciences, **Stanford Medical School**, October 17, 2016.
- "Evaluating the Death Penalty," Forum on California Propositions 62 and 66, **Stanford Law School**, September 14, 2016.
- "Empirical Analysis and the Fate of Capital Punishment," Colloquium, Presley Center for Crime and Justice Studies; **University of California, Riverside**, October 24, 2016.
- "Gun Violence and Mental Illness," Department of Psychiatry, **Stanford University**, August 25, 2016.
- "The Battle Over Gun Policy In America," Physicians and Social Responsibility" seminar; **Stanford Medical School**, October 3, 2016; **Bioethics Committee of the San Mateo County Medical Association**, April 27, 2016; **The League of Women Voters of Palo Alto**, April 19, 2016; Human Rights and Health Seminar, **Stanford University**, April 12, 2016; Bechtel International Center, **Stanford University**, February 23, 2016; Stanford in Government Seminar, Haas Center, **Stanford University**, February 2, 2016.
- American Economic Association Continuing Education Course "The Economics of Crime" (with Jens Ludwig), **AEA Annual Meeting**, San Francisco, January 5-7, 2016.
- "Race and Arbitrariness in the Connecticut Death Penalty," **University of Connecticut School of Law**, Nov. 20, 2015.
- *"Connecticut v. Santiago* and the Demise of the Connecticut Death Penalty," Faculty Workshop, **Stanford Law School**, August 19, 2015.
- "Do Handguns Make Us Safer? A State-Level Synthetic Controls Analysis of Right-to-Carry Laws," Second Amendment Conference, **Covington and Burling, New York**, May 14, 2015; **NBER Summer Institute**, Cambridge, MA, July 23, 2015; Faculty Workshop, **Stanford Law School**, November 11, 2015.
- "U.S. Criminal Justice Under Siege : Will Becker or Beccaria Prevail?" Faculty Seminar, **Bocconi University School of Law, Milan, Italy**, June 18, 2015.
- "Can You Believe Econometric Evaluations of Law, Policy, and Medicine?" **Stanford Law School**, Legal Theory Workshop, March 1, 2007; Faculty Workshop, **Tel Aviv University School of Law**, May 14, 2007; Faculty Workshop, **University of Haifa Law School**, May 16, 2007; Law and Economics Workshop, **Georgetown Law School**, September 19, 2007; Law and Economics Workshop, **St. Gallen Law School**, Switzerland, November 29, 2007; and Yale Law School, February 25, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 21, 2008; Faculty Workshop, **University of Virginia Law School,** October 24, 2008; Plenary Session, Latin American and Caribbean Law and Economics Association, **Universitat Pompeu Fabra (Barcelona),** June 15, 2009; **Google, Milan**, Italy, June 8, 2015.
- Commentator: ""Throw Away the Jail or Throw Away The Key? The Effect of Punishment on Recidivism and Social Cost,"" by Miguel F. P. de Figueiredo, American Law and Economics Association Meetings, **Columbia Law School**, May 15, 2015.
- "Broken Windows, Stop and Frisk, and Ferguson," 2015 Justice Collaboratory Conference: Policing Post-Ferguson, **Yale Law School**, April 17, 2015.
- "Assessing the Development and Future of Empirical Legal Studies," **Stanford Law School** course on Modern American Legal Thought, February 25, 2015.
- Commentator: "Payday Lending Restrictions and Crimes in the Neighborhood," by Yilan Xu, 9th Annual Conference on Empirical Legal Studies, **Boalt Hall**, Berkeley, CA, November 7, 2014.

- "An Empirical Evaluation of the Connecticut Death Penalty Since 1973: Are There Unconstitutional Race, Gender and Geographic Disparities?" Faculty Workshop, **Economics Department, Rice University**, Houston, TX, Feb. 18, 2014; Law and Economics Workshop, **University of Virginia Law School**, September 11, 2014; Faculty Colloquium, **University of San Diego School of Law**, October 3, 2014.
- "What's Happening to the Death Penalty? A Look at the Battle in Connecticut," **Hamilton College**, Clinton, New York, June 6, 2014.
- Panel Member, Research Methods Workshop, Conference for Junior Researchers on Law and Society, **Stanford Law School,** May 15, 2014.
- "Logit v. OLS: A Matter of Life and Death," Annual Meeting of the American Law and Economics Association, **University of Chicago**, May 9, 2014.
- "Guns: Law, Policy, Econometrics," Second Amendment Litigation and Jurisprudence Conference, **Jenner & Block**, Chicago, May 8, 2014.
- "The Impact of Antidiscrimination Law: The View 50 Years after the Civil Rights Act of 1964," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.
- "Concealed Carry and Stand Your Ground Law," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.
- "Reducing Gun Violence," Forum on Gun Violence Reduction, **Mountainview City Hall**, Mountainview, CA, Feb. 8, 2014.
- "Gun Policy Debate," **C-SPAN**. National Cable Satellite Corporation, Jan. 16, 2014. <http://www.c-span.org/video/?317256-1/GunPoli>.
- "Trial and Decision in the Connecticut Death Penalty Litigation," Faculty Workshop, **Stanford Law School**, November 20, 2013.
- "Rethinking America's Illegal Drug Policy," Law and Economics Workshop, **Harvard Law School**, April 20, 2010; NBER Conference, "Economical Crime Control," **Boalt Hall**, Berkeley, CA, January 16, 2010; **NBER Summer Institute** Pre-Conference "Economical Crime Control," July 23, 2009; **Whitney Center** Lecture Series, Hamden, CT, October 5, 2009; Law and Economics Workshop, **University of Chicago Law School**, October 13, 2009; Seminar for Spanish Law Professors, **Harvard Law School**, October 23, 2009; The Criminal Law Society, **Stanford Law School**, March 31, 2011, **University of Denver Sturm College of Law**, April 21, 2011; Law and Economics Workshop, **Boalt Hall**, Berkeley, CA, October 17, 2011; Shaking the Foundations Conference, **Stanford Law School**, November 2, 2013.
- "The Challenge to the Connecticut Death Penalty," **Yale Law School**, Death Penalty Clinic, November 5, 2007; Graduate Student Seminar, November 11, 2009; Stanford Program in International Legal Studies Seminar, **Stanford Law School**, Nov. 11, 2010; Faculty Workshop, **Stanford Law School**, June 8, 2011; Faculty workshop, **Duke Law School**, April 13, 2012; Program on Public Policy, **Stanford University**, May 2, 2012; Annual Meeting of the American Law and Economics Association, **Vanderbilt Law School**, Nashville, TN, May 18, 2013; Faculty Workshop, **University of Arizona Law School**, October 17, 2013; 8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 26, 2013.
- Commentator: "How to Lie with Rape Statistics" by Corey Rayburn Yung, 8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 2013.
- "An Empirical Look at Gun Violence in the U.S." **University of Arizona Law School**, October 17, 2013
- Discussant, "Sex Offender Registration and Plea Bargaining," **NBER Labor Summer Institute**, Cambridge, MA, July 25, 2013.

