**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF ILLINOIS**

DAVID MEYER, et al.,                )
                                   )
       Plaintiffs,            )
                                   )     CIVIL ACTION NO. 3:21-cv-
v.                                          )     00518-SMY
                                   )
KWAME RAOUL, et al.,               )
                                   )
       Defendants.            )

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, Illinois 60187
(630) 452-4547
dsigale@sigalelaw.com

David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

The Second Amendment "right to possess and carry weapons in case of confrontation" presumptively "belongs to all Americans," not "an unspecified subset." *Dist. of Columbia v. Heller*, 554 U.S. 570, 580, 581, 592 (2008). Indeed, the Amendment states clearly it is a right of "the people" to carry arms. Plaintiff Eva Davis is part of "the people." She is an 18-to-20-year-old adult citizen who is barred by nothing but her age from acquiring a carry permit and carrying a handgun in public for self-defense. Because the "plain text" of the Second Amendment covers the conduct being restricted by Illinois' Carry Ban, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022), it follows that the Carry Ban must fall unless the State can prove that it "is consistent with this Nation's historical tradition." *Id*. The State has not, and cannot, make such a showing. There is absolutely zero historical warrant for banning any category of law-abiding adults from exercising their Second Amendment rights on account of their age.

As an initial matter, both the State and the Kendall County Defendants raise standing issues in this case, but none poses a bar to reaching the merits. The State argues that the Attorney General is not a proper defendant, but he has authority to enforce the Carry Ban and so he is a proper defendant in this pre-enforcement challenge. The same is true of the Kendall County Defendants, who have not disavowed enforcing the Carry Ban against Davis if she were to violate it by carrying a handgun in public for self-defense without a license and while under 21 years old.

The State offers a defense of the Carry Ban on the merits, but it is unconvincing. First, the State argues that the text of the Amendment does not extend to 18-to-20-year-olds like Davis because people in her age group were "minors" for certain purposes at the Founding. But this is not a textual argument at all, and nothing in the text of the Amendment indicates that "minors" or any other Americans are categorically excluded from its scope. *Heller* forecloses this reading, since the Court held that the phrase "right of the people" in the Second Amendment creates "a

1

strong presumption that the Second Amendment right is exercised individually and belongs to *all Americans*." 554 U.S. at 579, 581 (emphasis added). It is therefore the State's burden to prove that the restrictions on the rights of 18-to-20-year-olds are historically grounded.

Here again, the State's reliance on the age of majority comes up short because, at the Founding and after, minors who were at least 18 were unrestricted in the exercise of their firearm rights and were in fact *required* to possess firearms to comply with many militia laws. And even at later periods of history, the State has very few laws that could plausibly serve as historical analogues under *Bruen.* Perhaps most importantly, the state has not cited one law from any time before the late twentieth century that restricted the rights of legal adults to carry firearms on account of their age.

### RESPONSES TO DEFENDANTS' STATEMENTS OF MATERIAL FACTS

**RESPONSE to ¶ 1:** Admit.

**RESPONSE to ¶ 2:** Admit.

**RESPONSE to ¶ 3:** Admit.

**RESPONSE to ¶ 4:** Admit, except that David Meyer is 21 years old. Pls.' Br. in Supp. of Their Mot. for Summ. J., Doc. 99 at 4 (Jan. 6, 2023) ("Pls.' Br.").

**RESPONSE to ¶ 5:** Admit.

**RESPONSE to ¶ 6:** Admit. Plaintiffs Davis and Meyer have never been threatened with prosecution in relation to the Challenged Statutes because they have refrained from violating the Challenged Statutes for fear of prosecution.

**RESPONSE to ¶ 7:** Dispute. This is fundamentally a legal issue. Plaintiffs are suing the Attorney General because of his role in enforcing the Carry Ban.

**RESPONSE to ¶ 8:** Admit.

**RESPONSE to ¶ 9:** Dispute to the extent meant to infer that ISRA supported every aspect of the CCA. Illinois enacted the CCA following a lawsuit brought by ISRA in which the Seventh Circuit held that Illinois' flat ban on carrying firearms in public for self-defense was unconstitutional under the Second Amendment. *See Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012); Defs.' Combined Mot. for Summ. J. Under Fed. R. Civ. P. 56 and Mem. of Law in Supp. ("State Br."), Ex. A at 87:2–8 (Jan. 6, 2023) ("ISRA Dep.").

**RESPONSE to ¶ 10:** Dispute to the extent meant to infer that ISRA's membership supported every aspect of the CCA. ISRA's membership supported the passage of the CCA, which provided a legal way for some Illinoisans to carry firearms concealed in public for self-defense. Illinois had previously (and unconstitutionally) been the only state in the country where there was no legal way for ordinary adult citizens exercise their Second Amendment rights in public. ISRA Dep. at 86:3–87:10. ISRA's membership was not perfectly content, but they supported the CCA because "it was the best [they] could get at the time." ISRA Dep. at 67:25–68:1; 88:2–10.

**RESPONSE to ¶ 11:** Admit in part. ISRA does not seek the authorization of its members before filing a lawsuit. ISRA's participation in this lawsuit was approved by its executive director, who has authority to make it a plaintiff in litigation. ISRA Dep. at 53:2–8. ISRA's membership is well aware of this lawsuit and has expressed support for the lawsuit. ISRA Dep. at 69:10–16.

