DEFENDANTS' EXHIBIT 1

# Jones v. Bonta

United States District Court for the Southern District of California

December 8, 2023, Decided; December 8, 2023, Filed

Case No.: 19-cv-1226-L-AHG

**Reporter**
2023 U.S. Dist. LEXIS 219150 *; 2023 WL 8530834

**MATTHEW JONES**, et al., Plaintiffs, v. **ROB BONTA**, in his official capacity as Attorney General of California, et al.[1], Defendants.

**Prior History:** Jones v. Becerra, 2020 U.S. Dist. LEXIS 6368, 2020 WL 8920621 (S.D. Cal., Jan. 14, 2020)

**Counsel:** For **Matthew Jones**, Thomas Furrh, PWGG, L.P., doing business as | Poway Weapons and Gear and PWG Range |, North County Shooting Center, Inc., Beebe Family Arms and Munitions LLC, doing business as | BFAM and Beebe Family Arms and Munitions |, FIREARMS POLICY COALITION, INC., Firearms Policy Foundation, The California Gun Rights Foundation, Second Amendment [*1] Foundation, Kyle Yamamoto, Plaintiffs: John W. Dillon, LEAD ATTORNEY, Dillon Law Group, APC, Carlsbad, CA USA.

For Xavier Becerra, in his official capacity as Attorney General of the State of California |, Martin Horan, in his official capacity as Director of the Department of Justice Bureau of Firearms |, Defendants: John Darrow Echeverria, California Attorney General, San Francisco, CA USA; Jennifer E. Rosenberg, California Department of Justice, Los Angeles, CA USA.

For Giffords Law Center to Prevent Gun Violence, Amicus: Robert Andrew Sacks, LEAD ATTORNEY, Sullivan & Cromwell LLP, Los Angeles, CA USA.

For Everytown for Gun Safety Support Fund, Amicus: Kenneth M. Fitzgerald, LEAD ATTORNEY, Fitzgerald Knaier LLP, San Diego, CA USA; Lisa Kobialka, Kramer Levin Naftalis & Frankel LLP, Redwood Shores, CA USA.

For Brady Center to Prevent Gun Violence, Amicus: [*2] Jeremy Todd Elman, LEAD ATTORNEY, Allen & Overy LLP, Palo Alto, CA USA.

**Judges:** Hon. M. James Lorenz, United States District Judge.

**Opinion by:** M. James Lorenz

# Opinion

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

### [ECF NO. 103]

Plaintiffs in this Second Amendment rights case have filed a Motion for Preliminary Injunction or Alternatively Motion for Summary Judgment [ECF No. 103.] Defendants filed an Opposition and Plaintiffs filed a Reply. The matter is submitted on the briefs without oral argument. *See* Civ. L. R. 7.1(d)(1). For the reasons stated below, Plaintiffs' Motion is DENIED.

I. FACTUAL BACKGROUND[2]

*A. Pertinent California Age-Based Firearm Restrictions*

Under California law, all commercial sales of firearms must occur through a federally licensed firearms dealer ("FFL"). Cal. Penal Code §§27545, 28050. At issue in the present case is California Penal Code Section 27510 which prohibits FFLs from selling a firearm to a person under 21 years of age with certain exceptions. Cal. Penal Code §27510(a).

In 2018, the California Legislature amended Section

---

[1] **Rob Bonta** is automatically substituted for his predecessor, Xavier Becerra, as California Attorney General, and Allison Mendoza is automatically substituted for her predecessors, former Directors Louis Lopez and Martin Horan, and former Acting Directors Brent E. Orick and Blake Graham. Fed.R. Civ.P. 25(d).

[2] Unless noted otherwise, the facts are taken from the Third Amended Complaint.

27510 by enacting Senate Bill 1100 ("SB 1100") in response to the mass shooting by 19-year-old Nikolas Cruz at Marjory Stoneman Douglas High School in Parkland, Florida in which the perpetrator used assault rifles to kill 17 people and wound 17 more. **[*3]** (ECF no. 111-2, Woods Dec. Ex 14). Among other provisions, SB 1100 restricts the sale, rental, delivery, or transfer of long guns[3] to any person under the age of 21 unless the individual has a valid, unexpired hunting license issued by the Department of Fish and Wildlife, is an active-duty member of the Armed Forces, is an active-duty peace officer, or honorably discharged member of the Armed Forces. (Woods Dec. Ex. 14, 2017 California Senate Bill No. 1100 (ECF No. 111-2)).)

In 2019, Section 27510 was further amended by Senate Bill 61 ("SB 61") which limited the sale of semiautomatic centerfire rifles by FFLs to individuals under age 21 with exceptions for active duty or reserve law enforcement officers who are authorized to carry a firearm in the course of their employment, or active-duty or reserve members of the Armed Forces. (Woods Dec. Ex. 16 (2019 California Senate Bill No. 61).)

B. *Plaintiffs*

Plaintiffs include individuals who are between 18 and 20 years old, licensed firearms retailers, and organizations who claim that California Penal Code Section 27510(a), as amended by SB 1100 and SB61, violates the Second Amendment rights of 18-20-year-old persons.

