# EXHIBIT A

# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-2248

_____

Kristin Worth; Austin Dye; Axel Anderson; Minnesota Gun Owners Caucus;
Second Amendment Foundation; Firearms Policy Coalition, Inc.

*Plaintiffs - Appellees*

v.

Bob Jacobson, in his individual capacity and in his official capacity as
Commissioner of the Minnesota Department of Public Safety

*Defendant - Appellant*

Kyle Burton, in his individual capacity and in his official capacity as Sheriff of
Mille Lacs County, Minnesota; Dan Starry, in his individual capacity and in his
official capacity as Sheriff of Washington County, Minnesota; Troy Wolbersen, in
his individual capacity and in his official capacity as Sheriff of Douglas County,
Minnesota

*Defendant*s

------------------------------

Everytown for Gun Safety, formerly known as Everytown for Gun Safety Action
Fund; United States; State of Illinois; State of Arizona; State of California; State of
Colorado; State of Connecticut; State of Delaware; District of Columbia; State of
Hawaii; State of Maryland; State of Massachusetts; State of Michigan; State of
New Jersey; State of New Mexico; State of New York; State of North Carolina;
State of Oregon; State of Pennsylvania; State of Rhode Island; State of Vermont;
State of Washington; Giffords Law Center to Prevent Gun Violence; March For
Our Lives Foundation; Brady Center to Prevent Gun Violence; Holly Brewer

*Amici on Behalf of Appellant(s)*

National Rifle Association of America, Inc.

*Amicus on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: February 13, 2024
Filed: July 16, 2024
_____

Before SMITH, Chief Judge,[1] BENTON, and STRAS, Circuit Judges.
_____

BENTON, Circuit Judge.

Minnesota's permit-to-carry statute, among its objective criteria, requires applicants to be at least 21 years old. Three gun rights organizations—the Second Amendment Foundation, the Firearms Policy Coalition, Inc., and the Minnesota Gun Owners Caucus, through their members Kristin Worth, Austin Dye, Alex Anderson, and Joe Knudsen—challenge this age restriction for violating the Second and Fourteenth Amendments to the United States Constitution. The district court[2] granted summary judgment to the Plaintiffs, finding the Second Amendment's plain text covered their conduct and that the Government did not meet its burden to demonstrate that restricting 18 to 20-year-olds' right to bear handguns in public was consistent with this Nation's historical tradition of firearm regulation. Minnesota appeals. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

_____

[1]Judge Smith completed his term as chief judge of the circuit on March 10, 2024. *See* 28 U.S.C. § 45(a)(3)(A).

[2]The Honorable Katherine M. Menendez, United States District Judge for the District of Minnesota.

-2-

I.

The Minnesota Citizens' Personal Protection Act of 2003 criminalized carrying handguns by ordinary people (non-peace officers) in "a public place," unless they have a permit-to-carry. **Minn. Stat. § 624.714, subd. 1a**. To get a permit-to-carry, among other objective criteria, an applicant must be "at least 21 years old." **Id. at subd. 2(b)(2)**. State law, since 2003, therefore, bans those under 21 years old from carrying handguns in public ("the Carry Ban").

The individual plaintiffs wish to carry handguns in public. The district court found: "Except for failing to meet the age requirement," they were "otherwise eligible to receive a permit to carry a pistol in Minnesota." ***Worth v. Harrington***, 666 F. Supp. 3d 902, 908 (D. Minn. 2023). The organizational plaintiffs collectively have thousands of members in Minnesota.

The Plaintiffs sued the Commissioner of the Minnesota Department of Public Safety (the permitting scheme's state administrator) and the Sheriffs of Mille Lacs County, Douglas County, and Washington County (local adjudicators of permit applications) in their official capacities.[3] The Plaintiffs allege Minnesota's statute is unconstitutional, facially and as applied to the individual plaintiffs.

---

[3]The Commissioner tries to invoke sovereign immunity. *See **Ex parte Young***, 209 U.S. 123, 156 (1908). If sovereign immunity applies, then this court must dismiss the claims against the Commissioner for lack of subject-matter jurisdiction. *See **Seminole Tribe of Fla. v. Fla.***, 517 U.S. 44, 75-76 (1996). Under *Ex Parte Young*, Eleventh Amendment sovereign immunity does not apply and "a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law." ***281 Care Comm. v. Arneson***, 638 F.3d 621, 632 (8th Cir. 2011). For a defendant "to be amenable for suit challenging a particular statute the [defendant] must have some connection with the enforcement of the act." ***Id.*** (internal quotations omitted); ***Calzone v. Hawley***, 866 F.3d 866, 869 (8th Cir. 2017) (same). The district court properly found the Commissioner had some connection with enforcing the statutory scheme. The Commissioner, under the Minnesota permit statute, has several duties connected with the statute's enforcement: making application forms available on the internet, providing relevant data to Sheriffs, and

-3-

Specifically, the Plaintiffs asked for the following relief:

a) Declare that Minn. Stat. § 624.714, subd. 1a and § 624.714, subd. 2(b)(2), their derivative regulations, and all related laws, policies, practices, and customs violate—facially, as applied to otherwise qualified 18–20-year-olds, or as applied to otherwise qualified 18–20-year-old women—the right of Plaintiffs and Plaintiffs' similarly situated members to keep and bear arms as guaranteed by the Second Amendment and Fourteenth Amendments to the United States Constitution; [and]

b) Enjoin Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with him from enforcing, against Plaintiffs and Plaintiffs' similarly situated members Minn. Stat., § 624.714, subd. 1a and § 624.714, subd. 2(b)(2), their derivative regulations, and all related laws, policies, practices, and customs that would impede or criminalize Plaintiffs and Plaintiffs' similarly situated members' exercise of their right to keep and bear arms.

*Worth*, 666 F. Supp. 3d at 926-27.