- "What Works in the War Against Crime?" **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.
- Seminar Presentation, "Statistics and the Streets – Curbing Crime, Realities of the Death Penalty, and Successes in Public Safety," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.
- Flashes of Genius (Glimpses of Extra-ordinarily Novel Thinking) -- "Stemming Gun Violence," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.
- "Can Laws Reduce Crime?" Safe Oakland Speakers Series, Holy Names University, Oakland, CA, May 1, 2013, http://www.ustream.tv/channel/safe-oakland-speaker-series
- Presentation on "The Death Penalty in America" on a panel on "human rights and criminal justice systems in the world," Science for Peace conference at Bocconi University in Milan, Italy, November 15, 2012. http://www.fondazioneveronesi.it/scienceforpeace2012/
- Seminar Presentation, "America's Criminal Justice System," **Renaissance Weekend**, Santa Monica, CA., Feb. 19, 2012.
- "Statistical Inference, Regression Analysis and Common Mistakes in Empirical Research," SPILLS Fellow's Workshop, **Stanford Law School**, February 2, 2012.
- "New Evidence in the 'More Guns, Less Crime' Debate: A Synthetic Controls Approach," Conference on Empirical Legal Studies, **Northwestern Law School**, November 4, 2011.
- "Drug Legalization and its Alternatives," *Lessons from the Economics of Crime: What Works in Reducing Offending?* **CESifo Venice Summer Institute Workshop,** July 22 , 2011.
- "Incapacitating Addictions: Drug Policy and American Criminal Justice," in Rethinking the War on Drugs through the US-Mexico Prism," **Yale Center for the Study of Globalization**, May 12, 2011.
- Plenary Session: Flashes of Genius (Glimpses of Extra-ordinarily Novel Thinking) -- "Has Legalized Abortion Reduced Crime?" **Renaissance Weekend**, Liguna Niguel, CA., Feb. 18, 2011.
- "An Evidence-Based Look at the More Guns, Less Crime Theory (after Tucson)" The American Constitution Society for Law and Policy (ACS), **Stanford Law School**, January 25, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 19, 2011; "Faculty Forum" at the External Relations Office, **Stanford Law School**, April 5, 2011.
- "Empirical Evaluation of Law: The Dream and the Nightmare," SPILS Fellows Lecture, **Stanford Law School**, January 15, 2015; Legal Studies Workshop, **Stanford Law School**, Feb. 7, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 20, 2011; **University of Denver Sturm College of Law**, April 22, 2011; Presidential Address, Annual Meeting of the American Law and Economics Association, **Columbia University**, May 20, 2011.
- Death Sentencing in Connecticut," **American Society of Criminology Annual Meeting**, San Francisco, Nov. 17, 2010.
- "The Impact of Right to Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.
- Comment on Bushway and Gelbach, "Testing for Racial Discrimination in Bail Setting Using Nonparametric Estimation of a Parametric Model," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.
- Commentator, "A Test of Racial Bias in Capital Sentencing," **NBER Political Economy Program Meeting**, April 23, 2010.