**RESPONSE to ¶ 12:** Admit.

**RESPONSE to ¶ 13:** Admit.

**RESPONSE to ¶ 14:** Dispute. This statement, as well as the others in paragraphs 14–38, relate to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See Bruen*, 142 S. Ct. at 2130 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal*

questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry,' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (emphasis in original)). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis. Finally, the State's expert, Saul Cornell, is not a reliable source on the history of firearm regulation in this country. He has derided *Bruen* as "bonkers" for applying "fiction, fantasy, and mythology" as an interpretive model. Saul Cornell, *Cherry-picked history and ideology-driven outcomes:* Bruen's *originalist distortions*, SCOTUSBLOG (Jun. 27, 2022), *available at* https://bit.ly/3Jp4EDa. While Plaintiffs will respond to the substance of statements 14 to 38 below to the extent there are additional objections, this objection is applicable to and incorporated into each of those responses. Plaintiffs will engage with the substance of these claims in their legal analysis, where they belong.

**RESPONSE to ¶ 15:** Admit that this accurately reproduces the report. Dispute that the report is correct.

**RESPONSE to ¶ 16:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 17:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 18:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 19:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 20:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 21:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 22:** Dispute. See response to ¶ 14. For authority on this point, Professor Cornell cites a set of cases involving a dispute between mothers and fathers over which religious tradition their children should be raised in. State Br., Ex. F at 14 (Jan. 6, 2023) ("Cornell Report"). But these cases say nothing more than that a child had no claim for religious freedom against his

father, or that a mother's rights to raise her children in a given religious tradition were trumped by a father's. It says nothing at all about whether the children had religious rights that could be recognized against the state. The remainder of the support Professor Cornell offers on this point are regulations of religious behavior of students in colleges at the Founding era. The perils of relying on such regulations to interpret the scope of constitutional rights are discussed below.

**RESPONSE to ¶ 23:** Dispute. See response to ¶ 14. Admit to the extent this accurately reproduces a quote from Kent.

**RESPONSE to ¶ 24:** Dispute. See response to ¶ 14. As the context of the report indicates, it was a proposal to extend the franchise that was considered a joke, not "the idea of extending full constitutional rights" to minors. Cornell Report at 16–17.

**RESPONSE to ¶ 25:** Dispute. See response to ¶ 14. Admit to the extent this accurately reproduces a quote from Bouvier.

**RESPONSE to ¶ 26:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 27:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 28:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 29:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 30:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 31:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 32:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 33:** Dispute. See response to ¶ 14.

**RESPONSE to ¶ 34:** Dispute. See response to ¶ 14. Admit to the extent this reproduces a quote from Hochheimer.

**RESPONSE to ¶ 35:** Dispute. See response to ¶ 14. The cited laws speak for themselves.

Dispute any characterization to the extent inconsistent with the laws themselves.

**RESPONSE to ¶ 36:** Dispute. See response to ¶ 14. The cited laws speak for themselves. Dispute any characterization to the extent inconsistent with the laws themselves.

**RESPONSE to ¶ 37:** Dispute. See response to ¶ 14. The cited laws speak for themselves. Dispute any characterization to the extent inconsistent with the laws themselves.

**RESPONSE to ¶ 38:** Dispute. See response to ¶ 14. The cited laws speak for themselves. Dispute any characterization to the extent inconsistent with the laws themselves.

**RESPONSE to ¶ 39:** Admit that this is what Donohue purported to do. Dispute that Donohue's analysis is at all relevant after *Bruen*, which eliminated means-ends scrutiny from Second Amendment analysis and made clear that such analysis was not to be brought back in through the guise of analogical reasoning. *See Bruen*, 142 S. Ct. at 2133 n.7. What is more, the matters discussed in paragraphs 40 through 45 are not adjudicative facts but rather legislative facts and therefore not subject rules regarding adjudicative facts. *See Moore*, 702 F.3d at 942. We incorporate these objections by reference into the responses to paragraphs 40 through 45.

**RESPONSE to ¶ 40:** Dispute. See response to ¶ 39.

**RESPONSE to ¶ 41:** Dispute. See response to ¶ 39. 18-to-20-year-olds commit more homicides and violent crimes than other age groups by a very slight margin and 18-to-20-year-old women, like Davis, commit homicides and violent crime at a rate significantly below that of the general population. *See* Off. of Juvenile Justice & Delinquency Prevention, *Arrest rates by offense and age group, 2019 (rates per 100,000 in age group), Gender: Females*, U.S. DEP'T OF JUST., *available at* https://bit.ly/3mbxA65.

**RESPONSE to ¶ 42:** Dispute. See response to ¶ 39. The Carry Ban does not prevent anyone from purchasing firearms. It only prohibits carriage of firearms in public, which will have

no effect on suicide rates.

**RESPONSE to ¶ 43:** Admit to the extent it describes what Steinberg purported to do.

**RESPONSE to ¶ 44:** Dispute. See Response to ¶ 39.

**RESPONSE to ¶ 45:** Dispute. See Response to ¶ 39.

**RESPONSE to ¶ 46:** Admit.

**RESPONSE to ¶ 47:** Admit.

**RESPONSE to ¶ 48:** Admit. Employees or agents of the County Defendants' respective offices have not threatened to enforce or actually enforced the Carry Ban against Plaintiffs because Plaintiffs have not violated the law for fear of prosecution.