Individual Plaintiff Jose Lupe Chavez is a 20-year-old resident of Tracy, California currently **[*4]** attending University of California, San Diego, who was denied the ability to obtain a firearm by purchase or transfer from Moreau Works LLC gun shop, an authorized FFL in San Marcos, California. Individual Plaintiff Andrew Morris is a 19-year-old individual who resides in Poway, California, who was denied the ability to obtain a long gun by purchase or transfer by several licensed firearms dealers in San Diego County. Chavez and Morris are individual members of the organizational Plaintiffs Firearms Policy Coalition ("FPC"), Firearms Policy Foundation ("FFP"), The California Gun Rights Foundation ("CGF"), and the Second Amendment Foundation ("SAF").

Plaintiff PWGG, L.P, d/b/a Poway Weapons and Gear is a California limited partnership and licensed firearms retailer in Poway, California that includes a shooting range, retail store, and provides firearm rentals and training. Plaintiff North County Shooting Center Inc. is an S-Corp and a federal and state licensed firearms retailer in San Marcos, California that also rents firearms for use in the range and firearms training courses.

Institutional Plaintiff FPC is a non-profit organization incorporated under the laws of Delaware with its principal place **[*5]** of business in Sacramento, California with members and supporters within and outside San Diego, California. FPC engages in direct legislative advocacy, grassroots advocacy, legal efforts, research, education, outreach and other programs. Plaintiff FFP is a non-profit 501(c)(3) organization that has taken legal action to advance the Second Amendment rights of its members and supporters. Plaintiff CGF is a 501(c)(3) non-profit that has taken part in numerous litigation efforts to advance Second Amendment and related rights. Plaintiff SAF is a non-profit educational foundation incorporated under the laws of Washington state that seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs.

C. *Plaintiffs' Claim*

Plaintiffs contend that Section 27510(a) violates the Second Amendment rights of individuals between the ages of 18 and 20 by prohibiting access to firearms in common use throughout the United States, specifically long guns and semiautomatic centerfire rifles. (ECF no. 103-1, Mot. at 1, 9). According to Plaintiffs, Section 27510 cannot satisfy the two-part constitutionality test established under N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022), because (1) the conduct Plaintiffs wish to engage in, purchase and possession of firearms for self-defense, is covered by the Second Amendment's plain **[*6]** text and therefore presumptively protected; and (2) Defendants have not met their burden to "demonstrate that the age-based regulation is consistent with this Nation's historical tradition of firearm regulation." (*Id.* at 1 (citing *Bruen*).)

Defendants (sometimes referred to as the "government") counter that the Court should deny Plaintiffs' request to enjoin enforcement of Section 27510 because Plaintiffs cannot show they are likely to succeed on the merits of their claims. (ECF no. 111, Oppo. at 1.) Defendants argue that Section 27510, as

---

[3] A long gun is "a handheld firearm with a long barrel, as a rifle, designed to be fired when braced against the shoulder." https://www.dictionary.com/browse/long-gun

amended by SB 1100 and SB 61, is not an outright ban for individuals between the ages of 18 and 20 years old because it provides for several exceptions. (*Id.*) Defendants argue that the balance of equities and public interest weigh against enjoining enforcement of a law that promotes firearm safety and limits access to dangerous semiautomatic weapons by individuals in an age group that is disproportionately prone to reckless behavior, including gun violence. (*Id.* at 1-2.)

II. Procedural Background

On July 1, 2019, Plaintiffs filed the original Complaint in this action asserting that Section 27510 unconstitutionally violates the Second and Fourteenth Amendment rights of individuals between the ages of 18 and 20, and seeking **[*7]** declaratory and injunctive relief under 42 U.S.C. §1983. (ECF no. 1.) On July 30, 2019, Plaintiffs filed a First Amended Complaint. (ECF no. 3.) On November 8, 2019, the Court granted the parties' joint motion to file an amended complaint, and Plaintiffs filed a Second Amended Complaint. (ECF no. 20.) On November 12, 2019, Plaintiffs filed a Motion for Preliminary Injunction. (ECF no. 21.) It was denied on November 3, 2020. (ECF no. 66.)

On November 6, 2020, Plaintiffs filed a Notice of Appeal. (ECF no. 67.) On May 11, 2022, the appellate court affirmed in part, and reversed and remanded in part the order denying Plaintiffs' motion for preliminary injunction. *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022), vacated on reh'g, 47 F.4th 1124 (9th Cir. 2022). On July 25, 2022, Appellees **Rob Bonta** and Martin Horan filed a petition for panel re-hearing and petition for rehearing *en banc*. On September 7, 2022, the appellate court granted the request, vacated the panel's May 11, 2022 opinion, vacated this Court's order denying Plaintiffs' preliminary injunction motion and remanded the case for further proceedings consistent with the United States Supreme Court's decision in *Bruen*. *Jones v. Bonta*, 47 F.4th 1124 (9th Cir. 2022); (ECF no. 91.)

On September 14, 2022, this Court ordered the parties to file supplemental briefing discussing **[*8]** the impact of *Bruen* on Plaintiffs' preliminary injunction motion. (ECF No. 92.) The parties timely filed supplemental briefing. (ECF Nos. 95, 96.) On December 14, 2022, this Court issued an Order finding that *Bruen* represented a change in the legal framework applied when initially deciding Plaintiffs' preliminary injunction motion, denied Plaintiffs' initial motion for preliminary injunction as moot, and issued a scheduling order to allow for new briefing. (ECF No. 100.)