The district court applied the two-part test in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 17 (2022): (1) a textual analysis of the Second Amendment and (2) a historical analysis of the Nation's tradition of firearm regulation. *See Worth*, 666 F. Supp. 3d at 910. The district court ruled that the plain text of the Second Amendment covered the Plaintiffs' conduct because 18 to 20-

---

collecting processing and renewal fees. **Minn. Stat. § 624.714, subd. 3**. The Commissioner is also required to adopt statewide standards governing the form and contents of all permit-to-carry applications. **Minn. Stat. § 624.7151**. In fact, the applications require the applicants to provide his or her date of birth, a key to enforcing the statute against those under 21 years old. Because he has some connection to enforcing the Carry Ban, the Commissioner is not entitled to state sovereign immunity.

year-olds are among "the people" and that the Second Amendment presumptively guarantees Plaintiffs "the right" to bear handguns in public for self-defense. *See* *id*. at 912-16. It then ruled that the government did not meet its burden to demonstrate that restricting the right to bear arms for 18 to 20-year-olds, based on their age, is consistent with the Nation's history and tradition of firearm regulations. *See* **id.** at 916-25. It granted summary judgment to the Plaintiffs, declared the age restriction facially unconstitutional for otherwise qualified 18 to 20-year-olds, and enjoined enforcement against them. The district court stayed the injunction, pending appeal. The determination that the Carry Ban is facially unconstitutional, for otherwise qualified 18 to 20-year-olds, is on appeal.

This court reviews de novo a grant of summary judgment. ***Torgerson v. City of Rochester***, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). As this is a facial challenge, the "individual circumstances" are not important as the Carry Ban must be "unconstitutional in *all* its applications" to 18 to 20-year-olds. ***United States v. Veasley***, 98 F.4th 906, 909 (8th Cir. 2024), *quoting* ***Bucklew v. Precythe***, 587 U.S. 119, 138 (2019).

"In effect," the Plaintiffs, by asking this court to affirm the grant of the facial challenge, are "speaking for a range of people," all those 18 to 20-year-olds who want to publicly carry a firearm for self-defense. ***Id.*** at 910. A facial challenge "requires [the challenger] to 'establish that no set of circumstances exists under which the Act would be valid.'" ***United States v. Rahimi***, 602 U.S. ___, No. 22-915, 2024 WL 3074728, at *6 (U.S. June 21, 2024), *quoting* ***United States v. Salerno***, 481 U. S. 739, 745 (1987). "To counter a facial challenge . . . all the government must do is identify constitutional applications . . . using the same text-and-historical-understanding framework." ***United States v. Veasley***, 98 F.4th at 910.

II.

All the individual plaintiffs, now over 21 years old, may now apply for a permit-to-carry. Their claims—by and through whom the organizational plaintiffs had standing—are moot. *See Hawse v. Page*, 7 F.4th 685, 694 (8th Cir. 2021).

To avoid mootness of the entire case, before the last individual plaintiff turned 21, the Plaintiffs moved to supplement the record with the affidavit of Joe Knudsen—a 19-year-old Minnesotan seeking a permit-to-carry, who is a member of all three organizations—in order to continue the standing of the organizational plaintiffs.

The organizational plaintiffs assert "standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). To have standing "an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. Pres. and Fellows of Harvard College*, 600 U.S. 181, 199 (2023), *quoting Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ("we held that the organization lacked standing because it failed to 'submit affidavits . . . showing, through specific facts . . . that one or more of [its] members would . . . be 'directly' affected'"), *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992).

As for (a), since the filing of the complaint, the organizational plaintiffs have demonstrated that at least one of their members has had continuous standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 190 (2000) ("[T]he description of mootness as 'standing set in a time frame' is not comprehensive."). *Cf. Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 601-02 (8th Cir. 2022) (finding organizational plaintiff "lacks associational standing to sue

-6-

on behalf of unnamed members" when it failed to identify any members who suffered the requisite harm).

As for (b), each organizational plaintiff's purpose is to promote gun rights. The interest they seek to protect, the exercise of the individual right to bear arms, is germane to their purpose.

As for (c), Plaintiffs assert that the Carry Ban is facially unconstitutional, and the relief sought is a permanent injunction on its enforcement.  Neither requires an individual plaintiff's participation in the lawsuit.  *See Veasley*, 98 F.4th at 909.  Thus, the organizational plaintiffs still have standing in this suit through Knudsen.

Minnesota does not contend that the organizational plaintiffs fail to meet the organizational standing test.  Instead, Minnesota asserts that the court should not supplement the record because the record below has no evidence about Knudsen. *See* ***Dakota Indus., Inc. v. Dakota Sportswear, Inc.***, 988 F.2d 61, 63 (8th Cir. 1993) ("Generally, an appellate court cannot consider evidence that was not contained in the record below.  However, this rule is not etched in stone.  When the interests of justice demand it, an appellate court may order the record of a case enlarged.") (citations omitted).  *Cf.* ***Carpenters' Pension Fund of Illinois v. Neidorff***, 30 F.4th 777, 795 n.16 (8th Cir. 2022) (maintaining that the general principle of not supplementing the record on appeal is most applicable when the supplemental evidence does not impact the outcome of the present case); ***Torres v. City of St. Louis***, 39 F.4th 494, 503-04 (8th Cir. 2022) (same).

In a facial challenge, "individual circumstances" are irrelevant apart from establishing standing. ***Veasley***, 98 F.4th at 909.  *See* ***Ezell v. City of Chicago***, 651 F.3d 684, 697 (7th Cir. 2011) ("In a facial constitutional challenge, individual application facts do not matter.  Once standing is established, the plaintiff's personal situation becomes irrelevant.").  Specific to mootness, courts "may consider any evidence bearing on whether the appeal has become moot." ***Constand v. Cosby***, 833 F.3d 405, 409 (3d Cir. 2016).  *See* ***Lara v. Commr. Pennsylvania State Police***, 91

-7-

Appellate Case: 23-2248   Page: 7   Date Filed: 07/16/2024 Entry ID: 5413715

F.4th 122, 138 n.22 (3d Cir. 2024) (taking judicial notice of an individual plaintiff with standing to allow similarly situated organizational plaintiffs to continue their suit); ***Reese v. BATFE***, No. 23-30033 (5th Cir. 2024) (order granting a similar motion to supplement the record).