- “The (Lack of a) Deterrent Effect of Capital Punishment,” Faculty Workshop, **University of Chicago Economics Department**, October 21, 2009.
- Keynote Address, “The Evolution of Econometric Evaluation of Crime and Deterrence,”1st Paris& Bonn Workshop on Law and Economics: The Empirics of Crime and Deterrence, **University of Paris Ouest Nanterre,** September 24, 2009.
- Comment on Cook, Ludwig, and Samaha, “Gun Control after *Heller*: Litigating Against Regulation,” NBER Regulation and Litigation Conference, **The Boulders**, Carefree, Arizona, September 11, 2009.
- "Impact of the Death Penalty on Murder in the US," Faculty Workshop, Law School, **Universitat Pompeu Fabra (Barcelona),** June 18, 2009.
- Comment on Joanna Shepherd’s “The Politics of Judicial Opposition,” Journal of Institutional and Theoretical Economics Conference, **Kloster Eberbach, Germany**, June 12, 2009.
- “The Great American Crime Drop of the ‘90s: Some Thoughts on Abortion Legalization, Guns, Prisons, and the Death Penalty,” **Hamilton College**, Clinton, NY, June 5, 2009.
- “The Impact of the ADA on the Employment and Earnings of the Disabled,” **American Law and Economics Association Meetings**, University of San Diego, May 15, 2009.
- “Crime and Punishment in the United States," **Eastern State Penitentiary, Yale Alumni Event**, Philadelphia, PA, April 26, 2009.
- “Measuring Culpability in Death Penalty Cases,” Conference on Applications of Economic Analysis in Law, **Fuqua School of Business, Duke University,** April 18, 2009.
- “Autopsy of a Financial Crisis,” Workshop on New International Rules and Bodies for Regulating Financial Markets, **State University of Milan**, March 23, 2009.
- “Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell, Law and Economics Workshop**, NYU Law School**, March 10, 2009.
- Intelligence-Squared Debate: “Guns Reduce Crime,” **Rockefeller University**, New York, October 28, 2008.
- “The D.C. Handgun Controls: Did the Supreme Court’s Decision Make the City Safer?” Debate, **The Contemporary Club of Albemarle**, Charlottesville, VA, October 23, 2008.
- “Evaluating the Empirical Claims of the Woman-Protective Anti-Abortion Movement,” Panel on The Facts of the Matter: Science, Public Health, and Counseling, Yale Conference on the Future of Sexual and Reproductive Rights, **Yale Law School**, October 11, 2008.
- “Empirical Evaluation of Gun Policy,” **Harvard Law School**, October 9, 2008.
- “Assessing the Relative Benefits of Incarceration: The Overall Change Over the Previous Decades and the Benefits on the Margin,” **Russell Sage Foundation**, New York, May 3, 2007; Law and Economics Workshop, **Tel Aviv University School of Law**, May 28, 2008.
- Death Penalty Debate with Orin Kerr, Bloggingheads, April 11, 2008.
- “Evaluating Connecticut’s Death Penalty Regime,” Faculty Public Interest Conversation, **Yale Law School**, April 9, 2008.
- “The Death Penalty in Connecticut and the United States,” **The Whitney Center**, Hamden, CT, November 5, 2007; Seminar on Advanced Criminal Law: Criminal Sentencing and the Death Penalty, **Fordham Law School**, April 8, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 20, 2008.

- Radio Interview, "The Death of Capital Punishment?" Morning Edition: Where We Live. WNPR. Connecticut, March 10, 2008.
- Comment on Thomas Dee's "Born to Be Mild: Motorcycle Helmets and Traffic Safety," **American Economics Association Meetings**, New Orleans, Louisiana, January 4, 2008.
- "The Empirical Revolution in Law and Policy: Jubilation and Tribulation," **Keynote Address, Conference on Empirical Legal Studies, NYU Law School,** Novermber 9, 2007.
- "The Optimal Rate of Incarceration," **Harvard Law School**, October 26, 2007.
- "Empirical Evaluation of Law: The Impact on U.S Crime Rates of Incarceration, the Death Penalty, Guns, and Abortion," Law and Economics Workshop, **St. Gallen Law School, Switzerland**, June 25, 2007.
- Comment on Eric Baumer's "A Comprehensive Assessment of the Contemporary Crime Trends Puzzle," Committee on Law and Justice Workshop on Understanding Crime Trends, **National Academy of Sciences**, Washington, D.C., April 25, 2007.
- Comment on Bernard Harcourt, Third Annual Criminal Justice Roundtable Conferemce, **Yale Law School,** **"**Rethinking the Incarceration Revolution Part II: State Level Analysis," April 14, 2006.
- "Corporate Governance in America: The Disney Case," **Catholic University Law School**, Milan, Italy, March 19, 2007.
- "The U.S Tort System," (Latin American) Linkages Program, **Yale Law School**, February 13, 2007.
- Panel Member, "Guns and Violence in the U.S.," **Yale University, International Center**, January 24, 2007.
- **"**Economic Models of Crime and Punishment," Punishment: The U.S. Record: A Social Research Conference at **The New School**, New York City, Nov. 30, 2006
- Comment on Baldus et al, "Equal Justice and the Death Penalty: The Experience fo the United States Armed Forces, Conference on Empirical Legal Studies, **University of Texas Law, School**, Austin, Texas, October 27, 2006.
- "Empirical Evaluation of Law: The Promise and the Peril," **Harvard Law School**, October 26, 2006.
- "Estimating the Impact of the Death Penalty on Murder," Law and Economics Workshop, **Harvard Law School**, September 12, 2006; Conference on Empirical Legal Studies, **University of Texas Law School**, October 28, 2006; Joint Workshop, Maryland Population Research Center and School of Public Policy, **University of Maryland,** March 9, 2007.
- "Why Are Auto Fatalities Dropping so Sharply?" **Faculty Workshop, Wharton**, Philadelphia, PA, April 19, 2006.
- "The Law of Racial Profiling," Law and Economic Perspectives on Profiling Workshop, **Northwestern University Department of Economics**, April 7, 2006.
- "Landmines and Goldmines: Why It's Hard to Find Truth and Easy To Peddle Falsehood in Empirical Evaluation of Law and Policy," **Rosenthal Lectures, Northwestern University School of Law**, April 4-6, 2006.
- "The Impact of Legalized Abortion on Crime," **American Enterprise Institute**, March 28, 2006.
- "The Impact of Damage Caps on Malpractice Claims: Randomization Inference with Difference-in-Differences,"**Conference on Medical Malpractice, The Rand Corporation**, March 11, 2006.
- "Powerful Evidence the Death Penalty Deters?" **Leighton Homer Surbeck Chair Lecture, Yale Law School**, March 7, 2006.