**RESPONSE to ¶ 49:** Admit. Employees or agents of the County Defendants' respective offices have not threatened to enforce or actually enforced the Carry Ban against Plaintiffs because Plaintiffs have not violated the law for fear of prosecution.

**RESPONSE to ¶ 50:** Admit. Employees or agents of the County Defendants' respective offices have not threatened to enforce or actually enforced the Carry Ban against Plaintiffs because Plaintiffs have not violated the law for fear of prosecution.

## ARGUMENT

### I.   This Court Has Jurisdiction.

"To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (cleaned up). "In evaluating ripeness, [courts] consider 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Sweeney v. Raoul*, 990 F.3d 555, 560 (7th Cir. 2021) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). In a pre-enforcement challenge like this one, standing and ripeness are both

present if the Plaintiff has alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159.

### A. Plaintiff Davis Has Standing.

The State and the Kendall County Defendants each raise arguments regarding Plaintiffs' standing. At the outset it should be noted that no one has argued that Plaintiff Eva Davis lacks standing to sue Defendant Kelly. Under the test outlined above, she indisputably does. Davis lawfully possesses a FOID card and a handgun. If it were not for the Carry Ban, Davis would carry her handgun on her person in public for self-defense. But she cannot do so without directly violating the Carry Ban and risking arrest by Director Kelly or one of his officers who—it is not contested—enforce the State's criminal laws, including the State's general prohibition against 18-to-20-year-olds carrying loaded handguns in public and the State's carry licensing regime. 20 Ill. Comp. Stat. 2610/1–2. Furthermore, Davis's injury is traceable to Director Kelly for a second reason—as head of the State Police, he is in charge of the processing of applications for carry licenses. 430 Ill. Comp. Stat. 66/25.

The State does, however, contest that Davis can sue the Attorney General, asserting that the Eleventh Amendment bars her claims. State Br. 11. Plaintiffs have responded to this argument in response to the State's motion to dismiss. *See* Pls.' Opp. to Defs.' Mots. To Dismiss at 10–12, Doc. 55 (Sept. 13, 2021). Like the State, Plaintiffs incorporate their arguments here by reference.

The Kendall County Defendants also argue that Davis lacks standing to sue them because, they allege, she cannot satisfy either the "injury-in-fact" or "causation" elements of standing. But as explained above, Davis meets the requirements for pre-enforcement standing and her injuries are just as traceable to the Kendall County Defendants, who enforce the Carry Ban in the county where Davis resides, as they are to Director Kelly. In arguing otherwise, the Kendall County

Defendants protest that, "no agents or employees of the Kendall County' defendants' respective offices have ever taken *any action* against her in connection with her desire to keep or bear a firearm." Fayette and Kendall County Defendants' Mot. for Summ. J. and Mem. of Law at 7, Doc. 100 (Jan. 6, 2023) "("Kendall Br.") (emphasis in original). But that is no surprise—Davis has not violated any law, so there is no reason that the Kendall County Defendants would have taken action against her. As the Kendall County Defendants themselves acknowledge, "it would be both foolhardy and unfair to always force a plaintiff to break a law to challenge its legitimacy." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (quoted in Kendall Br. 6–7). That the Kendall Defendants have so far taken no action against Davis does not defeat her standing.

Next, the Kendall County Defendants argue that Davis does not face a "credible threat of prosecution" and that Davis is required to "identify other related criminal arrests or prosecutions by the Kendall County defendants to show a history of enforcement" to have standing. Kendall Br. 7 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) and *ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012)). But Plaintiffs do not need to show any special threat of prosecution to bring a pre-enforcement challenge, *see Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003), because "[t]he existence of a statute implies a threat to prosecute," *Alvarez*, 679 F.3d at 591 (quotation marks omitted). *Holder* did not require evidence of a history of prosecution either, it merely noted that evidence of a history of enforcement supported its finding of standing. 561 U.S. at 15–16. The Court also found standing was supported by the fact that "the Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do." *Id.* at 16. The same is true here. None of the defendants, the Kendall County Defendants included, have ever said that Davis would not be subject to prosecution if she carried a handgun in public in defiance of the Carry Ban. Plaintiff Davis has standing to bring this pre-enforcement suit.

**B.  The Organizational Plaintiffs Have Standing.**

Because Plaintiff Davis has standing to sue both the State and Kendall County Defendants, this Court need not reach the issue of whether the Organizational Plaintiffs have standing, since "jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Ezell v. City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011).

Only the State discusses the standing of the Organizational Plaintiffs, and the State does not contest that SAF and FPC have standing. The State *does* argue that because SAF has only alleged that two of its members have been injured (Plaintiffs Davis and Meyer), and because FPC has not presented admissible evidence of other members who have been injured, the Court should not consider information regarding any other members in determining whether these Plaintiffs have standing. State Br. 13–14. The Court does not need to consider anyone but Davis. An organization has standing as long as (1) its members would otherwise have standing to sue in their own right, (2) the interests the organization seeks to protect are germane to the organizations' purpose, and (3) neither the claims asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). And an organization only needs *one* injured member to have standing. *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *United Food and Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996). As a result, if Davis has standing, so do SAF and FPC.