On January 16, 2023, Plaintiffs filed the present Motion for Preliminary Injunction or in the Alternative Motion for Summary Judgment.[4] (ECF No. 103.) On February 16, 2023, Plaintiffs filed a Motion for Leave to Amend the Complaint, including a stipulation agreeing that Defendants would not oppose Plaintiffs' motion to amend, subject to certain terms agreed upon by the parties, such as (1) the dismissal of the three Plaintiffs who turned 21 during the pendency of this action (**Matthew Jones**, Thomas Furrh, and Kyle Yamamoto), and (2) the inclusion of amendments clarifying both that in this action Plaintiffs do not contest California's laws limiting the sale or transfer of handguns to people under the age of 21, and that this is **[*9]** not a class action. (ECF no. 108.) On March 20, 2023, the Court granted Plaintiffs' motion for leave to amend, and dismissed Plaintiffs **Matthew Jones**, Thomas Furrh, Kyle Yamamoto, and Beebe Family Arms and Munitions. (ECF No. 113.) On March 22, 2023, Plaintiffs filed a Third Amended Complaint as the operative pleading adding Plaintiffs Jose Chavez and Andrew Morris. (ECF No. 114.)

On March 16, 2023, Defendants filed a Response in Opposition to the Motion for Preliminary Injunction. (ECF nos. 111, 112.) On April 17, 2023, Plaintiffs filed a Reply. (ECF No. 118.) On May 23, 2023, Plaintiffs filed a Notice of Supplemental Authority. (ECF No. 119.) On August 17, 2023, Plaintiffs filed a second Notice of Supplemental Authority. (ECF No. 120.)

III. Legal Standard

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). *Winter*'s standards "apply to Second Amendment claims like any other constitutional claim[.]" *Baird v. Bonta*, 81 F.4th 1036, 1044 (9th Cir. 2023).

A party seeking preliminary injunctive relief under Federal Rule of Civil Procedure 65 must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of **[*10]** equities tips in his favor,

---

[4] Plaintiffs move for a preliminary injunction with an expedited trial on the merits, or in the alternative for summary judgment. (Mot. at 3). However, Plaintiffs have briefed their arguments only under the preliminary injunction standard. Accordingly, the Court denies Plaintiffs' summary judgment motion without prejudice to refiling with appropriate briefing.

DEFENDANTS' EXHIBIT 1

and that an injunction is in the public interest." *Am. Trucking Ass'ns v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir.2009)* (quoting *Winter, 555 U.S. at 20*). The Ninth Circuit applies a sliding scale approach. *See Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011)*. Under this approach, the elements of the preliminary injunction test are balanced and where a plaintiff can make a stronger showing of one element it may offset a weaker showing of another. *Id. at 1131, 1134-35*. "Therefore, 'serious questions going to the merits' and a hardship balance that tips sharply towards the plaintiff can support issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest." *Id. at 1134-35*. However,

> The first *Winter* factor, likelihood of success, is a threshold inquiry and is the most important factor in any motion for a preliminary injunction. That holds especially true for cases where a plaintiff seeks a preliminary injunction because of an alleged constitutional violation. If a plaintiff bringing such a claim shows he is likely to prevail on the merits, that showing will almost always demonstrate he is suffering irreparable harm as well.

*Baird, 81 F.4th at 1042* (internal quotation marks and citation omitted).

IV. DISCUSSION

A. *Second Amendment*

The merits inquiry in this action is governed by the *Second Amendment*. *See Baird, 81 F.4th at 1042*. The **[*11]** *Second Amendment* states: "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." *U.S. Const. Amend. II*. The *Second Amendment* guarantees the individual right to keep and bear arms for self-defense within the home and in public. *District of Columbia v. Heller, 554 U.S. 570, 629, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)* (in the home); *Bruen, 597 U.S. at 8* (public carry).[5] "[T]he *Due Process Clause of the Fourteenth Amendment* incorporates the *Second Amendment* right" and applies it against the states. *McDonald v. City of Chicago, 561 U.S. 742, 791, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)*.

The *Second Amendment* right is "not unlimited[,]" and individuals may not "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller, 554 U.S. at 626*. Accordingly, while the *Fourteenth Amendment's* incorporation limits the states' "ability to devise solutions to social problems that suit local needs and values [it] by no means eliminates" them. *McDonald, 561 U.S. at 784-85*.

> The *Second Amendment* guaranteed to all Americans the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. Those restrictions, for example, limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms[.]

*Bruen, 597 U.S. at 70, 142 S. Ct. at 2162* (internal quotation marks and citation omitted). The "longstanding prohibitions" such as restrictions "on the possession of firearms by felons and the mentally ill, or laws forbidding **[*12]** the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms[]" are examples of regulations which do not run afoul of the *Second* and *Fourteenth Amendments*. *Heller, 554 U.S. at 626-27 & n.26* ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."); *Bruen, 597 U.S. at 21, 142 S. Ct. at 2162*.