In *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 718 (2007), after an organization's members with standing aged out, the Supreme Court accepted an affidavit from the organization listing other members with standing.  *See **Ala. Legis. Black Caucus v. Alabama***, 575 U.S. 254, 285-86 (2015) (Scalia, J., dissenting) (describing supplementation of the record in *Parents Involved*).

This court grants the motion to supplement the record (and denies the related motion to dismiss the appeal).  The organizational plaintiffs have an unbroken chain of standing through Knudsen.

### III.

The Second Amendment reads:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  **U.S. Const. amend. II**.  The Supreme Court, in *Heller*, recognized that the Second Amendment's right to keep and bear arms "protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes. . . ."  ***District of Columbia v. Heller***, 554 U.S. 570, 577 (2008).

"[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right," "the natural right" to "resistance," "self-preservation and defence," not merely a common law right.  ***Id.*** at 593-94, *quoting* 1 William Blackstone, **Commentaries On The Laws Of England** 139-40 (1765).

The Supreme Court has applied that right against the states through the Fourteenth Amendment (with a plurality incorporating it through the Due Process Clause and Justice Thomas recognizing it as within the Privileges or Immunities Clause). ***McDonald v. City of Chicago***, 561 U.S. 742, 791 (2010) (plurality opinion) ("We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*"); ***id.*** at 858 (Thomas, J., concurring in part) ("I agree with the Court that the Second Amendment is fully applicable to the States. I do so because the right to keep and bear arms is guaranteed by the Fourteenth Amendment as a privilege of American citizenship."). Thus, courts apply against the states, through the Fourteenth Amendment, the right to bear arms—the natural right of resistance, self-preservation, and defense.

"[C]onsistent with *Heller* and *McDonald*," *Bruen* held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." ***Bruen***, 597 U.S. at 10. The *Heller* opinion demands "a test rooted in the Second Amendment's text, as informed by history." ***Id.*** at 19.

Before *Bruen*, many circuits—but not this court—had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." ***Id.*** at 17. The Supreme Court, in *Bruen*, rejected the two-step test as "one step too many." ***Id.*** at 19. The Court provided a new test to evaluate the text consistent with *Heller*'s reasoning:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

***Id.***, *quoting* ***Konigsberg v. State Bar of Cal.***, 366 U.S. 36, 50, n.10 (1961).

The test has two parts: text, then history.  (1) *If* a "focused" application of "the 'normal and ordinary' meaning of the Second Amendment's language" "covers an individual's conduct," *then* (2) "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  ***Id.*** at 17, 19-20, *quoting* ***Heller***, 554 U.S. at 576-77.

First, this court conducts a textual analysis, determining if the Amendment's plain text covers the Plaintiffs—are they part of 'the people' with a right to keep and bear arms?  If so, then that conduct is presumptively protected.

Second, the burden shifts to the government to demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation.  "[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'"  ***Rahimi***, 2024 WL 3074728, at *6, *quoting* ***Bruen***, 597 U.S. at 24.  This court analyzes the government's identified historical analogues, whether "the government identif[ies] a well-established and representative historical *analogue*, not a historical *twin*."  ***Bruen***, 597 U.S. at 30 (emphasis in original).  If the regulation is consistent with the Nation's historical tradition of firearm regulation, it does not infringe the right of the people.  If not, then the regulation improperly infringes the individual right to keep and bear arms.

A.

"*Bruen* does not command us to consider only 'conduct' in isolation and simply assume that a regulated person is part of 'the people.'"  ***United States v. Sitladeen***, 64 F.4th 978, 987 (8th Cir. 2023), *citing Bruen*, 597 U.S. at 24.[4]  Instead,

---

[4]In its reply brief, Minnesota argues that Plaintiffs did not meet their "burden" of proving *Bruen*'s textual part because they did not submit expert reports or facts about the Second Amendment's text.  This court does not normally consider arguments raised in a reply brief.  ***Gatewood v. City of O'Fallon***, 70 F.4th 1076,

-10-

we must begin by asking whether the Carry Ban "governs conduct that falls within the plain text of the Second Amendment." *Id.* at 985, *citing **Bruen***, 597 U.S. at 17. That is, *Bruen* tells us to begin with a threshold question using the plain text, are the Plaintiffs part of the people? ***Range v. Attorney General***, 69 F.4th 96, 101 (3d Cir. 2023) (en banc) ("After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct."), *cert. granted, vacated and remanded*, No. 23-374 (U.S. July 2, 2024).

Minnesota asserts that ordinary, law-abiding, adult citizens that are 18 to 20-year-olds are not members of "the people," and, thus, the Plaintiffs are not protected under the plain text of the Second Amendment. *See **Bruen***, 597 U.S. at 31-32 ("It is undisputed that . . . ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects"); ***Maryland Shall Issue, Inc. v. Moore***, 86 F.4th 1038, 1042-43 (4th Cir. 2023), *reh'g en banc granted*, 2024 WL 124290 (4th Cir. Jan. 11, 2024) ("'the people' whom the Second Amendment protects includes, at a minimum, 'ordinary, law-abiding, adult citizens'"), *quoting **Bruen***, 597 U.S. at 31-32; ***Lara***, 91 F.4th at 131 n.9 ("*Bruen* also stated that the protections of the Second Amendment extend to 'ordinary, law-abiding, adult citizens.'"), *quoting **Bruen***, 597 U.S. at 31-32. *See generally **Sitladeen***, 64 F.4th at 984 (noting that *Bruen* did not specifically "address the meaning of 'the people'" in the Second Amendment).