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," Faculty Workshop, **University of Connecticut Law School,** October 18, 2005; Faculty Workshop, **UCLA Law School**, February 3, 2006; Law and Economics Workshop, **Stanford Law School**, February 16, 2006; ; Law Faculty, **University of Cambridge, Cambridge, England**, February 28, 2006; **University of Illinois College of Law,** Law and Economics Workshop, March 2, 2006; Faculty Workshop, **Florida State University Law School**, March 30, 2006; **ALEA**, Berkeley, CA May 6, 2006; **University of Chicago Law School,** Law and Economics Workshop, May 9, 2006.
- "Is Gun Control Illiberal?" Federalist Society Debate with Dan Kahan at Yale Law School, January 31, 2006.
- "Witness to Deception: An Insider's Look at the Disney Trial," **2005-2006 Distinguished Lecture, Boston University School of Law**, November 10, 2005; Center for the Study of Corporate Law, **Yale Law School**, November 3, 2005; **Law Offices of Herbert Smith, London, England**, February 23, 2006; Law Faculty, **University of Cambridge, Cambridge, England**, February 27, 2006.
- "Understanding the Surprising Fall in Crime in the 1990s," **Rotary Club**, Orange, CT, August 5, 2005; Faculty Workshop, **Yale School of Management**, September 21, 2005.
- Panel Member, "The Board's Role in Corporate Strategy," The Yale Global Governance Forum, **Yale School of Management**, September 8, 2005.
- "Crime and Abortion," **Museo de la Cuidad de Mexico**, Mexico City, October 20, 2003.
- "Allocating Resources towards Social Problems and Away From Incarceration as a Means of Reducing Crime," **MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice**, San Francisco, CA, February 28, 2003.
- "Shooting Down the More Guns, Less Crime Hypothesis," **Stanford Law School**, Law and Economics Seminar, January 28, 2003; Faculty Workshop, Center for the Study of Law and Society, **Boalt Hall**, University of California, Berkeley, Feb. 24, 2003; Development Workshop, **Stanford Law School**, April 25, 2003; Faculty Workshop, **Stanford Law School**, July 2, 2003; Law and Public Affairs Program Workshop, **Princeton University,** September 29, 2003; Stanford Alumni Weekend, **Stanford University**, October 17, 2003; Faculty Workshop, **CIDE**, Mexico City, October 20, 2003.
- **"**The Impact of Legalized Abortion on Teen Childbearing," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2002.
- "Do Concealed Handgun Laws Reduce Crime?" Faculty Workshop, **Stanford Law School**, October 4, 2000; First-Year Orientation, **Stanford Law School**, September 5, 2001; Faculty Workshop, **Harvard Law School**, April 26, 2002; Faculty Workshop, **Columbia Law School**, April 29, 2002.
- "The Evolution of Employment Discrimination Law in the 1990s: An Empirical Investigation," Fellows Workshop, American Bar Foundation, February 11, 2002.
- "The Role of Discounting in Evaluating Social Programs Impacting on Future Generations: Comment on Arrow and Revesz," Colloquium on Distributive Justice, **Stanford Law School**, Oct. 18, 2001.
- "The Impact of Wrongful Discharge Laws," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2001; Labor and Employment Seminar, **NYU Law School**, October 16, 2001; Faculty Workshop, **Stanford Law School**, September 18, 2002; **Yale Law School**, January, 2004.
- "Racial Profiling: Defining the Problem, Understanding the Cause, Finding the Solution," **American Society of Criminology Conference**, San Francisco, CA, November 15, 2000.
- "Institutional Architecture for Building Private Markets," Conference on "Latin America and The New Economy" at **Diego Portales University** in Santiago, Chile, October 26, 2000.