The State argues that ISRA lacks standing, asserting that it fails the second element of the *Hunt* test, that "the interests it seeks to protect are germane to the organization's purpose." *Hunt*, 432 U.S. at 343; *see* State Br. 12. The State's theory is that ISRA lacks this element because this suit, if successful, would cause "a direct detriment to the interests of some of its members and the litigation was not properly authorized." *Retired Chi. Police Ass'n v. City of Chi.*, 76 F.3d 856, 864 (7th Cir. 1996); *see* State Br. 12. However, "a plaintiff can defeat a direct-detriment conflict

challenge by showing that the litigation, if successful, will not cause a direct detriment to any of its members or that the litigation was properly authorized." *Retired Chi. Police*, 76 F.3d at 865. ISRA can show both.

ISRA's participation in this lawsuit is not detrimental to any of its members. In *Retired Chicago Police*, the Seventh Circuit pointed to *Maryland Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246 (4th Cir. 1991), as exemplary of a detrimental lawsuit filed by an organization. *See Retired Chicago Police*, 76 F.3d at 864. In that case, the organizational plaintiff sought to invalidate the Maryland Minority Business Enterprise statute, but some of the organization's members were certified minority business enterprises who benefited from the statute, while other members stood to gain if the statute were invalidated. 933 F.2d at 1253. A virtually identical dynamic was at play in *Retired Chicago Police*, where under the challenged settlement legislation "some of the RCPA's members, namely widows, pay less for their health care premiums . . . than they would if the RCPA were successful" in its lawsuit. 76 F.3d at 864–65. In both cases, the lawsuit brought by the organization would have created winners and losers among its own members, so it would have constituted a "direct detriment" to at least some of them. Nothing like that situation is present here—a judgment for Plaintiffs would not hurt a single ISRA member and it would help ISRA members who are currently unjustly denied the right to carry because of their age.

The State's theory of detriment is that ISRA lobbied in favor of the Concealed Carry Act when it was passed and its members favored that legislation, but this present lawsuit is a challenge to that same Act. State Br. 13. The CCA was passed after Illinois was found by the Seventh Circuit to be in violation of the Second Amendment because it afforded no method for public carriage of handguns, in a case in which ISRA was a plaintiff. *See Moore*, 702 F.3d 933; ISRA Dep. 86:8–

87:22. But that ISRA's members supported being afforded a method for public carriage of firearms does not mean that they supported even those aspects of the law that limited its scope. In fact, they were not pleased with the Carry Ban when the CCA was passed in 2013. ISRA Dep. 87:10–88:10. More importantly, this lawsuit does not aim to undo the CCA, but to broaden it. If ISRA prevails, its members who currently have carry licenses will be in the same position that they were in before, but its members who are 18-to-20-year-olds currently barred from acquiring a license will be in a markedly better position. There would be no detriments to any of its members, only benefits.

The lack of a direct detriment alone defeats the State's argument, but it is also the case that ISRA had proper authorization to file this lawsuit. The State claims otherwise because ISRA Director Richard Pearson said in his deposition that he did not consult with his members before filing. State Br. 12. But there is no requirement that a membership organization poll its members to file a lawsuit, and in *Retired Chicago Police*, the Seventh Circuit recognized that concerns over detriment "are allayed where the litigation was properly authorized *in accordance with the association's procedures*." 76 F.3d at 865 (emphasis added). ISRA's Executive Director has the authority to approve the decision to participate in litigation. ISRA Dep. 53:2–8. He has done so here, so ISRA has followed its procedures and has standing to participate in this lawsuit.

## II. The Carry Ban is Unconstitutional.

This Court should invalidate the Carry Ban which is the source of the injuries to Davis and the 18-to-20-year-old members of the Organizational Plaintiffs. Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation . . . the government must demonstrate that the regulation is consistent with this nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. The Court must therefore begin with the text of the Amendment.

### A. The Conduct Prohibited by the Carry Ban is Covered by the Plain Text.

The Second Amendment says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Under *Bruen*, the first analysis is purely textual. The State does not dispute (nor could it) that carrying arms in public is covered by the Second Amendment's plain text. But the State does argue that 18-to-20-year-olds are not part of "the people" protected by the Amendment. *See* State Br. 17. This argument ignores binding Supreme Court precedent.

This Court is not writing on a blank slate in construing the text. In *Heller*, the Supreme Court already defined "the people" in the Second Amendment. *Bruen*, 142 S. Ct. at 2126. "[T]he people" "unambiguously refers to *all members* of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580 (emphasis added). After all, the Constitution refers to "the people" in "six other provisions." *Id.* These uses indicate that "the people"

> Protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id.* (cleaned up). Accordingly, *Heller* held that the use of the term "the people" created a "strong presumption that the Second Amendment right is exercised individually and belongs to *all Americans*." *Id.* at 581 (emphasis added). Citing *Heller*, *Bruen* reiterated that "[t]he Second Amendment guaranteed to *all Americans* the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 142 S. Ct. at 2156 (emphasis added, quotation marks omitted). The restrictions are a matter of history, not plain text, and must be evaluated accordingly.