The constitutional text and history "define the controlling *Second Amendment* inquiry." *Baird, 81 F.4th at 1043*. Accordingly,

> [W]hen the *Second Amendment's* plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical

---

[5] Four justices concurred in the *Bruen* majority opinion (Justice Alito, Justice Barrett, and Justice Kavanaugh joined by Chief Justice Roberts) and three dissented (Justice Breyer joined by Justices Sotomayor, and Kagan). "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]'" *Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977)*. This is not the case here as six justices were joined in Justice Thomas's opinion.

tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

Bruen, 597 U.S. at 17, 142 S. Ct. at 2126 (internal quotation marks omitted). "[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 19, 142 S. Ct. at 2127 [*13] .

This historical inquiry "will often involve reasoning by analogy[.]" Id. at 28, 142 S. Ct. at 2132. The "*central considerations*" in this inquiry are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified[.]" Id. at 29, 142 S. Ct. at 2133 (emphasis in original).

> [A]nalogical reasoning under the Second Amendment is neither a regulatory straitjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

Id. (internal quotation marks and citation omitted). This analysis requires the courts to determine whether the regulations are "relevantly similar." Id. at 29, 142 S. Ct. at 2133 (internal quotation marks omitted). The Court identified "two metrics" by which regulations must be "relevantly similar under the Second Amendment" "how and [*14] why the regulations burden a law-abiding citizen's right to armed self-defense." Id.

V. ANALYSIS

A. *Likelihood of Success on the Merits*

Under Bruen, this Court looks first to the "plain text" of the Second Amendment to determine whether Plaintiffs' conduct is presumptively protected under the Constitution. The government agrees for purposes of this motion that "18-20-year-olds are part of the 'people' protected by the Second Amendment and that the acquisition restrictions imposed through FFLs implicate the right to 'keep and bear arms.'" (Oppo at 8-9). Accordingly, the first prong of the Bruen test is satisfied. (*See* Oppo. at 9 n. 4).

The Court turns next to the second prong of the Bruen test: determining whether the government can justify its regulation by showing that the law is "consistent with this Nation's historical tradition of firearm regulation." Bruen, 597 U.S. at 17, 142 S. Ct. at 2126. The government bears the burden to justify its age-based regulation. Id.

Against this backdrop, the Court evaluates Section 27510's restrictions. The Court first turns to the question "how and why the regulations burden a law-abiding citizen's right to armed self-defense" and then proceeds to the question whether Section 27510 is consistent with Second Amendment's "historical understanding." Id. at 29-31, 142 S. Ct. at 2133.

1. *The Burden Imposed* [*15] *by* California Penal Code Section 27510

With certain exceptions, Section 27510 prohibits FFLs (federally licensed firearms dealers) from selling, supplying, delivering, or giving possession or control of firearms to individuals under 21 years of age. Cal. Pen. Code § 27510(a)&(b). Plaintiffs challenge Section 27510 to the extent it limits access to long guns and semiautomatic centerfire rifles. (Mot. at 9).

Section 27510 does not preclude, and California's statutory scheme expressly provides, alternate means for individuals aged 18 to 20 to acquire, possess, and use firearms. These individuals can acquire a firearm from immediate family members "by gift, bequest, intestate succession, or other means from one individual to another," Cal. Pen. Code §27875(a), s*ee also id.* §16720 (defining "immediate family"), or "take title or possession of a firearm by operation of law," as, for example, between spouses, id. §27920(a)(2), *see also id.* §16960(g) (defining "operation of law"), Cal. Fam. Code §850 (defining transmutation of property between spouses). They can also lawfully borrow a firearm from any family member, Cal. Pen. Code §27880, or from any person over 18 years of age, so long as that person is at all times present, *id.* §27885. Finally, they can rent a firearm "for the purposes of shooting at targets" at a licensed target facility, *id.* §27910, or rent a firearm other than a handgun [*16] for purposes of hunting if they have a hunting license, *id.* §27950.

DEFENDANTS' EXHIBIT 1

In addition, pursuant to the exceptions to Section 27510, FFLs *can* sell, supply, deliver, or give possession or control of firearms in certain situations to individuals ages 18 to 20. Cal. Pen. Code §27510(b). Examples of such instances are as follows: (1) long guns if the individual "possesses a valid, unexpired hunting license," id. §27510(b)(1) ("hunting license exception"); (2) long guns if the individual is "an honorably discharged member of the United States Armed Forces, the National Guard, the Air National Guard, or the active reserve components of the United States[,]" id. §27510(b)(2) ("honorably discharged military exception"); and (3) long guns and semiautomatic centerfire rifles if (i) the individual is an active peace officer, active federal officer or law enforcement agent, or a reserve peace officer authorized to carry a firearm in the scope of employment, or (ii) the individual is an active member of the United States Armed Forces, the National Guard, the Air National Guard, or the active reserve components of the United States[,]" id. §27510(b)(3) ("active police and military exception").

Based on the foregoing exceptions and a statutory framework providing for alternate means **[\*17]** of access, Section 27510 is not a firearms ban, including semiautomatic centerfire rifles, for individuals between 18 and 20 years of age. To the extent Defendants rely on this contention (*see, e.g.*, Mot. at 18 (*citing* Bruen, 597 U.S. at 47)), their argument is rejected.