Minnesota argues that 18 to 20-year-olds are not members of "the people" because at common law, individuals did not have rights until they turned 21 years old. *See* 1 William Blackstone, ***Commentaries on the Laws of England*** 451 (Oxford, Clarendon Press 1765) ("So that full age in male or female, is twenty one years . . . who till that time is an infant, and so styled in law."); John Bouvier, **1**

---

1080 (8th Cir. 2023).  Regardless, this requirement contradicts *Bruen*'s command that part one is a "focused" application of "the 'normal and ordinary' meaning" that would have been discernable by the people. *Bruen*, 597 U.S. at 20, *quoting **Heller***, 554 U.S. at 576-77.

-11-

**Institutes of American Law 148** (1858) (explaining that upon reaching the age of majority, "every man is in full enjoyment of his civil and political rights.").

Ordinary, law-abiding, adult citizens that are 18 to 20-year-olds are members of the people because: (1) they are members of the political community under *Heller*'s "political community" definition; (2) the people has a fixed definition, though not fixed contents; (3) they are adults; and (4) the Second Amendment does not have a freestanding, extratextual dangerousness catchall.

First, the right to keep and bear arms "is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed . . . ." ***United States v. Cruikshank***, 92 U.S. 542, 553 (1876); ***Heller***, 554 U.S. at 592 (same). The people codified that right, and that political tradition, in the Constitution. *Heller* recognizes the universal applicability of that right to "all Americans." ***Id.*** at 581.

*Heller* and *Bruen* command focus on the "normal and ordinary" meaning of the text of the Second Amendment. ***Bruen***, 597 U.S. at 20, *quoting **Heller***, 554 U.S. at 576-77; ***Heller***, 554 U.S. at 576 ("the Constitution was written to be understood by the voters"), *citing **United States v. Sprague***, 282 U.S. 716, 731 (1931). The 1773 edition of Samuel Johnson's dictionary definition of people reaffirms the definition used in *Heller*: "A nation; these who compose a community." **1 Dictionary of the English Language** (4th ed.) (reprinted 1978); *see* N. Bailey, **An Universal Etymological English Dictionary** 601-02 (1770) (defining "people" as "the whole Body of Persons who live in a Country[ ] or make up a Nation."). ***See generally United States v. Duarte***, 101 F.4th 657, 673 (9th Cir. 2024) (discussing additional, analogous dictionary definitions of "people").

Minnesota must overcome the "strong presumption" that the right applies to "all Americans." ***Heller***, 554 U.S. at 581. Further, "the term unambiguously refers to all members of the political community, not an unspecified subset." ***Id.*** at 580.

-12-

Eighteen to 20-year-olds are included in the "political community."  *See* ***Cruikshank***, 92 U.S. at 549 ("Citizens are the members of the political community to which they belong.  They are the people who compose the community, and who, in their associated capacity, have established or submitted themselves to the dominion of a government for the promotion of their general welfare and the protection of their individual as well as their collective rights."); ***United States v. Verdugo-Urquidez***, 494 U.S. 259, 265 (1990) (holding that "the people" covers even some non-citizens who are members of the "national community").[5]  *See also* ***Duarte***, 101 F.4th at 673 ("This notion that one's status as a 'citizen' signified his membership among 'the people' traces its roots to English common law.").

Second, Minnesota asserts that because 18 to 20-year-olds did not possess all their "civil and political rights" as minors at the founding, they cannot today be considered members of the people.  *See* 1 John Bouvier, **Institutes of American Law** 148 (Robert Peterson, ed., 1851). Minnesota emphasizes that the "political community at the time of the founding" was restricted not only to those over the age of 21, but also to "eligible voters, namely white, male, yeomen farmers."  It concludes that because those 18 to 20-year-olds were not legally autonomous members of the political community at the founding, they are not part of the people in the plain text of the Second Amendment.

Arguments of this type, focusing on the original contents of a right instead of the original definition—i.e., that only those people considered to be in the political community in 1791 "are protected by the Second Amendment," instead of those

---

[5]The parties dispute whether this court should use the "political community" definition of the people from *Heller* and *Bruen,* or the "national community" definition from *Verdugo-Urquidez.*  *See* Note, *The Meaning(s) of 'The People' in the Constitution*, 126 **Harv. L. Rev.** 1078, 1079-86 (2013) (arguing *Verdugo-Urquidez*'s "national community" definition is more expansive than *Heller*'s "political community" definition).  Any difference between these definitions does not affect this case.  This court relies on the definition from *Heller* and *Bruen*, "political community."

-13-

meeting the original definition of being within the political community—are "bordering on the frivolous." *Heller*, 554 U.S. at 582. "We do not interpret constitutional rights this way." *Id.* (examining the interpretation of First and Fourth amendments, which consider modern forms of communications and search, respectively). *Heller* rejected the idea that the Second Amendment protected only the original contents of the defined term "arms" and, instead, applied that original definition "to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. *Cf. Bruen*, 597 U.S. at 47 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today."). "Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 28.

Similarly, *Heller* defines "the people" as "all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580 & 582. "[T]he Second Amendment extends, prima facie," to all members of the political community, "even those that were not [included] at the time of the founding." *Id.* Contrary to Minnesota's assertion, the political community is not confined to those with political rights (eligible voters) at the founding. *See Verdugo-Urquidez*, 494 U.S. at 265; *Bush v. Vera,* 517 U.S. 952, 1075 n.9 (1996) (Souter, J., dissenting) ("[Voting] is an assertion of belonging to a political community . . . ."), *quoting* Kenneth L. Karst, *Paths to Belonging: The Constitution and Cultural Identity*, 64 **N.C. L. Rev.** 303, 347, 350 (1986).