- "The History and Current Status of Employment Discrimination Law in the United States," Unicapital School of Law, (Centro Universitario Capital), Sao Paulo, Brazil, March 10, 2000.
- "Corporate Governance in Developing Countries: Opportunities and Dangers," Conference on Neoliberal Policies for Development: Analysis and Criticism," University of Sao Paulo Law School, March 13, 2000
- "Legalized Abortion and Crime," Law and Economics Workshop, **University of Pennsylvania Law School**, September 21, 1999; Faculty Workshop, **Yale Law School**, September 27, 1999; **John Jay College of Criminal Justice**, October 7, 1999; Faculty Workshop, **Quinnipiac Law School**, October 13, 1999; Faculty Workshop, **University of Connecticut Law School**, October 19, 1999; **University of Virginia Law School**, October 25, 1999; Faculty Workshop, **Baruch College**, November 9, 1999; MacArthur Foundation Social Interactions and Economic Inequality Network Meeting, **Brookings Institution**, December 4, 1999; Faculty Workshop, **NYU Law School**, January 21, 2000; Faculty Workshop, **University of San Diego Law School**, February 18, 2000; Public Economics Workshop, Department of Economics, **Stanford University**, April 28, 2000; Law and Economics Workshop, **University of California at Berkeley Law School**, September 18, 2000; Faculty Workshop, **Cornell Law School**, September 26, 2000; OB-GYN Grand Rounds, **Stanford Medical School**, October 2, 2000; **Center for Advanced Studies in the Behavioral Sciences,** October 11, 2000; Faculty Workshop, **Graduate School of Business**, February 5, 2002.
- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 23, 1999.
- "Exploring the Link Between Legalization of Abortion in the 1970s and Falling Crime in the 1990s," Law and Economics Workshop, **Harvard Law School**, March 16, 1999; Law and Economics Workshop, **University of Chicago Law School**, April 27, 1999; Faculty Workshop, **Stanford Law School**, June 30, 1999.
- "Is the Increasing Reliance on Incarceration a Cost-Effective Strategy of Fighting Crime?" Faculty Workshop**, University of Wisconsin School of Social Science**, February 19, 1999.
- "What Do We Know About Options Compensation?" Institutional Investors Forum**, Stanford Law School**, May 29, 1998.
- Commentator on Orlando Patterson's presentation on "The Ordeal of Integration," **Stanford Economics Department**, May 20, 1998.
- "Understanding The Time Path of Crime," Presentation at Conference on Why is Crime Decreasing? **Northwestern University School of Law**, March 28, 1998; Faculty Workshop, **Stanford Law School**, September 16, 1998; Faculty Workshop, **University of Michigan Law School**, February 18, 1999.
- Commentator, Conference on Public and Private Penalties, the **University of Chicago Law School**, Dec. 13-14, 1997.
- "Some Thoughts on Affirmative Action," Presentation at a conference on Rethinking Equality in the Global Society, **Washington University School of Law**, November 10, 1997.
- Commentator on Chris Jencks' Presentation on Welfare Policy, **Stanford Economics Department**, October 8, 1997.
- "The Impact of Race on Policing, Arrest Patterns, and Crime," Faculty Workshop, **Stanford Law School**, September 10, 1997; Law and Economics Workshop, **University of Southern California Law School**, October 23, 1997; Law and Economics Workshop, **Columbia University Law School**, November 24, 1997; Law and Economics Workshop, Haas School of Business**, University of California at Berkeley**, February 19, 1998; Annual Meeting of the American Law and Economics Association, **University of California at Berkeley**, May 8, 1998; Conference on the Economics of Law Enforcement, **Harvard Law School**, October 17, 1998.
- "Crime in America: Understanding Trends, Evaluating Policy," **Stanford Sierra Camp**, August 1997.

- "Executive Compensation: What Do We Know?" TIAA-CREF Committees on Corporate Governance and Social Responsibility, Center for Economic Policy Research, **Stanford University**, June 27, 1997; NASDAQ Director's Day, **Stanford University**, June 30, 1997.
- Panel Chair, Criminal Law (Theory), Criminal Law (Empirical), and Labor/Discrimination/Family Law, American Law and Economics Association, **University of Toronto Law School**, May 9-10, 1997.
- Commentator, "Diversity in Law School Hiring," **Stanford Law School**, February 25, 1997.
- Keynote Speaker, "The Optimal Rate of Crime," 11th Annual Conference, **The Oklahoma Academy for State Goals**, Tulsa, Oklahoma, May 7, 1996.
- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 28-29, 1996.
- "The Power of Law: Can Law Make a Difference in Improving the Position of Women and Minorities in the Labor Market?" The Fellows of the **American Bar Foundation**, Baltimore, Maryland, February 3, 1996.
- "Public Action, Private Choice and Philanthropy: Understanding the Sources of Improvement in Black Schooling Quality in Georgia, 1911-1960," **Stanford Faculty Workshop**, January 24, 1996; Faculty Workshop, **University of Virginia Law School**, January 22, 1997; **National Bureau of Economic Research**, Cambridge, Massachusetts, Labor Studies Conference, April 3, 1998.
- Commentator, "The Effect of Increased Incarceration on Crime," Meetings of the **American Economics Association**, San Francisco, January 6, 1996.
- Commentator, Symposium on Labor Law, **University of Texas Law School**, November 10-11, 1995.
- Panel Member, Symposium on Criminal Justice, **Stanford Law School**, October 6-7, 1995.
- Commentator, "The Litigious Plaintiff Hypothesis," Industrial and Labor Relations Conference, **Cornell University**, May 19, 1995.
- Commentator on Keith Hylton's, "Fee Shifting and Predictability of Law," Faculty Workshop, **Northwestern University School of Law**, February 27, 1995.
- "The Selection of Employment Discrimination Disputes for Litigation: Using Business Cycle Effects to Test the Priest/Klein Hypothesis," **Stanford University**, Law and Economics Seminars, October 31, 1994.
- "Is the United States at the Optimal Rate of Crime?" Faculty Workshop, **Indiana University School of Law**, Indianapolis, November 18, 1993; Faculty Workshop, **Northwestern University School of Law**, April 18, 1994; Law and Economics Workshop, **Stanford Law School**, April 28, 1994; Meetings of the American Law and Economics Association, **Stanford Law School**, May 13, 1994; **American Bar Foundation**, September 7, 1994; Faculty Workshop, **DePaul Law School**, September 21, 1994; Law and Economics Workshop, **University of Chicago Law School**, October 11, 1994; Faculty Seminar, **Stanford Law School**, October 31, 1994; Law and Economics Luncheon, **Stanford Law School**, November 1, 1994; Faculty Seminar Workshop, **University of Illinois College of Law**, Champaign, November 22, 1994; Law and Economics Workshop, **Harvard Law School**, November 29, 1994; School Alumni Luncheon, Chicago Club, December 13, 1994; **Northwestern Law School**; Law and Economics Workshop, **Yale Law School**, February 1, 1996; Faculty Workshop, **Cornell Law School**, April 10, 1996; Faculty Workshop, **Tokyo University Law School**, June 4, 1996; Panel on "The Economics of Crime," **Western Economics Association** Meeting, San Francisco, July 1, 1996.
- "The Broad Path of Law and Economics," Chair Ceremony, **Northwestern University School of Law**, September 30, 1994.