If there were any room doubt that "the people" includes 18-to-20-year-olds, then the Second Amendment's reference to the "militia"—which the State fails to discuss in its brief—is additional evidence that the right includes 18-to-20-year-olds. Unlike "the people," the "Militia"

in the Second Amendment is not the entire political community of the United States but is instead a defined "subset of the people" consisting only of "those who were male, able bodied, and within a certain age range." *Heller*, 554 U.S. at 580. The Militia very clearly encompassed 18-year-olds at the Founding. Just months after ratification of the Second Amendment, Congress required all able-bodied men to enroll in the militia and to arm themselves upon turning 18. *See* Militia Act of 1792, 1 Stat. 271 (1792). This Act reflected the widespread understanding from the Founding era that citizens reached the age for militia membership by 18—an understanding that simply cannot be squared with the notion that ordinary 18-to-20-year-olds fall outside the Second Amendment's protective scope. *See Jones v. Bonta*, 34 F.4th 704, 719 (9th Cir. 2022), *remanded in light of Bruen*, 47 F.4th 1124 (9th Cir 2022); *Nat'l Rifle Ass'n, Inc. v. BATFE*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissental); *Hirschfeld v. BATFE*, 5 F.4th 407, 453–57 (4th Cir. 2021) (collecting Founding-era militia laws), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021); *Firearms Pol'y Coal., Inc. v. McCraw*, -- F. Supp. 3d ----, 2022 WL 3656996, at *4 (N.D. Tex. Aug. 25, 2022). Had 18-to-20-year-olds not been understood to be members of the militia, Congress would have lacked authority to include them in its legislation organizing that body. *See* U.S. CONST. art. I, § 8, cl. 16.

Unless the State is arguing that this Court should deny 18-to-20-year-olds a whole host of other constitutional rights that undeniably apply to them, the State must be treating the Second Amendment differently than the other protections of the Bill of Rights. This, too, is contrary to binding Supreme Court precedent, which has said that the *Heller* standard "accords with how we protect *other* constitutional rights" like "the freedom of speech in the First Amendment," and that "the constitutional right to bear arms in public for self-defense" is not a "second-class right." *Bruen*, 142 S. Ct. at 2130, 2156.

The State does not engage with the text of the Amendment at all. Instead, its contrary

argument is that "the historical record—as described by Professor Cornell in his expert report—shows that individuals under the age of twenty-one did not have a right to bear arms at the time of the ratification of the Second Amendment" because they were, at the time, considered minors. State Br. 17. But the Amendment does not reference "minors", and this is plainly a historical, *not* a textual argument. *Bruen*, 142 S. Ct. at 2130. Plaintiffs will discuss this historical evidence below.

### B. The State's Proposed Analogous Firearm Restrictions Do Not Justify The Carry Ban.

Plaintiffs are part of "the people" within the meaning of the Second Amendment and so the burden falls on Defendants to "justify [the Carry Ban] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. In assessing historical evidence on this issue, the Court must "reason[ ] by analogy" from earlier restrictions on the right to bear arms. *Id.* at 2132. The relevance of a purported historical predecessor to the Carry Ban must be judged by whether it "impose[d] a comparable burden on the right of armed self-defense and whether that burden [was] comparably justified." *Id.* at 2133. The State has failed to point to any historical tradition adequate to justify the Carry Ban.

#### 1. The Minority Status of 18-to-20-Year-Olds at Earlier Periods of American History Is Irrelevant.

As noted, the State places significant weight (in what it styles as its textual argument) on the status of people under 21 as minors for certain purposes during the Founding era (and on into later periods of our history). State Br. 17–19. This argument is severely flawed and fails both parts of *Bruen*'s requirement that a historical analogue and its modern counterpart "impose a comparable burden" on the right that is "comparably justified." 142 S. Ct. at 2133. First, the evidence the State presents does not demonstrate a comparable burden on the right to bear arms to the one imposed by the Carry Ban. The State argues that, at the Founding era, individuals under 21 were "infants" or "minors" who lacked full legal rights which were only conferred upon reaching "adulthood,"

but the State's sources do not discuss the right to bear arms specifically, which is fatal to their utility under *Bruen*. "Majority or minority is a status that lacks content without reference to the right at issue." *Hirschfeld*, 5 F.4th at 435 (cleaned up); *see also Jones*, 34 F.4th at 722. Furthermore, the State is wrong about the way Constitutional rights work: "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74 (1976). The question should not be whether the Amendment applies to 18-year-olds at all but whether certain restrictions are nevertheless permissible because they are well-founded in our nation's history.

The State argues that at the Founding "infants were severely circumscribed by law and had only a narrow range of legal autonomy," State Br. 18, but without evidence of restrictions from the Founding showing that firearms *were not* within that "narrow range," assertions about the minority status of 18-to-20-year-olds cannot advance the argument that the Carry Ban is historically justified. In fact, the evidence shows that firearms rights *were* within the range of autonomy afforded to 18-to-20-year-old minors. For example, although state militia laws in some cases required parents to pay fines incurred by their minor sons in relation to the service, or to purchase firearms for them, "the point remains that those minors were in the militia *and, as such,* they were required to own their own weapons." *NRA*, 714 F.3d at 342 (Jones, J., dissental). While minority status might have some implications for the rights of minors to contract, it renders "inconceivable . . . any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms." *Id.* In short, nothing in the State's brief comes close to supporting its sweeping conclusion that 18-to-20-year-olds were not considered to be protected by the Second Amendment at the Founding.