In the context of California's statutory framework, Section 27510 regulates commercial firearms transactions based on age by limiting rather than prohibiting the access of individuals 18 to 20 years of age to certain firearms offered by FFLs. Section 27510 does not interfere with intrafamily transfers, loans of firearms from family or any supervising individual over 18, or commercial loans for specific purposes such as target practice and hunting.

17-22 ("No other three-year age group above or below **[\*18]** age 21 is as homicidal as 18-20-year olds.").) Plaintiffs provided the expert report of developmental psychologist Dr. Laurence Steinberg regarding the neurobiological and psychological development of adolescents aged 18-20. (Woods Dec. Ex. 5 (ECF No. 111-2).) Relying on scientific methodology, including functional Magnetic Resonance Imaging ("fMRI"), Dr. Steinberg opines that studies have concluded individuals between the ages of 18 and 20 "are more impulsive, more likely to engage in risky and reckless behavior, unduly influenced by peer pressure, motivated more by rewards than costs or negative consequences, less likely to consider the future consequences of their actions and decisions, and less able to control themselves in emotionally arousing situations." (*Id.* at ¶ 11.) This is due to the "still-developing cognitive systems of 18-20-year-olds" contributing to "increas[ed] risk of impulsive behavior." (Donohue Dec. ¶¶ 15, 73-76.) "One of the last parts of the brain to mature — and which continues to develop into the mid-twenties — is the prefrontal cortex, which supports self-control, including judgment, impulse control and inhibition, and long-range planning." (*Id.* ¶ 74.)

Based **[\*19]** on the foregoing, the purpose of Section 27510 is public safety. The purpose is advanced by the hunting license, honorably discharged military, and active law enforcement and miliary exceptions, all of which ensure that the individual under 21 participating in a commercial firearm transaction has received proper training. The surrounding statutory structure, allowing for intrafamily transfers and loans, as well as commercial loans for hunting and target practice, implicitly (family) and explicitly (hunting and target practice) ensures that the individual under 21 entrusted with a firearm receives a measure of supervision absent from purely commercial transactions.

2. Why California Penal Code Section 27510 Was Enacted

The stated objective of SB 1100 and SB 61, which were incorporated into Section 27510, was to increase public safety by limiting access to certain firearms by 18-to 20-year-old individuals. *See* Senate Floor Analysis, Aug. 20, 2018 (reproduced at ECF no. 111-2 ("Woods Dec.") Ex. 13 at p. 3). The 18-to-20-year age group targeted by Section 27510 has been identified as disproportionately prone to violence, including gun violence, compared to older age groups. (ECF no. 111-6, Donohue Dec. ¶¶ 11,

3. Historical Analogues

The next step is to determine by "analogical reasoning" whether Section 27510 is consistent with the historical understanding of the Second Amendment. *See* Bruen, 597 U.S. at 27. In this regard, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations." Id. at 29, 142 S. Ct. at 2133 (quoting McDonald, 561 U.S. at 767; Heller, 554 U.S. at 599) (emphasis in original).

The government, as the party with the burden, *see, e,g,, Baird, 81 F.4th at 1046*, has filed several expert declarations presenting the historical record in opposition to Plaintiffs' **[*20]** motion. Plaintiffs have filed no evidence of historical record in support of their motion, opting instead to rely on legal argument. In the "adversarial system of adjudication, [courts] follow the principle of party presentation[ and] are thus entitled to decide a case based on the historical record compiled by the parties." *Bruen, 597 U.S. at 25 n.6, 142 S. Ct. at 2130*.

a. Age Restrictions

That individuals between the ages of 18 and 21 are not yet fully mature and are prone to impulsive decision making is not new. As evidenced by legal sources from the period between the Second Amendment enactment in 1791 and Fourteenth Amendment enactment in 1868, the rights of individuals under 21 years of age were commonly curtailed for the same reason.

"Persons aged 18-20 were considered 'infants' or 'minors' under the law in the Founding era." (ECF no. 111-5, Cornell Dec. ¶ 42 (footnote omitted); *see also id.* ¶¶ 44, 50 (citing Zephaniah Swift, 1 A System of the Laws of the State of Connecticut 213 (1795).) This remained black letter law after the Second Amendment was enacted. (*Id.* ¶ 51.) A legal treatise from 1836 states, "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained **[*21]** the age of twenty-one years." (*Id.* (quoting James Kent, 2 Commentaries on American Law 259 (3d ed., 1836)).) Similarly, the first American law dictionary in 1858 stated, "The rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights." (*Id.* (quoting John Bouvier, 1 *Institutes of American Law* 148 (1858)).) "This legal fact did not change until the latter half of the twentieth century." (*Id.* ¶ 42 (footnote omitted); *see also id.* ¶ 44.)[6]

Accordingly, since the Founding era and until recent decades,

> infants' or minors' legal status has been significantly constrained under law and would not have included the ability to assert a legal claim in any court of law that would vindicate a Second Amendment right or a similar claim under an analogous state constitutional provision. Therefore, treating infants as autonomous legal actors capable of having the right to keep, bear, and acquire arms is profoundly anachronistic and ignores the common law context in which the Second Amendment and similar state constitutional provisions were enacted in the eighteenth and early nineteenth centuries. **[*22]**

(*Id.* ¶ 42 (footnote omitted); *see also* ¶¶ 45, 47, 48.)