Even if Minnesota were correct in its assertions about the political community's definition, the contents of that defined term have changed. Since the founding, the guarantee of political rights has constitutionally expanded, especially in the right to vote. *See* **U.S. Const. amend. XV** (proscribing the abridgment of voting rights based on race); **U.S. Const. amend. XIX** (proscribing the abridgment of voting rights based on sex); **U.S. Const. amend. XXIV** (proscribing the poll tax); **U.S. Const. amend. XXVI** (proscribing the abridgment of voting rights based on

-14-

age for those over 18). Reading the Second Amendment in the context of the Twenty-Sixth Amendment unambiguously places 18 to 20-year-olds within the national political community. *See* ***Armstrong v. Exceptional Child Ctr., Inc.***, 575 U.S. 320, 325-26 (2015) (explaining that constitutional exegesis requires reading each provision "in the context of the Constitution as a whole," suggesting later amendments can impact the context of prior amendments); John F. Manning, *Foreword: The Means of Constitutional Power*, 128 **Harv. L. Rev.** 1, 61 (2014) (arguing that constitutional textual provisions are best understood "only after reading its text in the context of the Constitution as a whole. Reading a text in the context of a surrounding text is a standard form of textual exegesis."). Reading the Constitution as a whole, the Third Circuit recently (correctly) explained that "consistency has a claim on us." *Lara*, 91 F.4th at 131. Those 18 to 20-years-old are "among 'the people' for other constitutional rights such as the right to vote, freedom of speech, peaceable assembly, government petitions, and the right against unreasonable government searches and seizures." ***Id.*** (internal citations omitted). "[T]here is no reason to adopt an inconsistent reading of 'the people.'" ***Id.***, *citing* ***Range***, 69 F.4th at 102. An inconsistent reading subjugates "the constitutional right to bear arms in public for self-defense [to] . . . 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" ***Id.*** at 132, *quoting* ***Bruen***, 597 U.S. at 70.

Minnesota asserts that this court has held that "the people" can have different meanings in different parts of the Constitution. *See* ***Sitladeen***, 64 F.4th at 983-84. In *Sitladeen*, this court held that *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) is still good law post-*Bruen*, reaffirming the holding in *Flores* that illegal aliens are not part of the people. ***Id.***, *discussing* ***Flores***, 663 F.3d at 1023, *citing* ***United States v. Portillo-Munoz***, 643 F.3d 437, 441-42 (5th Cir. 2011). That holding is consistent with *Heller*—at a minimum, "all Americans" in the "political community" that are law-abiding "citizens" are members of the people. ***Heller***, 554 U.S. at 580 & 635; ***Kanter v. Barr***, 919 F.3d 437, 451-53 n.3 (7th Cir. 2019) (Barrett, J. dissenting) (interpreting *Heller*'s mandate that "all Americans" are members of the people to mean that the textual basis for gun regulation does not come from a

-15-

narrow definition of the people, even those presumptively stripped of the right (i.e. felons) are members of the people), *majority opinion abrogated by **Bruen***, 597 U.S. at 19. Even if the 18 to 20-year-olds were not members of the "political community" at common law, they are today.

Third, it is not disputed that plaintiffs are "ordinary," "law-abiding," or "citizens," only whether they are "adult" citizens. The "age of majority or minority is a status" "that lack[s] content without reference to the right at issue" rather than a fixed or vested right. ***Hirschfeld v. BATFE***, 5 F.4th 407, 435, *vacated as moot*, 14 F.4th 322 (4th Cir. 2021), *quoting* Jeffrey F. Ghent, Annotation, *Statutory Change of Age of Majority as Affecting Pre-Existing Status or Rights*, 75 **A.L.R. 3d** 228 § 3. Minnesota seems to assert the age of majority is fixed at 21 permanently. *But see* **Minn. Stat. § 645.451, subd. 3**. ("'Adult' means an individual 18 years of age or older."). That is not so. For political rights, the Twenty-Sixth Amendment sets the age of majority at age 18. *See* **U.S. Const. amend. XXVI**.

Fourth, Minnesota states that from the founding, states have had the power to regulate guns in the hands of irresponsible or dangerous groups, such as 18 to 20-year-olds. At the step one "plain text" analysis, a claim that a group is "irresponsible" or "dangerous" does not remove them from the definition of the people.

> Neither felons nor the mentally ill are categorically excluded from our national community[, the people]. That does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all.

***Kanter***, 919 F.3d at 453 (Barrett, J., dissenting). *See **Rahimi***, 2024 WL 3074728, at *11 ("[W]e reject the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.'").

-16-

Importantly, the Second Amendment's plain text does not have an age limit. *See e.g.,* **U.S. Const. art. I, § 2 & 3** (asserting, in the plain text, a 25-year-old age requirement to serve in the House of Representatives and a 30-year-old age requirement to serve in the Senate); **U.S. Const. art. III § 2** (asserting, in the plain text, a 35-year-old age requirement to serve as President); *Hirschfeld*, 5 F.4th at 421 ("In other words, the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment.").

Ordinary, law-abiding 18 to 20-year-old Minnesotans are unambiguously members of the people. Because the plain text of the Second Amendment covers the plaintiffs and their conduct, it is presumptively constitutionally protected and requires Minnesota to proffer an adequate historical analogue consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 19.

B.

The historical analysis presumes that the individuals' conduct is protected and requires Minnesota to "identify a well-established and representative historical analogue." *Id.* at 30. "[W]hether modern and historical regulations impose a *comparable burden* on the right of armed self-defense and whether that burden is *comparably justified* are 'central' considerations when engaging in an analogical inquiry"—the "how and why," respectively, must be analogous. *Id.* at 29 (emphasis added).

As a threshold matter, the district court addressed which time period is better for understanding the scope of the Second Amendment as applied to the states, "1791 or 1868?" *Worth*, 666 F.Supp.3d at 918.

"*Bruen* cautions that 'not all history is created equal.'" *Sitladeen*, 64 F.4th at 985, *quoting Bruen*, 597 U.S. at 34. Rather, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."

-17-

*Bruen*, 597 U.S. at 34, *quoting* ***Heller***, 554 U.S. at 634-35.  "Strictly speaking," Minnesota "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." ***Id.*** at 37.  Even so, *Bruen* strongly suggests that we should prioritize Founding-era history.  *See id.*  Otherwise, the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment" might not have "the same scope as against the Federal Government." ***Id.***  And for decades, the Court has "generally assumed" that "the public understanding of the right when the Bill of Rights was adopted in 1791" governs. ***Id.***, *citing* ***Crawford v. Washington***, 541 U.S. 36, 42-50 (2004) (Sixth Amendment); ***Virginia v. Moore***, 553 U.S. 164, 168-169 (2008) (Fourth Amendment); *and* ***Nevada Comm'n on Ethics v. Carrigan***, 564 U.S. 117, 122-125 (2011) (First Amendment).