- Commentator on Paul Robinson's "A Failure of Moral Conviction," **Northwestern University School of Law**, September 20, 1994.
- "The Do's of Diversity, The Don'ts of Discrimination," Kellogg School of Business, **Northwestern University**, May 17, 1994.
- "Does Law Matter in the Realm of Discrimination?" **Law and Society Summer Institute**, Pala Mesa Lodge, Fallbrook, California, June 25, 1993.
- Commentator, "The Double Minority: Race and Sex Interactions in the Job Market," Society for the Advancement of Socio-Economics, **New School for Social Research**, March 28, 1993.
- "The Effects of Joint and Several Liability on Settlement Rates: Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," <u>Economic Analysis of Civil Procedure</u>, **University of Virginia School of Law**, March 26, 1993.
- Debate with Richard Epstein on Employment Discrimination Law, **Chicago Federalist Society**, February 23, 1993.
- Panel Chair, "Optimal Sanctions and Legal Rules in Tort and Criminal Law," Meetings of Annual Association of Law and Economics, **Yale Law School**, May 15, 1992.
- Panel Member, "The Law and Economics of Employment at Will," **The Institute For Humane Studies**, Fairfax, Virginia, March 27, 1992.
- "The Efficacy of Title VII," Debate with Professor Richard Epstein, **University of Chicago Law School**, February 26, 1992.
- Moderator, "Using Testers to Demonstrate Racial Discrimination," **University of Chicago Law School**, February 13, 1992.
- "Law & Macroeconomics: The Effect of the Business Cycle on Employment Discrimination Litigation," Law and Society Workshop, **Indiana University**, November 6, 1991; Faculty Workshop, **University of North Carolina Law School**, Chapel Hill, November 8, 1991; Faculty Workshop, **Northwestern University School of Law**, December 11, 1991; Law and
- Economics Conference, **Duquesne Law School**, March 14, 1992; **University of Chicago Law School**, April 2, 1992.
- Panel Chair and Commentator, "New Perspectives on Law and Economics," **Society for the Advancement of Socioeconomics**, Stockholm, June 17, 1991; **Law and Society Meetings**, Amsterdam, June 29, 1991.
- Panel Chair, "Regulation of International Capital Markets," **Law and Society Meetings**, Amsterdam, June 27, 1991.
- Panel Chair, "The Law and Economics of Discrimination," American Association of Law and Economics, **University of Illinois Law School**, May 24, 1991.
- "The Economics of Employment Discrimination Law," **Industrial Relations Research Association**, Chicago, Illinois, March 4, 1991.
- "Does Current Employment Discrimination Law Help or Hinder Minority Economic Empowerment?" Debate with Professor Richard Epstein, The Federalist Society, **Northwestern Law School**, February 26, 1991.
- Panel Member, "The Law and Economics of Employment Discrimination," **AALS Annual Meeting**, Washington, D.C., January 6, 1991.