Second, the evidence regarding the age of minority at the Founding (and on into later periods) fails because the purported justification for treating 18-to-20-year-olds differently—minority status—no longer applies. Thus, even if minority had been attended with lesser firearm rights, it would be completely irrelevant in this case. The Carry Ban targets adults, not minors, and cannot be justified based on this historical status. Indeed, several of the sources that the State relies upon actually underscore the inappropriateness of the Carry Ban to legal adults. The State quotes, for example, John Bouvier for the proposition that "[t]he rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. *At this period, every man is in the full enjoyment of his civil and political rights.*" 1 JOHN BOUVIER, INSTITUTES OF AMERICAN LAW 148 (1858) (emphasis added) (quoted at State Br. 18). Another of the State's sources says: "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years." 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 233 (O. W. Holmes, Jr. ed., 12th ed., Little Brown, and Co. 1873 (1836)) (quoted in part at State Br. 18). As these sources make clear, the sole basis for treating 18-to-20-year-olds differently than 21-year-olds at earlier periods of American history was that they were minors under the authority of their parents. Blackstone, who is not cited in the State's brief, in his influential Commentaries, drove home this point when he noted that "the power of a father, I say, over the persons of his children ceases at the age of twenty-one; *for they are then enfranchised.*" 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 441 (1769). But minority status is inapplicable to 18-year-olds today. Plaintiff Davis is a legal adult and has full legal rights, including the right to bear arms. There is therefore no basis to extend the entirely hypothetical restrictions on the right of minors to bear arms at the Founding to her today.

**2.  Founding Era Evidence Shows that the Carry Ban is Incompatible with the Second Amendment.**

Turning from generalities about minors at the Founding, the State sets to the task set it by *Bruen*—to justify the Carry Ban by reference to historic analogues that were accepted as constitutional and that are "relevantly similar" to the Carry Ban itself. At the Founding period, the evidence is strongly in Plaintiffs' favor. The only real restrictions on the rights of 18-to-20-year-olds from this period that the State has identified are rules on certain college campuses that prohibited students from possessing guns or gunpowder, *see* State Br. 20 (discussing rules at Yale, University of Georgia, and University of North Carolina), but these are not appropriate analogues because they were not bans on carriage by all ordinary 18-to-20-year-olds. If a 19-year-old were in New Haven, Connecticut but not enrolled at Yale College, he could carry freely on campus. *See* The Laws of Yale-College, in New-Haven, In Connecticut, Enacted by the President and Fellows, the Sixth Day of October, A.D. 1795 26 (1800). What is more, the basis for these restrictions was not the generalized police power but rather *in loco parentis* authority of schools over students in their charge. In this capacity the schools could require other things of their students that, if commanded by the government, would certainly violate their constitutional rights. *See, e.g.*, *University Church in Yale marks 250 years of tradition and reform*, 36 Yale Bulletin & Calendar 4 (Sept. 28, 2007), *available at* https://bit.ly/3PNmwt1 ("Yale students were required to attend daily chapel services for the first 170 years of the church's history."). The restrictions thus reflected the rights of parents, and those standing in their stead, over minors, and say nothing about restrictions the government may impose on law-abiding adults, or even children for that matter. *See Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 795 n.3 (2011).

The other laws cited by the State from this period actually lend support to Plaintiffs' claims. The State notes that "at the time of the Founding, nearly all States enacted detailed militia laws"

that required certain people to purchase certain firearms and to comply with militia service requirements, including 18-to-20-year-olds. State Br. 20. "At the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in every state became eighteen." *Jones*, 34 F.4th at 721 (cleaned up). The State tries to spin these statutes in its favor, suggesting that they showed that "young men below the age of the majority could not be trusted with firearms without proper supervision in most circumstances." State Br. 20. But there is simply no support for that proposition. The State does not cite a single law that limited 18-to-20-year-olds' use of their firearms to times when they were serving in the militia or otherwise supervised, and Plaintiffs are aware of none. Instead, when individuals were not actively engaged in militia service, their firearms were their own and they could do with them as they pleased. For this reason, courts that have analyzed these militia statutes have repeatedly found them to be "strong" evidence that 18-to-20-year-olds had firearm rights that were unrestricted at the founding. *Jones*, 34 F.4th at 721; *see also, e.g.*, *NRA*, 714 F.3d at 340 (Jones, J., dissental).

The State suggests that these laws had the same basis as the Carry Ban because "[i]n each case, these restrictions rest on the understanding that people under 21 are not adults and cannot be responsibly trusted with firearms in many circumstances." State Br. 21. The State then claims that "[c]urrent scientific research" on brain development "bears out [the] Founding era understand" of the trustworthiness of 18-to-20-year-olds. *Id.* Both statements undermine the State's argument. Leaving aside, as already discussed, the fact that the State has misread militia laws to find restrictions where there are none, the State has asserted that its own law is based on the premise that "people under 21 are not adults." But people under 21 *are* adults in Illinois, and every other constitutional right vests fully *at least* by the age of 18. *See Hirschfeld*, 5 F.4th at 423. And in suggesting that modern science has borne out Founding era experience, the State recognizes that

the cited problems here—the alleged immaturity of 18-to-20-year-olds and corresponding concerns with mental illness and crime—are in fact very old problems with which the Founders would themselves have been familiar. In *Bruen*, the Supreme Court said that in such cases, where "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131 (emphasis added). Far from "distinctly similar," the Carry Ban is fundamentally opposed to the Founding era militia statutes the State cites. As Judge Jones remarked in *NRA*, the Founders "were familiar" "with late teenage males," and rather than restricting their rights, they required them to own firearms. The Founding era history is conclusively in Plaintiffs' favor.

### 3. Nineteenth Century Laws Cannot Support the Carry Ban.

The text of the Second Amendment covers 18-to-20-year-olds and the Founding era evidences no exceptions to that text, so the Court need go no further before declaring the Carry Ban unlawful. That is because, "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S. Ct. at 2136. Courts "must . . . guard against giving postenactment history more weight than it can rightly bear." *Id.* As a result, the key period for understanding the Second Amendment is the time of its ratification, and later sources can only confirm that understanding. *See* Pls.' Br. 11–13.