In keeping with the public understanding that individuals under the age of 21 were "infants" and did not enjoy the same rights as adults, numerous states and municipalities enacted age-based restrictions on the sale, gift, or loan of weapons including firearms, in the time preceding the adoption of the Fourteenth Amendment. For example, in 1803, New York City passed ordinances which punished guardians for firearms infractions committed by minors in their charge. (*Id.* at ¶108.) In 1817, Columbia South Carolina enacted a law allowing for weapons to be seized from minors within city limits. (*Id.*)

Moreover, in 1855, twelve years before the ratification of the Fourteenth Amendment, Alabama prohibited selling, giving, or lending, "to any male minor, a bowie knife, or knife, or instrument of the like kind or description, by whatever named called, or air gun, or pistol." (*Id.* ¶ 105 (quoting Act of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Acts 17, 17).) Similarly, in 1858, Tennessee enacted a law prohibiting the selling, loaning, giving, or delivering "to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defence in traveling." (*Id.* ¶ 106; Tenn. Code § 4864 (1858), **[*23]** reprinted in 1 The Code of Tennessee Enacted by the General Assembly of 1857-8 871 (Return J. Meigs & William F. Cooper eds. 1858)). In 1859, Kentucky passed a law that prohibited selling, giving, or loaning "any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon ... to any minor." (*Id.* ¶ 106 (quoting 1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23).)

The foregoing are examples of historical regulations which limited the ability of 18-20-year-olds to purchase, acquire and possess certain weapons in common use to ensure public safety due to the immaturity of individuals

---

[6] In California, this change did not come until 1972. *See Cal. Fam. Code §6502*.

DEFENDANTS' EXHIBIT 1

under the age of 21. Section 27510 was animated by the same purpose. As the Bruen Court noted, a historical analogue does not need to be a "historical twin" or "dead ringer" for modern restrictions. 597 U.S. at 30. The government has identified well-established and representative historical analogues. No more is required.

Plaintiffs dispute that the government drew on the relevant historical period of reference. The Court disagrees.

In Heller, the Supreme Court held that "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" represented a "critical tool of constitutional interpretation." 554 U.S. at 605. In Bruen, the Court refined this [*24] concept by opining that the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government" and in the context of the First, Fourth, and Sixth Amendments it was generally assumed that "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." Bruen, 597 U.S. at 37, 142 S. Ct. at 2137.

Nevertheless, Bruen noted the existence of "an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* The distinction is based on the theory that "[w]hen the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Id. at 38, 142 S. Ct. at 2138. Bruen did not resolve this debate because it found that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.*

The same is true here. That 21 was the age of majority was black letter law in the Founding [*25] era as well as in the mid-nineteenth century. Plaintiffs do not contend that the early- to mid-nineteenth century firearm age restrictions were under constitutional attack at the time. Accordingly, the Court can assume them to be settled law given the lack of "disputes regarding the lawfulness of such prohibitions." See id. at 30, 142 S. Ct. at 2133.

Further, all of the firearm age restrictions cited above predate the Civil War (1861-1865). They are therefore close enough in time to the Second Amendment enactment (1791) to be historically relevant. *Cf.* id. at 36, 142 S. Ct. at 2137 ("[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'") (quoting Heller, 554 U.S. at 614).)

Moreover, the declaration of government expert Saul Cornell, Ph.D., supports the conclusion that the public understanding of the Second Amendment's scope, *i.e.*, that firearm access of individuals less than 21 years of age was restricted, did not change between 1791 and the 1850s. (Cornell Dec. *passim* ¶¶ 42-108.) Plaintiffs do not dispute Professor Cornell's expert qualifications or academic credibility of the sources cited. The sources he cited show a continuity of public [*26] understanding from the Founding era until at least the 1850's. Alternatively, the Ninth Circuit recently suggested historical analogues from 1791 or 1868 are relevant. See Baird, 81 F.4th at 1040-41, 1042. Accordingly, the Court can consider historical analogues from the time surrounding the adoption of the Second Amendment in 1791 until its incorporation to the States via the Fourteenth Amendment in 1868.

University regulations of student gun ownership and possession during and after the Founding era confirm that that the public understanding of the Second Amendment accepted age limitations. (*See* Cornell Dec. ¶ ¶ 59-60) In the era immediately prior to the Second Amendment enactment, universities took note of the potential harm posed by unlimited access to firearms by minors for whom they had adopted the role of *in loco parentis*. (*Id.* ¶ 59.)