While the Second Amendment is not a "regulatory straightjacket" and Minnesota does not need to provide this court with a "dead ringer," a regulation that "remotely resembles" the Carry Ban will not suffice. ***Id.*** at 30.  "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit[.]" ***Rahimi***, 2024 WL 3074728, at *6.  Minnesota must prove that it "is consistent with this Nation's historical tradition of firearm regulation" for the state to ban, on account of their age, the public carrying of handguns by ordinary, law-abiding, adult citizens. *See* ***Bruen***, 597 U.S. at 34.  For each proffered analogue, this court considers (1) the "how" (comparable burden) and (2) the "why" (comparably justified). ***Id.*** at 29; *see* ***Rahimi***, 2024 WL 3074728, at *6 ("Why and how the regulation burdens the right are central to this inquiry.") (citation omitted).

The "how" of the Carry Ban—the burden to be compared—is a ban on the bearing of arms in an otherwise constitutional manner. *See* ***Bruen***, 597 U.S. at 70, *quoting* ***McDonald***, 561 U.S. at 780 (plurality opinion) ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").

Minnesota states the "why" of the Carry Ban is that 18 to 20-year-olds are not competent to make responsible decisions with guns and pose a risk of dangerousness to themselves and to others as a result.

Minnesota proffers three reasons that the Carry Ban survives *Bruen*'s historical tradition test:  (1) a freestanding catchall for groups the state deems dangerous; (2) founding-era and common law analogues; and (3) Reconstruction-era analogues.

1.

Minnesota contends that status-based restrictions from the founding-era created a freestanding dangerousness catchall analogue:  if the state deems a group of people to pose a risk of danger, it may ban the group's gun ownership.[6]  *See* Joseph Blocher & Catie Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders* 12, in **New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society** (Joseph Blocher, Jacob Charles, & Darrell Miller, eds., 2023) ("One can accept that the Framers denied firearms to groups they thought to be particularly dangerous (or unvirtuous, or irresponsible) without sharing their conclusion about which groups qualify as such.").

Assuming that historical regulation of firearm possession can be viewed as an effort to address a risk of dangerousness, this risk does not justify the Carry Ban.

---

[6]Minnesota relies on *United States v. Jackson*, 69 F.4th 495, 502-03 (8th Cir. 2023), discussing restrictions on Catholics, American Indians, slaves, and people who would not swear a loyalty oath to the government. *Cf.* **United States v. Jackson**, 85 F.4th 468, 470-72 (8th Cir. 2023) (Stras, J., dissenting from the denial of rehearing en banc) (reaching a different conclusion based on the same history).  This court's *Jackson* opinion has, however, been vacated, and the case remanded.  *See* **Jackson v. United States**, No. 23-6170 (U.S. July 2, 2024) (granting certiorari, vacating the judgment, and remanding for further consideration in light of *United States v. Rahimi*, 602 U.S. ___ (2024)).

-19-

Minnesota claims that 18 to 20-year-olds present a danger to the public, but it has failed to support its claim with enough evidence. *See Rahimi*, 2024 WL 3074728, at *9 (upholding a carry ban, the Court repeatedly emphasized that the law at issue "applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another.") (citation omitted). Although we take no position on how high the risk must be or what the evidentiary record needs to show, the answer is surely more than what Minnesota's general crime statistics say. According to the report, "the murder arrest rate for 18 to 20-year-olds is almost 33 percent higher than the murder arrest rate for the next most homicidal age group." And they are the "most likely" of any age group "to use firearms to commit homicides and other violent crimes."

Even if we have no reason to doubt the accuracy of these statistics, they do not support the Carry Ban. *See Rahimi*, 2024 WL 3074728, at *9 (noting that the statute at issue did "not broadly restrict arms use by the public generally"). For one thing, the Minnesota legislature could not have relied on them. The expert report, which was prepared solely for this case, uses data from 2015 through 2019—more than 10 years *after* it enacted the Carry Ban. And the record is devoid of statistics that Minnesota could have used to justify a conclusion that 18 to 20-year-olds present an unacceptable risk of danger if armed. After all, even using these recent statistics, it would be a stretch to say that an 18-year-old "poses a clear threat of physical violence to another." *Id*.

For another, Minnesota has not attempted to explain why its other statutory restrictions, none of which the Plaintiffs have challenged, do not reduce the risk of danger already. First, permit applicants must complete "training in the safe use of a pistol" and not be "listed in the criminal gang investigative data system." **Minn. Stat. § 624.714, subd. 2(b)(1), (5)**. Certain state and federal statutes might already render an applicant ineligible, *See **id**. § 624.714, subd. 2(b)(4),* including those who have been convicted of "a crime of violence" or a recent controlled-substance offense, *see **id**. § 624.713, subd. 1(2), (3), (4)*. What the record lacks, in other words, is any support for the claim that 18 to 20-year-olds, who are otherwise eligible for a

-20-

public-carry permit, "pose [such] a credible threat to the physical safety of others" that their "Second Amendment right may . . . be burdened." *Rahimi*, 2024 WL 3074728, at *9.

A legislature's ability to deem a category of people dangerous based only on belief would subjugate the right to bear arms "in public for self-defense" to "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70, *quoting* *McDonald*, 561 U.S. at 780 (plurality opinion); *see also* *Rahimi*, 2024 WL 3074728, at *11 ("[W]e conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment."). While "our tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others[,]" Minnesota has failed to show that 18 to 20-year olds pose such a threat. *Id.* at *10. Accordingly, absent more, the Carry Ban cannot be justified on a dangerousness rationale.

2.

Minnesota proffers three founding-era sources:  (1) the common law, (2) college gun rules, and (3) municipal regulations.