- "Re-Evaluating Federal Civil Rights Policy," Conference on the Law and Economics of Racial Discrimination in Employment, **Georgetown University Law Center**, November 30, 1990.
- "Opting for the British Rule," Faculty Seminar, **Northwestern Law School**, September 11, 1990; Faculty Seminar, **University of Virginia Law School**, September 14, 1990; Law and Economics Seminar, **University of Michigan Law School**, October 18, 1990; Faculty Workshop, **NYU Law School**, November 14, 1990; Faculty Workshop, **University of Florida Law School**, March 18, 1991.
- "The Effects of Fee Shifting on the Settlement Rate: Theoretical Observations on Costs, Conflicts, and Contingency Fees," at the **Yale Law School Conference** "Modern Civil Procedure: Issues in Controversy," June 16, 1990.
- "Studying the Iceberg From Its Tip?: An Analysis of the Differences Between Published and Unpublished Employment Discrimination Cases," **Law and Society Meetings**, Berkeley, California, May 31, 1990.
- Panel Discussion on Tort Reform, **University of Pennsylvania Law School**, April 27, 1990.
- Panel Discussion of "The Role of Government in Closing the Socio-Economic Gap for Minorities," at the Federalist Society National Symposium on "The Future of Civil Rights Law," **Stanford Law School**, March 16, 1990.
- "Continuous versus Episodic Change: The Impact of Affirmative Action and Civil Rights Policy on the Economic Status of Blacks," **University of Virginia Economics Department**, February 15, 1990; **Princeton University Department of Economics**, February 21, 1990 (with James Heckman); Law & Economics Workshop, **University of Toronto Law School**, October 8, 1991.
- "Sex Discrimination in the Workplace: An Economic Perspective," Fellows Seminar, **American Bar Foundation**, October 16, 1989.
- "The Changing Nature of Employment Discrimination Litigation," Law and Economics Workshop, **Columbia Law School**, March 23, 1989; Faculty Seminar, **University of Virginia Law School**, March 24, 1989; Law and Economics Workshop, **University of Chicago**, April 25, 1989; **Law & Society Meeting**; Madison, Wisconsin, June 8, 1989; Labor Economics Workshop, **University of Illinois**, Chicago, November 1, 1989; Law & Economics Workshop, **University of Pennsylvania Law School**, November 9, 1989; Law and Economics Seminar, **University of California at Berkeley**, October 4, 1990; Law and Social Science Workshop, **Northwestern University**, February 3, 1991; Law and Economics Seminar, **Stanford Law School**, March 21, 1991; Faculty Workshop, **Cornell Law School**, April 3, 1991; Visiting Committee, **Northwestern Law School**, April 5, 1991.
- "Law & Economics: The Third Phase," The Association of General Counsel, **Northwestern University School of Law**, October 14, 1988.
- "Employment Discrimination Litigation," **Northwestern Law School** Alumni Monthly Loop Luncheon. **Chicago Bar Association**, May 31, 1988.
- "The Morality of the Death Penalty." A debate with Ernest Van Den Haag. **Northwestern University School of Law**, April 19, 1988.
- "Models of Deregulation of International Capital Markets." A presentation with David Van Zandt, Faculty Seminar, **Northwestern University School of Law**, April 1, 1988; Visiting Committee, May 5, 1988.
- "Is Title VII Efficient?" A debate with Judge Richard Posner, Faculty Seminar, **Northwestern University School of Law**, November 20, 1987.
- "The Senate's Role in Confirming Supreme Court Nominees: The Historical Record," **Northwestern University School of Law**, September 22, 1987.

- "Diverting the Coasean River: Incentive Schemes to Reduce Unemployment Spells," **Yale Law School** Civil Liability Workshop, March 30, 1987; Faculty Seminar, **Northwestern University School of Law**, March 18, 1987; **University of Southern California Law Center**, May 1, 1987; and Seminar in Law and Politics, Department of Political Science, **Northwestern University**, May 8, 1987; Labor Workshop, Department of Economics, **Northwestern University**, October 27, 1987; **AALS Annual Meeting**, New Orleans, January 7, 1989.
- "Women in the Labor Market--Are Things Getting Better or Worse?" **Hamilton College**, February 23, 1987.
- "The Changing Relative Quit Rates of Young Male and Female Workers," **Hamilton-Colgate Joint Faculty Economics Seminar**, February 23, 1987.
- "Living on Borrowed Money and Time--U.S. Fiscal Policy and the Prospect of Explosive Public Debt," **Orange Rotary Club**, February 22, 1985.
- "Capital Punishment in the Eighties," **Hamilton College**, April 6, 1981.
- "Terms and Conditions of Sale Under the Uniform Commercial Code," Executive Sales Conference, **National Machine Tool Builders' Association**, May 12, 1980.

## AWARDS

- **47th Tikkun Olam Award**, The Haiti Jewish Refugee Legacy Project, February 2014, "Awarded for incredibly significant work that explores and inspires the search for justice and taking serious, correct and timely action." Tikkun Olam is a Hebrew phrase that means 'repairing the world.' https://haitiholocaustsurvivors.wordpress.com/guest-posts/47th-tikkun-olam-award-to-professor-john-j-donohue-iii/

## PROFESSIONAL ACTIVITIES

- Member, Stanford Law School academic reading group evaluating the criminal law opinions of U.S. Supreme Court nominee Judge Ketanji Brown Jackson for the ABA Standing Committee on the Federal Judiciary, March 2022.
- Member, USF Institute for Nonviolence and Social Justice Leadership Council, University of San Francisco, June 2021 – present.
- Member, Criminal Justice Expert Panel, @CJExpertPanel, providing information on the relevance of criminal justice research to current events, beginning April 2021.
- Statistical Consultant to the Fairness Committee of the 9th Circuit Court of Appeals investigating issues of sentencing disparities by race, ethnicity, and gender in federal criminal sentencing, March 2018 – March 2020.
- Legal Scholarship Network Advisory Board Member, SSRN.
- Member, Committee on Law and Justice, National Research Council, October 2011 – December 2018.
- Fellow of the Society for Empirical Legal Studies, 2015 - present.
- Member, International Advisory Council, Economic Order Study Center, Federal University of San Paolo, Brazil.
- Co-Editor (with Steven Shavell), American Law and Economics Review, May 2006 – August 2012.
- President, American Law and Economics Association, May 2011 – May 2012.
- Co-President, Society for Empirical Legal Studies, November 2011 - August 2012. Member, Board of Directors from November 2011 - November 2014.