Nevertheless, even apart from the conclusive timing issue, the State's nineteenth century sources fail to justify the Carry Ban. First, the State cites to an 1868 treatise which said that "the State may prohibit the sale of arms to Minors" as evidence of the Carry Ban's validity. Thomas M. Cooley, *A Treatise on Constitutional Limitations* 739–40 n. 4 (6th ed. 1890); State Br. 21. As discussed above, laws that applied to minors are irrelevant to Plaintiffs, who are adults, but there are other problems here. This quote comes from Cooley's discussion of the general police power

20

of the state and it does not address the Second Amendment or the right to bear arms. What is more, Cooley's authority for the sentence was *State v. Callicutt*, 69 Tenn. 714 (1878), which upheld a conviction for selling pistols to minors. But in that case, the Tennessee Supreme Court made clear that the law in issue "addressed concealed carry of dangerous weapons, not the right to keep and bear arms more generally." *Jones*, 34 F.4th at 720. Furthermore, the only legal reasoning in *Callicutt* on the scope of the right to bear arms is a pair of citations to *Aymette v. State*, 21 Tenn. 154 (1840) and *Page v. State*, 50 Tenn. 198 (1871). *Heller* singled out *Aymette* as demonstrating an "odd reading of the right" which was "not the one [the Court] adopt[ed]," and simultaneously permitted citizens "to carry arms openly, unconnected with any service in a formal militia, but  . . . use them only for the military purpose of banding together to oppose tyranny." 554 U.S. at 613. *Page* asserted that the legislature could restrict carrying a revolver because it was not "an arm for war purposes." 50 Tenn. at 198. Again, *Heller* made clear that the Amendment is not limited to protecting arms for war purposes but "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at *2. *Callicutt* is not good law and has nothing informative to say about the appropriate scope of the Second Amendment right.

Furthermore, Cooley was not weighing in on the legitimacy of the decision when he cited it in his treatise. Instead, he was "simply identifying [it] as a case related to his discussion, which is how he utilized footnotes to cite thousands of cases throughout the treatise." David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. Ill. U.L.J. 119, 143 (2018). Cooley did, however, elsewhere address the right to bear arms, but he specifically did not discuss the legitimacy of restrictions on the right:

> [H]ow far it may be in the power of the legislature to regulate the right [to keep and bear arms] we shall not undertake to say. Happily, there neither has been, nor, we may hope, is likely to be, much occasion for an examination of that question by the courts.

Cooley, *supra* at 427. And again, any justification for a limitation on arms based on minority status has no bearing on this case.

The statutes the State cites from this period are likewise inadequate to establish the constitutionality of the Carry Ban. The earliest restrictions are city ordinances, one from New York (1803) and the other from Columbia, South Carolina (1817), both of which banned firing guns within city limits by *all persons*, regardless of age, and distinguished minors only as to the punishment available.[1] These laws forbade the same conduct regardless of age and provide no basis for imposing greater restrictions on the arms rights of 18-to-20-year-olds than other adults.

The State next argues that "in the 1850s, three states passed laws that criminalized selling, giving, or lending pistols to minors." State Br. 22 & ¶ 38. Plaintiffs addressed two of these laws, *see* 1856 Ala. Acts 17, 17; 1856 Tenn. Pub. Acts 92, 92, in their brief in support of summary judgment, noting that they were exceptions to the uniform practice up to the Civil War of respecting 18-to-20-year-olds rights regarding firearms, and explaining, as the Fourth Circuit did in *Hirschfeld*, "[it] would also be strange to rely on two southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period." 5 F.4th at 440; Pls.' Br. 15. The other law the State

---

[1] In New York, the five dollar penalty was to be paid by the minor's parent in all cases, *see Ordinance of the City of New York, to Prevent the Firing of Guns in the City of New York* § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN, AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF SAID CITY 83– 84 (1803), and in Columbia, recognizing that minors would "have no ostensible property whereof the said penalty can be levied," the statute permitted their firearm to be seized and sold to pay the fine unless "within ten days after conviction" the minor managed to pay, *An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817), Ordinances, of the Town of Columbia, (S.C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto* 61 (1823).

cites from this period comes from Kentucky in 1859, but that law, which again focused on sales of concealable weapons including pistols, specifically permitted parents or guardians to give their children pistols, 1859 Ky. Acts 245, 245. That law is not an analogue under *Bruen* because it did not "comparably burden" the exercise of the Second Amendment right. Unlike the Plaintiffs in this case, an 18-year-old Kentuckian in 1860, given a pistol by his father, would not be forbidden by statute from carrying that pistol in public for self-defense.

In addition, the Kentucky law applied against sales or gifts to "any minor, or slave, or free negro." *Id.* The *Jones* court remarked on the "deeply offensive nature" of firearms laws from around the time of the Reconstruction, 34 F.4th at 722, and this law highlights the strange willingness of the State to rely on repugnant statutes, which would be plainly unconstitutional under the Fourteenth Amendment (and were quite likely among the laws that motivated its ratification, *Hirschfeld*, 5 F.4th at 421 ("[T]he self-defense of freed Blacks was central to the passage of the Fourteenth Amendment.")), to define the scope of Plaintiffs' constitutional rights.