For example, in 1655, Harvard College enacted a campus policy which stated in part that "noe students shall be suffered to have [a g]un in his or theire chambers or studies, or keeping for theire use any where else in the town..." (Spitzer Dec. at ¶ 20 (ECF No. 111-3).) Yale College enacted a similar measure in 1745. (*Id.*) The University of Georgia, the first university in America to be created by a state government, prohibited students from keeping [*27] "any gun, pistol," or "other offensive weapon in College *or elsewhere*," restricting students from possession of such weapons even while they were away from college. (Cornell Dec. ¶

62 (quoting The Minutes of the Senate Academicus 1799-1842, University of Georgia Libraries, (1976)) (emphasis added).) In 1824, the University of Virginia enacted rules during a meeting attended by Thomas Jefferson and James Madison prohibiting students from keeping or using "weapons or arms of any kind, or gunpowder," on school grounds. (Cornell Dec. ¶ 63 (quoting University of Virginia Board of Visitors Minutes (October 4-5, 1824) 1, 6-7 (1824).) The University of North Carolina similarly prohibited students from keeping "firearms, or gunpowder" in 1838. (Cornell Dec. ¶ 62 (quoting Acts of the General Assemble and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina 15 (1838)).)

Contrary to Plaintiffs' assertions, Defendants do not conflate these university rules with laws, but use them to demonstrate the general understanding during the historically relevant era that firearm regulation of 18-20-year-olds was well-established on numerous fronts and consistent [*28] with municipal and state regulation in the first half of the nineteenth century. Plaintiffs have not provided any historical evidence that American males between the ages of 18-20-years-old were trusted with firearms without proper supervision and training, or that they had unfettered rights to keep, bear, and acquire them.

Last, Plaintiffs point to the fact that in the era surrounding Second Amendment's adoption, 18-to-20-year-olds were part of the militia required to use their own firearms. (Mot. at 13-14). From this they argue that the 18-20-year-olds of that era must have had the right to purchase firearms. They point to the militia laws as evidence for a preexisting right to keep and bear arms for this age group. (Reply at 9).

Defendants counter with evidence that participation in the militia did not include the concomitant right to purchase firearms or use them for any purpose. Although "[i]ndividuals below the age of legal majority served in the militia and participated in community-based efforts to keep the peace (such as the 'hue and cry'), these public safety duties were undertaken in a supervised setting under color of law." (Cornell Decl. ¶ 53 (footnote omitted).) Further, "over a third of [*29] state militia statutes in the Founding Era[7] enacted laws requiring parents or guardians to provide firearms to militia members under the age of 21 who were under their charge." (Cornell Decl. ¶55.) These statutes contradict Plaintiffs' proposition that militia service for individuals under the age of 21 equates to a general right to independently commercially acquire firearms for individual use for any purpose.

These militia regulations are consistent with the Heller Court's observation that an individual may not, now or historically, "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" he or she chooses. 554 U.S. at 626. Furthermore, the hunting license, honorably discharged military, and active law enforcement and military exceptions provided in Section 27510(b)[8] are consistent with the militia regulations Plaintiffs rely upon.

b. Regulation of Commerce

The United States has a long tradition of regulating the commercial sale of products to advance the goals of a well-regulated society including "public safety, morals, health, and welfare." (Oppo. at 10 (quoting William J. Novak, The People's Welfare, Law and Regulation in Nineteenth Century America at 84 (North Carolina Press 1996).) For example, "[b]etween 1780 and 1835, the Massachusetts legislature passed regulations that closely specified and controlled [*30] the way numerous products were manufactured and sold, including gunpowder and firearms." (Oppo. at 10 (citing Stearns and Metcalf, The General Laws of Massachusetts, 1780-1835 (1823-36).)

Plaintiffs cursorily dismiss this historic evidence, stating simply "these regulations do not justify the prohibition on the purchase and acquisition of firearms by legal adults." (Reply at 3). As noted, Section 27510 does not prohibit 18-20-year olds from acquiring firearms. Plaintiffs' further conclusory contention that the early 1800's legislation "has nothing to do with arms" (Reply at 4) is also rejected. As noted in Heller and McDonald, "Like most rights, the right secured by the Second Amendment is not unlimited[,]" and neither of these opinions "should be taken to cast doubt on ... laws imposing conditions and qualifications on the *commercial sale of arms*." McDonald, 506 U.S. at 787 (emphasis added); Heller, 554 U.S. at 626-72

---

[7] The Revolutionary and Founding eras include the period between 1776 and 1799, *i.e.* the period surrounding the enactment of the Second Amendment in 1791. (Cornell Dec. ¶ 9).

[8] *See* discussion in section V.A.1. above.

DEFENDANTS' EXHIBIT 1

(emphasis added, footnote omitted). Accordingly, the regulation of commercial firearm distribution and sales in the early nineteenth century provides additional relevant historic support for the regulation of commercial firearms sales enacted in Section 27510.

3. *Conclusion*

The government has provided relevant historical analogues to the limitations imposed by Section 27510 on the commercial [*31] firearm transactions with 18-20-year-olds i.e. the "how" of the regulation. The restrictions embodied in Section 27510 were enacted because individuals under the age of 21 lack cognitive maturity and are disproportionately prone to violence, i.e. the "why" of the regulation. For the same reasons, the rights of this age group were curtailed during the Founding era, including access to firearms. (*See* Cornell Dec. at ¶¶ 112). As a result, Defendants have demonstrated that Plaintiffs are not likely to succeed on the merits of the claim challenging Section 27510 under the Bruen standard.

B. *Irreparable Harm*

Plaintiffs' only argument in support of the irreparable harm requirement for preliminary injunctive relief is that they have been deprived of their Second Amendment rights, and that this is sufficient in itself to show irreparable harm. (Mot. at 21; Reply at 10). They claim that the government suffers no harm from an injunction. (Reply at 10.)