First, Minnesota reiterates that, at common law, 18 to 20-year-olds' Second Amendment rights were restricted because they were minors.  The common law "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19.  *See* Roscoe Pound, *Common Law and Legislation*, 21 **Harv. L. Rev.** 383, 403 (1908) (discussing the importance of the common law to pre-Civil War jurisprudence).  Minnesota cites common law evidence that (as minors) 18 to 20-year-olds did not have full rights. Minnesota, however, does not put forward common law analogues restricting the right to bear arms.  Instead, Minnesota points to statutory law, such as the Militia Act of 1792 that required 18 to 20-year-olds to acquire firearms, as evidence the common law

-21-

was the inverse.  *See The Militia Act of 1792*, ch. 33, **1 Stat. 271**, § 1.  A mandate to acquire a firearm is hardly "evidence" that one was previously prohibited from owning one.

Inverse evidence of the common law is not a sufficient analogue to meet the state's burden.  In fact, Minnesota contends elsewhere that statutes passed after the ratification of the Bills of Rights often codified the common law.  *See **Bruen***, 597 U.S. at 39 ("'[T]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted*,' not as they existed in the Middle Ages."), *quoting **Ex parte Grossman***, 267 U.S. 87, 108-09 (1925) (emphasis in original). Minnesota does not provide convincing evidence why the Militia Act of 1792 is inverse evidence of the common law, rather than evidence of its codification. Further, if the state is correct that the Militia Act is inverse evidence of the common law, then the Militia Act may demonstrate that the Second Amendment and the common law diverge.  *See **id.*** at 35. ("English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution . . . 'it [is] better not to go too far back into antiquity . . . unless evidence shows that medieval law survived to become our Founders' law."), *quoting **Funk v. United States***, 290 U.S. 371, 382 (1933).

Second, Minnesota cites college rules restricting students from possessing guns on campus.  *See **Worth***, 666 F.Supp.3d at 921 (discussing rules from Yale College, the University of Georgia, and the University of North Carolina).

These rules are very different in their "how."  These school procedural rules are not laws subject to constitutional limitations.  Minnesota acknowledges that universities had guardianship authority *in loco parentis*.  Universities had many practices that if compelled by the government, would have violated students' constitutional rights.  *See University Church in Yale*, **Yale University**, https://church.yale.edu/history (explaining that until 1927, chapel attendance was

mandatory) (last accessed May 19, 2024).  Thus, founding-era college rules are not persuasive sources to discern the constitutional rights of its students.

Further, a restriction on the possession of firearms in a school (a sensitive place) is much different in scope than a blanket ban on public carry.  *See **Bruen***, 597 U.S. at 30.  The Supreme Court has distinguished between "sensitive places" and the public.  ***Id.*** at 31 ("Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department.").  A sensitive place restriction is not analogous to a no-guns-in-public restriction.

Third, Minnesota cites three municipal ordinances.  *See **Worth***, 666 F.Supp.3d at 923 (discussing ordinances from New York, New York and Columbia, South Carolina); Oliver H. Strattan & John M. Vaughan, eds., *A Collection of the State and Municipal Laws in Force and Applicable to the City of Louisville, KY* (C. Settle, 1857), 175 (1853), available at https://firearmslaw.duke.edu/laws/oliver-h-strattan-city-clerk-a-collection-of-the-state-and-municipal-laws-in-force-and-applicable-to-the-city-of-louisville-ky-prepared-and-digested-under-an-order-from-the-general-council-of-s (last accessed May 22, 2024).

The first two ordinances, New York and Columbia, fine anyone who discharges a weapon within the city, increasing the fines (or allowing seizure of weapon in Columbia) for minors.  The third ordinance prohibited the sale of gunpowder (but not firearms) to minors in Louisville and is also not a founding-era source (enacted more than 60 years after 1791).  All three are distinct from the "how" of the Carry Ban, a blanket ban on carrying a weapon in public.  The "how" is also different in the New York and Columbia ordinances, which prohibit conduct regardless of age.

Minnesota's proffered founding-era analogues do not meet its burden to demonstrate that the Nation's historical tradition of firearm regulation supports the Carry Ban.

-23-

3.

Minnesota makes four arguments why the Reconstruction era evinces a historical tradition of firearm regulation sufficient to support the 18 to 20-year-old Carry Ban: (1) unprecedented social concerns in the second half of the 19th Century (the increased prevalence of handguns) require this court to take a more nuanced approach; (2) Reconstruction-era and late 19th Century statutes; (3) 19th Century state court cases; and (4) that, as a longstanding prohibition, the Carry Ban should be considered presumptively constitutional.

As discussed, it is questionable whether the Reconstruction-era sources have much weight. *See **Bruen***, 597 U.S. at 37 ("that the scope of the protection applicable to the Federal Government and States [under the Bill of Rights] is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."). Certainly, postenactment history of the Fourteenth Amendment is not given weight. ***Id.*** at 35 (explaining that for all history after the ratification of the Second Amendment, courts must "guard against giving postenactment history more weight than it can rightly bear"). Assuming it has any weight, this court will address Minnesota's arguments.

First, Minnesota argues that because the market revolution between the founding era and the Reconstruction era made pistols more accessible, this court must take a more "nuanced approach." *See **id.*** at 27 ("cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach").

Minnesota contends that because handguns were not "in common use" at the founding, founding-era regulations are insufficient to properly regulate them. This contention contradicts *Bruen* and *Heller*'s "in common use" doctrine: "the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" ***Id.*** at 47, *quoting **Heller***, 554 U.S. at 629. "Whatever the likelihood that handguns were

-24-

considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today.  They are, in fact, 'the quintessential self-defense weapon.'"  *Id.*  *See* Jamie McWilliam, *The Relevance of "In Common Use" After Bruen*, 37 **Harv. J. L. Pub. Pol'y (Per Curiam)** 1, 9 (2023) (describing how the "in common use" doctrine fits within *Bruen*'s test).