- Testified before the Connecticut Legislature in Support of Senate Bill 1035 and House Bill 6425 (A Bill to Eliminate the Death Penalty), March 7, 2011; Testified again before the Connecticut Judiciary Committee on March 14, 2012.
- Member of the Special Committee on ALI Young Scholars Medal, October 2009 – February 2011.
- Vice-President/President Elect, American Law and Economics Association, June 2010 – May 2011.
- Secretary-Treasurer, American Law and Economics Association, June 2009 – May 2010.
- Board of Advisors, Yale Law School Center for the Study of Corporate Law, July 2004 – August 2010.
- Evaluated the Connecticut death penalty system: "Capital Punishment in Connecticut, 1973-2007: A Comprehensive Evaluation from 4600 murders to One Execution," http://works.bepress.com/john_donohue/137/.
- Member, Panel on Methods for Assessing Discrimination, National Academy of Sciences, September 2001 – June 2004. Resulting Publication: National Research Council, Measuring Racial Discrimination (2004), http://www.nap.edu/catalog/10887.html.
- Member, National Science Foundation Review Panel, Law and Social Sciences, September, 1999 – April 2001.
- Editorial Board, Journal of Empirical Legal Studies, July 2003 – present.
- Editorial Board, International Review of Law and Economics, October 1999 – present.
- Editorial Board, Law and Social Inquiry, February 2000 – present.
- Board of Editors, American Law and Economics Review, August 1998 – April 2013.
- Consultant, Planning Meeting on Measuring the Crime Control Effectiveness of Criminal Justice Sanctions, National Academy of Sciences, Washington, D.C., June 11, 1998.
- Member, Board of Directors, American Law and Economics Association, June 1994-May 1997. Member, ALEA Nominating Committee, July 1995-May 1996. Member, Program Committee, July 1996-May 1998 and July 2000 – May 2002.
- Statistical Consultant, 7th Circuit Court of Appeals Settlement Conference Project (December, 1994).
- Testified before U.S. Senate Labor Committee on evaluating the Job Corps, October 4, 1994.
- Assisted the American Bar Association Standing Committee on the Federal Judiciary in evaluating the qualifications of Ruth Bader Ginsburg (June 1993) and David Souter (June, 1990).
- Chair, AALS Section on Law and Economics, January 1990-January 1991.
- Economic Consultant to Federal Courts Study Committee. Analyzing the role of the federal courts and projected caseload for Judge Richard Posner's subcommittee. February 1989-March 1990.
- Member, 1990 AALS Scholarly Papers Committee.
- Member, Advisory Board, Corporate Counsel Center, Northwestern University School of Law. Since December 1987.
- Associate Editor, Law and Social Inquiry. Summer 1987-December 1989.
- Interviewed Administrative Law Judge candidates for U.S. Office of Personnel Management. Chicago, Illinois. May 23, 1988.
- Member, Congressman Bruce Morrison's Military Academy Selection Committee. Fall 1983.

- 1982 Candidate for Democratic Nomination, Connecticut State Senate, 14th District (Milford, Orange, West Haven).

## PRO BONO LEGAL WORK

- Co-wrote amicus brief for the United States Supreme Court for "Social Scientists and Public Health Researchers in Support of Respondents" in *New York State Rifle & Pistol Association v. Bruen*, which discusses the evidence that right-to-carry laws increase violent crime in the brief, September 21, 2021.
- Co-wrote amicus brief for the United States Supreme Court for "Public Health Researchers and Social Scientists in Support of Respondents" in *New York State Rifle & Pistol Association v. City of New York*, which quotes my article *Right-to-Carry Laws and Violent Crime* in the brief, August 12, 2019.
- Death Penalty case: Heath v. Alabama. Fall 1986-Fall 1989.
- Wrote brief opposing death sentence in Navy spy case. Court ruled in favor of defendant John A. Walker on September 13, 1985.
- Staff Attorney, Neighborhood Legal Services, January-July 1981.
- Appealed sentence of death for Georgia defendant to the United States Supreme Court. Sentence vacated on May 27, 1980. Baker v. Georgia.
- Court-appointed representation of indigent criminal defendant in District of Columbia Superior Court, February-July 1980.

## RESEARCH GRANTS

- Stanford University Research Fund, January 1997 and January 1998.
- The National Science Foundation (project with James Heckman), December 1992; (project with Steve Levitt), July 1997.
- Fund for Labor Relations Studies, University of Michigan Law School, March 1988.

## BAR ADMISSIONS

- Connecticut - October 1977; District of Columbia - March 1978 (Currently Inactive Status); United States Supreme Court - November 3, 1980; U.S. District Court for the District of Connecticut – February 14, 1978.

## PROFESSIONAL and HONORARY ASSOCIATIONS

- American Academy of Arts and Sciences (since April 2009).
- Research Associate, National Bureau of Economic Research (since October 1996) – in Law and Economics and Labor Studies.
- Stanford Center for Racial Justice – August 2020 to present.
- American Law Institute (since September 29, 2010).
- Member, Fellows of the Society for Empirical Legal Studies (since October 2015).
- American Bar Association
- American Economic Association
- American Law and Economics Association

## PERSONAL

DEFENDANT'S EXHIBIT G

- Born: January 30, 1953.

29