The state claims that "in total, over the course of the 19th century, 19 states and the District of Columbia—almost half of the states—enacted laws that limited the ability of those under 21 to purchase and use firearms." State Br. 22 & ¶ 35. But notably absent from this list is *any* law that the State claims restricted legal adults in any way. That should be the end of the matter. Moreover, most of these laws are not like the Carry Ban. Six of the cited laws restricted sales but permitted some method for minors to acquire a firearm (either as a gift, or through a sale with permission from a parent or employer). *See* 1878 Miss. Laws 175–76; 16 Del. Laws 716 (1881); 1881 Ill. Laws 73; Mo. Rev. Stat. § 1274 (1879); 1893 N.C. Sess. Laws 468–69; 1897 Tex. Gen. Laws 221–22. Once an 18-to-20-year-old possessed a firearm, unlike in Illinois today, these statutes did not forbid her from carrying it. Two of the laws come from the antebellum South and are discussed

above. *See* Ala. Acts 17, 1856 Tenn. Pub. Acts 92. An 1885 Nevada law made it a misdemeanor to carry a concealed firearm, but did not make it illegal to carry openly, and so it did not burden the right to the same degree as the Carry Ban does. 1885 Nev. Stat. 51; *see Hirschfeld*, 5 F.4th at 438 n.50. Of the remaining statutes, five come from states that had no Second Amendment analogue at the time they were enacted, *see* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. OF L. AND POLITICS 191, 193–204 (2006) (1884 Iowa Acts 86; 1882 Md. Laws 656; 1890 La. Acts 39; 1882 W. Va. Acts 421–22; 1883 Wis. Sess. Laws 290), and one comes from Kansas, 1883 Kan. Sess. Laws 159, which had a Second Amendment analogue but was singled out by *Bruen* as an example of a state that, around this time, "operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*," *Bruen*, 142 S. Ct. at 2155. *Bruen* was also dismissive of overly restrictive firearm laws in the Western Territories, which "were rarely subject to judicial scrutiny" and deserving of "little weight," *id.* at 2121, and the State's Wyoming law qualifies. *See* 1890 Wy. Sess. Laws 1253. That leaves just four laws from the District of Columbia, Georgia, Indiana, and Kentucky. 27 Stat. 116–17 (1892) (District of Columbia); 1876 Ga. Laws 112; 1875 Ind. Acts 86; 1873 Ky. Acts 359. Four laws, from almost 100 years after the ratification of the Second Amendment, are too little too late to overcome the text of the Amendment and the unified practice at the Founding.

The State collects a handful of other laws to try to shore up its position, but none advance its cause much, if at all. *See* State Br. 22–23. One law, for instance, applied only within the city of Lincoln, Nebraska. 1895 Neb. Laws Relating to the City of Lincoln 237. *See Bruen*, 142 S. Ct. at 2154 (rejecting analogues that affected only a small group of people and "were irrelevant to more than 99% of the American population" and noting it would "not stake [its] interpretation of the Second Amendment upon a law in effect in a single State, or a single city, that contradicts the

overwhelming weight of other evidence regarding the right to keep and bear arms in public for self-defense" (quotation marks omitted)). On this score, a Chicago ordinance that denied permits to all minors is barely any better, *see Biffer v. City of Chicago*, 278 Ill. 562, 567–71 (1917), but it can be rejected for another reason. The ordinance in question was an amendment to the Chicago Code of 1911, and in *Bruen* the Court entirely disregarded evidence from the 20th century as too late to "provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." 142 S. Ct. at 2154 n.28. The State's reliance on a West Virginia law from 1925 as well as its assertion that *today*, at least 34 jurisdictions restrict the firearm rights of 18-to-20-year-old adults, can be disregarded for the same reason. State Br. 23.

Finally, the State is wrong to suggest that its argument is in line with the "overwhelming view" of courts that have confronted challenges to restrictions on 18-to-20-year-olds' exercise of the Second Amendment. State Br. 24. This claim is based entirely on pre-*Bruen* cases that applied an invalid framework to these challenges. Following *Bruen*, at least one court has invalidated a state's exclusion of 18-to-20-year-olds from its carry licensing regime. *See Firearms Pol'y Coal.*, 2022 WL 3656996, at *11 (Texas). And two courts of appeals, in the period just preceding *Bruen*, applied an analysis very much like the one the Court would eventually endorse in reaching the same conclusion. *See Hirschfeld*, 5 F.4th at 418–40 ("A review of the Constitution's text, structure, and history reveals that 18-year-olds are covered by the Second Amendment."); *Jones*, 34 F.4th at 717–23. While those opinions have been vacated, their reasoning remains persuasive and supports Plaintiffs. Under the analysis the Supreme Court has prescribed, and with due regard to the text and history of the Second Amendment, the Carry Ban must be declared unconstitutional.

## CONCLUSION

The Court should deny the Defendants' motions for summary judgment.

February 6, 2023

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, Illinois 60187
(630) 452-4547
dsigale@sigalelaw.com

Respectfully submitted,

/s/ David H. Thompson
David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| DAVID MEYER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. 3:21-cv- |
| v. | ) | 00518-SMY |
| | ) | |
| KWAME RAOUL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2023, I cause the foregoing to be filed using the CM/ECF system, which will send notification of such filing to counsel of record, who are registered CM/ECF participants.

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, Illinois 60187
(630) 452-4547
dsigale@sigalelaw.com

/s/ David H. Thompson
David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

27