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." Arizona Dream Act Coal. v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014). If a plaintiff shows he is likely to prevail on the merits of a constitutional violation claim, "that showing usually demonstrates he is suffering irreparable harm no [*32] matter how brief the violation." Baird, 81 F.4th at 1040. However, "[t]he smaller the probability of a plaintiff's success, the greater must be the showing of irreparable harm." A & M Records v. Napster, 239 F.3d 1004,1013 (9th Cir. 2001). A court need not consider the possibility of irreparable harm if a movant fails to show a likelihood of success on the merits. Baird, 81 F.4th at 1040.

As Plaintiffs have not shown a likelihood of success on the merits of their claims, they have not shown they will suffer irreparable harm in the absence of a preliminary injunction. *See* Germon v. Times Mirror Co., 520 F.2d 786, 788 (9th Cir. 1975) (no need to consider the issue of irreparable injury where plaintiff failed to show a likelihood of success on the merits.)

C. *Balance of Equities*

As noted in section III above, to prevail on a motion for preliminary injunction, Plaintiffs must establish four elements: likelihood of success on the merits, irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *See* Winter, 555 U.S. at 20. When the first two factors are met, the court turns to "assessing the harm to the opposing party and weighing the public interest. The factors merge when[, as here,] the government is the opposing party." Nken v, Holder, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009).

Plaintiffs have not established likelihood of success on [*33] the merits of their claims or likelihood of irreparable harm in the absence of preliminary relief. This is sufficient ground to deny the motion without proceeding to the question whether the balance of equities tips in their favor. *See* Herb Reed Enterprises, LLC v. Fla. Ent.Mgmt., Inc., 736 F.3d 1239, 1251 (9th Cir. 2013) ("In light of our determination that the record fails to support a finding of likely irreparable harm, we need not address the balance of equities and public interest factors.").) Plaintiffs' balance of equities argument is addressed herein solely for the sake of completeness.

A district court "must balance the competing claims of injury and consider the effect of granting or withholding the requested relief," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24 (internal quotation marks and citation omitted). The Court balances the burden some 18-20-year-olds will experience if they are temporarily deprived of their choice to purchase long guns or semiautomatic centerfire rifles from FFLs against the public safety benefit Section 27510 is designed to confer.

Plaintiffs contend that the balance of equities and the public interest support a preliminary injunction because "the State has no legitimate interest—and [*34] no public interest is served — in enforcing laws that strip a broad subset of 'the people' of their constitutional rights due to the criminal acts of an infinitesimal group." (Mot. at 23). They argue that the Second Amendment is the product of interest balancing by the people and "'surely elevates above all other interests the right of law-abiding responsible citizens to use arms' for self-defense." (*Id.*

at 10 (quoting Bruen, 597 U.S. at 26, 142 S. Ct. 2131).) This argument fails for two reasons. First, Plaintiffs have not shown that Section 27510 strips them of their Second Amendment rights. Second, they have not advanced any other argument to counter the public interest in safety from gun violence.

The government has presented persuasive expert evidence that the threat of gun violence perpetrated by individuals between 18 and 20 years of age is real because this age group is disproportionately prone to gun violence. (*See* Donohue Dec. ¶¶ 11, 17-21). Since 2020, 18-20-year-olds have been involved in several mass shootings. Those shootings have led to the deaths of dozens of children and adults, including the May 2022 shootings at Robb Elementary School in Uvalde, Texas (21 killed), a supermarket in Buffalo, New York (10 killed), and the April 2021 shooting at a FedEx **[*35]** facility in Indianapolis, Indiana (8 killed). (*Id.* ¶ 32).

> Of particular relevance to the present case, 6 out of the 30 double-digit-fatality mass shootings in American history were perpetrated by a shooter who was 18-20-years-old at the time of the attack. In other words, while historically accounting for approximately 4% of the post-World War II population in the United States, 18-20-year-olds have been involved in perpetrating 20% of the mass shootings resulting in 10 or more deaths—a roughly five-fold over-representation.

(ECF NO. 111-9, Klarevas Dec. ¶ 16.) The government has presented sufficient evidence to show that public interest warrants denying Plaintiff's motion

The temporary inconvenience 18-20-year-olds may experience by the limitations on *commercial* acquisition of firearms until they reach the age of 21, especially in light of avenues to lawfully access firearms through family, supervised target shooting, or licensed hunting, does not outweigh the public safety interests promoted by Section 27510. To borrow a phrase from a sister district, "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would **[*36]** be grave." *See*, Tracy Rifle & Pistol LLC v. Harris, 118 F.Supp. 3d 1182, 1193 (E.D. Cal. 2015), aff'd, 637 Fed.Appx. 401 (9th Cir. 2016). Here, the public interest outweighs the potential harm to Plaintiffs.

VI. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' motion for preliminary injunctive relief. As neither party briefed Plaintiffs' alternative motion for summary judgment, the summary judgment motion is **DENIED** without prejudice to refiling with appropriate briefing.

**IT IS SO ORDERED**

Dated: December 8, 2023

/s/ M. James Lorenz

Hon. M. James Lorenz

United States District Judge

---

**End of Document**