Second, Minnesota proffers 20 state laws from the Reconstruction-era and late 19th Century that in some way limit the Second Amendment rights of those under 21 years old.  *See NRA v. BATFE*, 700 F.3d 185, 202 (5th Cir. 2012) (citing the 20 state laws), *abrogated by Bruen*, 597 U.S. at 19 n.4.  Minnesota believes this represents a historical tradition of restricting the gun rights of those under 21 years old.  As we have already discussed, however, these laws carry less weight than Founding-era evidence.  *See Bruen*, 597 U.S. at 37.

Besides, these laws have "serious flaws even beyond their temporal distance from the founding."  *Id.* at 66.  For starters, several prohibited only *concealed* carry.  *See* **1859 Ky. Acts 245 § 23** (Kentucky); **1885 Nev. Stat. 51** (Nevada); **1890 La. Acts 39** (Louisiana); **1890 Wyo. Sess. Laws 1253** (Wyoming).  Others prohibited only the kinds of weapons that could be easily concealed, like bowie knives and pistols.  *See* **1856 Ala. Laws 17** (Alabama); *see also State v. Reid*, 1 Ala. 612, 619 (1840) ("the Legislature cannot inhibit the citizen from bearing arms openly"); **1875 Ind. Acts 59** (Indiana) (prohibiting giving minors weapons that can be "concealed upon or about the person"); **1881 Ill. Laws 73** (Illinois) (prohibiting giving minors weapons "capable of being secreted upon the person"); **1882 Md. Laws 656** (Maryland) (permitting the sale of "shot gun[s], fowling pieces[,] and rifles" to minors, but not other "deadly weapons").  And as *Bruen* clarifies, these "concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry."  *Bruen*, 597 U.S. at 53.

Many, including some already mentioned, criminalized the *sale* or *furnishing* of weapons to minors, meaning they could publicly bear arms subject to generally applicable concealed-carry rules.  *See* **16 Del. Laws 716 (1881)** (Delaware); **1856**

Tenn. Pub. Acts 92 (Tennessee); 1876 Ga. Laws 112 (Georgia); 1878 Miss. Laws 175-76 (Mississippi); 1893 N.C. Sess. Laws 468-69 (North Carolina); 1897 Tex. Gen. Laws 221-22 (Texas); 27 Stat. 116-17 (1892) (D.C.); Mo. Rev. Stat § 1274 (1879) (Missouri). Several included exceptions for parental permission, *see* 1881 Ill. Laws 73; 1897 Tex. Gen. Laws 221-22; Mo. Rev. Stat § 1274 (1879), or self-defense, *see* 1876 Ga. Laws 112. And others prohibited the sale of only easily concealable weapons. *See* 1856 Tenn Pub. Acts 92; 1878 Miss. Laws 175-76. The point is "[n]one of these historical limitations on the right to bear arms approach" the burden of Minnesota's Carry Ban. *Bruen*, 597 U.S. at 60.

Third, Minnesota argues that, because no historic cases found age restrictions to be unconstitutional, the Carry Ban is consistent with the historical tradition of firearms regulation. It cites four state supreme court cases involving laws restricting access to firearms by 18 to 20-year-olds. *See State v. Callicutt*, 69 Tenn. 714, 714-15 (1878); *Coleman v. State,* 32 Ala. 581, 582-83 (1858); *State v. Allen*, 94 Ind. 441, 441 (1884); *Tankersly v. Commonwealth*, 9 S.W. 702, 703 (Ky. 1888). Three of these cases do not analyze or discuss the constitutionality of the laws, rendering them irrelevant analogues.

Only one case addresses the constitutionality of a state law prohibiting carry by a minor. *Callicutt,* 69 Tenn. at 714-15. *Callicut*, a postenactment case interpreting a state statute that applies only to concealed carry by minors, is not analogous in its "how" (solely a conceal ban) or its "why" (only affecting minors).

Fourth, Minnesota argues the Carry Ban is a "presumptively lawful" "longstanding prohibition." *See Heller*, 554 U.S. at 626-27 & n.26. *Heller* offered a list, which does not purport to be exhaustive, of longstanding prohibitions that were presumptively lawful. *Id.* Age restrictions are not on that list. *Id.* The Carry Ban here was enacted in 2003. Minnesota claims this court should look to Alabama's 1856 statute for the principle that all age restrictions are in the class of "longstanding prohibitions." *See* 1856 Ala. Acts 17. Alabama's statute, a status-based law, targets only minors, a status not held by 18 to 20-year-olds in Minnesota. Further,

-26-

Minnesota tries to link the Carry Ban to several 20th Century laws banning the carry of arms by the mentally ill or those with unsound minds. *See* ***Mai v. United States***, 974 F.3d 1082, 1089 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc) (the 1930 Uniform Firearms Act "prohibited [the] delivery of a pistol to any person of 'unsound' mind"). Those laws, still in effect, prevent the mentally ill from acquiring firearms. Minnesota may not claim all 18 to 20-year-olds are comparable to the mentally ill. This court declines to read a new category into the list of presumptively lawful statutes.

Minnesota did not proffer an analogue that meets the "how" and "why" of the Carry Ban for 18 to 20-year-old Minnesotans. The only proffered evidence that was both not *entirely* based on one's status as a minor and not *entirely* removed from burdening carry—Indiana's 1875 statute—is not sufficient to demonstrate that the Carry Ban is within this nation's historical tradition of firearm regulation. *See* ***Bruen***, 597 U.S. at 65 (a "single" "postbellum" "state statute" is insufficient weight to meet the state's burden).

Minnesota has not met its burden to proffer sufficient evidence to rebut the presumption that 18 to 20-year-olds seeking to carry handguns in public for self-defense are protected by the right to keep and bear arms. The Carry Ban, § 624.714 subd. 2(b)(2), violates the Second Amendment as applied to Minnesota through the Fourteenth Amendment, and, thus, is unconstitutional.

\* \* \* \* \* \* \*

The judgment is affirmed.

_____